# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REGINALD G. MOORE,
  2265 Aubrey Manor Court
  Waldorf, MD 20603

JOHN E. TURNER,
  1505 Silverado Court
  Mitchellville, MD 20721

C. YVETTE SUMMEROUR,
  3183 Champion Court
  Snellville, GA 30039

LEROY HENDRIX,
  2801 Pen Court
  Waldorf, MD 20601

CHERYL L. TYLER,
  1363 Somerset Pl. N.W.
  Washington, DC 20011

LUTHER K. IVERY,
  5655 Tower Hill Circle
  Alexandria, VA 22315

ANDREW E. HARRIS, JR.,
  12413 Crystal Pond Court
  Upper Marlboro, MD 20772

KENNETH ROOKS,
  3641 Addison Woods Road
  Frederick, MD 21704

CAMILLA SIMMS,
  2307 East 70th Place, Unit 114
  Chicago, IL 60649

Civil Action No. 00-0953 (RWR-DAR)

**CLASS ACTION**

JURY DEMANDED

LISA ROBERTSON,
    1111 East 93rd
    Brooklyn, NY 11236

INDIVIDUALLY AND ON BEHALF OF
ALL OTHER SIMILARLY-SITUATED
PERSONS,

                    Plaintiffs,

    vs.

MICHAEL CHERTOFF, SECRETARY
Department of Homeland Security,
Washington, D.C. 20528

                    Defendant.

## SECOND AMENDED AND SUPPLEMENTAL CLASS COMPLAINT

**I.**      **NATURE OF ACTION**

1.      Plaintiffs, current and former African-American Special Agents (or "Black Agents")

of the United States Secret Service ("Secret Service"), bring this action, on their own behalf and

on behalf of a class of other current and former African-American Secret Service Special Agents,

to redress a pattern and practice of discrimination on the basis of race by the Secret Service in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) and the

Civil Rights Act of 1991, 42 U.S.C. § 1981(a).  Plaintiffs allege that, from 1993 forward, the

Secret Service has discriminated against African-American Special Agents in its promotion

process for competitive positions at grades GS-14, GS-15, and SES.  Plaintiffs complain of

discrimination in every step of the promotion process, from the discriminatory assignment of

Merit Promotion Plan ("MPP") scores to the discriminatory selection of Special Agents for

specific promotions.

2.      Plaintiffs also challenge discrimination in the "building blocks" of promotion, including discrimination in transfers, assignments, and other career enhancing opportunities; discriminatory assignments to undercover work; discriminatory testing and hiring practices; discriminatory disciplinary policies and practices; and discrimination in awards and bonuses. Each of these alleged discriminatory practices adversely affected the ability of Plaintiffs to secure promotion or access to terms and conditions of employment that were career enhancing. Plaintiffs allege discrimination in the "building blocks" of promotion from 1999 forward.

3.      Plaintiffs seek to have the Secret Service implement systemic changes that will result in a non-discriminatory promotion system and non-discrimination in the "building blocks" of promotion.  Specifically, Plaintiffs seek equitable relief, including, but not limited to, back pay, front pay, and other lost compensation, compensatory damages, a declaratory judgment, and an injunction directing the Secret Service to cease and desist from and remedy its illegal conduct.

## II.      **JURISDICTION, EXHAUSTION OF ADMINISTRATIVE REMEDIES, AND TOLLING**

4.      Jurisdiction in this case exists pursuant to 42 U.S.C. § 2000(e) et seq. and 42 U.S.C. § 1981(a).  Venue is proper in this District pursuant to 28 U.S.C. § 1391(e).

5.      Plaintiffs have exhausted their administrative remedies.

6.      On March 31, 2006, this Court ruled that the claims in the Second Amended Class Complaint consolidating the administrative claims of Plaintiffs Reginald G. Moore, John Turner, and C. Yvette Summerour have been administratively exhausted.  See March 31, 2006 Order at 12-13.   In their administrative class complaint, Plaintiffs Moore, Turner and Summerour alleged discrimination in competitive selections, discrimination in MPP performance evaluations, discrimination in opportunities to serve as acting supervisors, discrimination in transfers and assignments, discrimination in access to training opportunities, discrimination in

assignments to undercover work, discrimination in hiring practices, discrimination in testing, discrimination in discipline, discrimination in awards and bonuses, retaliation for reporting discrimination, and the establishment of a racially hostile environment. This complaint tolled the statute of limitations forward from its initial filing as to all members of the class for these continuing claims, or any claims reasonably arising therefrom or the investigation thereof.

7.      On July 7, 2006, this Court ruled that Plaintiffs had exhausted non-promotions claims from 1993 to the present and confirmed that Plaintiffs had exhausted claims relating to the "building blocks" of promotion from 1999 to the present. See July 7, 2006 Order at 12, 16-17. In this Complaint, Plaintiffs plead only the claims that this Court ruled exhausted. See id.

8.      Plaintiff Andrew E. Harris, Jr. independently exhausted his administrative remedies. On March 26, 2005, Plaintiff Harris timely contacted an EEO counselor regarding discrimination in non-promotion to GS-15. On June 30, 2005, Plaintiff Harris filed a formal EEO complaint alleging a pattern and practice of discrimination against African-Americans in non-promotion to GS-15 positions on behalf of himself and a class of African-American Special Agents. Plaintiff Harris' administrative complaint has been pending for more than 180 days. With the consent of the Secret Service, the EEOC Administrative Judge assigned to Plaintiff Harris' EEO complaint has stayed consideration of his EEO complaint pending the outcome of class certification in this matter.

## III.   THE SECRET SERVICE'S LONG HISTORY OF RACIAL DISCRIMINATION

9.      The Secret Service has failed to protect its African-American Special Agents from racial discrimination in virtually every aspect of their employment. Discrimination against African-American Agents in the Secret Service has become part of the fabric of the agency and has spanned several decades. In 1964, the Secret Service employed only four Black Agents.

Since then, the number of African-American Agents has increased, but over the years, Black Agents have suffered from a persistent pattern and practice of racially discriminatory employment practices. These racially discriminatory practices relate to, among other things, hiring, assignments, transfers, awards, discipline, and promotions.

10.     Over the past four decades, African-American Agents frequently and repeatedly have brought the Secret Service's discriminatory employment practices to the attention of Directors, Assistant Directors, and other top-level officials. Specifically, Black Agents have complained (i) that the discriminatory hiring and recruiting practices of the Secret Service have resulted in a relatively few number of African-Americans entering the Service; (ii) that, once in the Secret Service, Black Agents have suffered from discriminatory assignment practices, which result in Black Agents receiving fewer career-enhancing opportunities than similarly situated or junior non-Black Agents; (iii) that Black Agents have been more severely disciplined than non-Black Agents who committed similar or more serious infractions, thereby delaying their advancement and promotion as compared to non-Black Agents; (iv) that Black Agents have received fewer training opportunities than similarly situated or junior non-Black Agents, thereby delaying their advancement and promotion as compared to non-Black Agents; and (v) that Black Agents consistently have been denied promotions to the GS-13 level and higher on the basis of their race. Despite receiving repeated complaints from Black Agents about these discriminatory employment practices, the Secret Service has never remedied the pattern and practice of discrimination.

11.     The Secret Service's discriminatory employment practices have occurred in a racially insensitive atmosphere that tolerates and fails to punish racial slurs and participation in racist activities. For example, in the late 1980s, a Special Agent was promoted to Assistant Director of

Investigations, despite the fact that, during the time he was Special Agent in Charge ("SAIC") of the Los Angeles Field Office, white Agents had posted a Swastika with the word "Nigger" on the walls of the office and the SAIC did not punish or otherwise discipline the culprits for their actions.

12.     The Secret Service's toleration of racism and participation in racist activities became public in 1995 when the press reported that, since 1980, federal and state law enforcement officers, including Secret Service Agents, had attended an annual racist event known as the "Good Ol' Boys Roundup."  White Secret Service Agents twice served as President of the Roundup, and at least one Agent was elected "Redneck of the Year."  The racist conduct that occurred at the Roundup include the posting of racist signs like "Nigger check point," a simulated lynching of a black man from a tree, and a host of racist skits and songs.  Officials at the Secret Service knew about this event, and at least 30 Secret Service Agents were documented as attending the event.  Instead of condemning by word and deed these racist activities, the leadership of the Secret Service turned a blind eye to their Special Agents' involvement in the Roundup and rewarded those who participated.  For example, many white Special Agents who attended the Roundup were promoted to high-ranking positions in the Secret Service, including three Agents who became SAICs of field offices, six Agents who reached the GS-15 level, and two Agents who were promoted to the Senior Executive Service ("SES") level.

13.     The Secret Service has done little to remedy the pattern and practice of discrimination against African-American Special Agents.  Black Agents continue to suffer from discriminatory employment practices in hiring, testing, assignments, transfers, awards and bonuses, discipline, and promotions.  Despite receiving repeated complaints of discrimination, the Secret Service has no systematic method for documenting, monitoring, evaluating, or curing the discriminatory

employment practices that currently operate with both the intent and the effect of disadvantaging African-American Special Agents.

