**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| REGINALD G. MOORE, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 00-953 (RWR/DAR) |
| | ) | |
| v. | ) | CLASS COMPLAINT |
| | ) | |
| MICHAEL CHERTOFF | ) | **ORAL HEARING REQUESTED** |
| SECRETARY, U.S. | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY. | ) | |
| | ) | |
| Defendant. | ) | |

---

### PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Pursuant to Federal Rule of Civil Procedure 23 and Local Rule 23.1, Plaintiffs

Reginald G. Moore, John E. Turner, C. Yvette Summerour, Leroy Hendrix, Cheryl L.

Tyler, Luther K. Ivery, Andrew E. Harris, Jr., and Kenneth Rooks (hereinafter "Class

Plaintiffs"), by and through counsel, hereby move for class certification in this class

action that seeks to redress a pattern and practice of race discrimination in promotions by

the United States Secret Service in violation of Title VII of the Civil Rights Act of 1964

(the "1964 Act"), as amended, 42 U.S.C. § 2000(e), and the Civil Rights Act of 1991 (the

"1991 Act"), 42 U.S.C. § 1981(a).  See Second Amended and Supplemental Class

Complaint (the "Complaint"). 1/

---

1/      Pursuant to Local Rule 7(m), Plaintiffs' counsel conferred with counsel for
Defendant regarding the relief sought in this motion, and Defendant opposes this motion.

In this motion for class certification2/, Class Plaintiffs respectfully request that this Court certify a class, pursuant to Rule 23(b)(2) of the Federal Rules for Civil Proedure, for Class Plaintiffs' promotions claims (both their disparate treatment and disparate impact claims); bifurcate the proceeding in liability and remedial stages; and order notice and the right to opt-out for class members at the latter stage.  Class Plaintiffs specifically request that a Rule 23(b)(2) class be certified on behalf of **all current and former African-American Agents who were employed as Criminal Investigators (GS/GM-1811) and who had the required time-in-grade to seek promotion to competitive positions at the GS-14 level at any time during the years 1995 to 2004, and/or who had the required time-in-grade to seek promotion to competitive positions at the GS-15 level at any time during the years 1995 to 2005.** 3/  Class Plaintiffs also seek an order, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, appointing undersigned counsel as class counsel.

For the reasons set forth in the accompanying Memorandum (with Exhibits thereto), the separately bound declarations of at least 62 Class Plaintiffs, class members, and other former and current African-American Special Agents, the record in this case, and such further argument or evidence as may be submitted, the Court should grant this Motion.

---

2/      An earlier motion for class certification was originally filed on August 15, 2000 (D.E. 52), and an amended motion was filed on May 24, 2001 (D.E. 83).  That motion was deemed moot by this Court in an order dated October 24, 2004 (D.E. 129), in which the Court, *inter alia*, granted in part and denied in part Defendant's Motion to Dismiss (D.E. 19).  Plaintiffs then filed the Second Amended and Supplemental Class Complaint, which remains the operative Complaint in this action, on August 7, 2006.

3/      In the alternative, Class Plaintiffs ask the Court to certify this action as a "hybrid" class action, pursuant to Rule 23(b)(2) and 23(b)(3), for Class Plaintiffs' claims for class-wide injunctive and declaratory relief, and Class Plaintiffs' claims for monetary relief, respectively.

Respectfully submitted,

_____/s/_____
E. Desmond Hogan (D.C. Bar # 458044)
Melissa N. Henke (D.C. Bar # 483741)
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

_____/s/_____
John P. Relman (D.C. Bar # 405500)
Jennifer I. Klar (D.C. Bar # 479629)
Relman & Dane PLLC
1225 Nineteenth Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888

*Attorneys for Plaintiffs*

Dated: August 4, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| REGINALD G. MOORE, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 00-953 (RWR/DAR) |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| MICHAEL CHERTOFF | ) | **ORAL HEARING REQUESTED** |
| SECRETARY, U.S. | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ....................................................................................1

STATEMENT OF RELEVANT FACTS ....................................................5

I.    THE SECRET SERVICE'S PROMOTIONS PROCESS HAS A
      STATISTICALLY SIGNIFICANT ADVERSE IMPACT ON
      AFRICAN-AMERICAN AGENTS..........................................................5

      A.    The Use of MPP Scores Has an Adverse Impact on
            African-American Agents Competing for Promotion..................6

            1.    The Use of MPP Scores to Construct the Best
                  Qualified List Disproportionately Disqualifies
                  African-American Agents from Promotion .....................6

            2.    The Use of MPP Scores to Rank Agents on the Best
                  Qualified List Has an Adverse Impact on African-
                  American Agents ...........................................................9

      B.    Despite Suppression of Best Qualified African-Americans,
            There is Adverse Impact in Selection for Promotion from
            Best Qualified Candidates.........................................................11

      C.    The Parties' Experts Agree that the Secret Service's
            Promotions Process has an Adverse Impact on African-
            American Agents .....................................................................14

II.   THE AGENCY-WIDE PROCESS FOR COMPETITIVE
      PROMOTIONS IS HIGHLY SUBJECTIVE AND UNFETTERED....................14

      A.    The MPP Score .......................................................................15

      B.    The Best Qualified List............................................................18

      C.    Advisory Board Recommendations and Director Selections.....................19

III.  THE MPP IS ARBITRARY, EXCESSIVELY SUBJECTIVE
      AND UNRELIABLE, AND THUS CANNOT BE VALID ................................21

      A.    The MPP Score is Arbitrary and Unreliable..............................22

## <u>TABLE OF CONTENTS</u>—Continued

<u>PAGES</u>

B.    The Best Qualified List Is Constructed From the Arbitrary and Unreliable MPP Score ........................................................................26

C.    Advisory Board Recommendations and Director Selections are Arbitrary, Excessively Subjective and Unfettered ..............................26

    1.    Arbitrary and Unreliable Use of MPP Score Differences ........................................................................28

    2.    Arbitrary and Unreliable Use of Agent's Bid History ....................................................................29

    3.    Unwritten, Arbitrary "Practice" of Preferring Laterals ........................................................30

IV.    CLASS PLAINTIFFS HAVE BEEN SUBJECTED TO THE SECRET SERVICE'S DISCRIMINATORY PROMOTIONS PROCESS ......................................................................................32

    A.    Special Agent Reginald G. Moore ............................................33

    B.    Special Agent Luther K. Ivery ..................................................36

    C.    Special Agent John E. Turner ...................................................39

    D.    Special Agent Cheryl L. Tyler ..................................................41

    E.    Special Agent C. Yvette Summerour ........................................44

    F.    Special Agent Kenneth Rooks ..................................................47

    G.    Special Agent Andrew E. Harris, Jr. ........................................49

    H.    Special Agent Leroy Hendrix ...................................................52

V.    THE SECRET SERVICE HAS A LONG-STANDING HISTORY OF RACE DISCRIMINATION THAT CAN ONLY BE REMEDIED THROUGH THE RELIEF SOUGHT BY THIS CLASS ACTION ......................................................................................54

    A.    Promotion of White Agents Involved in the Notoriously Racist "Good Ol' Boys Roundup" ..........................................56

    B.    A Long History of Discriminatory Selections for Promotions ......................................................................58

**TABLE OF CONTENTS**—**Continued**

**PAGES**

C.      The Black Agents' Efforts to Stop the Discrimination That Were Repeatedly Ignored by the Secret Service.........................................58

ARGUMENT ....................................................................................................................60

I.      CLASS CERTIFICATION IS PROPER FOR THIS TITLE VII ACTION ....................................................................................60

      A.      Class Plaintiffs Meet the Requirements of Rule 23(a) ..............................62

            1.      The Class is So Numerous that Joinder of all Members Would Be Impracticable ................................62

            2.      Questions of Law or Fact Common to the Class Exist.....................................................................64

            3.      Class Plaintiffs' Claims are Typical of the Claims of the Class ...................................................................69

            4.      Class Plaintiffs Will Fairly and Adequately Protect the Interests of the Class .................................................71

      B.      Class Plaintiffs Meet the Requisite Standards in Rule 23(b) ....................72

            1.      The Secret Service Has Acted and Refused to Act on Grounds Generally Applicable to the Class .............................73

            2.      The Significant Injunctive and Declaratory Relief Sought by Class Plaintiffs is Predominant.....................................74

            3.      Notice and Opt-Out Rights at Remedial Stage Can Address any Class Member Due Process Concerns .....................80

II.      APPOINTMENT OF CLASS COUNSEL IS APPROPRIATE ...........................82

CONCLUSION ................................................................................................................83

<u>**TABLE OF AUTHORITIES**</u>

<u>**PAGES**</u>

<u>**CASES**</u>**:**

<u>Adair v. England</u>, 209 F.R.D. 5 (D.D.C. 2002) ............................................................63, 64

<u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405 (1975)........................................................74

<u>Allison v. Citgo Petroleum Corp.</u>, 151 F.3d 402 (5th Cir. 1998)......................................76

<u>Amchem Prods., Inc., v. Windsor</u>, 521 U.S. 591 (1997) ..............................................71, 73

<u>Barrett v. U.S. Civil Serv. Comm'n</u>, 69 F.R.D. 544 (D.D.C. 1975)..................................74

<u>Bazemore v. Friday</u>, 478 U.S. 385 (1986) ..........................................................................5

<u>Caridad v. Metro-North Commuter R.R.</u>, 191 F.3d 283 (2d Cir. 1999)......................61, 68

<u>Dukes v. Wal-Mart Stores, Inc.</u>, 222 F.R.D. 137 (N.D. Cal. 2004)................65, 68, 74, 79

<u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156 (1974) ....................................................60, 61

<u>Ellis v. Costco Wholesale Corp.</u>, 240 F.R.D. 627 (N.D. Cal. 2007) ...........................79, 81

<u>Eubanks v. Billington</u>, 110 F.3d 87 (D.C. Cir. 1997)................................................ *passim*

<u>Garcia v. Johanns</u>, 444 F.3d 625 (D.C. Cir. 2006) ...........................................................65

<u>Gen. Tel. Co. v. EEOC</u>, 446 U.S. 318 (1980)............................................................ 62-63

<u>Gen. Tel. Co. v. Falcon</u>, 457 U.S. 147 (1982) ...........................................64, 65, 66, 68, 69

<u>Gonzalez v. Brady</u>, 136 F.R.D. 329 (D.D.C. 1991)...........................................................61

<u>Hartman v. Duffey</u>, 19 F.3d 1459 (D.C. Cir. 1994)...........................................................65

<u>In re Employment Discrimination Litig.</u>, 198 F.3d 1305 (11th Cir. 1999)........................73

<u>Int'l Bhd of Teamsters v. United States</u>, 431 U.S. 324 (1977) .................................. *passim*

<u>Jarvaise v. Rand Corp.</u>, 212 F.R.D. 1 (D.D.C. 2002) ..................................................61, 72

<u>Johns v. Rozet</u>, 141 F.R.D. 211 (D.D.C. 1992) .................................................................71

<u>Love v. Johanns</u>, 439 F.3d 723 (D.C. Cir. 2006)...............................................................64

## <u>TABLE OF AUTHORITIES</u>—Continued

<u>PAGES</u>

McReynolds v. Sodexho Marriott Servs., Inc., 208 F.R.D. 428
(D.D.C. 2002) ...................................................................................... *passim*

Molski v. Gleich, 318 F.3d 937 (9th Cir. 2003) ...................................................76, 77, 78

Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Matthews,
551 F.2d 340 (D.C. Cir. 1976) .....................................................................71

Pigford v. Glickman, 182 F.R.D. 341 (D.D.C. 1998)................................. *passim*

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)........................................................5

Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147
(2d Cir. 2001)...................................................................................... *passim*

Robinson v. Sears, Roebuck & Co., 111 F. Supp. 2d 1101
(E.D. Ark. 2000) ........................................................................................81

Segar v. Smith, 738 F.2d 1249 (D.C. Cir. 1984) ...............................................65

Stewart v. Rubin, 948 F. Supp. 1077 (D.D.C. 1996)................................. *passim*

Taylor v. D.C. Water & Sewer Auth., 205 F.R.D. 43 (D.D.C. 2002)................................76

Taylor v. D.C. Water & Sewer Auth., 241 F.R.D. 33 (D.D.C. 2007)....................... *passim*

Thomas v. Albright, 139 F.3d 227 (D.C. Cir. 1998).............................................75, 76, 81

Twelve John Does v. District of Columbia, 117 F.3d 571 (D.C. Cir. 1997) ...................71

Wagner v. Taylor, 836 F.2d 578 (D.C. Cir. 1987)...........................................61, 65, 70, 71

## <u>STATUTES</u>:

42 U.S.C. § 2000e-2(k)(1)(A)...........................................................................5

## <u>RULES</u>:

Fed. R. Civ. P. 23 ...................................................................................... *passim*

Fed R. Civ. P. 23(a) ................................................................................... *passim*

Fed. R. Civ. P. 23(a)(1)...............................................................................62

Fed. R. Civ. P. 23(a)(2)...............................................................................64, 70

## TABLE OF AUTHORITIES—Continued

**PAGES**

Fed. R. Civ. P. 23(a)(3) ........................................................................69, 70

Fed. R. Civ. P. 23(a)(4) ............................................................................71

Fed. R. Civ. P. 23(b) ...................................................................62, 72, 76

Fed. R. Civ. P. 23(b)(2), with Advisory Committee Notes (1966
    Amendment) ................................................................................. *passim*

Fed. R. Civ. P. 23(b)(3) ........................................................................4, 81

Fed. R. Civ. P. 23(d) ................................................................................80

Fed. R. Civ. P. 23(g) ................................................................................81

Fed. R. Civ. P. 23(g)(1)(A) ......................................................................82

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv) ..........................................................82

Fed. R. Civ. P. 23(g)(1)(B) ......................................................................82

## OTHER AUTHORITIES:

1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions,
    § 3.22 (4th ed. 2002) ......................................................................70

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
    Federal Practice and Procedure § 1763 (3d ed. 2005) ................................64

### INTRODUCTION

Class Plaintiffs in this action are current and former African-American Special Agents ("African-American Agents" or "Black Agents") of the United States Secret Service (the "Secret Service" or "Agency") who have honorably served their country, risking their lives to protect our leaders and other world leaders, and to enforce the laws of the United States.  In return for their years of honorable service, the Secret Service has responded to these Agents – and Black Agents in general – by discriminating against them on the basis of race in the Agency's promotions process, erecting a glass ceiling that delayed and denied them opportunities to reach the highest supervisory levels.

For decades, Black Agents worked internally at the Agency in an attempt to effectuate a change in Secret Service culture so that they – and the next generation of Black Agents – would be given a fair chance to advance based on the merit of their record, rather than be held back based on the color of their skin.  Unfortunately, the Agency refused to eliminate racism from the fabric of its promotions process, and continued to promote less qualified white Agents into supervisory positions, leaving highly-skilled Black Agents in subordinate positions.  Unable to cure this appalling situation internally, Class Plaintiffs decided to seek this Court's assistance in ensuring that a fair and objective promotion system would be implemented at the Secret Service, and thus this Title VII action ensued eight years ago.

In the intervening eight years – and despite the Agency's stonewalling, as evidenced by the myriad of sanctions and other discovery rulings entered against the Secret Service by Magistrate Judge Robinson – Class Plaintiffs have developed through discovery a highly-troubling evidentiary record showing that discrimination in the

promotions process is the standard operating procedure at the Secret Service.  For

example, as discussed below in Section I of the Statement of Relevant Facts, the analysis

of one of the country's leading statistical experts establishes that the policies and

practices of the Agency's promotions process have a statistically significant adverse

impact on African-American Agents.  Sections II and III provide background detail and

expert analysis that explains how the Secret Service's "good old boy" system is destined

to impact the decision-making process for promotions, thus delaying and denying

African-American Agents from being allowed to advance fairly to supervisory positions.

Sections IV and V, in turn, provide some typical examples of the record evidence

of racial discrimination that Class Plaintiffs and other Black Agents have suffered for

decades at the hands of the Secret Service.  The testimony presented here shows, among

other things:  (1) that the ubiquitous use of the word "nigger" and other repulsive racial

epithets by white Agents was and remains accepted practice; (2) a supervisory culture

that was unwilling to discipline its Agents who participated in racist events like the Good

Ol' Boys Roundup; (3) a long history of blatant racial discrimination that Secret Service

management has failed to acknowledge, much less address; (4) that racial tolerance

among the very top management of the Secret Service remains in place today; for

example, the Secret Service has known since he was a GS-13 that the current Special

Agent in Charge of the Dignitary Protective Detail has complained that "Niggers don't

belong on this job," yet he was subsequently promoted to the GS-14, GS-15 and Senior

Executive Service levels and is now in charge of protection of all foreign leaders and

presidential candidates4/; and (5) that less qualified white Agents repeatedly were selected over Class Plaintiffs (and other class members) to fulfill critical Agency functions.  For example, Plaintiff Moore was thrown out of his position of commanding the White House Joint Operations Center ("JOC") to make way for a less qualified white Agent (who had no experience in the JOC) to take the job.  Plaintiff Ivery was passed over for a position on the Counter Assault Team (a position in which he had served successfully as a GS-13) once it was upgraded to GS-14, and the less qualified white Agent selected over Plaintiff Ivery for that promotion was arrested for drunk driving on his way to work at the White House.  Plaintiff Harris was likewise passed over by Secret Service management in favor of less qualified white Agents for numerous GS-15 positions in the Dignitary Protective Division despite the fact that the Special Agent in Charge of that division swore under oath that he recommended Special Agent Harris for *every* open GS-15 position in the division.

This record of racism at the Secret Service is beyond intolerable, and thus Class Plaintiffs ask that this Court certify their promotions claims5/ as a class action under Rule 23 of the Federal Rules of Civil Procedure and Local Rule 23.1, on behalf of **all current and former African-American Agents who were employed as Criminal Investigators**

---

4/    See July 28, 2000 Decl. of A. Webb ¶ 17 (included in separately bound Ex. 1, Decls. of Current and Former Special Agents Submitted in Support of Pls.' Mot. for Class Certification); see also D.E. 570 (Notice Regarding Def.'s Additional Violation of Ct. Order for Consideration in Pls.' Mot. for Sanctions (Docket No. 488, Pt. 2)) at Ex. 10 (reflecting an inquiry by that same Special Agent in Charge regarding whether he can forward a racist rant to another white Agent because he is "worthy of trust and confidence" – the motto of the Secret Service).

5/    While Plaintiffs allege discrimination in the Secret Service's hiring process, their hiring claims are not the subject of this motion because the parties have agreed that Plaintiffs may move to certify a class on these claims at a later date after the Court rules on Defendant's related motion to dismiss or for summary judgment.

**(GS/GM-1811) and who had the required time-in-grade to seek promotion to competitive positions at the GS-14 level at any time during the years 1995 to 2004, and/or who had the required time-in-grade to seek promotion to competitive positions at the GS-15 level at any time during the years 1995 to 2005 (the "class").** This proposed class satisfies all requirements set forth in Rule 23(a).  Members of this proposed class and Class Plaintiffs alike have suffered from this pattern and practice of race discrimination in promotions, and of the disparate impact on African-American Agents that results from the arbitrary, excessively subjective, and unreliable decision-making process for promotions, thus entitling them to the primary, class-wide injunctive and declaratory relief requested, as well as back pay and compensatory damages.  As such, certification is appropriate pursuant to Rule 23(b)(2); or, alternatively, pursuant to "hybrid" certification under Rule 23(b)(2) and 23(b)(3).

<u>**STATEMENT OF RELVANT FACTS**</u>

**I.   THE SECRET SERVICE'S PROMOTIONS PROCESS HAS A STATISTICALLY SIGNIFICANT ADVERSE IMPACT ON AFRICAN-AMERICAN AGENTS.** <u>6</u>/

Class Plaintiffs have amassed significant statistical evidence of racial discrimination in the Secret Service's promotions process and can prove their claims on the basis of that statistical evidence.  Class Plaintiffs' statistical expert, Dr. Charles Mann<u>7</u>/, has concluded that the policies and practices for promotions used by the Secret Service disadvantage African-American Agents seeking promotion to GS-14 and GS-15 positions in three distinct ways, each of which is described in turn below:

---

<u>6</u>/       At the core of this discrimination case is the Agency's formal process for selection of Agents for promotions to the GS-14 and GS-15 levels.  The Merit Promotion Program, or the "MPP," is a common set of policies and practices that have both the intent and the effect of discriminating against African-American Agents.  Class Plaintiffs thus assert both "pattern-or-practice" disparate treatment and disparate impact claims pursuant to the 1964 and 1991 Acts.  The U.S. Supreme Court has stated that success on a pattern-or-practice claim requires proof that intentional discrimination was the defendant's "standard operating procedure."  <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 366 (1977) (explaining that plaintiffs must produce evidence at the liability stage to establish a prima facie case of a policy, pattern, or practice of intentional discrimination against a protected group).  While statistical evidence alone is sufficient to establish a pattern or practice of intentional discrimination, plaintiffs often also rely on anecdotal evidence from class members because it "brings the cold numbers convincingly to life" through testimony of specific instances of discrimination.  <u>See</u> <u>id.</u> at 339. Statistical evidence is also typically used to establish liability on a disparate impact claim, which requires proof that the defendant "uses a particular employment practice that causes a disparate impact on the basis of race," and the employer then fails to demonstrate that the challenged practice is "job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A).