## IV.        **PARTIES**

14.    The named Plaintiffs are all current or former African-American Special Agents of the Secret Service.  The named Plaintiffs were each denied promotions or the "building blocks" thereof on the basis of their race.  Many of the Plaintiffs have received commendations for their work – including the highest awards given by the Secret Service – and all have risked their lives for the Secret Service and those the Secret Service protects.  The named Plaintiffs are as follows:

a.      Plaintiff Reginald G. Moore ("Special Agent Moore") is an African-American and a resident of the State of Maryland.  He has been employed by the Secret Service as a Special Agent since 1984.  At the time of the filing of this lawsuit, Special Agent Moore was a GS-13 Special Agent who held the highest job performance ranking of any African-American Special Agent and had applied for approximately 90 GS-14 positions.  After bidding for approximately 100 additional positions, he was finally promoted as a result of the filing of this lawsuit.  Special Agent Moore is currently a GS-15 Assistant Special Agent in Charge ("ASAIC") of the Dignitary Protective Division in Washington, D.C.

b.      Plaintiff John E. Turner ("Special Agent Turner") is an African-American and a resident of the State of Maryland.  In 1980, Special Agent Turner was hired by the Secret Service as an officer in the Uniform Division and became a Special Agent in 1984.  When this lawsuit was filed, Special Agent Turner was a GS-13 Special Agent assigned to the Washington, D.C. Field Office.  While he had served in an acting GS-14 position, he had not been promoted. Special Agent Turner was promoted as a result of this lawsuit and retired from the Secret Service

as a GS-14 in March 2001.  Special Agent Turner was awarded the Albert Gallaton Award for integrity upon his retirement.

c.      Plaintiff C. Yvette Summerour ("Special Agent Summerour") is an African-American female and a resident of the State of Georgia.  She has been employed as a Special Agent by the Secret Service since 1986.  Special Agent Summerour served for over five years on the Presidential Protective Detail ("PPD") where she protected former President Clinton, former First Lady Hillary Rodham Clinton, and Chelsea Clinton.  At the time this lawsuit was filed, Special Agent Summerour was the most senior African-American female Special Agent.  As a result of this lawsuit, Special Agent Summerour became one of the first two African-American women to be promoted to GS-14.  Special Agent Summerour is currently assigned as a GS-14 Assistant to the Special Agent in Charge ("ATSAIC") in the Atlanta Field Office.

d.      Plaintiff Leroy Hendrix ("Special Agent Hendrix") is an African-American and a resident of the State of Maryland.  He has been employed as a Special Agent of the United States Secret Service since 1989.  At the time this lawsuit was filed, Special Agent Hendrix was a GS-13 Special Agent assigned to the Vice Presidential Protective Detail ("VPPD").  As a result of this lawsuit, Special Agent Hendrix was promoted to a GS-14 position and is now a GS-14 ATSAIC in the Baltimore Field Office.

e.      Plaintiff Cheryl L. Tyler ("Special Agent Tyler") is an African-American female and a resident of the District of Columbia.  She was also the first African-American female Special Agent in the Atlanta Field Office, the New York Field Office, the PPD, the Technical Security Division and the Training Division.  Special Agent Tyler left the Secret Service in 1999 because she was unable to secure promotion to a GS-14 position.  She currently serves as a

senior GS-14 with the Transportation Security Administration ("TSA"), which is part of the Department of Homeland Security.

      f.      Plaintiff Luther K. Ivery ("Special Agent Ivery") is an African-American and a resident of the Commonwealth of Virginia. He was initially hired as a Special Agent in 1983. At the time this lawsuit was filed, Special Agent Ivery was a GS-13 Special Agent assigned to the Dignitary Protective Division. Special Agent Ivery won the Director's Medal of Valor for his service on September 11, 2001. Special Agent Ivery was promoted as a result of this lawsuit and retired in 2004 as a GS-14. Special Agent Ivery currently works as a defense contractor in Chantilly, Virginia.

      g.      Plaintiff Andrew E. Harris, Jr. ("Special Agent Harris") is an African-American and a resident of the State of Maryland. After a long delay, he was hired by the Secret Service in 1987. Special Agent Harris is currently a GS-15 ASAIC in the Dignitary Protective Division assigned to the Office of Protective Operations.

      h.      Plaintiff Kenneth Rooks ("Special Agent Rooks") is an African-American and a resident of the State of Maryland. After a long delay, he was hired by the Secret Service in 1995. Special Agent Rooks is currently a GS-13 Special Agent assigned to the J.J. Rowley Training Center.

      i.      Plaintiff Camilla Simms ("Special Agent Simms") is an African-American female and a resident of the State of Illinois. She was hired by the Secret Service in 2002. Special Agent Simms is currently a GS-13 Special Agent in the Chicago Field Office.

      j.      Plaintiff Lisa Robertson ("Special Agent Robertson") is an African-American female and a resident of the State of New York. Special Agent Robertson was hired by the Secret Service in 2002 after approximately 12 years in federal service with the Internal Revenue

Service and the Environmental Protection Agency Office of Inspector General. Special Agent

Robertson is a GS-13 Special Agent assigned to the New York Field Office.

15.    Defendant Michael Chertoff is sued in his official capacity as Secretary of the

Department of Homeland Security. As part of his official duties, he is responsible for the United

States Secret Service.

## V.    CLAIMS

### A.    Discriminatory Selections for Competitive Positions

16.    From 1993, continuing up to and including the time of adjudication of these claims,

the named Plaintiffs and the Plaintiff class have been discriminated against in selections for

competitive positions ranked GS-14, GS-15, and SES on the basis of their race by the

employment policies, procedures and practices of the Secret Service. The promotion system is

excessively subjective, is not job-related and has been implemented through a "good old boy"

network" to the exclusion of African-American Special Agents. These practices have an adverse

impact on African-American Special Agents that cannot be justified by business necessity. The

continued use of such policies and practices reflects an intent to discriminate against African-

American Agents in violation of Title VII. These practices also independently constitute

intentional discrimination on the basis of race. These alleged discriminatory policies and

practices adversely affect the ability of African-Americans to secure promotion or access to

terms and conditions of employment that are career enhancing.

17.    The Merit Promotion Plan ("MPP") in its various forms throughout the relevant

period is the formal program through which the Secret Service selects and promotes Special

Agents to competitive positions at the GS-14 and GS-15 levels. The selection process under the

MPP has a disparate impact on African-American Special Agents that is neither job-related nor

required by business necessity.  Rather, the Secret Service's selection systems promote agents

based upon factors, other than knowledge, skills and ability, that disproportionately benefit white

Agents, which has a disparate impact upon African-American Special Agents.  Further, although

the Secret Service has known that its promotion practices have a disparate impact on African-

American Special Agents since at least March 26, 1974, it has failed to implement procedures

that are valid and have less adverse impact on African-American Special Agents in violation of

the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 et seq.  The Secret

Service has done nothing to validate the selection process of Special Agents for promotion.  The

continued use of such policies and practices reflects an intent to discriminate against African-

American Agents in violation of Title VII.

18.    Throughout the various versions of the MPP, the Secret Service has used MPP scores

or their equivalents to develop "best qualified" lists for competitive positions.  Although the

exact methodology for determining MPP scores through the relevant period has varied, all

contained the same material components (i.e., a total score comprised of scores from the first

level, peer panel level, and second level evaluations) that were excessively subjective and lacked

objective job-related criteria.  As a result, MPP performance evaluation scores or their

equivalents are arbitrary and capricious, failing to reflect actual job performance differences

between Special Agents.

19.    The Secret Service's practice of relying on MPP performance evaluation scores or

their equivalents had and continues to have an adverse impact on African-American Special

Agents that cannot be justified by business necessity.  African-American Special Agents who

received low MPP scores or their equivalent were discouraged from competing for competitive

promotions when the scores themselves were discriminatorily assigned.  The Secret Service has

failed to implement procedures that are valid and have less adverse impact on African-American

Special Agents in violation of the Uniform Guidelines on Employee Selection Procedures, 29

C.F.R. § 1607 et seq.

20.   The MPP, in its various forms, is excessively subjective and unreliable at all levels of

the evaluation system and the ultimate decision-making process.  For example, Assistant

Directors may adjust ratings at the second level panel given by their representatives without

justification, rendering that component of the MPP score subjective and invalid.  Moreover,

Assistant Directors may recommend to the Director a candidate from the best qualified list

without using acceptable criteria for their recommendations and without identifying the reasons

for their recommendations.  Also, the Director may reject the Assistant Directors'

recommendations and may choose another candidate for the position for any reason the Director

deems appropriate.