<u>7</u>/       Dr. Mann is a statistician who has been accepted as a statistical expert in many cases in numerous federal courts over the past four decades. <u>See</u> Ex. 2 (Fourth Supp. Decl. of Charles R. Mann, Ph.D.) (hereinafter "Mann Report") at Attachment A.  For example, Dr. Mann was the statistical expert in the key employment cases of <u>Bazemore v. Friday</u>, 478 U.S. 385 (1986) and <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989).  He was elected a Fellow of the American Statistical Association.  <u>See</u> <u>id.</u>

1.      The use of MPP scores to create a cut-off for inclusion on the best qualified list disproportionately disqualifies African-American Agents from promotion.

2.      Even for African-American Agents who, despite the discrimination described in paragraph (1), reach the best qualified list, the consideration of rank by MPP score on the best qualified list disproportionately disadvantages African-American Agents.

3.      Fewer African-American Agents are promoted from the best qualified list than would be expected in the absence of discrimination, even considering that African-American Agents are disproportionately kept off the best qualified list.

**A.    The Use of MPP Scores Has an Adverse Impact on African-American Agents Competing for Promotion.**

**1.      The Use of MPP Scores to Construct the Best Qualified List Disproportionately Disqualifies African-American Agents from Promotion. 8/**

The Secret Service's promotions process disproportionately <u>disqualifies</u> African-American Agents for promotion to the GS-14 and GS-15 levels.  Statistical evidence confirms that adverse impact in the construction of the best qualified list has the effect of disqualifying African-American Agents at a higher rate than their non-African-American peers.  Plaintiffs' expert, Dr. Mann, concluded that the use of MPP scores to determine which applicants for a promotion make the best qualified list has a statistically significant adverse impact on African-Americans seeking promotion to both the GS-14 and GS-15 levels.  <u>See</u> Mann Report (Ex. 2) ¶¶ 36-43. 9/

---

8/      Bidders or candidates for a GS-14 or GS-15 promotion are ranked in order exclusively by their MPP score on a best qualified list, and the number of bidders or candidates on the list (and thus the cut-off score) is established by a formula set forth in the MPP.  <u>See</u> <u>infra</u> at 18-19.  For example, if the formula indicates that thirty individuals are to be on the best qualified list, the thirtieth ranked MPP score is the cut-off score.  <u>Id.</u> According to the Secret Service, an Agent seeking promotion who does not make the best qualified list may not be promoted to the position.  <u>Id.</u> at 19.

9/      All data used for Dr. Mann's analysis was provided by Defendant, the details of which are described in Dr. Mann's report.  <u>See id.</u> ¶¶ 3-7.

Specifically, Dr. Mann found statistically significant adverse impact against African-American Agents in the construction of the best qualified list for the following four sets of data:

1.    For promotion from the GS-14 to the GS-15 level during the class period (1995-2005).  Id. ¶¶ 41, 43.

2.    For promotion from the GS-14 to the GS-15 level during the class period (1995-2005) plus a four-year background period10/.  Mann Report ¶¶ 40, 42.

3.    For promotion from the GS-13 to the GS-14 level during the class period (1995-2004).  Id. ¶¶ 37, 39.

4.    For promotion from the GS-13 to the GS-14 level during the class period (1995-2004) plus a four-year background period.  Id. ¶¶ 36, 38.

This means that for both promotion to the GS-14 and GS-15 levels, and for both the class periods and the class periods plus a four-year background period, there are fewer African-American Agents on the best qualified list than the number of African-American Agents that would be expected in the absence of racial discrimination.  Because Agents who do not make the best qualified list are not eligible for promotion to the position, this result means that for both promotion to the GS-14 and GS-15 levels during both the class periods and the class periods plus a four-year background period, more African-American Agents are disqualified from promotion than would be expected in the absence of racial discrimination.

Notably, Defendant's expert, Dr. Paul White, did not dispute these results during his deposition.  See Ex. 4 (Feb. 15, 2008 Dep. of P. White) at 20-21, 25, 69-70, 220.  In addition, Dr. White's own analysis of bidder or candidate to best qualified list data found

---

10/    The background period starts in 1991, which represents the first year of data provided by the Defendant.  Id. ¶ 5; Ex. 3 (Sept. 26, 2006 Letter from J. Klar).

similar statistically significant results adverse to African-American Agents.  For example, for the class period plus background period for GS-15 claims, Dr. White also found statistically significant adverse impact with a probability level of 0.0000, which he listed as corresponding to 6.27 standard deviations.  See id. at 23-25; Ex. 5 (Ex. 1 to Dep. of P. White) at 1.  For the class period plus background period for GS-14 claims, Dr. White also found statistically significant adverse impact with a probability level of 0.0257, which he listed as corresponding to 2.22 standard deviations.  See Feb. 15, 2008 Dep. of P. White at 23-24 (Ex. 2); Ex. 1 to Dep. of P. White (Ex. 5) at 2.

Moreover, Defendant's expert admitted during his deposition that the use of MPP scores to construct the best qualified list has a statistically significant adverse impact on African-American Agents.  Indeed, Dr. White stated:

> "Let me state my opinion on this.  A couple of times in the report, I recognize, and many times in this deposition I've recognized, that there is statistical significance from the applicant to best qualified analysis.  Okay?"

Feb. 15, 2008 Dep. of P. White (Ex. 4) at 146; see also id. at 158-59.  Because failure to make the best qualified list disqualifies Agents from promotion to that position, Dr. White agreed that African-American Agents are disproportionately disqualified for promotion by the use of MPP scores to construct the best qualified list.  When asked whether he agreed with the statement: "a higher percentage of African-American agents are disqualified at the best qualified step than white agents," Dr. White admitted: "I would agree with that."  Id. at 154-55.

Thus, there is significant evidence that the use of MPP scores to construct the best qualified list disproportionately disqualifies African-Americans from promotion.  In short,

African-American Agents are disproportionately kept from even reaching the best qualified list; i.e, the starting gate to compete for all relevant promotions.

> **2.      The Use of MPP Scores to Rank Agents on the Best Qualified List Has an Adverse Impact on African-American Agents.**

The harm to African-American Agents of the use of MPP scores does not end at the construction of the best qualified list.  Even those African-American Agents who are able to make the best qualified list despite discrimination are then disproportionately disadvantaged by management's consideration of their rank among those on the best qualified list in deciding who to recommend for promotion.  Therefore, the Secret Service's use of MPP scores in the promotions process has an adverse impact on African-American Agents at *two stages*:  first in constructing the best qualified list and then again in selecting among those on the best qualified list for promotion.  In other words, even those African-American Agents who survive discrimination in the construction of the best qualified list and become eligible for promotion face a second round of discrimination in the consideration of their MPP score/rank among those on the best qualified list.

Bidders or candidates for promotion are ranked exclusively by their MPP score on the best qualified list.  See infra at 18-19.  The top ranked candidate on a best qualified list has the highest MPP score of those on the list, the second-ranked candidate has the second highest MPP score, and so on.  Id.  Several former and current decision-makers have admitted they consider rank on the best qualified list in deciding who to recommend for selection for promotion from that list.  See Ex. 6 (Def.'s Resp. to Class Pls.' First Set of Interrogatories, Excerpts of Resp. to Interrogatory 4(c)) (indicating rank is considered).  Dr. Mann has concluded that rankings among those on the best qualified list have a

statistically significant adverse impact on African-American Agents.  See Mann Report
(Ex. 2) ¶¶ 59-75.  In other words, African-Americans on best qualified have lower MPP
scores than would be expected in the absence of racial discrimination.  See id. ¶¶ 59-
75. 11/

Specifically, Dr. Mann found statistically significant adverse impact against
African-American Agents in testing the mean rank12/ of candidates on the best qualified
list for the following four sets of data:

1.      For promotion from the GS-14 to the GS-15 level during the class period

(1995 to 2005).  Id. ¶¶ 70-71, 74-75.

_____

11/      There is also testimony (including, for example, from current Director Sullivan)
that even among those scores on the best qualified list, some are simply too low to result
in promotion.  See, e.g., Ex. 7 (Def.'s Resp. to Class Pls.' First Set of Interrogatories,
Excerpt of Resp. to Interrogatory 4(c)).  This means that there is effectively a "cut-off
score" on the best qualified list that is above the cut-off score set by MPP policy.
Plaintiffs' expert modeled this decision-making "practice" by determining for each
relevant year the lowest MPP score held by an Agent who was promoted ("effective cut-
off score"), and then determining whether there was a disparate impact on African-
American Agents in regard to Agents who made the best qualified list yet had an MPP
score lower than the "effective cut-off score."  See Mann Report (Ex. 2) ¶ 49.  Dr. Mann
found that, among those on the best qualified list, African-Americans were less likely to
achieve a score at or above the "effective cut-off score" (i.e., the lowest MPP score that
resulted in promotion that year).  Indeed, for both class periods, Dr. Mann found
disparate impact with a probability level of 0.0000, corresponding to one chance in
20,000, or more than 4.0 standard deviations.  See id. ¶¶ 51, 53, 55, 57; see also id. ¶¶ 50,
52, 54, 56 (finding same result when including background period).  This means that in a
world without discrimination, the probability that so few African-Americans among those
who actually made the best qualified list would achieve an MPP score at or above the
"effective cut-off score" that year is 0.000.
12/      Best qualified lists for different promotions contain different numbers of Agents
and different ranges of MPP scores.  See infra at 19.  Therefore, Dr. Mann tested whether
the mean rank of African-Americans on each best qualified list was higher or lower than
that of non-African-Americans and aggregated the results, see Mann Report (Ex. 2) ¶ 59,
in order to test the adverse impact on African-Americans of the consideration of rank or
MPP score by decision-makers among Special Agents on the best qualified list.

2.     For promotion from the GS-14 to the GS-15 level during the class period (1995-2005) plus a four-year background period.  Id. ¶¶ 68-69, 72-73.

3.     For promotion from the GS-13 to the GS-14 level during the class period (1995 to 2004).  Id. ¶¶ 62-63, 66-67.

4.     For promotion from the GS-13 to the GS-14 level during the class period (1995-2004) plus a four-year background period.  Id. ¶¶ 60-61, 64-65.

This means that for both promotion to the GS-14 and GS-15 levels, and for both the class periods and the class periods plus a four-year background period, African-American Agents are ranked lower among those on the best qualified list than what would be expected without racial discrimination.  For both promotion to the GS-14 and GS-15 levels, and for both the class periods and the class periods plus a four-year background period, decision-makers' consideration of rank or MPP score among candidates on a best qualified list disadvantages African-American Agents competing for promotion.

The consideration of rank among those on a best qualified list disadvantages African-American Agents seeking promotion to both GS-14 and GS-15 positions.  Therefore, the Secret Service's use of MPP scores disadvantages African-American Special Agents at two stages:  first in the construction of the best qualified list and then again in selecting among those on the best qualified list for a particular promotion.

**B.** **Despite Suppression of Best Qualified African-Americans, There is Adverse Impact in Selection for Promotion from Best Qualified Candidates.**

In addition to discrimination in the formation of the best qualified list, there is also significant adverse impact on African-American Agents in regard to being promoted from the best qualified list.  Considering the *entire* subjective selection process among candidates on the best qualified list, there is adverse impact disadvantaging African-

American Agents. In other words, there are fewer African-American Agents who are actually promoted than would be expected in the absence of discrimination given the makeup of the best qualified list.

It is axiomatic that if there was adverse impact in the construction of the best qualified list, the number of African-Americans on the best qualified list available to be selected will be fewer than would be expected in the absence of discrimination. See Feb. 15, 2008 Dep. of P. White (Ex. 4) at 179-82 (Defendant's expert admitting the same). The expected number of African-American promotions in an analysis of the difference between the actual number of African-American promotions and the expected number of African-American promotions will be lower because of the adverse impact at the stage of construction of the best qualified list. Id. at 181-82 (Defendant's expert admitting the same). Therefore, given the adverse impact at the stage of construction of the best qualified list, it is more difficult to find adverse impact at the stage of selection from the best qualified list. Stunningly, the data reflects such "double adverse impact."

Plaintiffs' expert, Dr. Mann, found that for both promotion from GS-13 to GS-14 and from GS-14 to GS-15, there was adverse impact on African-American Agents in selection from the best qualified list. In other words, fewer African-Americans were selected for promotion to GS-14 and GS-15 levels than would be expected in the absence of discrimination. And, again, the number of African-Americans expected to be promoted is lower than it would be if there was not adverse impact against African-Americans in the construction of the best qualified list itself.

Specifically, for promotions to the GS-14 level, Dr. Mann found that for the years 1998 to 2000[13]/, the difference between expected African-American promotions in the absence of discrimination, taking as given the presence of African-Americans on the best qualified list, and actual African-American promotions to GS-14 was statistically significant and adverse to African-Americans with a probability level of 0.0045, which corresponds to less than one chance in 222 or more than 2.8 standard deviations.  See Mann Report (Ex. 2) ¶ 45.  In other words, fewer African-Americans were promoted to GS-14 than would be expected in the absence of discrimination based even on the number of African-Americans who actually made the best qualified list.

For promotions to the GS-15 level, Dr. Mann found that for the years 2002 to 2005[14]/, the difference between expected African-American promotions in the absence of discrimination, taking as given the presence of African-Americans on the best qualified list, and actual African-American promotions to GS-15 was statistically significant and adverse to African-Americans with a probability level of 0.0195, which corresponds to less than one chance in 51 or more than 2.3 standard deviations.  See id. ¶ 47.  In other words, fewer African-Americans were promoted to GS-15 than would be expected in the absence of discrimination based even on the number of African-Americans who actually made the best qualified list.

Therefore, for time periods within the class period, African-American Agents face what can be termed "double adverse impact" in competing for promotion to both the GS-14 and GS-15 levels.  In other words, African-American Agents who survive the adverse

---

[13]/      These years reflect the first year a Class Plaintiff made a best qualified list for GS-14 through the year this litigation was filed.

[14]/      These years reflect the first year a Class Plaintiff made a best qualified list for a GS-15 position through the last year of data provided by Defendant.

impact of the construction of the best qualified list and are deemed eligible for promotion face a second – independently statistically significant – adverse impact in selection from the best qualified list.  Even when African-American Agents, despite discrimination in its construction, make the best qualified list, they face a second round of discrimination in selection from among those on the best qualified list.

> **C.    The Parties' Experts Agree that the Secret Service's Promotions Process has an Adverse Impact on African-American Agents.**

Plaintiffs' expert and Defendant's expert both conclude the Secret Service's promotions practices have an adverse impact on African-American Agents.  After analyzing the data provided by Defendant, Dr. Mann concluded:  "The results above support a finding of adverse impact against African Americans with regard [to] the promotion from GS-13 to GS-14 and GS-14 to GS-15."  Id. ¶ 78.  In his sworn deposition, Defendant's expert agreed that the Secret Service's promotions process has a statistically significant adverse impact on African-Americans.  When asked "Would you agree that there is at least one aspect of the promotions process that has a statistically significant adverse impact on blacks," Defendant's expert admitted:  "I've said that a number of times, yes."  Feb. 15, 2008 Dep. of P. White (Ex. 4) at 149.

## II.    THE AGENCY-WIDE PROCESS FOR COMPETITIVE PROMOTIONS IS HIGHLY SUBJECTIVE AND UNFETTERED.

The Merit Promotion Plan for GS/GM-1811 Promotions, or the "MPP," is the formal, Agency-wide program through which the Secret Service selects and promotes Agents to competitive positions at the GS-14 and GS-15 levels.  The key components include:  (A) the MPP score; (B) the best qualified list; and (C) the Advisory Board recommendations and Director selections.  While there have been some variations in, or amendments to, the MPP policies and practices for some of these components during the

years 1995 to 2005, the rating and decision-making policies and practices have remained substantively the same throughout the proposed class periods.  See Exs. 8–16 (1995-2005 MPP, including amendments).

### A.    The MPP Score

Each eligible GS-13 or GS-14 Special Agent who has elected to participate in the promotions process receives an MPP score annually.  The MPP score totals 100 points, and is used by the Agent to bid on available or "vacant" positions throughout the coming year or "bid cycle."  See, e.g., Ex. 8 (1995 MPP) at 9; Ex.14 (2003 MPP) at 6-8; see also Ex. 17 (2000 30(b)(6) Dep. of B. Saliunas) at 137-38. 15/  While the exact methodology for determining MPP scores has varied during the class periods, the key components have remained substantially the same for all relevant MPP versions:

- A participating GS-13 Agent receives a total MPP score that is comprised of three components:  (1) the First-Level evaluation (50% of the score); (2) the Peer Review Panel evaluation (20% of the score); and (3) the Second Level Panel evaluation (30% of the score).  See, e.g., 2003 MPP (Ex. 14) at 7. 16/

- A participating GS-14 Agent receives a total MPP score that is comprised of two components, each of which represents 50% of the total score:

---

15/    This 30(b)(6) deposition, referred to hereafter as the "2000 30(b)(6) Deposition," took place on June 27-28, July 31, August 1, and August 7, 2000.

16/    This percent breakdown applies to the 1997 through 2005 MPP.  The 1995 MPP score was made up of the same three components, but had a minor difference in point breakdown:  (1) the First Level evaluation (50 points); (2) the Peer Review Panel evaluation (34 points); and (3) Second Level Panel evaluation (16 points).  See 1995 MPP (Ex. 8) at 2, 9.

(1) the First Level evaluation; and (2) the Second Level Panel evaluation.

See, e.g., 2003 MPP (Ex. 14) at 8. 17/

**The First Level Evaluation (GS-14 and GS-15 Promotions).**  The First Level

evaluation process is the same for GS-14 and GS-15 promotions, and has been

substantially the same for all MPP versions at issue here.   See, e.g., 1995 MPP (Ex. 8) at

9-11; 2003 MPP (Ex. 14) at 10-13; see also Feb. 11, 2005 30(b)(6) Dep. (Ex. 18) at 341.

The evaluation is completed by, or includes comments from, the candidate's immediate

supervisor, and is signed by the applicable Special Agent in Charge ("SAIC").   See, e.g.,

1995 MPP at 9-11, 53-62; 2003 MPP at 10-13. 18/  Using a standard form and a scale of

one to five, the evaluator rates the Agent on ten factors, including writing ability,

problem solving and oral communication.  Only ratings at Levels 1 (marginal) and 5

(superior), however, must be documented in writing.  See, e.g., 1995 MPP at 9-10, 53-62;

2003 MPP at 12-13.

**The Qualification Review or "Peer Review" Panel (GS-14 Promotions Only).**

Candidates for GS-14 promotions are next evaluated on their "protection" and

"investigation" experience by a Peer Review Panel (or "Peer Panel"), which consists of

Agents at the GS-14 level or above.  See, e.g., 1995 MPP (Ex. 8) at 11; 2003 MPP (Ex.

14) at 13-14.  Peer Panel members are generally selected by lottery.  Id.  For each Agent

to be evaluated, the Peer Panel members receive a written Special Agent Qualification

---

17/      With the exception of the 1995 MPP, the Peer Review Panel is not a component at
this stage.  See id.; see also Ex. 18 (Feb. 11, 2005 30(b)(6) Dep. of B. Saliunas)
(hereinafter "Feb. 11, 2005 30(b)(6) Dep.") at 331-32.  For the 1995 MPP score, which
included a Peer Review Panel evaluation, the score breaks down as:  (1) First-Level
evaluation (50 points); (2) Peer Review Panel evaluation (30 points); and (3) Second
Level Panel evaluation (20 points).  See 1995 MPP (Ex. 8) at 3, 9.
18/      A SAIC is the head of a field office, protective detail or headquarters office.

Statement (hereinafter "Qualification Statement").  <u>See, e.g.</u>, 1995 MPP at 12; 2003 MPP at 14. [19]/  At least since the 1997 MPP, any instructions given to Peer Panel members regarding how the panel should be conducted are primarily given orally.  Feb. 11, 2005 30(b)(6) Dep. (Ex. 18) at 350.  Moreover, no notes are taken during the Peer Panel evaluation; in fact, panel members are specifically instructed not to take notes.  Ex. 19 (Nov. 28, 2006 Dep. of T. Lawson) at 116-17.