21.   Plaintiffs and the class they represent have been intentionally discriminated against

on the basis of their race by managers who have rigged the systems and assigned them lower

MPP scores (or their equivalents) than their white counterparts.  Moreover, even when African-

American Special Agents are awarded high MPP scores (or their equivalents), the Secret Service

may "reach down" to select preferred white candidates with lower rankings than African-

American Special Agents.  The result is a personnel selection system based on excessive

subjectivity where Agents are promoted based on who they know, not what they know.  A "good

old boy network" operates as a glass ceiling to impede African-American Special Agents from

entering and advancing in management in the Secret Service.  The continued use of such policies

and practices reflects an intent to discriminate against African-American Agents in violation of

Title VII

22.     The Secret Service fills competitive positions outside of the MPP, adding unlimited subjectivity to the promotions process.  For example, in 1999 the Secret Service filled 20 unannounced GS-14 vacancies, referred to as "in addition to" promotions.  None of these unannounced vacancies was filled by an African-American Agent.  The Secret Service's shadow "in addition to" promotion system resulted in an "inexorable zero" African-American Agent promotions.  The Secret Service further added to the enormous subjectivity of the MPP by selecting Agents for competitive positions who did not even bid for those promotions.  The Secret Service's promotions outside the MPP have an adverse impact on African-American Special Agents and are used to intentionally discriminate on the basis of race.

23.     The Secret Service has established an unwritten policy of preferring lateral candidates over Special Agents seeking a promotion to a higher grade.  This policy is not in writing and is not in the MPP.  No specific weight is given to this consideration.  Upon information and belief, this practice has a disparate impact on African-American Special Agents that cannot be justified by business necessity.  In addition, the Secret Service has intentionally discriminated against Plaintiffs and the Plaintiff class on the basis of their race with regard to this practice.

24.     The Secret Service has established an unwritten practice of allowing white Special Agents to be promoted to positions in the same geographic area while requiring African-American Special Agents to move to other geographic locations to be promoted to competitive positions.  This is especially true for white Special Agents residing in the Washington, D.C. metropolitan area.  This practice is not written and is not in the MPP.  Upon information and belief, this practice has a disparate impact on African-American Special Agents that cannot be justified by business necessity.  In addition, the Secret Service has intentionally discriminated against Plaintiffs and the Plaintiff class on the basis of their race with regard to this practice.

Plaintiffs are disadvantaged by this practice in terms of securing future promotions and career enhancing positions. The practice injures Plaintiffs and the Plaintiff class financially because they are exposed to more frequent household moves than their white counterparts and as a result lose the opportunity to build equity in their homes over time. This practice also injures the Plaintiffs and Plaintiff class through interference with their family lives.

25.     Under the MPP, the Secret Service is required to take into account the Career Track Program when making selections. The Secret Service does not take into account the Career Track Program. In addition, upon information and belief, the Secret Service does not require the Advisory Board to review the Special Agent Qualification Statements of the candidates. As a result, upon information and belief, promotion recommendations are routinely made by the Assistant Directors without considering the candidates' Special Agent Qualification Statements.

26.     The Secret Service's promotions process tolerates racial bias. At least 12 individuals who attended the "Good Ol' Boys Roundup" were subsequently promoted to the GS-14 level or above. At least four individuals who attended the "Good Ol' Boys Roundup" were selected over the named Plaintiffs for positions for which they applied and were not selected. The Secret Service knew that these individuals had attended the racist event when they were promoted for positions for which the named Plaintiffs bid and were not selected.

27.     As of July 31, 1999, African-Americans comprised 10.76% of the Special Agents at the GS-13 level in the Secret Service. However, at the GS-14 level, African-Americans constituted only 4.18% of the total number of Special Agents. To put this in perspective, there were 12 African-American GS-14 Special Agents in 1992. As of July 1999, this number had not changed. In addition, there had never been an African-American female Special Agent selected for a GS-14 position in the history of the Secret Service until June 2001.

28.     As a result of the foregoing, Plaintiffs allege that qualified African-American Special

Agents are promoted to, or selected for, competitive positions less frequently than similarly

situated white Special Agents.  When Black Agents are selected, they are assigned to positions

that provide less opportunity for further promotional opportunities than similarly situated white

Special Agents.  Moreover, African-American Special Agents have been and continue to be

discouraged from applying for competitive positions because of discriminatory MPP scores or

their equivalents.

Special Agent Moore

29.     From 1999 through 2002, Special Agent Moore applied and was not selected for 187

GS-14 positions in the Secret Service.  In each instance, an equally or less-qualified Special

Agent was selected for the position, the majority of whom were white.  In this Complaint,

Special Agent Moore alleges discrimination in the denial of each and every one of the 187 GS-14

positions for which a non-Black Special Agent was selected.  For example, in May 1999, Special

Agent Moore applied to be promoted to ATSAIC, a GS-14 position where he was already

serving in an "acting" capacity.  He was informed that the Secret Service filled the position with

a less qualified white male Agent.  To add insult to injury, the Secret Service assigned Special

Agent Moore to train the white Agent selected.  On June 16, 1999, Special Agent Moore sought

a promotion to a GS-14 ATSAIC position in the PPD.  Again, the position was filled with a less

qualified white male.

30.     Despite his extraordinarily high MPP score, Special Agent Moore was passed over

for scores of GS-14 positions in favor of white Agents.  In 1999, Special Agent Moore had a

MPP score of 97.03 out of 100 total points.  This was the highest ranking of any African-

American GS-13 Special Agent.  In 2000, Special Agent Moore had an MPP score of 98.57 out

of 100 total points.  This was the second highest ranking of any African-American GS-13 Special

Agent.  MPP scores are not used in a manner consistent with the Uniform Guidelines on

Employee Selection Procedures, 29 C.F.R. § 1607 et seq.

31.     Special Agent Moore became eligible to bid for a GS-14 promotion in 1994 because

he had accrued three years time in grade required under the Merit Promotion Plan.  However, he

did not bid on a GS-14 position until 1999 because his MPP scores were considered too low to

be competitive.  Special Agent Moore later learned that MPP scores are excessively subjective

and lack objective criteria.  They are arbitrary and capricious, failing to reflect actual job

performance differences between Special Agents.  Agents are assigned higher scores based on

their familiarity with certain supervisors, not on their knowledge, skills or abilities to perform the

job.  Thus, Special Agent Moore was improperly discouraged from applying for promotion as a

result of an MPP scoring system that was discriminatory.

32.     In or about August 2002, Special Agent Moore was finally promoted to a GS-14

ATSAIC position in the Chicago Field Office.  In or about October 2004, he was subsequently

promoted to a GS-15 Assistant Special Agent in Charge ("ASAIC") position.  Had Special Agent

Moore not suffered years of discrimination in attempting to achieve a GS-14 promotion, he

would have reached the GS-15 and subsequent levels years earlier.

Special Agent Turner

33.     Special Agent John Turner became eligible to bid for promotion to GS-14 in 1994

and began bidding shortly thereafter.  Secret Service records show that from 1995 to 2000,

Special Agent Turner applied for 83 GS-14 supervisory positions for which he was not selected.

Special Agent Turner was qualified, but he was passed over in favor of equally or less qualified

Special Agents, most of whom were white.  In this Complaint, Special Agent Turner alleges

discrimination in the denial of each and every one of the GS-14 positions for which he applied

and a non-Black Special Agent was selected until the date of his first promotion to GS-14. For

example, on September 7, 1999 and December 7, 1999, Special Agent Turner applied for two

ATSAIC GS-14 positions. In each instance, Special Agent Turner became aware that he had not

been selected and that the Secret Service had selected a less qualified white male. It apparently

made no difference that Special Agent Turner had served in an "acting" capacity in those two

positions.

34.     For several positions for which Special Agent Turner applied, his MPP score was not

high enough to place him on the "best qualified" list. MPP scores are excessively subjective and

lack objective criteria. They are arbitrary and capricious, failing to reflect actual job

performance differences between Special Agents. Agents receive higher scores based on their

familiarity with certain supervisors not on their knowledge, skills or abilities to do the job.

35.     Even once Special Agent Turner received a high MPP score, he was denied dozens of

GS-14 positions despite that high MPP score. In 1999, Special Agent Turner had an MPP score

of 95.64 out of 100 total points. This was the third highest ranking of any African-American

GS-13 Special Agent. In 2000, Special Agent Turner had an MPP performance evaluation score

of 98.10 out of 100 total points. MPP scores are not used in a manner consistent with the

Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 et seq.

36.     Finally in October 2000, Special Agent Turner was promoted to a GS-14 ATSAIC

position in the Washington, D.C. Field Office. He retired from the Secret Service as a GS-14 in

March 2001. Had Special Agent Turner not experienced discrimination, he would have reached

the GS-15 or SES level before his March 2001 retirement, increasing his retirement payments.

In addition, had Special Agent Turner not experienced discrimination, he would have retired later than he did.

Special Agent Summerour

37.    From 1998 through 2001, Special Agent Summerour applied for and was denied promotion to 68 GS-14 positions. In most cases, white Special Agents with equal or less qualifications were selected for each of the positions. For example, from January to December, 1999, Special Agent Summerour applied for and was denied promotion to 12 ATSAIC GS-14 positions. All of the persons selected were white agents and were not as qualified as Special Agent Summerour. In this Complaint, Special Agent Summerour alleges discrimination in the denial of each and every one of the 68 GS-14 positions for which she applied before her promotion to GS-14 and for which a non-Black Special Agent was selected.