      **Second Level Panel (GS-14 and GS-15 Promotions).**  A Second Level Panel then evaluates each candidate for a GS-14 or GS-15 promotion.  While the same process is followed for both promotions at this stage, different competencies are evaluated.  Since the 1997 MPP, GS-13 Agents are evaluated on the two management competencies of "leadership and influencing" and "decision making."  <u>See, e.g.</u>, Ex. 9 (1997 MPP) at 17; 2003 MPP (Ex. 14) at 6; <u>see also</u> 2000 30(b)(6) Dep. (Ex. 17) at 271-74.  GS-14 Agents are rated on six managerial competencies, including written and oral communication, ability to lead or direct others, and ability to analyze problems and recommend solutions. <u>See, e.g.</u>, 1995 MPP (Ex. 8) at 12; 2003 MPP at 17; <u>see also</u> Feb. 11, 2005 30(b)(6) Dep. (Ex. 18) at 331-33.

      The Second Level Panel is comprised of representatives from each of the seven Assistant Director ("AD") offices[20]/.  <u>See, e.g.</u>, 1995 MPP (Ex. 8) at 24; 2003 MPP (Ex.

---

[19]/     Each Agent submits a Qualification Statement in each year in which he/she participates in the MPP.  The statement should describe the candidate's experience and is used in rating the Agent by the Peer Review and Second Level Panels.  <u>See, e.g.</u>, 1995 MPP at 8, 37-47; 2003 MPP at 9-10; <u>see also</u> 2000 30(b)(6) Dep. (Ex. 17) at 206-09.
[20]/     The Secret Service is divided into seven major offices headquartered in Washington, DC, each of which is run by an AD who reports to the Deputy Director ("DD") and the Director.  <u>See</u> Ex. 20 (United States Secret Service Organization Charts, dated 2000, 1998-1996).

14) at 6; see also 2000 30(b)(6) Dep. (Ex. 17) at 271-74. 21/  Second Level Panel

members are given the candidates' First Level evaluation, written Qualification

Statement, and Peer Panel results.  See, e.g., 1995 MPP at 24; Ex. 11 (2000 MPP) at 16.

Just like the Peer Panel, Second Level Panel members are specifically instructed not to

take notes.  Nov. 28, 2006 Dep. T. Lawson (Ex. 19) at 116-17.  Moreover, the ADs are

then able to review and adjust – without any justification whatsoever – the ratings given

by their respective representatives.  See Ex. 21 (Aug. 29, 2007 Dep. of W. Washington)

at 65-66 (noting also that ADs do not necessarily even have the candidates' materials

identified above).  As such, there is no way of knowing whether the basis for the AD's

change is proper.  See id. at 136-37.

### B.      The Best Qualified List

Participating GS-13 and GS-14 Agents then use their MPP score to "bid" on

vacant positions.  While the Secret Service generally informs Agents of such vacancies

through formal announcements, the MPP allows for a vacant position to be filled without

first posting it. 22/  MPP scores are then used to generate a Merit Promotion Certificate –

or "best qualified list" – for each vacant position.  See 2000 30(b)(6) Dep. (Ex. 17) at 137;

Feb. 11, 2005 30(b)(6) Dep. (Ex. 18) at 35.  The bidders or candidates are ranked

---

21/      The make-up of the Second Level Panel has remained the same throughout the
relevant MPP versions.  See id.; see also Feb. 11, 2005 30(b)(6) Dep. (Ex. 18) 343-44.
22/      Specifically, an unannounced vacant position can be filled by an Agent with a
MPP score that falls within a formula set by policy.  See, e.g., 1997 MPP (Ex. 9) at 21;
see also Ex. 22 (Mar. 1, 2007 30(b)(6) Dep. of B. Saliunas) (hereinafter "Mar. 1, 2007
30(b)(6) Dep.") at 229-30.  However, the only guidance about "in addition to" selections
is that they can be used in "situations where the bidding system cannot meet the
immediate needs of the Service."  Id.; see also id. at 230-35 (confirming there are no
other known Agency policies or practices relating to these selections, and no known limit
on the number of such selections in a year or bid cycle).  In fact, the Secret Service
admits there is no documentation about what the immediate needs of the Agency are,
much less the needs that would give rise to "in addition to" selections.  See id. at 237-39
(noting also that Agency needs "change over time").

exclusively by MPP score, organized in descending order from the highest to lowest MPP

score.  See, e.g., 2003 MPP (Ex. 14) at 23; see also Ex. 23 (Nov. 18, 2003 E-mail to W.

Washington).  The best qualified list is constructed by creating a "cut-off" on the ranked

list of bidders or candidates, see id., which is set by MPP policy.  See 2000 30(b)(6) Dep.

at 137-40; Feb. 11, 2005 30(b)(6) Dep. at 327-38. 23/  Given the different policy

formulation over time, and given that some positions may receive fewer bids than the

number allowed by policy, different best qualified lists can contain a different number of

candidates.

### C.    Advisory Board Recommendations and Director Selections

According to the Secret Service, only those Agents who make the best qualified

list can be promoted.  See Ex. 24 (Positions for Which Plaintiff(s) Not on BQL). 24/

Once generated, the lists for all vacant positions at issue are then provided to the

Advisory Board for use in making recommendations to the Director.

The Advisory Board is made up of the ADs, the DD, the Chief Counsel, and the

Chief of Personnel (only as recording secretary).  2000 30(b)(6) Dep. (Ex. 17) at 144; see

also 1997 MPP (Ex. 9) at 22.  In addition to receiving the best qualified lists for all vacant

positions to be considered by the Advisory Board, the voting members also receive the

assignment history, bid history, entry on duty date, and date of last promotion for each

bidder or candidate listed on these lists.  See Ex. 25 (Def.'s Resp. to Pls.' First Set of

Interrogatories, Resp. to Interrogatory No. 3(a)) at 16.  In addition, members also receive

---

23/    The MPP provides generally:  (1) for the years prior to 1997, a best qualified list
includes the top 15 (plus ties) ranked MPP scores of candidates who bid on the opening;
and (2) for the years 1997 through 2005, a best qualified list includes the greater of the
top 30 (plus ties) ranked MPP scores of candidates who bid on the vacant position, or the
top 25% of the MPP scores of candidates who bid on that position.  Id.; see also 1995
MPP (Ex. 8) at 29; 1997 MPP (Ex. 9) at 21.
24/    This list was produced by Defendant during discovery.

a list of Agents who bid on positions at their existing grade level. See, e.g., 1997 MPP at

22. These lateral candidates are not ranked by MPP score because MPP scores are only

given to candidates for promotion. See, e.g., 1995 MPP (Ex. 8) at 29; 2003 MPP (Ex. 14)

at 23; see also 2000 30(b)(6) Dep. (Ex. 17) at 142.

For each vacant position, the relevant AD makes a selection recommendation to

the Advisory Board from the best qualified list for that position (or a listed lateral

candidate). See 2000 30(b)(6) Dep. (Ex. 17) at 137-44; Def.'s Resp. to Pls.' First Set of

Interrogatories, Resp. to Interrogatory No. 3(a) (Ex. 25) at 16. 25/ The Advisory Board

then discusses these recommendations and reaches consensus on one candidate per

position to recommend to the Director. 2000 30(b)(6) Dep. at 144. 26/ The Secret

Service admits, however, that the MPP is void of any instruction or guidance to the

Advisory Board members on the process for – or criteria to use in – this decision-making

process, and further admits that there are, in fact, clear differences in how different ADs

---

25/    While most ADs receive input in making this decision, how and/or when it is used
differs. See, e.g., Ex. 26 (May 1, 2007 Dep. of K. Foley) at 34-35, 50-51 (conversations
with Deputy Assistant Directors ("DADs") and three recommendations from SAICs); Ex.
27 (July 20, 2005 Dep. of C. Spriggs) at 58-61 (focus centered on top three choices from
immediate supervisors); Ex. 28 (July 6, 2007 Dep. of M. Sullivan) at 281 (did not always
adopt SAIC recommendations). The source of the SAICs' input is likewise arbitrary, as
several SAICs testified that they solicit input from supervisory GS-14 and GS-15 Agents
under their chain of command. See, e.g., Ex. 29 (Dec. 11, 2006 Dep. of J. Dunlap) at 48;
Ex. 30 (Aug. 10, 2007 Dep. of M. Stenger) at 112; Ex. 31 (Aug. 17, 2007 Dep. of J.
Bauer) at 241. The Secret Service admits this practice is not in the MPP, and further
admits that different ADs do, in fact, have different practices in this regard. See 2000
30(b)(6) Dep. at 650-51.
26/    Notably, the MPP allows management to circumvent the entire bidding process by
selecting certain participating Agents for a vacant GS-14 or GS-15 position on which
he/she did not even bid (presumably because the Agent wasn't interested in the position);
i.e., fill vacancies with non-bidders. See, e.g., 1997 MPP (Ex. 9) at 21; see also Mar. 1,
2007 30(b)(6) Dep. (Ex. 22) at 230-31. Whether to invoke this non-bidder exception is
left entirely to the unfettered discretion of the Advisory Board, as there are no policies or
practices to which the ADs must adhere, and there are no limits on the number of
positions that can be filled by this exception in any year or bid cycle. See id. at 234-37.

go about this extremely subjective decision-making process.  See 2000 30(b)(6) Dep. at

145-46, 650-51; see also Ex. 32 (Excerpt, Def.'s Resp. to Pls.' Req. for Admission, May

20, 2005) ¶¶ 31-32 (admitting the same).

Upon consensus, the names of the Agents ultimately recommended by the

Advisory Board are recorded and delivered to the Director.  See 2000 30(b)(6) Dep. (Ex.

17) at 144; Feb. 11, 2005 30(b)(6) Dep. (Ex. 18) at 356-57. 27/  The Advisory Board's

discussions, reasons for recommendations, voting results, etc. are not recorded.  Aug. 29,

2007 Dep. of W. Washington (Ex. 21) at 82-83.

## III.   THE MPP IS ARBITRARY, EXCESSIVELY SUBJECTIVE AND UNRELIABLE, AND THUS CANNOT BE VALID.

Plaintiffs' expert, James Sharf, Ph.D, 28/ has reviewed and analyzed the

substantial documentation and deposition testimony regarding the MPP and the Secret

Service's policies and practices relating thereto, concluding that the Secret Service's

unfettered and overly-subjective promotions process "does not meet the generally

accepted principles and practices of industrial psychology."  Ex. 33 (Second Supp. Decl.

of Dr. James Sharf, dated Sept. 28, 2007) (hereinafter "Sharf 2007 Report") at 2, 4. 29/

He further concluded that the MPP policies and practices are "not 'job related for the

_____

27/      As the ultimate authority for selection of all Agents for positions at the GS-14
level and above, however, the Director is not bound by the Advisory Board's
recommendations.  2000 30(b)(6) Dep. at 201; Feb. 11, 2005 30(b)(6) Dep. at 349-51.
28/      In his notable career, Dr. Sharf's has served as, among other roles, Special
Assistant to the Chairman of the U.S. Equal Employment Opportunity Commission
("EEOC"), where he assisted in drafting the 1991 Act and advised the Chairman on
generally accepted principles and practices of industrial psychology involving employee
selection and appraisal systems.  See Exhibit C to Exhibit 33.
29/      In addition to his 2007 Report, Dr. Sharf issued reports in this case in 2000 and
2005, which are attached as exhibits to the 2007 Report.  Exhibit A to the 2007 Report is
the Declaration of James C. Sharf, PH.D, dated August 9, 2000 (hereinafter "Sharf 2000
Report"), and Exhibit B to the 2007 Report is the Supplemental Declaration of Dr. James
Sharf, dated July 18, 2005 (hereinafter "Sharf 2005 Report").

position in question and consistent with business necessity'" to conform with the EEOC's interpretation of Title VII detailed in its 1978 Uniform Guidelines (applicable to federal employment).  Id.; see also Sharf 2005 Report (Ex. B to Ex. 33) at 3-5.  It is these flaws that allow race discrimination to enter the Agency's promotion program.

As further detailed in his reports and discussed below, Dr. Sharf concluded that the MPP and its implementation are based on excessively subjective and unreliable decision-making, including in regard to the Peer Review Panels, the Second Level Panels, and the Advisory Board and Director stages.  Sharf 2007 Report (Ex. 33) at 3.  As Dr. Sharf noted during his deposition:  "It would seem that an agency, the [Secret] [S]ervice[,] that has a primary responsibility in preparing and documenting investigations has managed to design a process that leaves absolutely no fingerprints at all in significant components of the [promotions] decisionmaking process."  Ex. 34 (Mar. 25, 2008 Dep. of J. Sharf) at 28.  A sampling of Dr. Sharf's criticisms in regard to the MPP are discussed below.

**A.     The MPP Score is Arbitrary and Unreliable.**

Dr. Sharf concluded that the total MPP score, and its components, are arbitrary and unreliable.  As an initial matter, even though the First Level evaluation is based on an evaluation by an Agent with knowledge of the candidate's job performance, there is only accountability at the poles because only scores 1 and 5 must be justified with written comments.  As Dr. Sharf explained, "by simply anchoring the ends of the continuum, it allows the supervisor to basically make decisions favorable or unfavorable that are unaccountable."  Mar. 25, 2008 Dep. of J. Sharf (Ex. 34) at 132-33 (explaining a

supervisor can put a thumb on the scale by giving twos and threes without having to account in writing for the score). 30/

    With respect to the Peer Review and Second Level Panels, Dr. Sharf concluded that both are subjectively flawed and unreliable.  First, raters are chosen based on their knowledge of the position, not their knowledge of the candidate or his/her job performance. See Sharf 2005 Report (Ex. B to Ex. 33) at 8; Sharf 2000 Report (Ex. A to Ex. 33) at 9; see also Mar. 25, 2008 Dep. of J. Sharf (Ex. 34) at 139-43.  As such, the Secret Service's policies and practices in appointing panel members randomly and without first-hand knowledge of a candidate's actual job performance fall short of generally accepted principles of industrial psychology and/or the 1978 Uniform Guidelines, and thus are not job-related.  Sharf 2000 Report at 9-10; see also Sharf 2005 Report at 19 (explaining that the pretense of objectivity with standard forms and rating scales is abandoned by the fact that the evaluations are not based on job performance observations, and thus are not reliable).

    Second, while Peer Review Panel members are to review the candidate's job experience from the Qualification Statement, they are also as a matter of policy instructed to consider other documents if necessary.  Sharf 2005 Report (Ex. A to Ex. 33) at 8 (concluding that "while giving the appearance of objectivity in giving each candidate the opportunity to describe his/her job experience using a standardized, grade-specific

---

30/      The negative impact of the subjectivity of First Level evaluation scores, and the opportunity to manipulate such scores, is demonstrated by the experiences of class members as described in their declarations bound separately as Exhibit 1.  For example, in two separate instances, class members only received First Level evaluations comparable to their white peers after Class Plaintiffs Summerour and Moore, respectively, stepped in to try to end racial discrimination in the assignment of their scores.  See Ex. 35 (Jan. 17, 2007 Dep. of G. Armstrong) at 64-66; Aug. 1, 2008 Supp. Decl. of R. Stewart ¶ 21.

Qualification Statement, the review panels' decision-making becomes less reliable and more subjective with the consideration of 'other documents' of unknown relevance")31/; see also Mar. 25, 2008 Dep. of J. Sharf (Ex. 34) at 146. 32/  Moreover, given that the bases for the panel evaluations are not even recorded, the members are never held accountable for the information and/or criteria used in forming this component of the MPP score.  See Nov. 28, 2006 Dep. of T. Lawson (Ex. 19) at 116-17.  Indeed, even Defendant' expert, Dr. Frank Landy, admitted it is possible for a Second Level Panel member to disregard job-related information provided to him or her throughout the evaluation.  See Ex. 37 Mar. 26, 2008 Dep. of F. Landy at 136-37.  He further admitted that recording or documenting the basis for the rater's score may be a way to eliminate a source of unreliability or inconsistency.  Id. at 111-12.

Third, Dr. Sharf concluded that further evidence of the arbitrary and unreliable nature of the Second Level Panel (and thus the entire MPP score) is the fact that an AD may, in his/her sole discretion, change a candidate's score assigned under the MPP by adjusting ratings given by his/her representative.  2007 Report (Ex. 33) at 3 (citing

---

31/     Dr. Sharf also concluded that the Qualification Statement itself is of "unknown reliability" because it does not appear such statements are verified for accuracy, and panel members have questioned whether a candidate has actually performed certain duties.  Id. at 9 (citing "GS/GS 1811 Merit Promotion Plan (undated), Bates # 001712", attached as Ex. 36); see also Mar. 25, 2008 Dep. of J. Sharf (Ex. 34) at 122 (quoting Sharf 2005 Report).

32/     Even if panel members were limited only to the information in the Qualification Statement, however, Dr. Sharf explained that without candidate job performance knowledge or a candidate interview, the panel members cannot reliably evaluate or rate "intangible factors such as *impact, psychological demands on the candidate, political sensitivity* and organizational factors…."  Sharf 2005 Report at 9 (emphasis in original); see also Mar. 25, 2008 Dep. of J. Sharf at 140 (noting, for example, that it would be difficult to rate a candidate on oral communication simply by reading a written statement).

deposition testimony of former and current ADs confirming this policy).  Indeed, the AD

may do so without any justification for the adjustment.  See supra at 18.

The negative impact of the excessive subjectivity and lack of accountability in

creating MPP scores is illustrated by the experiences of class members.  See, e.g., July 30,

2008 Supp. Decl. of R. Hightower ¶¶ 10, 13-16, 24-25 (describing roadblocks to

promotions to GS-14 and GS-15 levels due to low overall MPP scores resulting from

unexplained and arbitrarily low Peer Panel and Second Level evaluations, where his First

Level evaluations from his direct supervisor were very high)[33]; see also July 28, 2000

Decl. of A. Webb ¶ 25 ("There is no merit involved in the recommendations and a 'good

old boys' network controls the Peer Panel Review process…without my presence on that

Peer Panel, it is doubtful that any black or other minority Special Agent would have

received good scores, since I was their only advocate.  Clearly, the MPP acts as a veneer

of legitimacy for a racial spoils system in the Secret Service").  Class Plaintiffs and class

members can likewise confirm how the lack of accountability for Peer Review and

Second Level Panel raters can, and has been, manipulated to impact Agents' MPP scores.

See, e.g., Ex. 38 Mar. 6, 2007 Dep. of A. Harris at 86-87 (testifying that when he served

on a Peer Panel, he observed a white Agent bring in a list of names and refer to it as he

assigned scores); Ex. 39 (Jan. 23, 2007 Dep. of E. Perry) at 117-22 (testifying that,

although she did not comply, as a Peer Panel rater she was asked in advance to give high

scores to specific Agents, and asked by other raters to raise specific Agent's scores

because they were golf buddies).  Agent Perry further testified that she was surprised to

later be asked onto a Second Level Panel, given that she had been so much "trouble" in

---

[33]/     See also infra at n.52.

the Peer Panel by ensuring the scores were fair.  Id. at 127, 133-134, 140 (explaining her experience as a rater at this level was no better, as she had to engage in "shouting matches" and "put up a big fight" to protect her fair scores).  In short, Agent Perry described a "good old boys" system run amok in which it was the burden of the one African-American rater to literally fight for any modicum of fairness.

Thus, for these reasons and those set forth in Dr. Sharf's expert reports, the MPP score – both in total and each of its components – is arbitrary and unreliable, and thus cannot be found to be valid.  As even Defendant's own expert conceded, unreliable scores undermine confidence in accurate decision-making.  See Mar. 26, 2008 Dep. of F. Landy (Ex. 37) at 154.

**B.      The Best Qualified List Is Constructed From the Arbitrary and Unreliable MPP Score.**

As the best qualified list is constructed solely from, and ranked in order of, the candidates' MPP scores, see supra at 18-19, Dr. Sharf's criticisms regarding the MPP score and its components discussed above apply equally to the Secret Service's policies and practices in regard to the best qualified list.  As such, the best qualified list is likewise arbitrary, excessively subjective and unreliable, and thus, cannot be found to be valid.  To be sure, Class Plaintiffs' strong statistical evidence confirms that the Secret Service's policies and practices regarding the best qualified list have indeed had a disparate impact on African-American Agents.  See supra Section I.