38.    For several positions for which Special Agent Summerour applied, her MPP score was not high enough to place her on the "best qualified" list. MPP scores are excessively subjective and lack objective criteria. They are arbitrary and capricious, failing to reflect actual job performance differences between Special Agents. Agents receive higher scores based on their familiarity with certain supervisors not on their knowledge, skills or abilities to do the job.

39.    In 1999, Special Agent Summerour received an MPP score of 86.89. Special Agent Summerour was docked points on her First Level Evaluation because she was a Whip over the Training Section of the PPD instead of on the "shift." Special Agent Summerour grieved her First Level Evaluation score and was told that her position was not eligible for the maximum number of points. However, the previous Whip of the Training Section had received a perfect First Level Evaluation. Special Agent Summerour had been denied the "number one" Whip position on the "shift" as a result of race discrimination. An agent serving as a Whip is in a

leadership position and is the immediate backup to the shift leader. Special Agent Summerour's discriminatory score was too low for her to make the "best qualified" list for several GS-14 positions for which she applied that year. In discovery in this matter, the Secret Service has sworn that the sole reason that Special Agent Summerour was not selected for these positions was because her MPP score did not place her on the "best qualified" list.

40.    In 2000, Special Agent Summerour received 93.31 out of 100 points on her MPP performance evaluation. Even with this high score, Special Agent Summerour was unable to obtain a promotion to a GS-14 position. MPP scores are not used in a manner consistent with the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 et seq.

41.    Special Agent Summerour became eligible to bid for a GS-14 promotion in 1996 because she had accrued three years time in grade required under the MPP. However, she did not bid on a GS-14 position until 1998 because her MPP scores were considered too low to be competitive. Special Agent Summerour later learned that MPP scores are excessively subjective and lack objective criteria. They are arbitrary and capricious, failing to reflect actual job performance differences between Special Agents. Agents are assigned higher scores based on their familiarity with certain supervisors, not on their knowledge, skills or abilities to perform the job. Thus, Special Agent Summerour was improperly discouraged from applying for promotion as a result of an MPP scoring system that was discriminatory.

42.    At the time this lawsuit was filed, the Secret Service had never promoted an African-American female Special Agent to a GS-14 position. During the period in which Special Agent Summerour applied for promotion, Secret Service affirmative action plans repeatedly noted that there was a conspicuous absence of African-American females in that job category.

43.     Special Agent Summerour was finally promoted to a GS-14 ATSAIC position in the

Intelligence Division on June 17, 2001.  She and another agent promoted at the same time were

the first GS-14 African-American female Special Agents in the history of the Secret Service.

Special Agent Tyler

44.     Special Agent Tyler was hired by the Secret Service in 1984.  It took eight years for

her to reach the GS-13 level.  She was the first African-American female Special Agent in the

Atlanta Field Office, the New York Field Office, the PPD, the Technical Security Division and

the Training Division.  She applied 12 times for GS-14 positions for which she was qualified, but

was denied in favor of equally or less qualified Special Agents, most of whom were white.  In

this Complaint, Special Agent Tyler alleges discrimination in the denial of each and every one of

the twelve GS-14 positions for which she applied and for which a non-Black Special Agent was

selected.

45.     Special Agent Tyler became eligible to bid for a GS-14 promotion in 1993 or 1994

because she had accrued three years time in grade required under the MPP.  However, she did

not bid on a GS-14 position immediately because her MPP scores were too low to be considered

competitive.  When she did bid for GS-14 positions during the 1998 and 1999 promotion cycles,

her MPP scores were not considered high enough to make the best qualified list.

46.     Special Agent Tyler later learned that MPP scores are excessively subjective, lack

objective criteria and fail to reflect actual job performance differences between Special Agents.

Agents are assigned higher scores based on their familiarity with certain supervisors, not based

on their knowledge, skills or abilities to perform the job.  Furthermore, MPP scores are not used

in a manner consistent with the Uniform Guidelines on Employee Selection Procedures, 29

C.F.R. § 1607 et seq.  Special Agent Tyler was improperly discouraged from applying for

promotion because of the discriminatory MPP scoring system.  She also was denied

consideration for promotion because of the discriminatory MPP scoring system used to select the

best qualified list.

47.     At the time this lawsuit was filed, the Secret Service had never promoted an African-

American female Special Agent to a GS-14 position in its history.  During the period in which

Special Agent Tyler applied for promotions, the Secret Service's annual affirmative action plans

repeatedly noted that there was a conspicuous absence of African-American females in that job

category.

48.     In 1999, after 15 years of service, Special Agent Tyler was forced to resign as a GS-

13 Special Agent, because she was unable to secure a GS-14 supervisory position.  Special

Agent Tyler was told that the Secret Service was not ready to have a black female agent in a GS-

14 position.  As a result of the Secret Service's total exclusion of female African-American

Agents from the supervisory ranks, Special Agent Tyler was constructively discharged as a GS-

13 in 1999 after 15 years of service.

Special Agent Ivery

49.     Special Agent Ivery was hired by the Secret Service in 1983, and attained a GS-13

position in 1990.  He remained at a GS-13 for over a decade.  Special Agent Ivery began bidding

on GS-14 positions as soon as he was eligible, but was not promoted to GS-14 until 2002.  Secret

Service records show that from 1995 until the date he was promoted, Special Agent Ivery applied

and was not selected for 137 GS-14 positions within nearly every division of the Secret Service,

including, but not limited to the Dignitary Protective Detail, Financial Crimes, Inspection,

Intelligence, Training, the Liaison Division, and the Washington, D.C. Field Office.  In most

instances an equally or less qualified white Special Agent was selected.  In this Complaint,

Special Agent Ivery alleges discrimination in the denial of each and every one of the GS-14

positions for which he applied until his promotion to GS-14 and for which a non-Black Special

Agent was selected.

50.     For several positions for which Special Agent Ivery applied, his MPP score was not

high enough to place him on the "best qualified" list.  According to the Secret Service, from

1998-2002, Special Agent Ivery was denied at least 18 GS-14 positions solely on the basis of his

MPP score.  MPP scores are excessively subjective and lack objective criteria.  They are

arbitrary and capricious, failing to reflect actual job performance differences between Special

Agents.  Agents receive higher scores based on their familiarity with certain supervisors, not on

their knowledge, skills or abilities to perform the job.

51.     In 2002, Special Agent Ivery was finally promoted to a GS-14 ATSAIC position at

the J.J. Rowley Training Center.  Special Agent Ivery never bid on or otherwise requested this

position.  He retired from the Secret Service in 2004.  Had Special Agent Ivery not experienced

discrimination at the hands of the Secret Service, he would have reached the GS-15 or SES level

before retirement.

### Special Agent Rooks

52.     Special Agent Rooks has been at the GS-13 level for approximately six years.  Since

2004, he has bid for 88 GS-14 positions, but has not been promoted.  For each position, equally

or less qualified Agents, most of whom were white, were selected.  In this Complaint, Special

Agent Rooks alleges discrimination in the denial of each and every one of the 88 GS-14

positions for which a non-Black Special Agent was selected.

53.     Special Agent Rooks' MPP score was suppressed due to discriminatory denial of the

position of "assistant detail leader" and Whip while on the PPD.  MPP scores are excessively

subjective and lack objective criteria.  They are arbitrary and capricious, failing to reflect actual

job performance differences between Special Agents.  Agents receive higher scores based on

their familiarity with certain supervisors, not on their knowledge, skills or abilities to perform the

job.

Special Agent Hendrix

54.     From 2000 to 2003, Special Agent Hendrix applied for and was denied promotion to

236 GS-14 positions, even though he was qualified for each position.  In most instances, the

Secret Service selected white Special Agents with similar or less management experience than

Special Agent Hendrix.  In this Complaint, Special Agent Hendrix alleges discrimination in the

denial of each and every one of the 236 GS-14 positions for which a non-Black Special Agent

was selected.

55.     For several positions for which Special Agent Hendrix applied, his MPP score was

not high enough to place him on the "best qualified" list.  MPP scores are excessively subjective

and lack objective criteria.  They are arbitrary and capricious, failing to reflect actual job

performance differences between Special Agents.  Agents receive higher scores based on their

familiarity with certain supervisors, not on their knowledge, skills or abilities to perform the job.

56.     Special Agent Hendrix was finally promoted to a GS-14 ASAIC position in the

Special Services Division, White House Mail Facility in November 2003.  However, Special

Agent Hendrix was again discriminated against on the basis of race in applying for GS-15

positions.  For example, in June, 2005, the Secret Service opened bids on a newly established

GS-15 Deputy Special Agent in Charge ("DSAIC") position in the White House Mail Room.

While Special Agent Hendrix's specialized experience and knowledge made him the most

qualified choice for this position, he was not selected.  Instead, he was forced both to vacate his

office to make room for the new DSAIC and to train him. Special Agent Hendrix has applied and not been selected for twelve GS-15 positions. In most instances, an equally or less qualified white Agent was selected. In this Complaint, Special Agent Hendrix alleges discrimination in the denial of each and every one of the twelve GS-15 positions for which a non-Black Special Agent was selected.