**C.      Advisory Board Recommendations and Director Selections are Arbitrary, Excessively Subjective and Unfettered.**

Dr. Sharf also concluded that the decision-making process at the Advisory Board and Director levels of the MPP, including factors supposedly considered, is "arbitrary,

unstandardized and therefore unreliable." Sharf 2007 Report (Ex. 33) at 3; see also Sharf

2005 Report (Ex. B to Ex. 33) at 10 (concluding that these MPP components are "not

structured and [are] therefore subjective and of unknown reliability as attested by the

Agency's 30(b)(6) designee Barbara Saliunas") (emphasis in original) (citing Feb. 11,

2005 30(b)(6) Dep.). Indeed, the Secret Service admits there is no mandated or

standardized method for how an AD arrives at his/her promotions recommendations. See

2000 30(b)(6) Dep. (Ex. at 17) at 145-46. The Secret Service further admits that each

AD is free to develop his/her own procedures and criteria (whether job-related or not),

and is also free to make recommendations from the best qualified list without any specific

criteria. See id. at 145-46. In fact, the ADs do employ different practices and consider

and/or weigh different criteria differently in deciding who to recommend for promotions.

See id. at 650-51; see also supra at 19-21. 34/ Given this complete lack of accountability,

the decision-making process is effectively unfettered and entirely subjective, leading to

the introduction of racial bias.

From the volumes of deposition testimony from current and former ADs and

SAICs, Dr. Sharf cited overwhelming fact evidence of the excessively subjective and

wholly unreliable decision-making at this stage of the MPP. Dr. Sharf's 2007 Report

gives "rich illustrations" in this regard, which enhance his "conclusions of the

subjectivity of the process, and the unreliability of the process, and [ ] inform the

---

34/     Moreover, the absence of any contemporaneous documentation of the ADs'
supposed reasons for specific recommendations further exacerbates the unreliability of
the resulting decisions. See Mar. 25, 2008 Dep. of J. Sharf (Ex. 34) at 147-50.
Defendant's expert conceded that he has not seen any documentation capturing the
justifications for Advisory Board decisions, yet admits that contemporaneous notes of the
board's discussions may help an AD later recall and/or explain the basis for a decision.
See Mar. 26, 2008 Dep. of F. Landy (Ex. 37) at 173, 194-95.

conclusion that [he] reached that the unreliability of the factors [that] were used in making decisions precludes any conclusion of the validity because the case is made clearly of unreliability."  Mar. 25, 2008 Dep. (Ex. 34) at 78; see also Sharf 2007 Report (Ex. 33) at 3-4; 2005 Report (Ex. B to Ex. 33) at 10-18.  Just a few of the numerous flaws identified by Dr. Sharf with respect to this MPP stage are discussed below, and are supported by compelling deposition testimony relating thereto.

### 1.    Arbitrary and Unreliable Use of MPP Score Differences

What MPP score difference was considered significant among those on the best qualified list varied significantly between ADs, and thus is an arbitrary and unreliable consideration in promotions.  See Sharf 2007 Report (Ex. 33) at 4.  For example, former AD Hedell testified that 2.3 points was "quite a difference," whereas former AD Bauer testified that two points "made no difference whatever."  Compare Ex. 40 (July 13, 2005 Dep. of G. Heddell) at 143-44 with Aug. 17, 2007 Dep. of J. Bauer (Ex. 31) at 99-100 (indicating fifteen points was significant but for a "2-point range, quite frankly, it made no difference whatever").  Current Director Sullivan testified that when he was an AD he would consider differences as small as fractions of a point or two points if the difference impacted an Agent's rank on the best qualified list.  July 6, 2007 Dep. of M. Sullivan (Ex. 28) at 72-73, 275-79.  In contrast, however, another AD over the very same division testified that a fifteen point spread was the level of difference that was significant to him. Ex. 41 (July 13, 2005 Dep. of D. Flynn) at 65. 35/

---

35/    Compare also Ex. 42 (Aug. 6, 2007 Dep. of B. Nagel) at 123-7 (former DD and AD stating he required justification to move down the best qualified list by MPP score rank, even if the difference among ranks was caused by only fractions of a point) with Ex. 43 (June 30, 2005 Dep. of B. Riggs) at 46 (former DD and AD testifying that she considered a significant difference in score as that between a 99 and a 71).

To that end, the ADs also disagreed on what constitutes a "good score."  For example, a current AD swore that a score below 50/50 on an Agent's First Level evaluation "may indicate a need for further experience" before promotion.  Aug. 10, 2007 Dep. of M. Stenger (Ex. 30) at 28.  In contrast, Director Sullivan swore that scores of 47 and above indicated "you're looking to promote that person."  July 6, 2007 Dep. of M. Sullivan (Ex. 28) at 90-91.  Indeed, while a First Level score of 49/50 indicates to one current AD the need for further experience before promotion, the very same score indicates to the current Director that the evaluator is looking to promote the Agent "sooner."  See id.  36/

## 2.   Arbitrary and Unreliable Use of Agent's Bid History

The significance of a candidate's bid history to decisions regarding promotions varied significantly among ADs such that its use in the decision-making process is arbitrary and unreliable.  See Sharf 2007 Report (Ex. 33) at 4.  For example, former AD Bauer testified that he considered bid history because it demonstrated a candidate's dedication and willingness to move for a promotion.  See Aug. 17, 2007 Dep. of J. Bauer (Ex. 31) at 89-90, 186-89.  Similarly, former DD and AD Spriggs testified to the importance of bid history as demonstrating "commitment" and the willingness to relocate. July 20, 2005 Dep. of C. Spriggs (Ex. 27) at 61-62.  In direct contrast, however, former DD and AD Cockell testified that bid history was not relevant to his decision-making for

---

36/     Moreover, when asked whether a certain score signaled that the evaluator thought the Agent should be promoted, AD Stenger indicated that 50/50 was "the number you're looking to see," while former AD Truscott was not aware of any score that signaled that an Agent should be promoted.  Compare Aug. 10, 2007 Dep. of M. Stenger at 28 with Ex. 44 (Dec. 21, 2006 Dep. of C. Truscott) at 35.

promotions and did not necessarily indicate an Agent's willingness to relocate.  Ex. 45

(July 26, 2005 Dep. of L. Cockell) at 174-76.

This arbitrary and unreliable component of the AD decision-making process

negatively impacts African-American Agents.  For example, according to Defendant's

discovery response, several ADs supposedly did not select some Class Plaintiffs for

promotions because the Agents limited (or largely limited) their bids to positions in the

Washington, D.C. area.  See, e.g., Ex. 46 (Def.'s Resp. to Class Pls.' First Set of

Interrogatories, Excerpt of Resp. to Interrogatory No. 4(c)) (indicating some Class

Plaintiffs were not selected in part because of their bid history).  The Secret Service took

this position notwithstanding that other decision-makers – including a former Director –

disagree about the relevance of such information in this decision-making process.  See Ex.

47 (July 19, 2005 Dep. of B. Stafford) at 33-34 (testifying that he reviewed bid history

only "occasionally," and that he was "not sure how relevant it would be [to decision-

making for promotions]"); see also July 13, 2005 Dep. of D. Flynn (Ex. 41) at 62-63

(testifying that bidding exclusively on positions in the Washington, DC area was *not* a

negative – in direct conflict with the purported reason why some Class Plaintiffs were not

selected for some promotions).  37/

### 3.    Unwritten, Arbitrary "Practice" of Preferring Laterals

There is also an unwritten and arbitrary "practice" of preferring lateral candidates

over those bidding for promotion that was unreliably used by ADs and Directors.  Sharf

_____

37/      Indeed, while Defendant's interrogatory response indicates that one AD's
purported reason for non-selection of Class Plaintiffs for several positions was bid history,
that same AD testified during his deposition that bid history was never dispositive.
Compare, e.g., Excerpt, Def.'s Resp. to Interrogatory No. 4(c) (Ex. 46) (indicating some
Class Plaintiffs were not selected because they bid predominantly in Washington, D.C.)
with May 1, 2007 Dep. of K. Foley (Ex. 26) at 42.

2007 Report (Ex. 33) at 3; see also 2005 Report (Ex. B to Ex. 33) at 12.  In fact, the

Secret Service admits this "practice" is not in writing much less in the MPP.  See 2000

30(b)(6) Dep. (Ex. 17) at 131, 154, 951; Feb. 11, 2005 30(b)(6) Dep. (Ex. 18) at 324-25.

This "practice" is also arbitrarily applied.  While many ADs testified they always

preferred laterals, at least one former DD and AD stated that he did not.  Compare, e.g.,

Ex. 48 (Aug. 15, 2007 Dep. of P. Irving) at 133; July 13, 2005 Dep. of G. Heddell (Ex. 40)

at 31-32; July 13, 2005 Dep. of D. Flynn (Ex. 41) at 70-71 (all testifying that they always

preferred lateral candidates) with Aug. 6, 2007 Dep. of B. Nagel (Ex. 42) at 140-42

(stating "it's hard to generalize at any one given time what might be the best course of

action, whether it's promote somebody or reassign a lateral").

        Moreover, even among ADs who expressed a preference for laterals, it was

applied inconsistently and arbitrarily.  For example, former AD Bauer testified that there

were times when he did not even consider promotion candidates for some positions and

instead considered only lateral candidates.  See Aug. 17, 2007 Dep. of J. Bauer (Ex. 31)

at 96-99.  In contrast, former AD Samway indicated that while he did apply a lateral

preference, he did not do so until he was deciding between the top two or three

candidates for the position, having weighed promotion candidates and lateral candidates

equally up to that point.  Ex. 49 (Sept. 4, 2007 Dep. of T. Samway) at 69-70. 38/

---

38/      Indeed, the "practice" of a lateral preference is so unreliable that deposition
testimony on the subject by some ADs contradicts the Secret Service's interrogatory
response in regard to the very same decision-makers.  For example, former AD Rogers
testified about the lateral preference at his deposition, explaining that the fact that he had
a preference for laterals did not mean he did not consider other bidder candidates as well.
Ex. 50 (Mar. 16, 2007 Dep. of G. Rogers) at 113.  Yet in responding to Plaintiffs'
interrogatory regarding AD Roger's decision-making, the Secret Service gave conflicting
information, stating, for example, that "AD Rogers did not consider *any* GS-13 level
Agents for this position because he was able to select an existing GS-14 level agent for

Furthermore, the Secret Service's own data shows that for much of the class period, this unwritten "practice" of preferring laterals had an adverse impact on African-American Agents.  For example, because of racial discrimination in promotion from GS-13 to GS-14 positions, African-American Agents were under-represented at the GS-14 level.  See Ex. 52 (Special Agent EEO Distribution by Grade).  As such, the preference for GS-14 laterals to fill GS-14 positions has an adverse impact on African-American Agents.  See id.

Overall, the MPP is fundamentally flawed in that it is unfettered and excessively subjective, and thus is unreliable as a matter of policy and practice.  As such, it is a ready vehicle for racial discrimination that falls short of either generally accepted principles and practices of psychology or the EEOC's Uniform Guidelines, and cannot be justified by business necessity as required by law.  See Mar. 25, 2008 Dep. of J. Sharf (Ex. 34) at 165-66 (concluding that "[t]he process itself was unreliable, and given its unreliability, it can't be valid.  That's my bottom line").

## IV.    CLASS PLAINTIFFS HAVE BEEN SUBJECTED TO THE SECRET SERVICE'S DISCRIMINATORY PROMOTIONS PROCESS.

Class Plaintiffs are all current or former African-American Agents of the Secret Service who have risked their lives in service of this country, yet have been denied promotions because of the color of their skin.  Class Plaintiffs' experiences illustrate how the MPP, in policy and practice, has adversely affected African-American Agents because they have been denied competitive promotions for which they were qualified in favor of less-qualified white Agents.  As such, the below excerpts of their horror stories,

---

lateral reassignment."  Ex. 51 (Def.'s Resp. to Class Pls.' First Set of Interrogatories, Excerpt, Resp. to Interrogatory 4(c)) (emphasis added).

and the strikingly similar narratives of class members, "bring the cold numbers [of disparate impact] convincingly to life."   Teamsters, 431 U.S. at 339. 39/

### A.   Special Agent Reginald G. Moore

Plaintiff Reginald G. Moore ("Special Agent Moore") is an African-American Special Agent who has been employed by the Secret Service for more than 20 years. July 27, 2000 Decl. of R. Moore ¶¶ 2-3 (stating that he began as a Special Agent in 1984). At the time he filed the EEO complaint that initiated this lawsuit, Special Agent Moore was a GS-13 Agent assigned to the Agency's premier assignment:  the Presidential Protective Division ("PPD").  Id. ¶¶ 7-18.  He had excelled beyond his peers while assigned to the PPD, serving as the Number 1 Whip on the President's protective shift (the highest GS-13 supervisory role on PPD), in the prestigious Operations Section, and in the White House Joint Operations Center ("JOC").  See Ex. 53 (Pls. Moore's Response to Interrogatory No. 1 of Def.'s Fourth Set of Interrogatories ("Pl. Moore's Resp. to Def.'s Interrogatory No. 1"), for position 00085) (noting also that he was chosen to conduct the most advanced protective assignment five different times; many more than his peers).  The trust that the highest-level PPD supervisors placed in Special Agent Moore is shown by the fact that, in 1999, he was given supervisory authority over all security for the White House complex as the Acting GS-14 Assistant to the Special Agent in Charge ("ATSAIC") of the JOC.  July 27, 2000 Decl. of R. Moore ¶¶ 8-9.  Yet despite this experience, he could not get promoted to a GS-14 supervisor due to the Secret Service's discriminatory promotions process.

---

39/     The declarations of Class Plaintiffs and class members cited in this Section can be found in alphabetical order in the separately bound Exhibit 1 (Decls. of Current and Former Special Agents Submitted in Support of Plaintiffs' Mot. for Class Certification).

Special Agent Moore became eligible to bid for a GS-14 promotion in 1994.  Ex. 54 (July 15, 2005 Dep. of R. Moore) at 186.  He did not bid until 1999, however, because of a double-standard for black and white Agents in regard to bidding while on the PPD.  Id. at 186-88; 283-84. 40/  From 1999 through 2002, Special Agent Moore bid on and was not selected for more than 180 GS-14 positions.  Ex. 55 (Special Agent Moore Bid History).  Yet at the time he filed his EEO complaint in 1999, Special Agent Moore was a GS-13 with the highest job performance ranking of any African-American Agent in the Secret Service.  July 17, 2000 Decl. of R. Moore ¶ 11. 41/  Despite his achievements, however, Special Agent Moore was passed over for scores of GS-14 positions in favor of less qualified white Agents.

For example, in 1999, Special Agent Moore bid for promotion to a GS-14 position in the JOC that he was then assigned to serve in an "acting" capacity. Although the Special Agent in Charge ("SAIC") of PPD recommended Special Agent Moore, see July 15, 2005 Dep. of R. Moore (Ex. 54) at 25-26, 115-16; July 26, 2005 Dep. of L. Cockell (Ex. 45) at 166, the promotion instead went to a less qualified white male Agent who had never even been assigned to the PPD, much less the JOC. See July 15, 2005 Dep. of R. Moore at 116; July 27, 2000 Decl. of R. Moore ¶ 17. To

---

40/     Special Agent Moore was discouraged by his supervisors from bidding on GS-14 positions because he was supposedly required to fulfill a four year "commitment" to the PPD.  See id. at 120-23, 186-87, 283.  Yet he witnessed white Agents receive a GS-14 promotion before the completion of this supposed four year "commitment."  See id. at 121-23, 263-64; see also Aug. 3, 2008 Decl. of D. White ¶ 11 (describing the same experience).

41/     In 1999, Special Agent Moore had a MPP score of 97.03 (out of 100), which was the highest ranking of any African-American GS-13 Agent.  Id.  In 2000, he had an MPP score of 98.57, which was the second highest ranking of any African-American GS-13 Agent.  Id. ¶ 15.

add insult to injury, the Secret Service assigned Special Agent Moore to train the white selectee.  July 15, 2005 Dep. of R. Moore at 257.

Instead of being promoted, Special Agent Moore was forced to move his family across the country after he was involuntarily transferred to a lateral position in the Dallas Field Office.  July 27, 2000 Decl. of R. Moore ¶ 18.  After the transfer, Special Agent Moore continued to bid on scores of GS-14 promotions, only to be passed over for less qualified white Agents.  For example, just with respect to PPD positions on which he bid, he was passed over in favor of non-African-American Agents who:  (1) were junior to Special Agent Moore as an Agent, as a detailee on PPD, and as a Whip on PPD; (2) had less advanced protection assignments and less overall protection experience than Special Agent Moore; (3) had worked for Special Agent Moore when he served in supervisory roles on PPD; (4) had never even worked on a major protective detail; (5) were Secret Service legacy Agents; (6) had made racist comments while on PPD; and (7) were known to have sexually harassed other Agents.  See Ex. 53 (Pl. Moore's Resp. to Def.'s Interrogatory No. 1, for positions 99027, 99141, 00085, 01137).  Even when Special Agent Moore bid for promotions in the Dallas Field Office, where he served in a supervisory role in two squads, he was passed over for promotions that went to less qualified non-African-American Agents who were not even serving in that field office.  See id. (Pl. Moore's Resp. to Def.'s Interrogatory No. 1, for positions 00067, 00130).

It was not until 2002 that Special Agent Moore was finally promoted to a GS-14 position in the Chicago Field Office (a position for which he was yet again required to move).  See July 15, 2005 Dep. of R. Moore (Ex. 54) at 43.  Thus, it took

Special Agent Moore eighteen years, as well as the filing of an EEO complaint and a federal lawsuit, to finally rise to the well-deserved level of GS-14 in the Secret Service, while his white counterparts were promoted after far fewer years.  Id. at 253-54. 42/  In 2004, Special Agent Moore was subsequently promoted to a GS-15 position.  Id. at 267.  Had he not suffered years of discrimination in the promotions process for competitive GS-14 position, Special Agent Moore would have reached the GS-15 and subsequent levels years earlier.  Id. at 271-72.

Special Agent Moore is currently the GS-15 Special Agent in Charge of the Agency's Recruiting Program in Washington, D.C.  Ex. 56 (Announcement with Special Agent Moore's selection as the SAIC of recruiting).  In 2007, Plaintiff Moore was accepted into the SES candidate development program.  Ex. 57 (Announcement with Special Agent Moore's selection for the SES program).

**B.      Special Agent Luther K. Ivery**

Plaintiff Luther K. Ivery ("Special Agent Ivery") is an African-American former Secret Service Special Agent.  Aug. 6, 2000 Decl. of L. Ivery ¶ 2.  The Secret Service hired Special Agent Ivery in 1983, and he attained a GS-13 position in 1990.  Id. ¶¶ 4, 13.  At the time this lawsuit was filed, Special Agent Ivery was a Senior Special Agent assigned to the Dignitary Protective Division ("DPD").  Id. ¶ 3.  In addition to the DPD, Special Agent Ivery had served the Secret Service in the Los Angeles Field Office, the Western Protective Division, the Vice Presidential Protective Detail

_____

42/      For example, the current Director has approximately six more months on the job than Special Agent Moore, however, when he finally received a GS-14 promotion in 2002, Director Sullivan had already surpassed the GS-14 and GS-15 levels to the Senior Executive Service ("SES") – level position of DAD.  See July 7, 2007 Dep. of M. Sullivan (Ex. 28) at 146-47.

("VPPD"), the Counter Assault Team ("CAT"), the CAT Training Section, and the Newark Field Office.  Id.  ¶¶ 4, 10, 12, 14-15, 18.  Indeed, he had more supervisory experience in the Secret Service than most Agents promoted to GS-14, and had received many awards for his work, including the Director's Medal of Valor for his service on September 11, 2001.  Ex. 58 (Pl. Ivery's Resp. to Interrogatory No. 1 of Def.'s Fourth Set of Interrogatories ("Pl. Ivery's Resp. to Def.'s Interrogatory No. 1"), for position 99072); Ex. 59 (July 22, 2005 Dep. of L. Ivery) at 45-46, 60, 70-71.  However, because of the Secret Service's discriminatory promotions process, Special Agent Ivery remained a GS-13 for over a decade.  See Aug. 6, 2000 Decl. of L. Ivery ¶ 22.

Special Agent Ivery first became eligible to bid on GS-14 positions in 1993.  July 22, 2005 Dep. of L. Ivery (Ex. 59) at 46.  Secret Service records show that from 1995 until the date he was promoted, Special Agent Ivery applied and was not selected for more than 130 GS-14 positions within nearly every division of the Secret Service.  See Ex. 60 (Special Agent Ivery Bid History).  For several positions for which he applied, his MPP score was not high enough to place him on the best qualified list.  See Ex. 24 (Positions for Which Plaintiff(s) Not on BQL).  Even when Special Agent Ivery made the best qualified list, however, he was passed over for scores of promotions as a result of the Agency's discriminatory promotions process.