### Special Agent Harris

57.     Special Agent Harris was unable to secure a promotion to both GS-14 and GS-15 until he made EEO complaints regarding discrimination in the promotions process. Between January and October 1999, Special Agent Harris bid on six different bid lists for a total of 17 GS-14 positions. He was denied every promotion and in most instances an equally or less qualified white Special Agent was selected. For example, in January 1999, Special Agent Harris applied for a GS-14 ATSAIC position in the Assessment Unit of the PPD. When he bid, Special Agent Harris was then the Whip – the number two position – in the Assessment Unit. Special Agent Harris had co-developed the assessment program with the departing ATSAIC in the newly-established Assessment Unit, who informed Special Agent Harris that he had recommended him for the promotion. However, a less-qualified white Special Agent with no experience in the Assessment Unit was selected. The selectee was chosen as an "in addition to" promotion that was not bid out. In October 1999, Special Agent Harris contacted the EEO Manager for the Secret Service and complained that he had been discriminated against in his non-selection for GS-14 promotions. In December 1999, Special Agent Harris was promoted to GS-14 Special Agent Recruiter in the Special Investigations & Security Division. Special Agent Harris would not have been promoted to GS-14 if he had not made an EEO complaint. In this

Complaint, Special Agent Harris alleges discrimination in the denial of each and every one of the 17 GS-14 positions for which a non-Black Special Agent was selected.

58.    For several positions for which Special Agent Harris applied, his MPP score was not high enough to place him on the "best qualified" list.  MPP scores are excessively subjective and lack objective criteria.  They are arbitrary and capricious, failing to reflect actual job performance differences between Special Agents.  Agents receive higher scores based on their familiarity with certain supervisors, not on their knowledge, skills or abilities to perform the job.

59.    Special Agent Harris became eligible to bid for a GS-14 promotion before he began bidding in 1999 because he had accrued the necessary years in grade required under the Merit Promotion Plan.  However, he did not bid on a GS-14 position until 1999 because his MPP score was considered too low to be competitive.  Special Agent Harris later learned that MPP scores are excessively subjective and lack objective criteria.  They are arbitrary and capricious, failing to reflect actual job performance differences between Special Agents.  Agents get higher scores based on their familiarity with certain supervisors not on their knowledge, skills or abilities to do the job.  Thus, Special Agent Harris was improperly discouraged from applying for promotion as a result of a MPP scoring system that was discriminatory.

60.    During the 2003-2004 and 2004-2005 promotion cycles, Special Agent Harris received a perfect score (50/50) on the First Level Evaluation from his immediate supervisor and his total MPP scores ranked him 58th out of 216 and 32nd out of 270 candidates for promotion to GS-15, respectively.  Special Agent Harris was informed by a Secret Service manager that he would have to relocate outside of Washington, D.C. in order to be promoted to GS-15.  The requirement of a geographic move is not in writing and is imposed discriminatorily on African-

American Special Agents.  Many white Special Agents have been promoted from GS-14 to GS-15 without having to relocate outside the Washington, D.C. metropolitan area.

61.     Special Agent Harris applied for and was denied more than 60 GS-15 positions. Special Agent Harris contacted an EEO counselor once again on March 26, 2004 regarding racial discrimination in the promotions process regarding his requests for promotion to GS-15.  In January 2005, after Special Agent Harris filed the complaint, he was promoted to a GS-15 position, ASAIC of the Dignitary Protective Division.  He would not have been promoted to GS-15 without this second complaint of racial discrimination.  In this Complaint, Special Agent Harris alleges discrimination in the denial of each and every one of the over 60 GS-15 positions for which a non-Black Special Agent was selected.

### B.     Discriminatory Discipline

62.     The Secret Service maintains excessively subjective processes for selecting individuals for discipline and for determining appropriate disciplinary punishments.  It has no centralized tracking or reporting system for employee misconduct allegations.  The Secret Service does not maintain a table of offenses and penalties to determine appropriate punishments when imposing discipline.  Rather, the level of punishment imposed is based entirely on the subjective judgment of Secret Service management.  These practices have an adverse impact on African-American Special Agents that cannot be justified by business necessity.  The continued use of such policies and practices reflects an intent to discriminate against African-American Agents in violation of Title VII.  These practices also independently constitute intentional discrimination on the basis of race.

63.     Whether a misconduct matter will be referred to the Office of Inspection for investigation is at the complete discretion of the Assistant Director's ("AD") Office to which the

employee is assigned.  The affected AD Office can choose to treat the misconduct as a

management matter and not report it at all.  In such cases, neither the Office of Inspection nor the

Inspection Division will maintain a record of the misconduct.

64.     These subjective processes function as a ready vehicle for discrimination and have

had an adverse impact on African-American Special Agents that can not be justified as consistent

with business necessity.  The Secret Service's continual and knowing use of policies and

practices which have a disparate impact constitute disparate treatment under Title VII.  African-

American Special Agents are selected for discipline more frequently than their white

counterparts.  When selected for discipline African-American Special Agents are punished more

harshly than similarly situated white Special Agents.  For example, prior to the liability period of

this litigation, Special Agents Hendrix and Harris were each suspended for loss of their Secret

Service weapons.  However, a white agent who lost her Secret Service weapon twice received no

discipline.  While Special Agent Hendrix's promotion to GS-13 was delayed as a result of this

discipline, the white Special Agent was promoted to GS-14 shortly after she lost her weapon.

65.     Additionally, the Secret Service has engaged in a pattern and practice of failing to

adequately discipline white agents involved in racial discrimination, such as those who attended

the "Good Ol' Boys Roundup."  The Secret Service uses its disciplinary system as a vehicle to

retaliate against African-American Special Agents who complain about discrimination in the

Secret Service.  In short, the Secret Service applies its discipline policies in a discriminatory

manner, adversely affecting African-American Special Agents both generally and in their

potential for promotion.

66.     These alleged discriminatory policies and practices adversely affect the ability of

African-Americans to secure promotion or access to terms and conditions of employment that

are career enhancing.  The consideration of discipline of a Special Agent in the promotions

process is not standardized and is entirely subjective.  Former Deputy Director Riggs testified in

this matter that she did not request inspection reports on all applicants for a competitive position,

but disqualified Special Agent Ivery because she happened to know that he had been inspected,

despite the fact that the inspection led to no discipline by the Secret Service.

Special Agent Robertson

67.     While Special Agent Robertson was at the Federal Law Enforcement Training Center

("FLETC") after her hire in 2002, she was sent home from training shortly after she held a "meet

and greet" for the National Organization of Black Law Enforcement Executives ("NOBLE"), a

fraternal organization of African-Americans in federal law enforcement of which she sat on the

national board.  A predominantly white organization, the Federal Law Enforcement Association,

recruits and holds meetings at FLETC.  Special Agent Robertson never received any written

documentation of the reason she was sent home.  She returned to FLETC several months later.

A few months after her return to FLETC, Special Agent Robertson was placed on administrative

leave pending termination with no legitimate or written explanation.  After contacting both a past

president and the then-current president and executive director of NOBLE to advocate on her

behalf, Special Agent Robertson was taken off administrative leave.  Special Agent Robertson's

discriminatory discipline – and the retaliatory treatment she received during training – delayed

her completion of training.  As a result, instead of receiving her yearly career-ladder promotions

on the anniversary date of her entry, she receives each approximately six months late, on the

anniversary of her completion of training.  Special Agent Robertson's eligibility for promotions

has been delayed as a result of the discriminatory discipline she suffered.  She does not know

whether the discipline she received during training will adversely affect her in the competitive promotions process.

**C.**      **Discrimination in Transfers, Assignments and Denial of Other Career-Enhancing Opportunities**

68.    The Secret Service maintains procedures for determining transfers, assignments and access to career-enhancing opportunities that are highly subjective. As a result of these procedures, African-American Special Agents receive fewer and less desirable transfers, assignments and other career-enhancing opportunities than similarly situated white Special Agents. These practices have an adverse impact on African-American Special Agents that cannot be justified by business necessity. The continued use of such policies and practices reflects an intent to discriminate against African-American Agents in violation of Title VII. These practices also independently constitute intentional discrimination on the basis of race. These alleged discriminatory policies and practices adversely affect the ability of African-Americans to secure promotion or access to terms and conditions of employment that are career enhancing. Each of these alleged discriminatory practices adversely affected the ability of Plaintiffs and the class they represent to secure promotion or access to terms and conditions of employment that are career enhancing.

69.    Furthermore, African-American Special Agents are subjected to arbitrary and discriminatory transfers to field offices throughout the nation, keeping them on a lateral career track. White Special Agents are not similarly subjected to such transfers. White Special Agents are more frequently allowed a lateral transfer in the same geographic area while African-American Special Agents are required to move. This practice injures Plaintiffs and the Plaintiff class financially because they are exposed to more frequent household moves than their white

counterparts and as a result they lose the opportunity to build equity in their homes over time and their family lives are disrupted.