By way of example, Special Agent Ivery served in the GS-13 supervisory position of Team Leader on the Counter Assault Team ("CAT") as well as the Senior Course Instructor and Program Manager for CAT Training.  See Ex. 58 (Pl. Ivery's Resp. to Def.'s Interrogatory No. 1, for position 99072).  He subsequently served as Program Manager for the Special Operations Training Section where he revolutionized CAT

training, including drafting and copywriting the training manual, and expanding the time period and curriculum of training for both selection to and participation in CAT.  Id. Indeed, the current SES level SAIC of PPD described Special Agent Ivery as "one heck of a CAT trainer."  Ex. 61 (Jan. 5, 2007 Dep. of D. White) at 125.  When the position of CAT Team Leader was later upgraded to a GS-14 position, Special Agent Ivery bid on the position for which he was obviously well qualified, but it was given to a less qualified white Agent.  See Ex. 58 (Pl. Ivery's Resp. to Def.'s Interrogatory No. 1, for position 99072).  In fact, while serving as the GS-14 CAT Team Leader, the white selectee was arrested for drunk driving on his way to work at the White House.  Id.  The white selectee was not terminated, however, and instead was demoted to GS-13 and subsequently re-promoted to a GS-14 position.  Id.  (noting white selectee was again involved in alcohol-related misconduct following re-promotion).

Moreover, even when Special Agent Ivery was recommended by a SAIC, the highest supervisor in an office or on a protective detail, he was still not promoted. Special Agent Ivery was also the GS-13 Operations Agent in the Dignitary Protective Division ("DPD"), a challenging assignment in which he, for example, coordinated logistics and security for more than 200 protectees at one event while supervising 20 Agents and other personnel.  See Ex. 58 (Pl. Ivery's Resp. to Def.'s Interrogatory No. 1, for position 02020).  The SAIC of DPD swore that the standard progression in this assignment was to be promoted to the GS-14 Operations Agent.  Ex. 62 (Dec. 1, 2006 Dep. of S. Carey) at 82-84.  Despite doing an "excellent job" and being recommended for promotion by his SAIC, however, Special Agent Ivery never received a promotion on DPD.  Id. at 71-72, 81-82.  In fact, he was passed over for promotion on DPD in favor of

a white Agent who had never served on any protective detail and who (unlike Special

Agent Ivery) had not been recommended for the promotion by the SAIC of DPD.  See Ex.

58 (Pl. Ivery's Resp. to Def.'s Interrogatory No. 1, for position 02020).

After having been a GS-13 for more than a decade, and as a result of this

lawsuit, Special Agent Ivery was finally promoted to a GS-14 position at the James J.

Rowley Training Center in 2002.  July 22, 2005 Dep. of L. Ivery (Ex. 59) at 77-78.

While Special Agent Ivery had bid on over 100 GS-14 positions, he never bid on nor

otherwise requested the GS-14 position he eventually received.  Id. at 77-78; see

supra at n.22 (explaining how vacancies can be filled by non-bidders under the MPP).

Special Agent Ivery subsequently retired from the Secret Service in 2004.  July 22,

2005 Dep. of L. Ivery at 85.  Had he not experienced discrimination at the hands of the

Secret Service, he would have reached the GS-15 or SES level before retirement.  Id. at

248-49.  Indeed, had he not experienced discrimination that delayed his promotions,

Special Agent Ivery would have stayed in the Secret Service longer; instead, he chose

to leave rather than to continue to be forced to serve under white Agents he had

trained.  Id. at 44, 252.

### C.     Special Agent John E. Turner

Plaintiff John E. Turner ("Special Agent Turner") is an African-American

former Special Agent.  July 26, 2000 Decl. of John E. Turner ¶ 2.  Special Agent

Turner was hired as an officer in the Uniform Division in 1980, and became a Special

Agent in 1984.  Id. ¶ 3.  When this lawsuit was filed, Special Agent Turner was a GS-13

Agent assigned to the Washington, D.C. Field Office.  Id. ¶ 12.  By that time, Special

Agent Turner had served in two field offices and on VPPD.  Id. ¶¶ 5-6, 12.  While on

VPPD, Special Agent Turner was responsible for security arrangements for all functions at the Vice President's residence and was the lead instructor for all personnel assigned to the division.  Id. ¶ 6.  In 1997, 1998, and 1999, Special Agent Turner received a perfect First Level evaluation (50/50) from those with first-hand knowledge of his performance in the Washington Field Office, and received cash awards for his work in 1996, 1997, 1998, and 1999. Ex. 63 (Pl. Turner's Resp. to Interrogatory No. 1 of Def.'s Fourth Set of Interrogatories ("Pl. Turner's Resp. to Def.'s Interrogatory No. 1"), for position 99177).

Special Agent Turner became eligible to bid for promotion to GS-14 in 1994, and began bidding shortly thereafter.  Ex. 64 (Aug. 5, 2005 Dep. of J. Turner) at 168. Secret Service records show that from 1995 to 2000, Special Agent Turner applied for more than 80 GS-14 positions for which he was not selected.  Ex. 65 (Special Agent Turner Bid History).  For several of these positions, his MPP score was not high enough to place him on the best qualified list.  See Ex. 24 (Positions for Which Plaintiff(s) Not on BQL).  Even once Special Agent Turner received a high MPP score – one of the highest among African-American Agents of the Secret Service – he was nevertheless denied dozens of GS-14 positions on which he bid. 43/

Despite his strong qualifications and scores, Special Agent Turner was passed over for scores of GS-14 positions in favor of less qualified white Agents.  For example, in 1999, Special Agent Turner bid for several GS-14 positions in the Washington Field Office.  See Special Agent Turner Bid History (Ex. 65).  In each instance, the Secret Service selected a less qualified white male.  See, e.g., Ex. 63 (Pl. Turner's

---

43/     In 1999, Special Agent Turner had an MPP score of 95.64.  July 26, 2000 Decl. of J. Turner ¶ 14.  In 2000, he had an MPP score of 98.10. Id.  ¶ 20.

Resp. to Def.'s Interrogatory No. 1, for position 99177).  It made no difference that Special Agent Turner had served in an "acting" capacity in the positions on which he bid, thereby demonstrating he could succeed in the position.  Id.; July 26, 2000 Decl. of J. Turner ¶¶ 15-16. 44/  It was not until October 2000, six years after he first became eligible and after filing an EEO complaint and this lawsuit, that Special Agent Turner was finally promoted to a GS-l4 position in the Washington, D.C. Field Office.  Aug. 5, 2006 Dep. of J. Turner (Ex. 64) at 155.

Special Agent Turner retired from the Secret Service as a GS-l4 in March 2001, at which time he was awarded the Albert Gallaton Award for integrity.  Id. at 41.  Had Special Agent Turner not experienced discrimination at the hands of the Secret Service, he would have reached the GS-15 or SES level before his retirement.  Id. at 209-10.  Indeed, had he not experienced such discrimination, Special Agent Turner would have retired later than he did.  Id. at 171-75.

## D.    Special Agent Cheryl L. Tyler

Plaintiff Cheryl L. Tyler ("Special Agent Tyler") is an African-American female former Special Agent who served in the Secret Service from 1984 to 1999.  July 27, 2000 Decl. of C. Tyler ¶ 2.  She was the first African-American female Special Agent in the Atlanta Field Office, the New York Field Office, the PPD, the Technical Security Division and the Training Division.  Id. ¶¶ 6, 18, 21, 24, 28.  At the time she resigned, and at the time of the filing of this lawsuit, there were no African-American female

---

44/    See also Aug. 1, 2008 Supp. Decl. of M. Keith Green ¶ 13; July 30, 2008 Supp. Decl. of T. Fulton ¶ 22; Oct. 30, 2000 Decl. of C. Bailey ¶¶ 8-9; (describing similar experiences of being passed over for supervisory positions in which they were already serving in an "acting" capacity).

Agents in a GS-14 position.  Id. ¶ 4. 45/

Despite the fact that Special Agent Tyler was showcased by the Secret Service as an African-American female Agent, the Agency would not promote her, or any other African-American female Agent.  Special Agent Tyler was selected by the Director's Office as the Secret Service representative to the Women in Federal Law Enforcement ("WIFLE"); in this role, she represented the Secret Service both internally and externally to all federal law enforcement agencies for over four years. See Ex. 67 (Pl. Tyler's Resp. to Interrogatory No. 1 of Def.'s Fourth Set of Interrogatories ("Pl. Tyler's Resp. to Interrogatory No. 1"), for position 98014). 46/  She also served as the Department of Treasury representative to WIFLE; in this capacity, Special Agent Tyler worked extensively with the department regarding hiring, promotion, retention, and career development of women in federal law enforcement.  Id.   Special Agent Tyler was so successful in these roles that she was elected the national Vice President of WIFLE. Id.

Special Agent Tyler became eligible to bid for a GS-14 promotion in 1993.  Ex. 68 (July 12, 2005 Dep. of C. Tyler) at 222.  However, she did not bid on a GS-14 position immediately because her MPP scores were too low to be considered

---

45/       In fact, even the Secret Service noted that there was a conspicuous absence of African-American females in that job category. Ex. 66 (May 8, 2000 Analysis of Barriers to Recruitment and Retention of Women and Minorities) at 9-10 ("We must note, however, that presently 100 percent of our GS-14 female criminal investigators are white and acknowledge that we must conduct further research to determine whether this process disparately impacts minority female criminal investigators").

46/       The Director's Office also chose her to represent the Secret Service on the television show "Working Women," which was broadcast in five major cities and highlights women in unusual careers.  Id.

competitive.  Id. 47/  When she did bid for GS-14 positions in 1996 through 1999, her

MPP scores were not high enough to make the "best qualified" list.  See Ex. 24

(Positions on Which Plaintiff(s) Not on BQL); Ex. 69 (Special Agent Tyler Bid

History); Ex. 70 (Excerpt of Def.'s Resp. to Interrogatory 5 of Pls.' First Set of

Interrogatories).  Special Agent Tyler's failure to make the "best qualified" list was as

a direct result of discrimination intended to prevent her promotion.  Alonzo Webb,

then an African-American supervisor who had been with the Secret Service since

1979 reacted:

> I was particularly troubled, however, by SA Cheryl Tyler's experience in
> the Secret Service's Office of Training.  While assigned to the Office of
> Training, SA Tyler had worked in every possible assignment and/or
> position within the Office, yet she was continually passed over for
> promotion.  In fact, SA Tyler trained several of the Special Agents who
> were promoted in her place, all of whom were junior to her in both time
> in the Secret Service and time in position at the Office of Training.
> Nevertheless, SA Tyler was repeatedly denied performance evaluation
> scores high enough to place her on the list of candidates for promotion.
> SA Tyler asked for an explanation every time, but her supervisor, SAIC
> Charles Devita of Training, never provided one.

July 28, 2000 Decl. of A. Webb ¶ 36; see also July 12, 2005 Dep. of C. Tyler (Ex. 68)

at 211-13.  Simply put, Special Agent Tyler's scores were in no way consistent with

her performance and could only be explained by discrimination.  See Ex. 67 (Pl.

Tyler's Resp. to Def.'s Interrogatory No. 1, for position 99123) (elaborating on her

performance and accomplishments in the Training Division and in her career).

The Secret Service constructed artificial barriers to keep Special Agent Tyler

from achieving her goal of becoming the first African-American woman to become a

GS-14 Agent.  For example, her supervisor in the Training Division instructed her

---

47/      Class members likewise declined to bid or stopped bidding even though eligible
because they also saw it as futile.  See, e.g., July 24, 2000 Decl. of R. Boswell ¶ 7; Mar.
8, 2007 Decl. of R. Hightower ¶ 10; July 28, 2000 Decl. of M. Landry ¶ 17.

that she had to teach each and every course before transferring or receiving a promotion.  July 27, 2000 Decl. of C. Tyler ¶ 30.  This "requirement" was a lie, and was not imposed on any white Agent in the Training Division.  Id. 48/

Special Agent Tyler thus resigned in 1999 because she could not reach the GS-14 level as a result of discrimination by the Secret Service.  Id. ¶ 36.  49/  At the time she resigned, she had served longer than any other female African-American Agent.  Id. ¶ 4.  While the Secret Service was apparently ready to showcase Special Agent Tyler to the outside world, she was told that the Agency itself was not ready for an African-American female supervisor.  Id. ¶ 34.  When Special Agent Tyler resigned, she was hired by the Office of Inspector General of the United States Postal Service – as the equivalent of a GS-14.  Id. ¶ 36.  After 25 years of federal law enforcement service, Special Agent Tyler recently retired as a senior GS-14 with the Transportation Security Administration, which is part of the Department of Homeland Security.

### E.      Special Agent C. Yvette Summerour

Plaintiff C. Yvette Summerour ("Special Agent Summerour") is an African-American female Special Agent who has been employed by the Secret Service since 1986.  July 27, 2000 Decl. of Y. Summerour ¶¶ 2-3.  She experienced discrimination before she even came on the job:  her hiring was delayed by five years by a Secret Service recruiter who incorrectly informed her she needed law enforcement experience or a law degree to

---

48/      She was also required to "interview" with another division for promotion, even though this is not part of the MPP nor required of any white Agent.  Id.  ¶ 31.

49/      See also Mar. 13, 2001 Decl. of Z. Flemister ¶¶ 4, 29 (first African-American female Special Agent, indicating she resigned because of discrimination in the Secret Service);  July 31, 2008 Supp. Decl. of C. Montgomery ¶¶ 4-5 (explaining she likewise resigned because of discrimination in the Secret Service in 2000, before any black female Special Agent had been promoted).

be hired; as a result of this lie, Special Agent Summerour joined a police force and accrued five years of law enforcement experience.  Id. ¶ 5.  At the time this lawsuit was filed, Special Agent Summerour was a GS-13 Special Agent assigned to the Intelligence Division, and had the most seniority of any African-American female Agent in the Secret Service.  Id. ¶¶ 2-3.  By then, she had served in the Detroit Field Office, as a national recruiter at Secret Service Headquarters, and in the PPD. Id. ¶ 10. In the PPD, Special Agent Summerour served on the details for President Clinton, the First Lady, and Chelsea Clinton, was selected for the GS-13 supervisory role of Whip, and worked in the Operations/Logistics and Training sections of PPD.  Id. ¶¶ 10, 13-14, 16.  While she was entrusted as the supervisor for a three-week foreign trip with Chelsea Clinton, the Secret Service refused to promote her.  See Ex. 71 (Pl. Summerour's Resp. to Interrogatory No. 1 of Def.'s Fourth Set of Interrogatories ("Pl. Summerour's Resp. to Interrogatory No. 1"), for position 00124).

Special Agent Summerour became eligible to bid for a GS-14 promotion in 1996.  Ex. 72 (July 8, 2005 Dep. of Y. Summerour) at 187.  She did not bid on a GS-14 position as soon as she was eligible, because her MPP scores were considered too low to be competitive.  Id. at 188.  From 1998 through 2001, Special Agent Summerour applied for and was denied promotion to almost 70 GS-14 positions.  See Ex. 73 (Special Agent Summerour Bid History).  For example, in the calendar year before this lawsuit was filed (1999), Special Agent Summerour applied for and was denied promotion to twelve GS-14 positions.  July 27, 2000 Decl. of Y. Summerour ¶ 20.  All of the persons selected for those promotions were less qualified white Agents.  Id.  In one instance, Special Agent Summerour was passed over for

promotion in favor of a white (male) Agent who had previously been transferred as a result of sexual harassment of Special Agent Summerour while they were both in the Detroit Field Office.  See Ex. 71 (Pl. Summerour's Resp. to Def.'s Interrogatory No. 1, for position 99172); see also July 8, 2005 Dep. of Y. Summerour (Ex. 72) at 88.  Both Agents had bid for a GS-14 promotion back to the Detroit Field Office; the white male with a history of sexual harassment was selected but Special Agent Summerour was passed over.  Id.

Moreover, for several positions for which Special Agent Summerour applied, her MPP score was not high enough to place her on the best qualified list.  See Ex. 24 (Positions for Which Plaintiff(s) Not on BQL).  Despite her impressive qualifications, Special Agent Summerour was also denied dozens of promotions for which she made the best qualified list.  See Special Agent Summerour Bid History (Ex. 73). 50/  In fact, Special Agent Summerour was not promoted even when she received high scores. July 27, 2000 Decl. of Y. Summerour ¶ 19.

As a result of this lawsuit, Special Agent Summerour was finally promoted to a GS-14 position in the Intelligence Division in 2001.  July 8, 2005 Dep. of Y. Summerour (Ex. 72) at 143.  She and another African-American female promoted at the same time, Agent Perry, were the first GS-14 African-American female Special Agents in the history of the Secret Service.  Id. at 32, 128, 143, 244.  Special Agent Summerour is currently assigned as a GS-14 Assistant to the Special Agent in Charge in the Atlanta Field Office.  Id. at 8.  Special Agent Summerour remains the most senior

---

50/     See also Aug. 1, 2008 Supp. Decl. of M. Keith Green ¶ 13; July 30, 2008 Decl. of R. Burrell ¶¶ 13-15 (describing experience of being passed over for promotion despite having accrued supervisory experience).

black female Special Agent in the Secret Service, and has served longer than any black

female Special Agent in the Agency's history.

### F.    Special Agent Kenneth Rooks

Plaintiff Kenneth Rooks ("Special Agent Rooks") is an African-American

Special Agent who joined the Secret Service in 1995.  Mar. 15, 2001 Decl. of K. Rooks

¶ 2.  At the time that he began bidding for GS-14 positions in 2004, he was serving on

the PPD, where he had served in the GS-13 supervisory role of Shift Leader on the Chief

of Staff's Detail.  See Ex. 74 (Pl. Rooks' Resp. to Interrogatory No. 1 of Def.'s Fourth

Set of Interrogatories ("Pl. Rooks' Resp. to Def.'s Interrogatory No. 1"), for position

04096).  Special Agent Rooks had additional supervisory experience as a Backup to the

GS-14 supervisor in the recruiting section of Secret Service Headquarters.  Id.  Despite

the fact that only one year in grade is required for promotion to the GS-14 level,

Special Agent Rooks has been a GS-13 for approximately eight years.  Mar. 15, 2001

Decl. of K. Rooks ¶ 2; 2003 MPP (Ex. 14) at 6.  In fact, Special Agent Rooks has just

begun his fourth GS-13 assignment; he has been assigned as a GS-13 to recruiting at

Headquarters, PPD, the James J. Rowley Training Center, and now the Richmond

Field Office.

Since 2004, Special Agent Rooks has bid for over 160 GS-14 positions, but

has not been promoted.  See Ex. 75 (Special Agent Rooks Bid History).  For several

of these positions his MPP score was not high enough to place him on the best qualified

list.  See Ex. 24 (Positions on Which Plaintiff(s) Not on BQL).  Special Agent Rooks'

experience with MPP scores demonstrates their excessively subjective and

discriminatory nature.  For example, in the 2003-2004 bid cycle, Special Agent

Rooks received a 48/50 (or 96%) from his first-level supervisor on the PPD, yet received an overall MPP score of 76.42.  Ex. 76 (Special Agent Rooks' 2003/04 and 2004/05 MPP Scores). <u>51</u>/  A similar scenario occurred in the 2004-2005 bid cycle, where Special Agents Rooks received a 49 on his First Level evaluation, yet received a total score of only 77.87.  <u>See id.</u>  While Special Agent Rooks got a high score from his supervisor on PPD (98%), his Peer Panel score for protection was yet again low (48%), which is particularly bizarre given that his protection score from the Peer Panel fell by 14% even though he an additional year of experience on the PPD and an even better evaluation from his direct supervisor.  <u>See id.</u>  As a result, Special Agent Rooks was kept off the best qualified list or ranked low on the best qualified list, and thus was effectively disqualified from promotions.  <u>See</u> Ex. 77 (Def.'s Resp. to Class Pls.' First Set of Interrogatories, Excerpt of Def.'s Resp. to Interrogatory No. 4(c)) (indicating Special Agent Rooks score kept him from being promoted). <u>52</u>/

Special Agent Rooks continues to bid for promotion to the GS-14 level.  For the last two years, he has received a perfect 50/50 on his First Level evaluations.  <u>See</u> Ex. 78 (Special Agent Rooks' 2006/07 and 2007/08 MPP Scores).  Despite his direct supervisors' verification of his outstanding performance, however, the Secret Service refuses to promote Special Agent Rooks.