70.     There are several positions below the GS-14 level at which a Special Agent has supervisory responsibilities, including but not limited to "Whip" and "assistant detail leader." Serving in these positions substantially improves a Special Agent's chances for promotion to GS-14. African-American Special Agents receive fewer opportunities to serve in these positions. These practices have an adverse impact on African-American Special Agents that cannot be justified by business necessity.  The continued use of such policies and practices reflects an intent to discriminate against African-American Agents in violation of Title VII.  These practices also independently constitute intentional discrimination on the basis of race.  These alleged discriminatory policies and practices adversely affect the ability of African-Americans to secure promotion or access to terms and conditions of employment that are career enhancing.  Each of these alleged discriminatory practices adversely affected the ability of Plaintiffs and the class they represent to secure promotion or access to terms and conditions of employment that are career enhancing.

71.     The Secret Service uses a method of selecting Special Agents for training that is excessively subjective.  Upon information and belief, African-American Special Agents receive fewer training opportunities, and receive training opportunities that are less career-enhancing, than similarly situated white Special Agents.  These practices have an adverse impact on African-American Special Agents that cannot be justified by business necessity.  The continued use of such policies and practices reflects an intent to discriminate against African-American Agents in violation of Title VII.  These practices also independently constitute intentional discrimination on the basis of race.  These alleged discriminatory policies and practices

adversely affect the ability of African-Americans to secure promotion or access to terms and conditions of employment that were career enhancing. Each of these alleged discriminatory policies and practices adversely affected the ability of African-American Special Agents to secure promotion or access to terms and conditions of employment that are career enhancing.

### Special Agent Moore

72.   As a result of a discriminatory transfer policy, Special Agent Moore was transferred to the Dallas Field Office in 1999. Similarly situated white Special Agents were not required to transfer. The transfer adversely affected Special Agent Moore in his ability to secure promotion or access to terms and conditions of employment that are career enhancing. He also lost the opportunity to build up equity in his home over time and disrupted his family life.

### Special Agent Hendrix

73.   Special Agent Hendrix made clear to his supervisor that he wanted to be a Whip. Special Agent Hendrix met the minimum qualifications for this position and in fact had been teaching the Whip training course. In or about March 2000, four Special Agents were made Whips on the VPPD. All four were white Special Agents who were not as qualified as Special Agent Hendrix. As a result of denying Special Agent Hendrix a position as a Whip, he was adversely affected in his ability to secure promotion or denied access to terms and conditions of employment that are career enhancing.

74.   Special Agent Hendrix sent an e-mail to SAIC William Pickle of the VPPD complaining about the lack of minority and female agents assigned to Whip positions on the VPPD and the fact that lesser qualified white males were being promoted instead. Special Agent Hendrix met with Pickle on March 9, 2000, barely two weeks after Director Stafford sent an agency wide e-mail expressing offense and disappointment at the allegations of discrimination in

this suit.  At the meeting, SAIC Pickle disclosed to Hendrix that white Special Agents had

complained about the fact that at one time there were three (3) number one Whips on the detail

who were minorities (two African-American and one Hispanic).  These complaints coupled with

the fact that no minorities or women had been promoted as Whips for many months, while less

qualified white male Special Agents were promoted, led Hendrix to believe that a limit had been

set on the number of minorities allowed to be Whips at any one time.  During the March 9, 2000

meeting, SAIC Pickle told Hendrix that he was "certain" that Hendrix would be promoted to

Whip.  However, Hendrix was never formally promoted to a Whip position.

<u>Special Agent Rooks</u>

75.     In 2004, Special Agent Rooks was discriminatorily denied the positions of

"assistant detail leader" and Whip on the PPD.  Special Agent Rooks was the second most senior

Agent to the assistant detail leader on Secretary Card's detail, and based on the practice of the

Secret Service was next in line to be assistant detail leader.  However, when the time came for

Special Agent Rooks to become assistant detail leader, he was told that he was being transferred

back to the shift and that a junior white Agent would be made assistant detail leader.  When

Special Agent Rooks complained that he was being transferred back to the shift without the

opportunity to become assistant detail leader, he was promised that he would be sent to lead

school and be made a Whip on the shift.  After serving several months under the junior white

assistant detail leader, Special Agent Rooks was transferred to the shift, but he was never sent to

lead school and was never made a Whip.

76.     While on the PPD, Special Agent Rooks asked repeatedly to go to lead school in

order to become a Whip.  However, he was always passed over, and junior White Agents were

allowed to go instead.  When he asked why he was not chosen, he was told on more than one

occasion that it was an "oversight" and that he would be chosen "next time." On one occasion, Special Agent Rooks asked the supervisor in charge of compiling the list for lead school attendees when the next list would be coming out. That supervisor told him that he did not know when the next lead school would occur and assured him that he would be on the next list of lead school attendees. The very next day, that same supervisor circulated the list for lead school attendees. Special Agent Rooks was not on the list. Even after his immediate supervisor sent a letter requesting that Special Agent Rooks be sent to lead school, he was not chosen. Special Agent Rooks spent four-and-a-half years on the PPD without the opportunity to go to lead school or be a Whip, thereby substantially harming his chances for promotion to GS-14.

77.    While on the PPD, Special Agent Rooks was approached by management about working on one of the small details as shift leader. He requested to be assigned to the detail of Secretary Rice. The then-current shift leader of Secretary Rice's detail told the detail leader that Special Agent Rooks would be "a problem," despite receiving references from the other shift leaders stating that Special Agent Rooks would be a great asset to Secretary Rice's detail. Special Agent Rooks was, as a result, passed over for the assignment.

78.    In 2005, Special Agent Rooks was told that his time on the PPD would come to an end. He was told that he would be transferred to the J.J. Rowley Training Center. Special Agent Rooks requested to be transferred to the Criminal Investigation Division ("CID") or the Intelligence Division. In response to his request, Special Agent Rooks was told that there were no slots available and that if he did not take a position at the J.J. Rowley Training Center, there was a possibility that he could be transferred to a less desirable location, such as the New York Field Office. Special Agent Rooks took the position at the J.J. Rowley Training Center to avoid the possibility of being transferred to an office such as the New York Field Office, which is

considered by many Agents to be one of the least preferable assignments in the Secret Service. He immediately called a friend in the CID and found out that there were several open positions that the division was actively seeking to fill.

### Special Agent Summerour

79.     On March 10, 2000, Special Agent Summerour was denied a career enhancing transfer to the Secret Service's Major Events Division on the basis of discrimination and retaliation for her participation in this suit and the EEO administrative process.  DSAIC Carl Truscott, Agent Summerour's supervisor, told her that her requested transfer to the Major Events Division was "closed to [her] personally, but that other members of PPD with less experience could still have that opportunity instead of [her]."  He also said, "he [Truscott] did not think any of [Summerour's] requested transfers were likely to succeed."  Truscott attempted to convince Summerour to go to a lateral position in the Intelligence Division, which was not career-enhancing.  In addition, DSAIC Truscott said to Summerour, "I have several friends in the Service who are minorities.  It hurts me to think that anyone would believe that there is discrimination within the Secret Service.  Larry Cockell is one of my dearest friends.  I just wanted you to know that."

80.     Since the filing of this lawsuit, Special Agent Summerour has been repeatedly denied training that she requested, limiting her further upper mobility within the Secret Service.  For example, Special Agent Summerour has applied for leadership and management courses and has not been chosen.  Also, Special Agent Summerour has applied several times and not been selected to attend the Women in Federal Law Enforcement annual national conference.  Special Agent Summerour has been denied these opportunities on the basis of her race and protected EEO activity.

### Special Agent Harris

81.     When the instant matter was filed, Special Agent Harris was the Special Agent

Recruiter in the Special Investigations & Security Division.  In November 2000, Special Agent

Harris was involuntarily transferred to a temporary assignment in the Inspection Division as a

GS-14 Assistant Inspector.  Special Agent Harris was later told that he was being moved because

the Deputy Director was certain that he had provided documents demonstrating discrimination in

recruiting and hiring to Plaintiffs in this matter and that the Deputy Director was "furious."

Special Agent Harris was never interviewed regarding this allegation and was never told whether

an inspection was conducted or the results of any inspection.  In his evaluation for promotion to

GS-15, Special Agent Harris was not credited with his accomplishments in the Inspection

Division.

### D.        **Discriminatory Testing and Hiring Practices**

82.     Throughout the class period, the Secret Service has discriminated against African-

Americans by administering an invalidated civil service exam called the Treasury Enforcement

Exam ("TEA") which is known (by the Secret Service) to have an adverse impact on African-

Americans which cannot be justified by business necessity.  Furthermore, the decision to

continue the use of such an exam by the Secret Service reflects an intent to discriminate against

African-American Agents in violation of Title VII.  The result of the use of this exam has been to

delay the employment of qualified African-Americans as Special Agents and to cause African-

American Special Agents to be hired in fewer numbers and into lower grades in numbers

disproportionate to white Special Agents.  The Secret Service was aware of the adverse impact of

the TEA but took no action.  These alleged discriminatory practices adversely affected the ability

of African-Americans Special Agents to secure promotion by delaying their accrual of the

requisite time in grade to compete for competitive promotions or by blocking their access to career enhancing terms and conditions of employment.