---

<u>51</u>/    Notably, while Special Agent Rooks got a 96% from his direct supervisor in the premier protective assignment, PPD, his Peer Panel score for protection was only 4.33/7 (or 62%).  <u>See id.</u>

<u>52</u>/    Several class members have described similar experiences of receiving high First Level evaluations from supervisors but inconsistent, low scores on the Peer Review and/or Second Level Panels.  <u>See, e.g.</u>, July 30, 2008 Supp. Decl. of R. Hightower ¶¶ 10, 14-16, 24; July 30, 2008 Decl. of R. Burrell ¶ 11; Aug. 3, 2008 Supp. Decl. of T. Blair ¶¶ 13-15; Aug. 3, 2008  Supp. Decl. of D. White ¶ 22; Aug. 1, 2008 Supp. Decl. of M. Keith Green ¶ 8.

### G.    Special Agent Andrew E. Harris, Jr.

Plaintiff Andrew E. Harris, Jr. ("Special Agent Harris") is an African-American Special Agent who was hired by the Secret Service in 1987.  Aug. 31, 2000 Decl. A. Harris ¶ 2.  Due to discrimination by the Secret Service, Special Agent Harris had to file EEO complaints in order to be (1) hired, (2) promoted to GS-14, and (3) promoted to GS-15.  Id. ¶¶ 4-19, 36; Mar. 6, 2007 Dep. of A. Harris (Ex. 38) at 94.  Special Agent Harris is currently the first African-American Special Agent in Charge of the Richmond Field Office.  Ex. 79 (Announcement with Special Agent Harris' selection as the SAIC of Richmond) at 2.

Special Agent Harris became eligible to bid for a GS-14 promotion before he began bidding in 1999; however, he did not bid on a GS-14 position until 1999 because his MPP score was considered too low to be competitive.  See Mar. 6, 2007 Dep. of A. Harris (Ex. 38) at 112-15.  Once he began bidding, his MPP score was not high enough to place him on the best qualified list for several positions.  See Ex. 24 (Positions for Which Plaintiff(s) Not on BQL).

Between January and October 1999, Special Agent Harris bid on and was denied more than 20 GS-14 positions, despite his qualifications, due to the discriminatory promotions process.  See Ex. 80 (Special Agent Harris Bid History).  The following example illustrates this point.  In January 1999, a list of promotions was announced, and twenty of the promotions were "in addition to" selections that were never announced or open for bidding.  Aug. 31, 2000 Decl. of A. Harris ¶ 31; see supra at n.22 (explaining "in addition to" promotions). One of the "in addition to" positions was a GS-14 position in the Assessment

- 49 -

Unit of the PPD.  Aug. 31, 2000 Decl. of A. Harris ¶¶ 31-32.  While assigned to

PPD, Special Agent Harris had served in the GS-13 leadership position of Whip

in the newly-developed Assessment Unit.  Id. ¶ 30.  He had also co-developed

the assessment program with the GS-14 Agent that was departing from the GS-

14 position in question, who informed Special Agent Harris that he had

recommended him for the promotion.  Id. ¶¶ 30, 32.  Nevertheless, a less

qualified white Agent was instead selected.  Id. ¶ 32.

In October 1999, Special Agent Harris contacted the EEO Manager for

the Secret Service and complained that he had been discriminated against in his

non-selection for GS-14 promotions.  Id. ¶ 36.  In December 1999, he was finally

promoted to a GS-14 position in the Special Investigations & Security Division.

Id. ¶ 38.  Special Agent Harris would not have been promoted to GS-14 if he had

not made an EEO complaint.  Id.

Special Agent Harris likewise had to file an EEO complaint in order to reach the

GS-15 level.  Mar. 6, 2007 Dep. of A. Harris (Ex. 38) at 94.  Special Agent Harris

began bidding for GS-15 positions in 2002, and between 2002 and 2004, bid for and

was denied more than sixty GS-15 promotions.  See Special Agent Harris Bid History

(Ex. 80). 53/  For some positions, his MPP score was not high enough to place him on

the best qualified list.  See Ex. 24 (Positions for Which Plaintiff(s) Not on BQL).

However, even when his score was high enough to make the best qualified list, he still

---

53/     When Special Agent Harris began bidding for GS-15 positions, he had served
in two GS-14 positions – the GS-14 promotion mentioned above and a position on the
DPD.  See Ex. 81 (Pl. Harris' Resp. to Interrogatory No. 1 of Def.'s Fourth Set of
Interrogatories ("Pl. Harris' Resp. to Def.'s Interrogatory No. 1"), for positions 03172,
04116) (explaining he had also previously served in a field office and on PPD).

was not promoted due to the discriminatory promotions process.  For example, the

SAIC of the DPD testified that he recommended Special Agent Harris for *every* GS-

15 position in DPD on which Special Agent Harris bid.  Ex. 82 (Dec. 12, 2006 Dep.

of D. Coyer) at 66-67.  Yet Special Agent Harris was passed over again and again for

these positions. 54/  Indeed, Special Agent Harris was passed over in favor of white

Agents who, for example, were not the recommendation of the SAIC, had never

served on a protective detail, had no experience managing other Agents, and had not

even bid on the position.  See Ex. 83 (Pl. Harris' Resp. to Def.'s Interrogatory No. 1, for

positions 03172, 04116).

Special Agent Harris' experience is an example of the additional requirements

placed on African-American Agents for promotion.  The Secret Service says that he was

not promoted to GS-15 because he had not served as a supervisor outside the Washington,

D.C. area and would need to bid outside of D.C. to be promoted.  See, e.g. Ex. 83

(Excerpt of Def.'s Resp. to Pls.' Interrogatory No. 4(c)) (indicating Special Agent Harris

was not promoted to due to his move/bid history).  Yet this "requirement" is not written

in the MPP, and is not imposed on white Agents; instead, it only serves as a barrier to the

promotion of African-American Agents. 55/  In support of his EEO complaint, Special

Agent Harris constructed a partial list of thirty-two non-African-American Agents who

were promoted from GS-13 to GS-14, and from GS-14 to GS-15, without ever leaving

---

54/     See also July 30, 2008 Supp. Decl. of R. Hightower ¶¶ 23, 29; July 30, 2008
Decl. of R. Burrell ¶¶ 20-21 (describing experiences of being passed over despite a
recommendation from SAIC of office or detail).

55/     Tellingly, the Secret Service has admitted that literally scores of Agents were
promoted to GS-14 and even GS-15 positions without having ever bid outside the
Washington, D.C. area.  See Ex. 84 (Excerpt, Def.'s Mar. 16, 2007 Resp. to Pls.' First Set
of Req. for Admis., Req. Nos. 476-77, 479-506, 508-10, 512-95, 597-98, 600-76, 678-
725).

the Washington, D.C. area.  See Ex. 85 (List of Non-Moving Agents); July 7, 2007 Dep.

of M. Sullivan (Ex. 28) at 299 (Director confirming accuracy of list). 56/

In January 2005, after Special Agent Harris filed his EEO complaint, he was

finally promoted to a GS-15 position on DPD.  Mar. 7, 2007 Dep. of A. Harris (Ex. 38)

at 91-93.  He would not have been promoted to GS-15 without having made his third

complaint of racial discrimination.  See id. at 93-94, 96.

### H.    Special Agent Leroy Hendrix

Plaintiff Leroy Hendrix ("Special Agent Hendrix") is an African-American

Special Agent who has been employed by the Secret Service since 1989.  Aug. 5, 2000

Decl. of L. Hendrix ¶¶ 2-3.  At the time this lawsuit was filed, Special Agent Hendrix

was a GS-13 Agent assigned to VPPD.  Id.  By that time, Special Agent Hendrix had

been assigned to the Springfield, Illinois and Washington Field Offices, and had worked

as a certified polygraph examiner for the Secret Service.  Id. ¶¶ 7, 12-13.

Because of the Secret Service's discriminatory promotions process, Special Agent

Hendrix was forced to bid for more than 230 different GS-14 positions prior to finally

being promoted, even though he was qualified for each and every position.  See Ex. 87

(Special Agent Hendrix Bid History).  For several of the positions on which he bid, his

MPP score was not high enough to place him on the best qualified list.  See Ex. 24

(Positions for Which Plaintiff(s) Not on BQL). 57/  However, even for the literally

---

56/      In addition to Special Agent Harris, at least two other African-American Agents
have also filed EEO complaints regarding this "requirement".  See Ex. 86 (EEO
complaints of Andrew Harris, Jr., Tony Ball, and Reginald Hightower); see also Aug. 3,
2008 Supp. Decl. of D. White ¶ 28; Aug. 1, 2008 Supp. Decl. of R. Stewart ¶¶ 23-24
(class members describing the same discriminatory "requirement").

57/      See also Aug. 1, 2008 Supp. Decl. of R. Stewart ¶ 14; Aug. 3, 2008 Supp. Decl.
of A. Burns-Ramirez ¶ 9; Aug. 1, 2008 Decl. of J. Wise ¶¶ 10, 12.

hundreds of positions for which Special Agent Hendrix had an MPP score high enough to make the best qualified list (and even when his score was higher than the selectee's score), he was denied the promotion.  In fact, Special Agent Hendrix was even passed over when his score was ten points higher than the selectee's score.  See Ex. 88 (Pl. Hendrix's Resp. to Interrogatory No. 1 of Def.'s Fourth Set of Interrogatories) ("Pl. Hendrix's Resp. to Def.'s Interrogatory No. 1"), for position 03069). 58/  After bidding for hundreds of positions, Special Agent Hendrix was finally promoted to a GS-14 position in the Special Services Division/White House Mail Facility in December 2003.  Ex. 90 (Announcement with promotion of Special Agent Hendrix to SSD).

However, Special Agent Hendrix was again discriminated against on the basis of race in applying for GS-15 positions for which he was qualified.  Despite his qualifications, from 2005 to 2007, Special Agent Hendrix bid on and was not selected for over forty GS-15 positions.  See Special Agent Hendrix Bid History (Ex. 87).  For example, in June 2005, the Secret Service opened bids on a newly established GS-15 position in the Special Services Division/White House Mail.  See Ex. 91 (Mem. from R. Hendrix to C. Brannon, EEO Director).  Previously, the highest-level position in that division was the GS-14 position that had been held by Special Agent Hendrix for almost two years.  Id.  (explaining that he was selected for that GS-14 position because of his experience with chemical/biological agent detection and mitigation, and his past experience as a military mail handler).  Indeed, Special Agent Hendrix thrived in that

---

58/      Moreover, even when Special Agent Hendrix was recommended for promotion by his SAIC, who had the best knowledge of his readiness to perform at the GS-14 level, he was still passed over.  See Ex. 89 (Mar. 16, 2007 30(b)(6) Dep. of B. Saliunas) at 95-96.

position, substantially growing the White House Mail Program.  Id.  While his specialized experience and knowledge made him the most qualified choice for this new position, he was not selected.  Id.  Instead, he was forced to vacate his office to make room for the white selectee, and, to make matters worse, train that Agent.  Id.

In 2007, Special Agent Hendrix was finally promoted to a GS-15 Assistant Special Agent in Charge position in the Los Angeles Field Office.  See Ex. 79 (Announcement with Special Agent Hendrix's promotion to GS-15) at 3.  However, he was required to accept a cross-country move to be promoted to GS-15.  While this is required of African-American Agents, it is not required of white Agents.  59/  Had he not faced discrimination, Special Agent Hendrix would have reached the levels of GS-14, GS-15 and higher earlier in his career.

## V.   THE SECRET SERVICE HAS A LONG-STANDING HISTORY OF RACE DISCRIMINATION THAT CAN ONLY BE REMEDIED THROUGH THE RELIEF SOUGHT BY THIS CLASS ACTION.

Class Plaintiffs and members of the proposed class are by no means the first African-American Agents to experience race discrimination at the hands of the Secret Service.  To be sure, there is overwhelming evidence that racism is ingrained in the culture of the Secret Service.  As long as African-American Agents have been employed by the Secret Service, they have suffered race discrimination.  The following are just some of the multitudes of egregious examples of the virulent race discrimination suffered by some of the first African-American Agents 60/:

---

59/     See also Ex. 92 (Jan. 24, 2007 Dep. of T. Ball) at 185-88 (class member describing the same experience).

60/     The declarations of Class Plaintiffs, class members and other former and current African-American Agent cited in this Section can be found in alphabetical order in the

- When Special Agent Kenneth Banner was transferred to the Philadelphia Field Office, he found two Nigerian postage stamps on his desk with a message to "Go back to Africa."  He received a message on his Secret Service phone that said:  "You little Nigger.  You better leave Philly or you'll never leave alive." 61/

- In 1972, Special Agent Horace Coleman was not hired into the San Francisco Field Office, with the following explanation by a high-level supervisor:  "Niggers don't know their asses from holes in the ground.  I already have three [Black Agents in this office], but I almost got a fourth [referring to Agent Coleman]." 62/

- Special Agent Robert Faison was told in 1969 that the Charlotte Field Office "wasn't ready for a black agent;" thirty years later, Class Plaintiff Tyler was told that the Secret Service was "not ready" for a Black female Agent at the GS-14 level. 63/

- Special Agent Todd Dillard was rejected by the SAIC of the Richmond Field Office because he had freckles and light skin, and therefore would not be able to do undercover work and was of no use to the Secret Service. 64/

Unfortunately, the number of egregious examples of racism appear endless.  See also, e.g., Aug. 10, 2000 Decl. of B. Coates ¶ 5 (Agent Coates was told by his SAIC that he should be used as a "human shield" during the 1968 riots); Apr. 18, 2002 Decl. of H. Hooper ¶ 14 (because of his exemplary performance, Agent Hooper was referred to as "Super Nigger"); Aug. 4, 2000 Decl. of M. Smith ¶ 7 (Agent M. Smith was referred to by the derogatory racial slur "boy" when he was told by his supervisor:  "Check me out of my

---

separately bound Exhibit 1 (Decls. of Current and Former Special Agents Submitted in Support of Plaintiffs' Mot. for Class Certification).

61/   July 28, 2000 Decl. of K. Banner ¶ 9 (emphasis added); see also Sep. 29, 2000 Decl. of W. Montgomery ¶ 34 (recounting a death threat by a white Agent against black SAIC Ralph Grayson).

62/   Aug. 4, 2000 Decl. of H. Coleman ¶ 9 (emphasis added); see also Mar. 28, 2001 Decl. of L. Sims ¶ 5 (stating that fifteen years later, Special Agent Sims was told by his SAIC that blacks should be drivers in the Secret Service, not Special Agents).

63/    Aug. 14, 2000 Decl. of R. Faison ¶ 11 (emphasis added); July 27, 2000 Decl. of C. Tyler ¶ 34.

64/   Aug. 11, 2000 Decl. of P. Strother ¶ 6 (emphasis added); see also July 28, 2000 Decl. of M. Landry ¶ 9 (stating that he was likewise told by his SAIC that Black Agents were hired only to do undercover work).

room boy, cause I don't have time.  And here's a few dollars.  Get yourself a coke."); Sep.

29, 2000 Decl. of W. Montgomery ¶¶ 34, 37 (white Special Agents posted a swastika

with the word "niggers" on it in the Los Angeles Field Office; and communications

between Black Agents were referred to as "nigger talk").  65/

A.     **Promotion of White Agents Involved in the Notoriously Racist "Good Ol' Boys Roundup"**

The Secret Service's reaction to the notoriously racist "Good Ol' Boys Roundup"

(or "Roundup") is reflective of the Agency's tolerance of racism, including in connection

with the highest levels of management.  The racist nature of the Roundup included, for

example:  the posting of a sign reading "Nigger Check Point" and indicating "17

cents/pound"; a skit in which a man in a Ku Klux Klan robe traded an individual in black

face for a dog; and a skit in which a black baby doll was pulled from a watermelon and

beaten.  66/  At least *thirty* Secret Service Agents who were still employed by the Agency

when news of the racist Roundup broke in 1995 had attended the racist event; at least one

was a high-level supervisor at the time of his attendance.  See July 11, 2005 Dep. S.

Michaelson (Ex. 94) at 57-58; July 31, 2000 Decl. of J. Walker-Clark ¶ 24.  Yet the most

severe punishment doled out by the Secret Service for involvement at the notoriously

---

65/     Indeed, generations of Black Agents have had to hear the term "Nigger" – in
reference to themselves, protectees, and criminal suspects – time and time again.  See,
e.g., July 28, 2000 Decl. of A. Evans ¶ 7; Mar. 13, 2001 Decl. of Z. Flemister ¶ 21; July
28, 2000 Decl. of M. Landry ¶ 19; Aug. 11, 2000 Decl. of P. Strother ¶¶ 27, 29; July 28,
2000 Decl. of A. Webb ¶ 12; July 28, 2000 Decl. of P. White ¶ 8.
66/     See Ex. 93 (Photo); Ex. 94 (July 11, 2005 Dep. of S. Michaelson) at 10-12, 29-30
(Director, Good Ol' Boys Roundup Policy Review); Ex. 95 (Excerpt of U.S. Dept. of
Justice, Office of Inspector General Report of Allegations of Racial and Criminal
Misconduct at the Good O' Boy Roundup).

racist Roundup was one single reprimand,67/ which was received by an Agent who had

attended the racist event for fourteen consecutive years, served as President, Vice

President and Board Member for the Roundup, and admitted to observing racist activity.

See Aug. 24, 2006 30(b)(6) Dep. (Ex. 96) at 110; Ex. 97 (Dec. 20, 2005 Decl. of B.

Saliunas and Attachment 1 to same); Ex. 98 (July 23, 2006 Mem. from E. Bowron).

The Secret Service's response (or lack thereof) to the Roundup, and their

tolerance of racist Agents and racism in the Agency, directly infected the promotions

process that is at the core of this Motion and case.  To be sure, ten white Agents who

were known by the Agency to have attended the racist Roundup were promoted to

managerial positions in the Secret Service, including two Agents who received

promotions to the SES level, three other Agents who received promotions to the GS-15

level, and five other Agents who received promotions to the GS-14 level.  See Dec. 20,

2005 Decl. of B. Saliunas (Ex. 97) ¶ 4.  The Secret Service has no records indicating that

attendance at the racist Roundup was considered in the promotions process.  Id. ¶¶ 6-7.

This reaction is in stark contrast to the recommendations of the Department of the

Treasury's Good Ol' Boys Roundup Policy Review, the Director of which testified that

repeated attendance at the Roundup should be considered in promotion because it called

into question the individual's ability to carry out the non-discrimination policy of the

Agency.  See July 11, 2005 Dep. of S. Michaelson (Ex. 94) at 96-99.  Instead, Black

Agents were forced to work with – and for – white Agents who they knew attended and

participated in the racist Roundup.  See generally July 31, 2000 Decl. of J. Walker-Clark

---

67/      A reprimand may be removed from an Agent's file after just one year and is
automatically removed after three years.  See Ex. 96 (Aug. 24, 2006 30(b)(6) Dep. of D.
Pupillo) (hereinafter "Aug. 24, 2006 30(b)(6) Dep.") at 110-11.

¶ 24; July 30, 2008 Supp. Decl. of T. Fulton ¶ 9; Sep. 29, 2000 Decl. of W. Montgomery ¶ 30; August 3, 2008 Supp. Decl. of T. Blair ¶ 30.

**B.      A Long History of Discriminatory Selections for Promotions**

Sadly, but not surprisingly, the long-standing history of racism has adversely affected scores of African-American Agents to come before Class Plaintiffs and other class members.  These African-American Agents invariably describe white Agents they witnessed first-hand advance faster and farther in their careers.  See, e.g., Aug. 11, 2000 Decl. of P. Strother ¶ 21. 68/  These Agents also describe the obstacles they faced in the promotions process, including, for example, being lied to about the availability of and requirements for GS-14 and GS-15 promotions, being passed over for promotions despite recommendations from their SAICs, and opting to give up on bidding for promotion because it was viewed as futile.  See, e.g., Apr. 18, 2002 Decl. of H. Hooper ¶ 9l; Aug. 4, 2000 Decl. of H. Coleman ¶ 16; July 29, 2000 Decl. of D. Coleman ¶ 30; July 24, 2000 Decl. of R. Boswell ¶ 7.