83.    The Secret Service has discriminated against African-American Special Agents by hiring them into lower civil service grades in numbers disproportionate to their white counterparts.  The Secret Service has a policy or practice of requiring African-Americans hired from other federal law enforcement agencies into Special Agent positions to accept a reduction in grade, but not white Special Agents.  The Secret Service has a policy or practice of hiring African-Americans into Special Agent positions in lower grades than their credentials warranted. The Secret Service engages in other discriminatory hiring practices including, but not limited to, falsely informing African-American Special Agents that law enforcement experience, a law degree or other unnecessary credentials were a prerequisite to being hired as a Special Agent in the Secret Service.  Each of these practices have an adverse impact on African-American Special Agents that cannot be justified by business necessity.  The continued use of such policies and practices reflects an intent to discriminate against African-American Agents in violation of Title VII.  These practices also independently constitute intentional discrimination on the basis of race.  Each of these alleged discriminatory policies and practices adversely affected the ability of African-Americans to secure promotion or access to terms and conditions of employment that were career enhancing.  In particular, African-American Special Agents were delayed in accruing the necessary time in grade to begin applying for promotion.

84.    Six of the ten named Plaintiffs were discriminated against in their initial hire to the Secret Service.  While the Court has ruled that Plaintiffs Harris, Summerour, Hendrix, Turner, Ivery and Rooks' hiring claims are time barred, they illustrate the Secret Service's dramatic pattern of dissuading African-American applicants from applying and then only reluctantly

hiring African-American Special Agents into lower civil service grades than their credentials warrant. Special Agent Harris was told the Secret Service was not hiring while it was indeed hiring white applicants. He was also told that his passing TEA exam score was too low to be hired when in fact only a passing score was required. Four years later, after Special Agent Harris unnecessarily took an additional test and was still rejected for employment, he was only hired after filing an EEO complaint. Similarly, Special Agent Summerour was falsely told she needed law enforcement experience following college in order to gain employment with the Secret Service. After six years of gaining experience, she was finally hired, only to learn that white applicants were hired directly from college. Further, Special Agents Harris, Hendrix, Turner, Ivery, and Rooks were all hired at grades lower than their credentials warranted and lower than those of similarly situated white Special Agent. In addition, Plaintiffs Hendrix and Tyler failed the TEA at least once. These Plaintiffs' experience of discriminatory hiring practices also adversely affected their ability to seek promotion and other career enhancing opportunities once employed. These Plaintiffs' experiences demonstrate a pervasive, persistent, ongoing pattern of discriminatory hiring practices that must be remedied.

### Special Agent Simms

85.     Since the time that Special Agents Harris, Summerour, Hendrix, Turner, Ivery, Rooks, and Tyler were hired, no steps have been taken to cure these discriminatory practices. When Special Agent Simms was hired by the Secret Service in 2002, she had approximately a decade of law enforcement experience, including eight years as a detective working narcotics, homicide, and sex crimes cases. During the interview process, Special Agent Simms was told by ATSAIC Mary Drury that she would be hired as a GS-7 or 9 and by Special Agent Mark Waterford that she would be hired as a GS-9. On her first day of work in August 2002, Special

Agent Simms learned that she was being hired as a GS-5, the lowest entry grade. After a Secret Service employee told Special Agent Simms that she should have been hired as a GS-7, she read the relevant written materials regarding hiring grade and learned she should have been hired as a GS-9. If a Special Agent starts as a GS-5 and experiences no delays, they will reach a GS-9 level in two years. Special Agent Simms submitted a grievance and received a GS-7 position. Special Agent Simms filed a second letter, explaining that she should be a GS-9, but was turned down. After a presentation during her initial training on how pay is determined, the presenter assured Special Agent Simms that she would review her file. Over seven months after she was hired, Special Agent Simms received her GS-9. Similarly situated white Special Agents are hired at higher GS-levels than Black Agents.

86.     One year from her date of hire, Special Agent Simms was entitled to a grade increase as a matter of course, but she did not receive her GS-11. Special Agent Simms was told that because she had received a "promotion" to GS-9, she would not receive her GS-11 until a year thereafter. Special Agent Simms wrote a memo explaining that her grade increase was as a result of being hired at the wrong level and she was entitled to her GS-11 on the anniversary of her hire. Eventually, Special Agent Simms was given her GS-11.

### E.     Discriminatory Case Assignments, including Undercover Work

87.     The Secret Service uses a discriminatory method of assigning cases to Special Agents, including, but not limited to, disproportionately assigning African-American Special Agents to undercover work. Additionally, African-American Special Agents are assigned to fewer high profile cases and smaller cases that are not career-enhancing, than similarly situated white Special Agents. These practices have an adverse impact on African-American Special Agents that cannot be justified by business necessity. The continued use of such policies and

practices reflects an intent to discriminate against African-American Agents in violation of Title

VII. These practices also independently constitute intentional discrimination on the basis of

race. These alleged discriminatory policies and practices adversely affect the ability of African-

Americans to secure promotion or access to terms and conditions of employment that are career

enhancing. Each of the aforementioned alleged discriminatory policies and practices adversely

affects the ability of African-American Special Agents to secure promotion or access to terms

and conditions of employment that are career enhancing.

88.     The Secret Service's discriminatory assignment of non-career enhancing undercover

work to African-American Special Agents is longstanding. The prevailing attitude held by

supervisors and white Special Agents is that black Special Agents will fit in with the criminal

element due to their race. For example, shortly after he was hired, Special Agent Moore was told

by a group leader in the counterfeit squad that he was "perfect" for undercover work on the basis

of his race. Special Agent Moore, one of two African-American Agents in the Miami Field

Office, was often "borrowed" by a group to which he was not assigned in order to complete

undercover assignments on the basis of his race. Special Agents Summerour and Ivery were

ordered to complete undercover assignments before they received their initial Secret Service

training at the Federal Law Enforcement Training Center ("FLETC") and before Special Agent

Ivery had been issued a gun. The assumption that regardless of background, knowledge of locale

or local customs that any black agent can blend in anywhere is false and dangerous to the health

and safety of Black Agents. Completing a disproportionate amount of undercover works harms

African-American Special Agent's careers. Special Agents who complete undercover work are

less likely to be the "case agent" and less likely to receive credit for resulting arrests.

Special Agent Simms

89.     These discriminatory practices have not changed.  In 2005, Special Agent Simms was asked to complete an undercover assignment when she was approximately seven months pregnant.  The Secret Service has a practice of offering accommodations to pregnant white women, but two supervisors asked Special Agent Simms to do undercover work – one of the most dangerous assignments – instead.  This request was made of Special Agent Simms solely because she was the only African-American female Special Agent in the Chicago Field Office at that time.

90.     Despite the fact that Special Agent Simms entered the Secret Service with approximately a decade of law enforcement experience, her access to career-enhancing assignments has been delayed when compared to white Special Agents with similar longevity in the Secret Service.  For example, she was not assigned to a protection "advance," which involves securing routes and locations before a protectee reaches them, until long after her white peers. When Special Agent Simms was finally assigned to an advance, it was because the Chicago Field Office had a new African-American supervisor in protective operations, Plaintiff Reginald Moore.  In addition, Special Agent Simms was not assigned to foreign travel, a career-enhancing assignment, until after her white counterparts.  Special Agent Simms and another junior African-American Special Agent were told that new Special Agents were not assigned to foreign travel for two years after their hire; yet Special Agent Simms observed white Special Agents assigned to foreign travel before that time.  Two years after she was hired, Special Agent Simms was told the two-year period started not at the date of hire, but at the date of graduation from training.

Special Agent Rooks

91.     Just days before Thanksgiving in 2004, Special Agent Rooks was told that he would

travel to Canada over the Thanksgiving holiday.  He was informed that he would be responsible

for securing a "major site," a career-enhancing assignment.  At the airport, on the way to the

"major site," he learned that a white Agent was also told that he would be securing the same site.

Special Agent Rooks was removed from the "major site" assignment and assigned to a site

usually given to junior Agents.  The junior Agent that had been assigned to the trip was allowed

to stay home for the holiday.

### F.        Discrimination in Bonuses and Awards

92.     The Secret Service uses methods of selecting Special Agents for awards and bonuses

that is excessively subjective.  These practices have an adverse impact on African-American

Special Agents that cannot be justified by business necessity.  The continued use of such policies

and practices reflects an intent to discriminate against African-American Agents in violation of

Title VII.  These practices also independently constitute intentional discrimination on the basis of

race.  These alleged discriminatory policies and practices adversely affect the ability of African-

Americans to secure promotion or access to terms and conditions of employment that are career

enhancing.  As a result of these subjective policies and practices, African-American Special

Agents receive fewer awards and bonuses, and bonuses of lower amounts, than similarly situated

white Special Agents.