**C.      The Black Agents' Efforts to Stop the Discrimination That Were Repeatedly Ignored by the Secret Service.**

Beginning in the 1960s, and for decades since, senior African-American Agents attempted tirelessly to work with the highest levels of leadership in the Secret Service to stop the Agency's virulent race discrimination, in an effort to avoid the need for litigation in order to ensure that future generations of Agents would not experience the same insidious discrimination.  See, e.g., Aug. 11, 2000 Decl. of P. Strother ¶¶ 9-17; Aug. 15, 2000 Decl. of H. Bell ¶¶ 25-30.   In 1974, the Black Agents began to formally express

---

68/      See also, e.g., July 25, 2000 Decl. of N. Bryant ¶ 3; July 29, 2000 Decl. of D. Coleman ¶¶ 15, 19; Aug. 9, 2000 Decl. of Robert Moore ¶ 17; July 28, 2000 Decl. of P. White ¶¶ 5-7.

their concerns regarding discrimination at the hands of the Secret Service through written correspondence with each Director.  See Ex. 99 (Correspondence between African-American Agents and the Agency) at PL-001211-17.  Indeed, it was as early as 1974 that African-American Agents were attempting to resolve the pattern and practice of race discrimination at the core of this motion and the case:  in short, African-American Agents were not making the best qualified lists for promotions and, even when they did, they were not being promoted.  Id. at PL-001215; see also id. at PL-001225 (expressing the same concerns in 1977).  In the 1970s, the Black Agents complained about the same "Good Old Boys" system that still flourishes today.  Id. at PL-001227.  In 1988, the Black Agents expressed to Secret Service leadership the same view they hold today:  "we feel strongly that [the lack of Black Agent supervisors] is not as a result of blacks being unqualified, but rather, due to discriminatory practices."  Ex.  100 (Remarks by Black Agents in Dallas on Minority Issues) at DEF00212987.

In 1992, when Black Agents of the United States Secret Service presented a statement to Director Magaw, there were twelve African-American GS-14 Special Agents; tellingly, in 1999, when Special Agent Moore filed the EEO complaint that began this lawsuit, the number was identical.  Ex. 99 (Correspondence between African-American Agents and the Agency) at PL-001287; Ex. 101 (U.S. Secret Service Criminal Investigator Workforce Profile as of July 31, 1999).  In the twenty-five years since the first African-American female Special Agent was hired, not a single black woman had been promoted to the GS-14 level.  See Mar. 13, 2001 Decl. of Z. Flemister ¶¶ 2, 4; see also U.S. Secret Service Criminal Investigator Workforce Profile as of July 31, 1999 (Ex. 101).

These numbers confirm that the efforts of the Black Agents to effect change from within the Agency, over the course of three decades, were ignored.  In fact, one signatory to the 1974 letter to then Director Knight who worked for the Secret Service from 1967 through 1996 observed the following about the Agency's inaction:  "At some point however, we realized that it did not matter what we said in our letters, and how we signed them – the Secret Service was not going to make changes….the issues that we put forth in 1972-1974 are the exact same problems that remained virtually unchanged throughout my 29 year career with the Service."  Aug. 15, 2000 Decl. of H. Bell ¶¶ 26-27.  Agent Bell retired in 1996 as an AD; he is now the Inspector General for the Nuclear Regulatory Commission.  Id. ¶¶ 2, 21. 69/

As such, Class Plaintiffs had no choice but to file this necessary Title VII class action to attempt to bring an end to the long-standing pattern and practice of race discrimination in promotions so that current and future African-American Agents will not be subjected to the Agency's discriminatory employment practices, and will instead have the chance to be promoted on the basis of their experience and accomplishments, not denied promotions on the basis of the color of their skin.

## ARGUMENT

## I.     CLASS CERTIFICATION IS PROPER FOR THIS TITLE VII ACTION.

Certification of the proposed class is warranted for this Title VII class action. Class Plaintiffs allege that the Secret Service's challenged employment practices, which apply to all class members, violate Title VII under both the disparate treatment and

---

69/      See also Aug. 11, 2000 Decl. of P. Strother ¶¶ 2, 5, 14 (one of the first four African-American Agents; worked for the Agency from 1964 to 1984); Aug. 4, 2000 Decl. of D. Tucker ¶¶ 2, 18 (Secret Service Agent from 1965 to 1990).

disparate impact theories.  Class certification, however, is not an occasion for examination of the merits of the case.  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974).  Rather, resolution of a class certification motion is strictly a procedural matter in which the Court need only determine whether the prerequisites of Rule 23 have been met.  See id.; see also Wagner v. Taylor, 836 F.2d 578, 587 (D.C. Cir. 1987) (explaining that although "some inspection of the circumstances of the case is essential" to a determination of whether these prerequisites have been met, this should not include even a "preliminary inquiry into the merits of a suit") (quoting Eisen, 417 U.S. at 177) (internal quotation marks omitted). 70/

Moreover, as class certification is a "highly case specific inquiry," there is no rote formula for the type of quantum of evidence that will support certification of a proposed class.  Statistical evidence alone can be sufficient to support class certification.  See, e.g., Jarvaise v. Rand Corp., 212 F.R.D. 1, 3 (D.D.C. 2002) (Roberts, J.).  Statistical evidence in conjunction with anecdotal evidence may also be used to support certification.  See, e.g., McReynolds v. Sodexho Marriott Servs., Inc., 208 F.R.D. 428, 441 (D.D.C. 2002).

Here, Class Plaintiffs seek certification of a well-defined class, see supra at 3-4, and have demonstrated that the general parameters of the class are "sufficiently definite" to ascertain whether an individual is a member of the class.  See Pigford v. Glickman,

---

70/      The restriction on conducting a merits inquiry at this stage applies equally to the Court's review of the evidence.  See Gonzalez v. Brady, 136 F.R.D. 329, 333 (D.D.C. 1991).  The weighing of competing expert evidence is inappropriate at this stage of the litigation.  See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292 (2d Cir. 1999) (stating that "statistical dueling" is irrelevant to the certification decision) (citation and internal quotation marks omitted); see also Taylor v. D.C. Water & Sewer Auth., 241 F.R.D. 33, 44 (D.D.C. 2007) ("The only relevant question at this stage is whether [plaintiff] has put forth evidence that is sufficient to raise an inference of discrimination to create a common question regarding discrimination in [promotions].") (citing Caridad, 191 F.3d at 292).

182 F.R.D. 341, 346 (D.D.C. 1998) (noting the requirement to demonstrate general parameters of a class is not a stringent one).  Class Plaintiffs have also shown that certification of their promotion claims is warranted because all relevant requirements set forth in Rule 23(a) and 23(b) of the Federal Rules of Civil Procedure are clearly satisfied, and certification serves the best interests of the putative class members while promoting judicial economy.

### A.      Class Plaintiffs Meet the Requirements of Rule 23(a).

Class Plaintiffs have shown that all four of Rule 23(a)'s requirements are met.

Specifically, Rule 23(a) provides:

> One or more members of a class may sue…as representative parties on behalf of all members only if:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a) (2008).  For the reasons set forth below, the class satisfies the requirements of numerosity, commonality, typicality, and adequacy.  The proposed class is so numerous as to make joinder of all members impracticable.  Common questions of law and fact abound, as class members were all subjected to the same Agency-wide promotions process that is at the core of this Title VII litigation.  As such, Class Plaintiffs' claims are typical of those of the proposed class, and they will fairly and adequately protect the interests of that class.

### 1.      The Class is So Numerous that Joinder of all Members Would Be Impracticable.

Rule 23(a) permits certification of a class when "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); <u>see also</u> <u>Gen. Tel. Co.</u>

v. EEOC, 446 U.S. 318, 330 (1980) (explaining court must examine each proposed class

on its own facts); Pigford, 182 F.R.D. at 347 (explaining that an exact number of putative

class members is not required to satisfy numerosity requirement).  While "[t]here is no

specific threshold that must be surpassed in order to satisfy the numerosity requirement,"

a proposed class of 40 members is generally sufficient.  Taylor, 241 F.R.D. at 37 (noting

that the D.C. Circuit has upheld the certification of classes consisting of forty members).

Moreover, class certification is appropriate when putative class members are disbursed

throughout the country, further making joinder impracticable.  See Stewart v. Rubin, 948

F. Supp. 1077, 1088 (D.D.C. 1996) (finding that joinder is not feasible where African-

American ATF Special Agents were spread out across multiple states).

        Here, according to numbers derived from the Secret Service's own bid database

produced to Plaintiffs during discovery, there can be no less than 120 members of the

proposed class.  See supra at 3-4.  Moreover, three former and current Agents are spread

out across the country and abroad, thus making joinder impracticable.  See Stewart, 948 F.

Supp. at 1088 (concluding joinder of class members impracticable where they were

spread out across multiple states); see also Adair v. England, 209 F.R.D. 5, 8 (D.D.C.

2002) (concluding joinder is "especially difficult and the class action device is more

appropriate" where class members work in locations around the world).  Indeed, class

members who are current Agents can be stationed at any given time in the Secret

Services' Headquarters in Washington, D.C., or one of the more than 150 field offices

and resident offices throughout the United States and abroad. 71/  Thus the proposed

class easily satisfies the numerosity requirement.

**2.      Questions of Law or Fact Common to the Class Exist.**

Rule 23(a)(2) requires the existence of "questions of law or fact common to the

class."  The inquiry here is not whether all such questions are common to every class

member, or even whether such questions of law or fact predominate.  Rather, the

"'commonality test is met when there is at least one issue, the resolution of which will

affect all or a significant number of the putative class members.'"  Taylor, 241 F.R.D. at

37 (citation omitted); see also Adair, 209 F.R.D. at 9 (stating that commonality is

satisfied if representatives "'share at least one question of fact or law with the grievances

of the prospective class'") (citation omitted) (collecting cases).  "Because the

commonality requirement may be satisfied by a single common issue, courts have noted

that it is 'often easily met.'"  Taylor, 241 F.R.D. at 37 (citation omitted).

As an initial matter, class actions seeking class-wide injunctive and declaratory

relief such as Class Plaintiffs do here, "'by their very nature' present common questions

of law and fact."  Id. (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, Federal Practice and Procedure § 1763 (3d ed. 2005)).  Moreover, in the context of

employment discrimination cases such as this one that alleges treatment based on

membership in a protected class, a plaintiff satisfies the commonality requirement by

"'bridg[ing] the gap' between [their] own alleged discrimination and a 'common policy'

---

71/      There are seven major offices in the Secret Service Headquarters in Washington,
DC, as well as approximately 150 field offices and resident offices throughout the United
States and internationally.  Each of these offices, as well as protective details, are staffed
by Special Agents such as Class Plaintiffs and class members.  See supra at n.20; see also
Ex. 102 (Mar. 18, 2008 Ltr. to J. Klar, attaching "Office Chronology").

that affected the members of the putative class." Id. at 37-38 (quoting Gen. Tel. Co. v. Falcon, 457 U.S. 147, 158 (1982)) (alternation omitted).  As such, plaintiffs seeking to certify a disparate treatment class under Title VII must show "'some additional factor that permits the court to infer that members of the class suffered from a common policy of discrimination.'"  Id. at 38 (quoting Love v. Johanns, 439 F.3d 723, 728 (D.C. Cir. 2006)); see also Hartman v. Duffey, 19 F.3d 1459, 1470 (D.C. Cir. 1994).  With regard to discriminatory impact claims, plaintiffs must "make a showing 'sufficient to permit the court to infer that members of the class experienced discrimination as a result of the disparate effect of a facially neutral policy.'"  Taylor, 241 F.R.D. at 38 (quoting Garcia v. Johanns, 444 F.3d 625, 632 (D.C. Cir. 2006)).

It is now well-established that a common discriminatory policy may be established by "'[s]ignificant proof that an employer['s]…promotion practices [were accomplished by] entirely subjective decisionmaking processes.'"  McReynolds, 208 F.R.D. at 439 (quoting Falcon, 457 U.S. at 159 n.15); see also Wagner, 836 F.2d at 589 (same); Taylor, 241 F.R.D. at 38 ("It is well established that 'the deliberate and routine use of excessive subjectivity is an employment practice that is susceptible to being infected by discriminatory animus.'") (quoting Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 149 (N.D. Cal. 2004)). 72/

_____

72/     This proof of a policy of excessive subjectivity supports the theories underlying both disparate treatment and impact claims because "both theories 'are attacks on the systemic results of employment practices' and 'proof of each claim will involve a showing of disparity between the minority and majority groups in an employer's workforce.'"  Taylor, 241 F.R.D. at 38 (quoting Segar v. Smith, 738 F.2d 1249, 1267 (D.C. Cir. 1984)); see also McReynolds, 208 F.R.D. at 440 (internal quotation marks omitted).  Thus, the fact that a plaintiffs' evidence at trial will establish Title VII liability under two different theories does not impact a finding of commonality.  See Segar, 738

For example, in <u>Stewart</u>, Judge Lamberth considered the following in finding that the African-American ATF Special Agents in a strikingly similar Title VII case satisfied the commonality requirement:

> All of the allegations in this case arise from the Defendant's alleged discriminatory employment policies and practices which allegedly rely upon excessive subjectivity in the employment-related decision-making process. These alleged discriminatory systems apply nationwide to all class members. Because the allegations arise from the same general alleged discriminatory policy, and manifest themselves in ways that have allegedly class-wide discriminatory effects, the entire class of African-American Special Agents is bound together by a common legal and factual thread.

948 F. Supp. at 1088. And in <u>McReynolds</u>, Judge Huvelle concluded that current and former African-American employees satisfied the commonality requirement in a Title VII case, like this one, that involved a promotions process that was the same throughout the country, that allowed for unfettered and subjective decision-making, and that, as a result, meant the class members had been affected in the same way: being denied promotions for which they were better qualified than the white employees who received them. 208 F.R.D. at 441.

Here, just as in <u>Stewart</u>, Class Plaintiffs' claims arise from the Secret Service's common policy of discrimination, and "manifest themselves in ways that have . . . class-wide discriminatory effects." 948 F. Supp. at 1088; <u>see also</u> <u>McReynolds</u>, 208 F.R.D. at 441. All class members were subjected to the same Agency-wide promotions process, the MPP, which sets forth the policies and practices that govern all promotions to the GS-14 and GS-15 levels. <u>See</u> <u>supra</u> Section II. As such, the manner in which this system affects the class raises issues common to all class members.

---

F.2d at 1266-67 (observing that there is an "important point of convergence" between disparate treatment and impact claims in class actions).

Moreover, as in <u>McReynolds</u>, the MPP's policies and practices permit unfettered and excessively subjective decision-making, which undoubtedly establishes the common discriminatory policy needed to satisfy commonality.  <u>See</u> 208 F.R.D. at 439 (quoting <u>Falcon</u>, 457 U.S. at 159 n.15); <u>see also</u> <u>Taylor</u>, 241 F.R.D. at 38 (same); <u>Stewart</u>, 948 F. Supp. at 1088 (same).  As discussed in detail above and in the reports of Class Plaintiffs' expert, Dr. Sharf, attached hereto as Exhibit 33, this excessive subjectivity allowed by the MPP infects all levels of the evaluation system and the ultimate-decision making process.  <u>See</u> <u>supra</u> Section III.  MPP scores, which form the sole basis for constructing best qualified lists for the promotions at issue, are arbitrary and unreliable, and fail to reflect actual job performance differences between Special Agents.  <u>See</u> <u>supra</u> at 22-26.  Decision-makers are admittedly given free reign to invoke different considerations (and weigh different considerations differently) in making selection recommendations, as neither the considerations nor the weight given thereto are defined in the MPP or any other Agency policy.  <u>See</u> <u>supra</u> at 26-32. <u>73</u>/  Moreover, the decision-makers are not required to document, much less explain, these considerations or how they impact a particular selection decision.  <u>See</u> <u>supra</u> at n.34.  These undisputed facts show that the MPP provides for excessively subjective and unfettered decision-making in competitive promotions, which, in turn, supports a finding of commonality.

It is this excessively subjective and unfettered decision-making process that, in turn, provides a conduit for racial bias that affects all class members in a similar fashion,

---

<u>73</u>/      Indeed, just like the defendant in <u>McReynolds</u>, here the Secret Service's 30(b)(6) witnesses admit that the Agency's "policy and practice is to allow each [AD] to make promotion decisions based on whatever criteria he or she chooses, with no guidance or rules."  208 F.R.D. at 441 (noting defendant's admission specifically in determining commonality requirement satisfied).

as demonstrated by Class Plaintiffs' statistical evidence of class-wide race disparities in

the promotions process and results attributable to discrimination, and their expert's

analysis thereof.  Use of such statistical evidence to raise an inference of class-wide

discrimination and satisfy commonality is well accepted.  See, e.g., McReynolds, 208

F.R.D. at 441; Caridad, 191 F.3d at 292.   The strong statistical evidence presented here

shows that there is racial discrimination in the MPP's policies and practices that impact

all class members in the same general manner:  African-American Agents are excluded

from the best qualified list at a higher rate than white Agents, and when they make the

best qualified list, are again disadvantaged by their MPP scores and are selected for

promotion at a rate lower than white Agents.  As explained above and in his expert report

attached as Exhibit 2, Class Plaintiffs' expert, Dr. Mann, has concluded that there are

statistically significant disparities between white and African-American Agents in terms

of the process for promotions to the GS-14 and GS-15 levels, and that these disparities

are wide-spread throughout the relevant time period.  See supra Section I.  This statistical

evidence gives rise to a strong inference of discrimination.

    The strong statistical evidence, combined with the evidence regarding the MPP's

policies and practices, is more than sufficiently probative of an inference of

discrimination to create a common question as to the existence of a pattern and practice

of race discrimination at the Secret Service.  See, e.g., Dukes, 222 F.R.D. at 149-50

(explaining that where "subjectivity is part of a consistent corporate policy and supported

by other evidence giving rise to an inference of discrimination, courts have not hesitated

to find that commonality is satisfied") (collecting cases); see also Taylor, 241 F.R.D. at

37-38 (quoting Falcon, 457 U.S. at 158).

Yet there's more.  Sworn declarations from Class Plaintiffs and class members recount the discriminatory attitudes they have experienced, which have long been held and even tolerated by Secret Service management.  They also describe the way in which this racist culture has contributed to the challenged employment practices at issue. 74/ Specifically, the declarants testify to being denied promotions, and being delayed in receiving promotions, in a disproportionate manner compared with similarly situated white Agents, to working in the racist culture that has been tolerated and continues to be condoned by the Secret Service, and to specific instances of insidious racism suffered in the course of their employment.  See supra Section IV.  Thus, these declarations provide the "personal experiences with the [Agency]" that bring "the cold numbers [of disparity] convincingly to life."  Int'l Bhd of Teamsters v. United States, 431 U.S. 324, 339 (1977).

Thus, through the above-described common evidence, which includes statistical and social science expert analysis, anecdotal evidence from Class Plaintiffs, class members and other Agency employees regarding the discriminatory promotions process, and evidence of long-standing culture of racism at the Secret Service, Class Plaintiffs have made a significant showing of factual and legal questions common to the class.

### 3.    Class Plaintiffs' Claims are Typical of the Claims of the Class.

Rule 23(a) also requires that the plaintiffs' claims are typical of the claims of the proposed class.  See Fed. R. Civ. P. 23(a)(3).  Typicality requires that the named plaintiffs be members of the class they represent and "'posses the same interest and suffer the same injury as the class members.'"  Falcon, 457 U.S. at 156 (citations omitted); see

---

74/    Submitted in support of this motion are declarations from each Class Plaintiff as well as declarations from class members and other former and current African-American Agents.  See Exhibit 1 (separately bound).

also Wagner, 836 F.2d at 591 (explaining class members and their representatives must have suffered a similar injury from the same discriminatory employment practice).  A finding of commonality ordinarily will support a finding of typicality, because the two requirements "tend to merge."  Falcon, 457 U.S. at 158 n.13; see also Taylor, 241 F.R.D. at 44-45.  That is because the typicality inquiry uses similar requirements to those for commonality, but applies them to the relationship between class members and their representatives.  See 1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, § 3.22 (4th ed. 2002) (explaining that the "commonality test focus[es] on the relationship of common facts and [legal] issues among class members, while [ ] typicality test examines the relationship of facts and issues between the representative[s] and the class") (footnote omitted).  To that end, where commonality is established by significant proof that the defendant's general discriminatory practice of using excessive subjectivity has caused class-wide injuries, as it has been here, see Sections I, II, III, typicality is satisfied by the same evidentiary showing.  See McReynolds, 208 F.R.D. at 445.  Thus, a finding by this Court of commonality under Rule 23(a)(2), in turn, compels a finding of typicality under Rule 23(a)(3).

To be sure, Class Plaintiffs and class members are all former or current African-American Agents of the Secret Service asserting promotion claims, the details of which are described above.  See supra Section IV (demonstrating that Class Plaintiffs' experiences with the discriminatory promotions process are typical of class members' experiences in regard to the same, and that Class Plaintiffs have been injured by the process in the same manner as class members).  In short, Class Plaintiffs were injured from the same excessively subjective policies and practices of the MPP as class members

did.  See Wagner, 836 F.2d at 591 (noting typicality satisfied where class and its

representatives suffered a similar injury from same discriminatory employment practice).

Class Plaintiffs and class members likewise have been injured in the same way:  they

have been discriminated against in their efforts to achieve promotions to competitive GS-

14 and/or GS-15 positions.  See id.  Thus, the Court should find that Class Plaintiffs'

promotion claims are also typical of those of the class.