Special Agent Rooks

93.     On information and belief, Special Agent Rooks was denied awards and bonuses on

the basis of his race while he was assigned to the Raleigh Field Office in 1998 and 1999.  In

1998, a new RAIC was assigned to the Raleigh Field Office.  Special Agent Rooks had received

awards and bonuses under the previous RAIC, but he received none in 1998 and 1999 under the new RAIC. Plaintiff Rooks alleges discrimination in his denial of awards and bonuses in 1999. The new RAIC also treated him differently from other Agents on the basis of his race, constantly scrutinizing him. When Special Agent Rooks confronted the new RAIC about this different treatment, the new RAIC offered a purported justification for his actions that was not related to Special Agent Rooks' job performance. After Special Agent Rooks transferred to Headquarters in 1999, he received bonuses.

## VI.        CLASS ACTION ALLEGATIONS

94.     Plaintiffs have filed this case as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3).

95.     This action is properly maintainable as a class action under Rule 23(a) because: (a) the class includes more than 100 former and current African-American Special Agents of the Secret Service, which makes the class so numerous that a consolidated complaint of the members of the class is impracticable; (b) the claims alleged on behalf of the class raise questions of law or fact common to the class; (c) the claims of the class representatives are typical of the claims of the class; and (d) the class representatives and class counsel will adequately and fairly protect the interests of the class.

96.     This action is properly maintainable as a class action under Rules 23(b)(2) and 23(b)(3) because: (a) the Secret Service has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; and (b) there are questions of law or fact common to members of the class that predominate over any questions affecting only individuals and a class action is superior to other methods for the fair and efficient adjudication of the controversy.

97.     Plaintiffs have brought their claims on behalf of all former and current African-American Secret Service Agents (Criminal Investigators GS-1811), known and unknown, who from 1993 to the time of adjudication of these claims, have suffered discriminatory non-promotion to GS-14 and above, including discriminatory MPP performance evaluations or their equivalents and who from 1999 to the time of adjudication of these claims have suffered discrimination in the following areas:  (a) discrimination in transfers, assignments, and other career enhancing opportunities; (b) discriminatory assignments to undercover work; (c) discriminatory testing and hiring practices; (d) discriminatory disciplinary policies and practices; and (e) discrimination in awards and bonuses.

98.     The number of members of this class is too large to make joinder practical.  The number of members of the class possibly affected by the Secret Service's illegal policies and practices of discrimination currently and in the past is larger than can be addressed by joinder.

99.     This action poses questions of law or fact that are common to and affect the rights of all members of the class.  The claims of the named plaintiffs are typical of the claims of class members as a whole.

100.    Plaintiffs will adequately represent the class.  Plaintiffs desire to represent the class and have retained counsel experienced in litigating class action discrimination claims.

101.    The Secret Service has a policy and practice of treating African-American Special Agents less favorably than white Special Agents in connection with the "building blocks" for promotion and in the promotion process.  The Secret Service's racially discriminatory behavior against Plaintiffs described herein is representative of a policy and practice of race-based discrimination in the "building blocks" for promotions and in the promotion process, which the Secret Service created, maintained and continues to maintain and which has the intent and effect

of discrimination against African-American Special Agents.  These policies and practices affect class members comprised of all former and current African-American Special Agents and constitute illegal race-based class-wide discrimination.  Named plaintiffs' claims are typical of those of members of the class affected.

## VII.     INJURY TO PLAINTIFFS AND PLAINTIFF CLASS

102.     Plaintiffs and the class they represent have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief.  Plaintiffs and the class they represent are now suffering and will continue to suffer irreparable injury from Defendant's discriminatory acts and omissions.

103.     Defendant's actions have caused and continue to cause Plaintiffs and the class they represent financial losses in an amount to be determined according to proof, including but not limited to lost wages and retirement earnings, out-of-pocket costs, other lost employment benefits and opportunities, and lost equity value in their homes.

104.     Plaintiffs and the class they represent have suffered emotional distress, humiliation and embarrassment, in a value to be determined according to proof.  Such emotional distress has been manifested in a variety of ways including, but not limited to, psychological trauma and physical symptoms to be proven at trial.

## CLAIMS FOR RELIEF

### Race Discrimination under 42 U.S.C. 2000e et seq.
### (Disparate Treatment)

105.     Paragraphs 1 through 104 are realleged and incorporated herein by reference.

106.     This claim is brought on behalf of all Plaintiffs and the class they represent.

107.   Defendant's conduct constitutes disparate treatment on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

108.   Paragraphs 1 through 102 demonstrate that Defendant has maintained a pattern and practice of race discrimination with respect to competitive promotions to grades GS-14 and above; MPP performance evaluations or their equivalents; transfers, assignments, and other career enhancing opportunities; assignment to undercover work; testing and hiring practices; disciplinary policies and practices; and awards and bonuses.  Race discrimination has become the standard operating procedure of Defendant with respect to these employment decisions.

109.   Each and all of the Plaintiffs and the Plaintiff class have been injured by the disparate treatment discrimination that they have encountered.

110.   On behalf of themselves and the Plaintiff class, Plaintiffs request relief as provided in the Prayer for Relief below.

### Race Discrimination under 42 U.S.C. 2000e et seq.
### (Disparate Impact)

111.   Paragraphs 1 through 104 are realleged and incorporated herein by reference.

112.   This claim is brought on behalf of all Plaintiffs and the class they represent.

113.   Defendant's conduct constitutes disparate impact on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

114.   Paragraphs 1 though 102 further demonstrate that Defendant has maintained a system with respect to competitive promotions to grades GS-14 and above, MPP performance evaluations or their equivalents, transfers, assignments, and other career enhancing opportunities, assignment to undercover work, testing and hiring practices, disciplinary policies and practices,

and awards and bonuses that has an adverse disparate impact on African-American Special Agents. This system is not and cannot be justified by business necessity, but even if it could be so justified, less discriminatory alternatives exist that could equally serve any alleged necessity.

115.    Each and all of the Plaintiffs and the Plaintiff class have been injured by the disparate treatment discrimination that they have encountered.

116.    On behalf of themselves and the Plaintiff class, Plaintiffs request relief as provided in the Prayer for Relief below.

## PRAYER FOR RELIEF

117.    Therefore, Plaintiffs pray that the following relief be granted to them and to those whom they represent:

(a)    Certify the case as a class action on behalf of the proposed Plaintiff class and designate Plaintiffs as representatives of the class and their counsel of record as Class Counsel;

(b)    Enter a declaratory judgment that Defendant's conduct as alleged herein has violated Plaintiffs' civil rights and the civil rights of the African-American Special Agents of the Secret Service under 42 U.S.C. § 2000e and 42 U.S.C. § 1981a;

(c)    Enter a permanent injunction barring Defendant from continuing to engage in the illegal and discriminatory conduct alleged herein;

(d)    Enter a permanent injunction directing Defendant to take affirmative steps to remedy the effects, and prevent future occurrences, of the illegally discriminatory conduct alleged herein;

(e)    Award compensatory damages according to proof for each Plaintiff and each class member as would compensate fully each Plaintiff and class member for their emotional distress,

embarrassment, humiliation, deprivation of their right to equal employment opportunity regardless of race and other harms alleged herein;

(f)     Award all financial damages that Plaintiffs and the Plaintiff class have sustained as a result of Defendant's conduct, including but not limited to back pay, front pay, retirement payments, out-of-pocket expenses and general and specific damages for lost compensation and job benefits that they would have received but for the discriminatory practices of Defendant;

(g)     Award reasonable attorneys' fees incurred in this action and the administrative claims that preceded it, expert fees, and costs;

(h)     Award pre-judgment and post-judgment interest, as provided by law; and

(i)     Order other such relief as the Court deems just and proper.

Respectfully submitted,

E. Desmond Hogan (D.C. Bar #458044)
Deborah L. Boardman (D.C. Bar # 476869)
Sarah Berger (D.C. Bar # 489359)
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

John P. Relman (D.C. Bar #405500)
Reed N. Colfax (D.C. Bar #471430)
Jennifer I. Klar (D.C. Bar #479629)
Relman & Associates PLLC
1225 Nineteenth Street, N.W., Suite 600
Washington, D.C. 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848

*Attorneys for Plaintiffs*

Dated:  August 7, 2006

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiffs demand a trial by jury of all issues so triable as of right.

Respectfully submitted,

E. Desmond Hogan (D.C. Bar #458044)
Deborah L. Boardman (D.C. Bar # 476869)
Sarah Berger (D.C. Bar # 489359)
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

John P. Relman (D.C. Bar #405500)
Reed N. Colfax (D.C. Bar #471430)
Jennifer I. Klar (D.C. Bar #479629)
Relman & Associates PLLC
1225 Nineteenth Street, N.W., Suite 600
Washington, D.C. 20036
Telephone:  (202) 728-1888
Facsimile:  (202) 728-0848

*Attorneys for Plaintiffs*

Dated:  August 7, 2006

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the attached Second Amended and

Supplemental Class Complaint was hand-delivered on August 7, 2006 to the following:

> Benton G. Peterson
> Marina Utgoff Braswell
> Assistant U.S. Attorneys
> U.S. Attorney's Office
> Civil Division
> 501 Third Street, N.W.
> Washington, D.C. 20530
>
> Counsel for Defendant

_____
Deborah L. Boardman