### 4. Class Plaintiffs Will Fairly and Adequately Protect the Interests of the Class.

The fourth component of Rule 23(a) requires that "the representative parties will

fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); see also

Amchem Prods., Inc., v. Windsor, 521 U.S. 591, 625-26 (1997).  The D.C. Circuit has set

forth two requirements to guide the Court in assessing this requirement:  "'1) the named

representative must not have antagonistic or conflicting interests with the unnamed

members of the class[;] and 2) the representative must appear able to vigorously

prosecute the interests of the class through qualified counsel.'"  Twelve John Does v.

District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997) (citing Nat'l Ass'n of Reg'l

Med. Programs, Inc. v. Matthews, 551 F.2d 340, 345 (D.C. Cir. 1976)).  "The burden is

on the defendants to demonstrate that the representation will be inadequate."  Johns v.

Rozet, 141 F.R.D. 211, 217 (D.D.C. 1992) (citations omitted).

Both requirements are readily met here.  First, there is no conflict of interest

between Class Plaintiffs and class members.  Just as the court found in Stewart, here

Class Plaintiffs share identical interests in this lawsuit as the class members, and thus

desire the same relief.  See 948 F. Supp. at 1088; see also McReynolds, 208 F.R.D. at 447

(concluding value of injunction in protecting African-American employees from

"epidemic discrimination" thought to be desired by named plaintiffs and class members alike) (internal quotation marks omitted).  Both seek to prove the existence of the Secret Service's pattern and practice of race discrimination in the promotions process, and the adverse impact on African-American Agents from the excessively subjective and unfettered policies and practices of the MPP.  Both also seek appropriate relief for their resulting injuries, including class-wide injunctive and declaratory relief to rid the Secret Service of its unlawful employment practices and to have the Secret Service implement the systemic changes needed to achieve a non-discriminatory and fair promotion system. See Compl. ¶¶ 117(a)-(d).

Second, Class Plaintiffs have undisputedly demonstrated their adequacy by their diligent prosecution of this case on behalf of the entire class during the more than eight years that this litigation has been pending.  See, e.g., Jarvaise, 212 F.R.D. at 3-4 (Roberts, J.) (stating that "the interest and persistence of the named plaintiffs cannot be questioned in light of their prolonged prosecution of this case").

Accordingly, the Court should find that Class Plaintiffs will fairly and adequately protect the interests of the class that they propose to represent.

### B.    Class Plaintiffs Meet the Requisite Standards in Rule 23(b).

Rule 23 of the Federal Rules of Civil Procedure requires that, in addition to satisfying the requirements in 23(a), a proposed class must also satisfy one of the subsections of 23(b).  For the reasons set forth below, Class Plaintiffs' promotion claims, under both the disparate treatment and disparate impact theories, should be certified in their entirety pursuant to Rule 23(b)(2), and notice and a right to opt-out should be afforded to class members at the remedial/damages stage of the litigation.

### 1.     The Secret Service Has Acted and Refused to Act on Grounds Generally Applicable to the Class.

Certification of a class pursuant to Rule 23(b)(2) is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief…is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); see also Eubanks v. Billington, 110 F.3d 87, 92 (D.C. Cir. 1997). The Advisory Committee Notes on Rule 23 explicitly state that "'cases in the civil-rights field' are 'illustrative' of the class actions meant to be certified under Rule 23(b)(2)." Stewart, 948 F. Supp. at 1089 (quoting Fed. R. Civ. P. 23(b)(2) advisory committee's. notes (1966 Amendment)). To be sure, Title VII and other civil rights class actions are frequently certified pursuant to Rule 23(b)(2). Eubanks, 110 F.3d at 92. 75/

Here, certification of a Rule 23(b)(2) class is appropriate because Class Plaintiffs have alleged that the Secret Service acted and refused to act in regard to promotions to the GS-14 and GS-15 levels on grounds generally applicable to the class, and final injunctive relief is, in turn, appropriate respecting the class as a whole. As an initial matter, for the same reasons that Class Plaintiffs' claims are common of the class, see supra at 64-69, Class Plaintiffs have also shown that the Secret Service's discriminatory promotions process (MPP) applies to all class members. See Taylor, 241 F.R.D. at 47 n.17 (explaining whether defendant acted on grounds generally applicable to the class is "often considered to be encompassed by the commonality requirement of Rule 23(a)") (citation omitted). Moreover, upon a finding of liability on Class Plaintiffs' promotion

---

75/     See also Amchem Prods., Inc., 521 U.S. at 614 ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples [of Rule 23(b)(2) classes]."); Pigford, 182 F.R.D. at 350-51 ("[I]n fact, [(b)(2)] was added specifically to ensure that there was a mechanism for certifying classes in civil rights cases.") (citations omitted).

claims under disparate treatment and/or impact theories, both of which are tied to the actions of the Secret Service with respect to the class as a whole, this Court can order class-wide injunctive or declaratory relief.  See Teamsters, 431 U.S. at 361; In re Employment Discrimination Litig., 198 F.3d 1305, 1315 (11th Cir. 1999).  As discussed below, such class-wide injunctive and declaratory relief is both appropriate and necessary in order to have any significant impact on the Agency's promotions process in relation to the entire class.

> **2.     The Significant Injunctive and Declaratory Relief Sought by Class Plaintiffs is Predominant.**

In the context of Title VII class actions such as this, the idea behind 23(b)(2) certification is that a finding of liability is tied to the defendant's actions as a whole, and thus any subsequent injunctive or declaratory relief would have a significant impact on the defendant's policies and practices with respect to the entire class.  See, e.g, McReynolds, 208 F.R.D. at 448.  As the D.C. Circuit explained in Eubanks, while the "defining characteristic" of a Rule 23(b)(2) class is that it seeks class-wide declaratory or injunctive relief, "it is not uncommon in employment discrimination cases for the class also to seek monetary relief in the form of back pay or front pay."  110 F.3d at 92; see also Dukes, 222 F.R.D. at 170 (stating "it is well established that lost pay is recoverable as an equitable, make-whole remedy in employment class actions notwithstanding its monetary nature").  Back pay awarded under Title VII, while monetary in nature, is a form of equitable relief.  See Eubanks, 110 F.3d at 95 (citation omitted).  Class actions seeking back pay have long secured certification under Rule 23(b)(2).  See, e.g., Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 169 (2d Cir. 2001) (collecting cases); see also Eubanks, 110 F.3d at 92; Barrett v. U.S. Civil Serv. Comm'n,

69 F.R.D. 544, 555 (D.D.C. 1975) (citing Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975)). 76/

Moreover, where plaintiffs seek compensatory and/or punitive damages in connection with a disparate treatment (pattern-or-practice) claim, in addition to claims for injunctive or declaratory relief, the case law from the D.C. Circuit Court of Appeals supports certification under Rule 23(b)(2) when the monetary relief is not predominant. See, e.g., Eubanks, 110 F.3d at 92 ("Courts have generally permitted (b)(2) classes to recover monetary relief in addition to declaratory or injunctive relief, at least where the monetary relief does not predominate.") (collecting cases); see also Pigford, 182 F.R.D. at 351 (stating that the fact that plaintiffs seek monetary relief in addition to injunctive and declaratory relief does not preclude class certification pursuant to Rule 23(b)(2)).

In determining whether a claim for monetary relief is the predominate relief sought, or whether it is instead secondary to the primary claim for injunctive or declaratory relief, the D.C. Circuit has signaled a preference for an ad hoc balancing approach that assesses each case on its own facts.  In Eubanks, the D.C. Circuit explained that a district court can exercise its discretion to evaluate whether injunctive or monetary claims predominate, and to consider which type of class certification is most appropriate under the particular circumstances presented.  See 110 F.3d at 96-97 (race discrimination claim seeking injunctive/declaratory relief in addition to $8.5 million in money damages; certification under (b)(2) affirmed); see also Thomas v. Albright, 139 F.3d 227, 235 (D.C.

---

76/     As the Second Circuit Court of Appeals explained in Robinson, given that the 1991 Act "did not alter the general remedial structure" of disparate impact claims, which provide for such equitable relief, 23(b)(2) certification of disparate impact claims remains appropriate for claims seeking both injunctive and equitable, monetary relief even after the Act.  267 F.3d at 169-70.

Cir. 1998) (race discrimination claim seeking injunctive/declaratory relief in addition to $2.4 to $4 million in compensatory damages; certification under (b)(2) affirmed); <u>Stewart</u>, 948 F. Supp. at 1092 (similar race discrimination claim seeking injunctive/declaratory relief as well as compensatory damages; certifying a (b)(2) settlement class where agreement as a whole was predominately equitable in nature). <u>77</u>/

Moreover, other federal appellate courts have held that 23(b)(2) certification is appropriate for Title VII cases seeking primarily injunctive or declaratory relief and only secondarily money damages, and have expressly adopted an ad hoc balancing approach to determine when the injunctive relief sought is predominant.  For example, in <u>Robinson</u>, the Second Circuit Court of Appeals concluded:  "[A] district court should, at a minimum, satisfy itself of the following:  (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits."  267 F.3d at 164. In <u>Molski v. Gleich</u>, the Ninth Circuit Court of Appeals stated that courts should examine the "specific facts and circumstances of each case," and attempt to ascertain the "intent of the plaintiffs in bringing the suit."  318 F.3d 937, 950 (9th Cir. 2003). <u>78</u>/

---

<u>77</u>/       <u>Thomas</u> and <u>Stewart</u> have precedential value in regard to certification under Rule 23(b)(2) because a settlement class must still comply with all of the Rule 23 requirements. <u>See</u> <u>Taylor v. D.C. Water & Sewer Auth.</u>, 205 F.R.D. 43, 49 n.6 (D.D.C. 2002) (citations omitted).

<u>78</u>/       <u>But see</u> <u>Allison v. Citgo Petroleum Corp.</u>, 151 F.3d 402, 415 (5th Cir. 1998) (adopting bright-line rule that "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief").  While the D.C. Circuit has not expressly addressed <u>Allison</u>, there is no question that "this bright line rule is not consistent with D.C. Circuit case law, which emphasizes an ad-hoc approach and does not treat compensatory damages claims as per se incompatible with 23(b)."  <u>Taylor</u>, 205 F.R.D. at 50 (citing <u>Eubanks</u>, 110 F.3d at 96; Fed. R. Civ. P. 23(d)(5)).  At least two other

Here, Class Plaintiffs seek significant injunctive and declaratory relief with respect to the class as a whole, including a permanent injunction barring the Secret Service from continuing to engage in the challenged conduct, and directing the Agency "to take affirmative steps to remedy the effect, and prevent future occurrences, of the illegally discriminatory conduct" at issue.  Compl. ¶¶ 117(b)-(d).  Indeed, the requested class-wide injunctive relief is at the heart of this Title VII class action.  See id.; see also supra Section V (recounting the long history of race discrimination at the Secret Service, the Black Agents' efforts to work with Agency management to effect change internally , and the Agency's unfulfilled promises to address from within the identified discriminatory policies and practices (including in promotions)).  While Class Plaintiffs also seek the monetary relief of back pay (equitable in nature) and compensatory damages, see Complaint ¶¶ 117(e)-(f), the class-wide injunctive and declaratory relief is clearly predominant such that certification under (b)(2) is appropriate.

Similar to this case, in Stewart, the African-American ATF Agents' claims all arose from a system of unlawful personnel actions that had been imposed on all class members, including the process for competitive promotions.  See 948 F. Supp. at 1092. Given the basis of the claims, the court concluded that "there is a significant identity of interest between class members for purposes of analyzing their economic injuries…[and] a meaningful class remedy [for those] injuries must be redressed primarily through broad

---

federal appellate courts have expressly considered and rejected a bright-line bar to 23(b)(2) class treatment of all claims for compensatory or other non-incidental damages. See Robinson, 267 F.3d at 164 (Second Circuit); Molski, 318 F.3d at 950 (Ninth Circuit). Indeed, the Ninth Circuit specifically noted that the proposition that a claim for compensatory damages necessarily predominates for purposes of Rule 23(b)(2) "holds troubling implications for the viability of future civil rights actions, particularly those under the Civil Rights Act of 1991." Molski, 318 F.3d at 950

injunctive relief." Id. (citation omitted).  Thus, the court found the relief sought was "predominately equitable in nature," even though the settlement provided for $4 million in compensatory damages, because in the absence of injunctive relief, "any award of monetary damages would merely be a stopgap measure, insufficient to prevent the reoccurrence of such injuries."  Id.  (certifying settlement class under 23(b)(2)).

It is for these very same reasons that Class Plaintiffs' claims for monetary damages are merely attendant to the primary claims for injunctive and declaratory relief.  Given the long history of racism that is tolerated and condoned by the Secret Service, monetary damages would merely be a stopgap measure.  Moreover, given the Secret Service's history of unfulfilled promises to effect change from within, the only way to prevent the reoccurrence of injuries such as those suffered by Class Plaintiffs and class members is through injunctive/declaratory relief that will require the Secret Service to take affirmative steps to create a promotions process that is fair and objective.  Thus, in order for Class Plaintiffs "[t]o provide a meaningful class remedy, any injuries must be redressed primarily through broad injunctive relief."  Stewart, 948 F. Supp. at 1092 (certifying (b)(2) class of former and current African-American ATF Agents); see also McReynolds, 208 F.R.D. at 448 (certifying liability class under (b)(2) because any injunctive/declaratory relief ordered "would have a significant impact on the company's policies and practices in relation to the entire plaintiff class").

Moreover, the ad hoc balancing factors considered by other federal appellate courts that supported (b)(2) certification of similar Title VII actions weigh in favor of certification here.  For example, in Molski, the Ninth Circuit concluded that the district court properly found the injunctive relief was the predominate remedy sought where it

was the "primary goal in the litigation."  318 F.3d at 950; see also Ellis v. Costco

Wholesale Corp., 240 F.R.D. 627, 642-43 (N.D. Cal. 2007) (concluding plaintiffs'

primary motivation in filing action was injunctive relief, as evidenced by requested

injunctive relief of changing promotion practices at issue).  Class Plaintiffs' primary goal

in this litigation has always been to change the Secret Service's promotions process and

improve promotion opportunities for African-American Agents at the Secret Service.  See

Compl. ¶ 117(a)-(d).  The injunctive and declaratory relief sought by Class Plaintiffs is

reasonably necessary and appropriate, even in the absence of a possible monetary

recovery.  See Robinson, 267 F.3d at 164; see also Dukes, 222 F.R.D. at 171 ("Plaintiffs'

claims for injunctive and declaratory relief, if successful, would achieve very significant

long-term relief in the form of fundamental changes to the manner in which [defendant]

makes its pay and promotions decisions nationwide that would benefit not only current

class members, but all future female employees as well.").

        Furthermore, as a finding of liability on these promotions claims will apply to

Class Plaintiffs and the entire class, and will result in class-wide injunctive relief,

certification promotes judicial economy and reduces the number of issues that will

remain at a subsequent remedial stage. 79/  Thus, the Court should exercise its discretion

to certify a class pursuant to Rule 23(b)(2) for Class Plaintiffs' promotion claims.

---

79/      For example, upon a finding of liability against the Secret Service on Class
Plaintiffs' disparate treatment claim, the class members enter the remedial phase of the
proceeding with a presumption in their favor "that any particular employment decision,
during the period in which the discriminatory policy was in force, was made in pursuit of
that policy."  Teamsters, 431 U.S. at 362 (explaining the effect of this presumption is to
substantially lessen each class member's evidentiary burden at the remedial stage of a
disparate treatment (policy or practice) claim).

### 3.   Notice and Opt-Out Rights at Remedial Stage Can Address any Class Member Due Process Concerns.

While notice and opt-out procedures are not generally provided in Rule 23(b)(2) class actions, because Class Plaintiffs seek individual relief in addition to their primary claims for class-wide injunctive and declaratory relief, the Court in its discretion may order these additional procedural protections at the second, remedial/damages stage of the case. 80/  Once the parties reach the second stage, the Could court provide notice and opt-out procedures for class members to address any concerns regarding the class cohesion that is found in claims for class-wide injunctive or declaratory relief.  See Eubanks, 110 F.3d at 92-95 (noting monetary damages now afforded by the 1991 Act, such as compensatory damages, may vary among class members depending on the circumstances and merits of each claim); see also Robinson, 267 F.3d at 166 ("[A]ny due process risk posed by (b)(2) class certification of a claim for non-incidental damages can be eliminated by the district court simply affording notice and opt out rights to absent class members for those portions of the proceedings where the presumption of class cohesion falters; i.e., the damages phase of the proceedings.").  Indeed, the D.C. Circuit has expressly held that "Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions.  Eubanks, 110 F.3d at 94 (signaling also that district courts have discretion to evaluate which type of class certification is

---

80/      Disparate treatment (pattern-or-practice) claims are generally divided into two phases:  liability and remedial.  See Robinson, 267 F.3d at 168 (citing Teamsters, 431 U.S. at 360-62).  Where individual relief is sought in addition to class-wide injunctive relief, a finding of liability must then proceed to a second, remedial (or damages) stage to make individual determinations of relief for the victims of the discriminatory policy or practice.  See Teamsters, 431 U.S. at 361-62.  A similar remedial stage is likewise generally required to determine individual equitable relief upon a finding of liability on a disparate impact claim.  See Robinson, 267 F.3d at 161-62.

most appropriate under the specific circumstances presented); <u>see also</u> Fed. R. Civ. P. 23(d).

For these reasons, Rule 23(b)(2) certification is appropriate for Class Plaintiffs' claims for class-wide injunctive/declaratory relief and attendant claims for monetary relief, and serves the interests of class members while promoting judicial economy.  <u>See i.d</u>; <u>see also, e.g.</u>, <u>Ellis</u>, 240 F.R.D. at 643 ("The need for individualized determinations of compensatory damages need not defeat certification under Rule 23(b)(2); rather, the court can accommodate this need by bifurcating the trial into different phases.");

<u>Robinson v. Sears, Roebuck & Co.</u>, 111 F. Supp. 2d 1101, 1127-28 (E.D. Ark. 2000) (certifying both disparate treatment and impact claims pursuant to Rule 23(b)(2) with notice and opt-out right).  Thus, this Court should exercise its discretion to bifurcate the action into liability and remedial/damages stages, and address any concerns that may arise as to the due process rights of absent class members at the latter stage by directing that notice and the right to opt-out be given to class members at that stage.

For these reasons, this Court should certify a Rule 23(b)(2) class for Class Plaintiffs' promotions claims, bifurcate the proceeding into liability and damages stages, and direct that after a finding of liability at the first stage, class members be provided notice and an opportunity to opt-out at the second stage. <u>81</u>/

---

<u>81</u>/      If this Court is concerned with notice and opt-out procedures for class members in the second, remedial stage, the Court can, in the alternative, certify Class Plaintiffs' claims pursuant to the "hybrid" approach to certification that has been recognized by the D.C. Circuit.  <u>See</u> <u>Eubanks</u>, 110 F.3d at 96 (explaining that in such circumstances, a district court my exercise its discretion to certify a Rule 23(b)(2) class as to the claims for injunctive/declaratory relief, and a Rule 23(b)(3) class as to the claims for monetary relief) (citations omitted); <u>see also</u> <u>Thomas</u>, 139 F.3d at 234 (citing <u>Eubanks</u>, 110 F.3d at 96) (same).

**II.      APPOINTMENT OF CLASS COUNSEL IS APPROPRIATE**.

The undersigned counsel also respectfully moves this Court to appoint them as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.  This rule, which governs the selection of class counsel for a certified class, articulates the following four criteria that the district court must consider in evaluating the adequacy of proposed counsel:  (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, or other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  A court is also free to consider any other matters pertinent to counsel's ability to fairly and adequately represent the interests of the class Id. at 23(g)(1)(B).

Class Plaintiffs are represented by lawyers from two established D.C. law firms, Relman & Dane, PLLC and Hogan & Hartson, LLP, who satisfy all of the requirements set forth in Rule 23(g)(1)(A) and described above, and thus respectfully seek appointment as co-lead counsel.  In short, counsel has substantial experience in class actions and other complex litigation, including complex civil rights cases.  Moreover, they have the expertise, resources and commitment to prosecute this action vigorously on behalf of the entire class.

## **CONCLUSION**

For the foregoing reasons, Class Plaintiffs respectfully request that the Court grant their Motion.

Respectfully submitted,

_____/s/_____
E. Desmond Hogan (D.C. Bar # 458044)
Melissa N. Henke (D.C. Bar # 483741)
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600


_____/s/_____
John P. Relman (D.C. Bar # 405500)
Jennifer I. Klar (D.C. Bar # 479629)
Relman & Dane PLLC
1225 Nineteenth Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888

*Attorneys for Plaintiffs*

Dated: August 4, 2008