UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REGINALD G. MOORE, et al.,

    Plaintiffs,

      v.

MICHAEL CHERTOFF, Secretary, U.S.
Department of Homeland Security,

    Defendant.

Civil Action No. 00-0953
RWR/DAR

<u>**MEMORANDUM OPINION**</u>

      Plaintiffs, ten African-American current and former special agents of the United States

Secret Service, brought this employment discrimination action individually and on behalf of a

putative class of African-American special agents.  Plaintiffs allege, among other things, that the

Secret Service has engaged in a pattern and practice of discrimination against African-American

Special Agents in its promotion process for competitive positions at grades GS-14 and GS-15,

and at the SES level.  Plaintiffs allege discrimination in every step of the promotion process,

from the discriminatory assignment of Merit Promotion Plan ("MPP") scores to the

discriminatory selection of Special Agents for specific promotions.  Second Amended and

Supplemental Class Complaint ("Second Amended Complaint") (Document No. 362) ¶1.

      The recalcitrance of Defendant in the conduct of discovery almost immediately became,

and to this date remains, the most prominent feature of the record in this action.  *See, e.g.,* Joint

Exhibit Regarding Orders Compelling Production from Defendant or for Sanctions ("Joint Ex.

3") (Document No. 565-3) at 2-5.  Indeed, Defendant acknowledges that since discovery

commenced in this action on December 3, 2004, the undersigned has entered (1) nine orders

compelling Defendant to provide discovery; (2) an order denying a motion for protective order

filed by Defendant; and (3) three orders imposing sanctions upon Defendant pursuant to Rule 37

of the Federal Rules of Civil Procedure.  *Id.*; *see also id.* at 5-7 (summarizing Plaintiffs'

contention that the number of rulings adverse to Defendant is higher than Defendant

acknowledges).  Plaintiffs' pending Motion for Sanctions ("Plaintiffs' Motion") (Document No.

488, Part 2), which is the subject of the instant Memorandum Opinion, arises from the grant of

Plaintiffs' ninth motion to compel.  *See* December 21, 2007 Docket Entry (granting said motion);

September 12, 2008 Memorandum Opinion and Order (Document No. 587) (denying

Defendant's motion for reconsideration of the order granting the motion to compel).

Upon consideration of the motion for sanctions; the memoranda in support thereof and in

opposition thereto; the evidence adduced at the evidentiary hearing on the motion; the closing

arguments of counsel; the parties' proposed findings of facts and conclusions of law and the

entire record herein, Plaintiffs' Motion for Sanctions will be **GRANTED**.

## BACKGROUND

On October 29, 2007, Plaintiffs filed a motion to compel the Defendant to comply with

his Federal Rules of Civil Procedure obligation to conduct a reasonable search for paper

documents responsive to Plaintiffs' requests for production of documents regarding their claims

of discriminatory non-promotion.  Plaintiffs' Motion to Compel Defendant to Comply With His

Discovery Obligation to Conduct a Reasonable Search for Responsive Paper Documents and For

Moore, et al., v. Chertoff                                                                                3

Sanctions (Document No. 488, Part 1) at 1.[1]  In it, Plaintiffs submitted that on August 22, 2007,

Defendant's 30(b)(6) designee testified that the Secret Service "had not searched the records of

any decision-maker for documents related to discovery requests regarding Plaintiffs' claims of

discriminatory non-promotion."  *Id.* at 7-9 ( "For example, notwithstanding their integral

involvement in the recommendations and selections for promotions, no search was conducted for

the records of any current or former Director, Deputy Director, Assistant Director, Deputy

Assistant Director or Special Agent in Charge.");  *see also id.,* Ex. 22 (Transcript of 30(b)(6)

Deposition of Tracy Lawson) at 85-87, 95 (testimony affirming that Defendant did not search the

records of Special Agents-in-Charge (SAICs) outside of the District of Columbia for documents

relating to Plaintiffs' discriminatory promotion claims, or the records of SAICs, Deputy Assistant

Directors (DADs), Assistant Directors (ADs), the Deputy Director, or the Director who are based

in Washington, D.C. ).  Plaintiffs sought an order directing the Defendant to conduct a reasonable

search for and to produce all documents responsive to their requests for production, including

"print and save" e-mails, "contemporaneous notes," and other documents "regarding the actual

substantive promotion[] decisions made by the Secret Service supervisors and managers that

adversely affected the Plaintiffs and the [putative] class."  *Id.* at 1-2, 15-18.  Additionally,

Plaintiffs "request[ed] that Defendant's egregious behavior be sanctioned."  *Id.* at 2.

Defendant opposed Plaintiffs' motion on the grounds that "(1) defendant has already

agreed to produce all the documents at issue in this matter and is in the process of producing

---

[1]  Plaintiffs sought responses to Class Plaintiffs' First Set of Requests for Production of Documents, served
on May 23, 2006, and Class Plaintiffs' Second Set of Requests for Production of Documents, served on June 15,
2006, which related to Defendant's reasons for non-selection of Plaintiffs.  *See generally* Plaintiffs' Motion to
Compel at 3-5; *see also* December 21, 2007 Transcript of Motions Hearing on Document No. 488, Part 1 (Document
No. 526) at 50 (counsel for Defendant agreed that the discovery requests which were the subject of the motion to
compel were served as early as May, 2006).

Moore, et al., v. Chertoff                                                                 4

these documents; (2) plaintiffs did not complete their obligation to consult with defendant prior

to filing their motion; (4) [sic] plaintiffs' discovery requests were not . . . reasonably calculated to

seek this information . . . ; and (5) [sic] plaintiffs' motion to compel is untimely."  Defendant's

Opposition to Plaintiffs' Motion to Compel Defendant to Search Again for Potentially

Responsive Documents and for Sanctions ("Defendant's Opposition") (Document No. 498) at 1-

2.  Defendant did not dispute the testimony of Ms. Lawson during her 30(b)(6) deposition; rather,

he represented that he performed a "search for the paper documents created by the defendant's

personnel and used by agency managers involved in the bid-selection process and produced these

[sic] results[.]"  *Id*. at 13.  Defendant further maintained that Plaintiffs' motion should be

"dismissed" [sic] as moot, given Defendant's "offers" to conduct searches for responsive paper

documents, and his "tremendous effort to locate and produce these responsive paper documents."

*See id.* at 8-10, 19.  In support of his contention that he was making an effort to locate responsive

paper documents, Defendant offered the declaration of Arthur Kuhn, Inspector, United States

Secret Service (*see id.,* Ex. 15), and represented that the declaration detailed Defendant's search

efforts in November, 2007.

In their reply, Plaintiffs contended that Defendant withheld "highly probative and relevant

contemporaneous records evidencing the actual decision-making process for the promotions at

issue in the case."  Reply in Support of Plaintiffs' Motion to Compel Defendant to Comply With

His Discovery Obligation to Conduct a Reasonable Search for Responsive Paper Documents and

For Sanctions ("Plaintiffs' Reply") (Document No. 505) at 2-3.  Plaintiffs further maintained that

(1) Defendant made "boilerplate objections" in response to Plaintiffs' first and second sets of

requests for production which were "insufficient under the Federal Rules of Civil Procedure,"

Moore, et al., v. Chertoff                                                                                    5

and did not "alleviate him of his obligation to search for and produce responsive information

from the files and records of Secret Service supervisors and mangers" (*id*. at 4); and (2)

Defendant's "production of Personnel Division records regarding the rote administration of the

promotions process" did not excuse him from "searching for and producing responsive

documents in the files of decision-makers regarding their actual substantive promotions

decisions" given that "Defendant has not demonstrated that the documents are duplicative." *Id*.

at 7.  Plaintiffs rejected Defendant's contention that Defendant's "belated proposed search[]"

rendered their motion to compel moot.  *Id.* at 8.  Plaintiffs maintained that Defendant's proposed

search would include production of "official personnel files, employee files and other

administrative documents[,]" which would not "contain contemporaneous evidence of the

decision-making process." *Id.* at 9.  Additionally, Plaintiffs submitted that such an effort would

not be "calculated to locate all responsive documents to which Plaintiffs are entitled." *Id.*

On December 21, 2007, following an oral argument which extended over two hours, the

undersigned granted Plaintiffs' motion to compel, and ordered Defendant to produce the

documents which were the subject of the motion by no later than January 7, 2008.  The

undersigned also ordered Defendant to pay Plaintiffs' costs, including reasonable attorneys' fees,

of moving to compel such discovery.[2]  *See* December 21, 2007 Minute Entry.  The undersigned

reserved for future consideration Plaintiffs' motion for sanctions (Document No. 488, Part 2),

and advised the parties that the award of costs and fees was "not the sole sanction that the Court

---

[2] Defendant moved for reconsideration of the undersigned's order (Document No. 520).  The court
(Roberts, J.) found that the undersigned's order "was not clearly erroneous or contrary to law," and therefore
overruled Defendant's objection to the order.  *See* September 12, 2008 Memorandum Opinion and Order (Document
No. 587) at 7.

Moore, et al., v. Chertoff                                                                                    6

intend[ed] to consider" and that a further hearing would be scheduled "with respect to the

appropriate sanction."  December 21, 2007 Tr. (Document No. 526) at 80.

## THE PARTIES' CONTENTIONS

### (1) The parties' written submissions

Plaintiffs move the court to sanction Defendant "by not allowing him to defend Plaintiffs'

individual and class *prima facie* case of discriminatory non-promotion."[3]  Plaintiffs' Motion at

20.  Plaintiffs contend that Defendant's "dilatory tactics" during the course of discovery,

including the Defendant's "woeful failure to timely satisfy his discovery obligations in regard to

both paper and electronic documents[,]" has prejudiced both the Plaintiffs and the court.  *Id.* at

21-22.  Plaintiffs further contend that Defendant's failure to search the records of decision-

makers for responsive documents effectively puts Plaintiffs  "back at square one with respect to

discovery[,]" and that no lesser sanction will cure the prejudice to Plaintiffs and the court caused

by Defendant's misconduct, or deter such misconduct in the future.  *Id.*

More specifically, Plaintiffs assert that (1) they have exhausted "thousands of hours of

attorney time and hundreds of thousands of dollars in out-of-pocket expenses[]" during the

course of discovery, which included "conduct[ing] depositions without the discovery which they

requested and to which they are entitled[]"; (2) additional discovery with respect to the decision-

makers may be required "after receipt of documents located by Defendant in a reasonable

search[]" for responsive paper documents; (3) during the course of discovery, the court "has

---

[3]  "Plaintiffs believe that the ultimate sanction of default judgment against Defendant would be justified and appropriate" (*id.* at 20); however, Plaintiffs, by the pending motion, do not request such sanction.  *See also id.* at 21 ("While Plaintiffs ask for a lesser sanction than default judgment, the justifications offered by the D.C. Circuit for the ultimate sanction each apply in this instance, and thus clearly support the lesser sanction that Plaintiffs request.").

Moore, et al., v. Chertoff                                                                                        7

expended countless hours" of time and resources to adjudicate discovery motions which led to

orders for Defendant to "'do  what the Federal Rules of Civil Procedure already require in no

uncertain terms, and that is to search for the responsive documents and produce them[]'"; (4)

Defendant's repeated failure to "search for the files of decision-makers . . . as . . . required by the

Federal Rules of Civil Procedure, is disrespectful  to the rights of Plaintiffs, . . . this court, the

orderly administration of litigation, and the pursuit of justice[]"; and (5) to "[s]imply order[]

Defendant to conduct the reasonable search that should have occurred within 30 days of service

of Plaintiffs' discovery requests[,]" or "to do what was already required[] [under the Federal

Rules of Civil Procedure][,]" would not remedy the prejudice to Plaintiffs.  *See generally*

Plaintiffs' Motion at 19-24.

Finally, Plaintiffs assert that no lesser sanction than the one they request is sufficient to

ensure that Plaintiffs are not prejudiced in their ability to prove their case and that the integrity of

the court is preserved.  Plaintiffs' Motion at 26.  Plaintiffs submit that "[t]he Court has the

authority both under its inherent powers and under the Federal Rules of Civil Procedure to

sanction Defendant for his misconduct in discovery."  *Id.* at 21 (citations omitted).

Defendant contends–albeit erroneously–that the Plaintiffs seek the ultimate sanction of

default judgment, and that "there is simply no evidence of misconduct . . . that would justify any

sort of sanction[.]"  *See* Defendant's Opposition to Plaintiffs' Motion for Sanctions

("Defendant's Opposition") (Document No. 498) at 27, 29.[4]  Defendant maintains that "the

---

[4] Elsewhere, Defendant maintains that the sanction Plaintiffs request is akin to a default judgment because "[i]f defendant cannot present evidence to 'defend' against plaintiffs' prima facie [sic] individual and class claims (by offering a nondiscriminatory rationale for the individual cases and statistical and other evidence to rebut the class claims), the [court] order would likely operate effectively as the functional equivalent of a default judgment, regardless of what it is called."  *Id.* at 27 (citation omitted).

Moore, et al., v. Chertoff                                                                           8

documents wich [sic] [Plaintiffs] now claim to seek do not relate in any way to the statistical

center piece [sic] of proof which is required in a pattern and practice case."  *Id.* at 28-29.

      In support of his opposition, Defendant generally contends that (1) no factual, statutory or

procedural rule can serve as a basis for imposing the requested sanction; (2) Plaintiffs'

allegations that they have been prejudiced are "purely speculative" and "unsupported

proclamations of extreme prejudice"; (3) Plaintiffs fail to show how Defendant's "delay in

producing any 'miscellaneous documents' that may exist would impact . . . Plaintiffs' ability to

go to trial[]"; (4) "the Court's calendar has not been prejudiced by defendant's allegedly late

production of any miscellaneous documents that may be located[]"; (5) the court should not

consider "deterrence of misconduct" in its decision regarding Plaintiffs' request for a sanction, as

this court has never found that defendant engaged in "flagrant or egregious misconduct in

discovery[]"; and (6) Plaintiffs have not established that to the extent any sanction may be

deemed warranted, a lesser sanction would not suffice.  *See* Defendant's Opposition at 2, 19, 23-

25.

      Additionally, Defendant states that "[t]he plaintiffs have not given any reason why this

dispute cannot be handled through the discovery process contained in the Federal Rules, as it has

been in the past."  Defendant's Opposition at 21, n.15.  Defendant suggests that "any prejudice[]

[suffered by the Plaintiffs], if any exists at all, is minimal[,]" and that he "sought to mitigate any

adverse impact of this *relatively minor delay* by attempting *to work with Plaintiffs* to

expeditiously retrieve the documents requested."  *Id.* at 24 (emphasis supplied).  Defendant

maintains that "regardless of any relatively minor delay, any residual prejudice is further

mitigated by the fact that responsive paper documents will have been produced in advance of (i)

Moore, et al., v. Chertoff                                                                      9

any class certification motion briefing, and (ii) any proceedings concerning the merits phase of

the case being scheduled." *Id.*

    In their reply, Plaintiffs maintain that they do not seek "the ultimate sanction of default

judgment[,]" but rather, an "issue-related" sanction requiring Plaintiffs to "continue to bear the

burden of proof with respect to their *prima facie* case."  Plaintiffs' Reply at 11.[5]  Plaintiffs

contend that the sanction they request is warranted because "despite the twenty-three orders by

this court requiring Defendant to comply with the Federal Rules of Civil Procedure, the issuance

of sanctions that precluded Defendant from introducing certain evidence and required payment of

attorneys' fees," Defendant failed to search the records of his decision-makers for responsive

documents. *Id.* at 10-11.  Plaintiffs identify two instances in which Defendant belatedly

produced such documents, and maintain that such documents "reveal unfavorable and

previously-undisclosed information about white selectees chosen over Plaintiffs and other

[putative] class members." *Id.* at 13.  Plaintiffs contend that they deposed the decision-maker

involved, but did not have the benefit of his statements during the deposition. *Id.*  Plaintiffs

contend that they are entitled to support their class certification briefing with such non-statistical

evidence, which is neither "miscellaneous" or "stray[,]" to prove Defendant's pattern and

practice of discrimination. *Id.* at 15.

    Plaintiffs contend that an examination of the record with respect to the conduct of

discovery in this action compels the finding that lesser sanctions "have already been entered

against Defendant as a result of his misconduct in discovery[,]" and that "there is no indication

that Defendant's reaction to additional, lesser sanctions would [have any impact][.]"  Plaintiffs'

─────────────

[5] *See also* n.3, *supra*, and accompanying text.

Reply at 16-17.  Moreover, Plaintiffs argue that the record supports their contention that the

judicial system has been prejudiced by Defendant's misconduct, and that "[a]fter twenty-three

Orders to compel in a single case, Defendant cannot with a straight face claim that he has not

shown "a willingness to subvert the Federal Rules of Civil Procedure." *Id.* at 15-16 (citation

omitted); *see also* Joint Ex. 3.

### *(2) Synopsis of the Evidence Adduced During the Evidentiary Hearing*[6]

The evidentiary hearing on Plaintiffs' motion for sanctions, scheduled for January 10,

2008,  ultimately consumed a total of sixteen days.  During opening statements, Plaintiffs'

counsel voiced Plaintiffs' intention to "demonstrate through live testimony to the Court the

egregiousness of Defendant's violation"; "that the search that the Defendants [sic] did was

completely inadequate . . . [in] that it had neither the intent nor the result of locating the

documents to which Plaintiffs are entitled"; and "that Plaintiffs[,] . . . almost eight years after the

case was filed, still do not have the documents that were created . . . which . . . are responsive to

Plaintiffs' document requests."  January 10, 2008 Evid. Hr'g Tr. (Document No. 555) at 12.

Counsel for Defendant voiced Defendant's intention to "establish that there was absolute

compliance with [the court's] order in December[,] [2007] ordering the Defendant to produce the

documents that Plaintiffs requested by January 7[th][]"; to "detail . . . exactly what steps were taken

---

[6]  On January 4, 2008, Plaintiffs filed a "Notice of Intent" (Document No. 514) to call United States Secret Service Inspector Arthur Kuhn as a witness at the evidentiary hearing.  On January 7, 2008, Defendant filed a "Notice of His Intent" (Document No. 515) to call Secret Service Inspectors Arthur Kuhn and Carrie Hunnicutt, and represented that "[b]oth of these employees have been involved in the Secret Service's efforts, both prior to and after the Court's December 21, 2007 ruling, to search for and produce the records sought by plaintiffs' motion to compel." Plaintiffs subsequently "reserve[d] the right to call Inspector Hunnicutt in their case as well as any other witness that Defendant may call."  Plaintiffs' Supplemental Notice of Intent to Call Witnesses at January 10, 2008 Sanctions Hearing (Document No. 516).  On February 25, 2008, Defendant expanded his list of witnesses to include six other witnesses.  Defendant's List of Potential Witnesses (Document No. 535).

with regard to contacting current and former employees[]"; that a "thorough search [was] conducted by the various offices that [Inspectors Kuhn and Hunnicutt] queried about those documents and how [the Inspectors] followed up with regard to those mechanisms that they put together." *Id.* at 17, 20, 22.

A total of ten witnesses testified during the course of the sixteen-day hearing.[7]  Only one witness, Barbara Saliunas, testified regarding Defendant's efforts in 2006 to search for and produce documents responsive to Class Plaintiffs' First and Second Set of Requests for Production of Documents, which Plaintiffs served on Defendant on May 23, 2006 and June 15, 2006, respectively.[8]  In testimony elicited by the Defendant, Barbara Saliunas, a Secret Service Attorney-Advisor and former Deputy Chief of the Personnel Division, testified that the Special Agent Uniform Division Support Branch of the Personnel Division oversees the staffing and merit promotion process, a process by which individuals are selected competitively for promotions.  March 19, 2008 Evid. Hr'g Afternoon Session Tr. (Document No. 548) at 13-15.

---

[7]  Testimony was elicited from the following witnesses: Inspector Kuhn; Inspector Hunnicutt; Gregory Mays, the Resident Agent-in-Charge ("RAIC") of the Atlantic City, New Jersey Resident Office; Andrew Jeff Gavin, RAIC of the Wilmington, Delaware Resident Office; Faron Paramore, Special Agent-in-Charge ("SAIC") of the Director's Office; Roy Sexton, SAIC of the Birmingham, Alabama Field Office; Michael Bryant, SAIC of the Buffalo, New York Field Office; Raymond Maytorena, SAIC of the Los Angeles, California Field Office; Barbara Alexander-Saliunas, a Secret Service Attorney-Advisor and former Deputy Chief of the Personnel Division; and Robert Slama, SAIC of Philadelphia Field Office.

[8]  On March 19, 2008, the parties stipulated that Defendant, in 2006, produced "approximately 93 boxes of documents" in response to the Class Plaintiffs' First and Second Sets of Requests for the Production of Documents. According to the parties' stipulation, "Defendant produced documents, including promotion-related documents, and made other documents, including promotion-related documents, available for inspection and copying from three Secret Service offices at headquarters: (1) Personnel Division; (2) E.E.O. Office; and (3) Management and Organization Division."  Joint Stipulation, Evid. Hr'g Joint Exhibit 1 ("Joint Ex. 1"); *see also* March 19, 2008 Afternoon Session Tr. (Document No. 548) at 7.  Plaintiffs, in their Motion to Compel, did not dispute that the Defendant searched these three offices; rather, Plaintiffs argued that because Defendant's search was *"limited* to these divisions," the search did not "capture all potentially relevant documents reflecting Defendant's substantive promotions decisions that adversely affected Plaintiffs and the [putative] class[.]"  *See* Plaintiffs' Motion at 9-10 (emphasis supplied).

Moore, et al., v. Chertoff                                                                                          12

Ms. Saliunas enumerated the types of the "official promotion-related information" provided to

the Personnel Division from Secret Service field offices and maintained by the Branch within its

merit promotion files.  *Id.* at 13-16.  Ms. Saliunas testified that she believed the "merit promotion

files were provided to the plaintiffs for inspection and copying in the late summer or early fall of

2006[.]"  *Id.* at 20.  Ms. Saliunas further testified on direct examination that it is possible that

field offices may maintain promotion-related information that is not sent to the Personnel

Division.  *Id.* at 18.  ("[I]t is possible that a field office may maintain – for example, if a special

agent in charge recommends selectees for a particular position within that office, that might be

done through an e-mail.  And if so, then they might maintain a copy in paper.").[9]

 During cross-examination, Ms. Saliunas characterized the Secret Service Advisory

Board's role in the promotions process as that of discussion regarding the selectees and

development of recommendations to the Director with respect to promotions or reassignments.

She testified that the Board is comprised of the "deputy director and the assistant directors of the

Secret Service."  *Id.* at 46.  She further testified that she did not know when the Deputy

Director's office was first searched for responsive paper documents.  *Id.* at 47.

 Testimony regarding the activity undertaken by the Secret Service following the October

29, 2007 filing by Plaintiffs of their motion to compel and for sanctions (Document No. 488),

and the December 21, 2007 Order granting the motion to compel, was the focus of the testimony

of the remaining witnesses.  United States Secret Service Inspector Arthur Kuhn testified that on

---

[9]  Ms. Saliunas further testified that "there could be an e-mail within the [field] office, a first line supervisor suggesting to the SAIC what first level scores he or she thinks that employee should receive – recommending those scores, and so conceivably that could be printed and saved in paper in the [field] office."  *Id.* at 18-19.  During cross-examination, Ms. Saliunas stated such documents do not have to be provided to the Personnel Division.  *Id.* at 60. She added that she believed e-mails of this sort were located and provided to the Plaintiffs in "approximately November of 2007."  *Id.* at 21.

Moore, et al., v. Chertoff                                                                13

October 31, 2007, he was directed by Kit Menches, SAIC of the Inspection Division, to work

with the Secret Service's Office of Chief Counsel on "a special project[.]"  January 10, 2008

Evid. Hr'g Tr. (Document No. 555) at 44-45.  Inspector Kuhn testified that the Office of Chief

Counsel directed him to conduct an e-mail inquiry of Secret Service supervisors at the GS-15

level and above, a category which included SAICs, Deputy Assistant Directors (DADs),

Assistant Directors (ADs), Deputy Directors (DDs), and the Director.  *Id.* at 46, 54.  Inspector

Kuhn's instruction, forwarded by e-mail on November 5, 2007 to approximately 182 supervisors,

required each recipient to respond, by the close of business on November 8, 2007, by forwarding

a copy of responsive records and a signed certification that the search was conducted.[10]   Each

individual was directed by Inspector Kuhn to search locations including "personal files,"  "office

files," and "the office files for offices to which [they] were previously assigned when involved in

the decision-making process[]" for "notes, letters, memoranda, emails (both paper and

electronically saved), or any other paper documents that specifically relate to the 'selection

decisions' for GS-14 and GS-15 promotions and reassignments from 1991 to 2005."

Defendant's Evid. Hr'g Ex. 1; *see also* January 10, 2008 Evid. Hr'g Tr. at 35-50; Declaration of

Arthur L. Kuhn, Inspector, United States Secret Service, Attachment 1 (Document No. 498,

Exhibit 15); Notice of Errata Regarding Attachments to Kuhn Declaration (Document No. 518).

Inspector Kuhn testified that his assignment included facilitating the inquiry, receiving any paper

documents forwarded by employees in response to the e-mail, and collecting the certifications.

January 10, 2008 Evid. Hr'g Tr. at 46, 53, 114.  Following this effort, Defendant produced nine

---

[10]   The "certification form" attached to the November 5, 2007 e-mail required each recipient to indicate
whether he or she held the following positions during the period of 1991-2005: SAIC, DAD, AD, DD, D; if not, then
he or she was not required to conduct the prescribed search.   *See* Defendant's Evid. Hr'g Ex. 20.

Moore, et al., v. Chertoff                                                                                   14

pages of responsive documents.  *See* Declaration of Arthur L. Kuhn Inspector United States

Secret Service (Document No. 498, Ex. 15).

Defendant employed a similar e-mail inquiry following the court's December 21, 2007

Order.  On December 26, 2007, the Secret Service's Office of the Chief Counsel forwarded an

e-mail to "all Assistant Directors [ADs], Special Agents in Charge [SAICs], Resident Agents in

Charge [RAICs], and Division Chiefs" directing a search "of their offices, including all personal

and office files, for any paper documents related to decision-making or recommendations for bids

of selections to any GS-14, GS-15, or SES Special Agent position from 1991 to 2005."

Defendant's Evid. Hr'g Ex. 14 at 1; *see also* February 1, 2008 Evid. Hr'g Tr. (Document No.

557) at 15.  Defendant transmitted the December, 2007 e-mail to 156 Secret Service employees,

and required that their search efforts be completed by January 4, 2008.  Defendant's Evid. Hr'g

Ex. 14 at 1; *see also* February 1, 2008 Evid. Hr'g Tr. at 74.

United States Secret Service Inspector Carrie Hunnicutt–called as a witness by both

parties–testified during a span of six court dates regarding her January 2, 2008 assignment to (1)

receive paper documents responsive to the inquiry; (2) collect faxed "certification forms" from

each e-mail recipient affirming that a search was performed[11] and (3) to "contact [the December

26, 2007 e-mail recipients] . . . and just learn from them how I could understand how it was that

they were able to thoroughly search their offices."  *See* February 1, 2008 Evid. Hr'g Tr. at 12 -77;

---

[11]   The December 26, 2007 e-mail inquiry included a "Paper Document Search Certification" form which required each recipient to "certify that [their] office has been thoroughly searched for paper documents created, received, or reviewed in connection with decision-making or recommendations for bids or selections to any GS-14, GS-15 or SES Special Agent Positions from 1991-2005."  Defendant's Evid. Hr'g Ex. 14 at 2.  Each recipient was directed to certify that "all personal and office files [were] searched[]" and to indicate whether or not these searches produced "materials responsive" to the e-mail inquiry.  *Id*.  The certification form transmitted with the November, 2007 e-mail included a provision that the certification was under the penalty of perjury; however, the certification form transmitted with the December, 2007 e-mail did not.

*see also* February 11, 2008 Evid. Hr'g Tr. (Document No. 559) at 20.  Inspector Hunnicutt was

also designated in the December 26, 2007 e-mail as a contact person should any of the recipients

have questions regarding the e-mail or the required search.

Inspector Hunnicutt testified that she surveyed all 156 e-mail recipients, between January

4 and January 9, 2008, "to learn how . . . the certification forms were [completed][,]" and that

during each interview, she recorded each individual's responses to her questions about the search

on questionnaire forms which she created and maintained.  *See* February 1, 2008 Evid. Hr'g Tr.

at 76-77; *see also* February 5, 2008 Evid. Hr'g Tr. (Document No. 540) at 43-44, 56, 89;

February 20, 2008 Evid. Hr'g Tr. (Document No. 561) at 14.   Inspector Hunnicutt testified that

she asked each recipient a series of questions to determine where they searched for responsive

documents.  *See* February 5, 2008 Evid. Hr'g Tr. at 45-50.  She acknowledged that as she

conducted her interviews, she learned that several of the recipients of the December 26, e-mail

did not search all areas in their offices where records are stored; she testified that she designated

these instances with an "N" on her questionnaire forms, but that she never instructed those

recipients to conduct a further search.  *See* February 11, 2008 Evid. Hr'g Tr. at 33-34 ("I marked

an 'N' to say that no, they had answered that they had not searched that location, or I marked

'NA' to say that they had not searched that location because that was not applicable to their

particular office.").

Inspector Hunnicutt also testified that she maintained a binder with the certification forms

which were transmitted to her, as well as the questionnaires she completed as part of her

interviews of the e-mail recipients, "so that it could be put into a statistical format . . . a snapshot

. . . of what the search entailed." February 20, 2008 Evid. Hr'g Tr. at 9.  She stated that she gave

Moore, et al., v. Chertoff                                                                                    16

the binder to Jessica Neff of the Secret Service's Chief Counsel's Office on January 9, 2008.

February 12, 2008 Evid. Hr'g Tr. (Document No. 560) at 40.  However, it was not until

Defendant's case-in-chief, and Inspector Hunnicutt's fifth court appearance, that the Inspector

testified that on January 7, 2008, the statistician assigned to assist Inspector Hunnicutt informed

her that her interview questionnaire forms were "misnumbered"; on January 9 and January 30,

2008, she "transferred" the recorded responses from each previously completed "misnumbered"

questionnaire form "exactly" to a "correctly numbered" questionnaire form; on January 30, 2008,

once she "believed that the information had been transferred," she "destroyed" the

"misnumbered" questionnaires by "plac[ing] them into a burn bag."  February 20, 2008 Evid.

Hr'g Tr. at 30 - 35.[12]   Inspector Hunnicutt later admitted during cross-examination by Plaintiffs'

counsel that she modified some of the responses originally captured on the original questionnaire

when she "transferred" information to the revised questionnaire form.  *See id.* at 108; *compare*

*with id.* at 66.

        Inspector Hunnicutt further testified that there were no responsive paper documents found

through the efforts required by the December 26, 2007 e-mail.  February 1, 2008 Evid. Hr'g Tr.

at 77*; see also* Plaintiffs' Evid. Hr'g Ex. 10 (January 7, 2008 Letter from counsel for Defendant

to Jennifer Klar).

        In addition to the testimony of Inspectors Kuhn and Hunnicutt, Defendant offered the

testimony of six individuals who purportedly conducted these searches in their respective field

---

        [12]  Inspector Hunnicutt testified that she also destroyed fax cover sheets, locator sheets, the January 9, 2008
paper version of the charts and graphs created by the statistician, and "[a]nything that might have been a duplicate of
something I already had."  February 20, 2008 Evid. Hr'g Tr. at 81-82, 84-85, 90, 92, 106.

Moore, et al., v. Chertoff                                                                      17

offices in November and December, 2007, or January, 2008.[13]  The individuals testified

regarding their efforts, or the lack thereof, to search for "notes, letters, memoranda, emails . . . or

any other paper documents that specifically relate[d] to the 'selection decisions' for GS-14 and

GS-15 promotions and reassignments from 1991 to 2005."  Document No. 498, Ex. 15,

Attachment 1.

### (3)  The parties' closing arguments

On May 29, 2008, during closing arguments, the parties largely reiterated the arguments

advanced in their written submissions, including their respective statements of Proposed Findings

of Fact and Conclusions of Law.  *See* May 29, 2008 Transcript of Closing Arguments (Document

No. 577).[14]

Plaintiffs maintained that no lesser sanction than the one they requested is warranted,

given Defendant's failure (1) for nearly two years, to search for and produce paper documents

from the records of Secret Service supervisors involved in the recommendations and promotions

process at the center of Plaintiffs' claims; (2) to conduct an adequate search for the requested

documents after the court's December 21, 2007 Order granting Plaintiffs' motion to compel; and

(3) to comply with his discovery obligations throughout the entire course of discovery.  *See* May

29, 2008 Tr. at 8-11.  Plaintiffs' counsel further argued that "this court has already previously

sanctioned the Defendant in three instances with respect to evidentiary exclusions and [a]

---

[13]  *See* n.7, *supra.*

[14]  *See also* Plaintiffs' Proposed Findings of Fact and Conclusions of Law Regarding Plaintiffs' Motion for
Sanctions (Docket No. 488 Part 2) ("Plaintiffs' Proposed Findings") (Document No. 568); Defendant's Errata of
Proposed Findings of Fact ("Defendant's Proposed Findings") (Document No. 572-2); Plaintiffs' Reply to
Defendant's Proposed Findings of Fact and Conclusions of Law ("Plaintiffs' Proposed Findings Reply") (Document
No. 573).

monetary sanction, and that has not been enough to stop the defendant from moving forward with

this pattern of discovery misconduct." *Id.* at 12-13.

Defendant asserted that no further sanction should be imposed because he performed a

reasonable search for paper documents as contemplated by the Federal Rules of Civil Procedure,

both at the time the discovery requests were propounded in 2006 and subsequent to the time

Plaintiffs filed their October, 2007 motion to compel.  Defendant maintained that (1) in 2006, he

conducted a search of the areas where he reasonably believed responsive documents would be

located; (2) in 2007, prior to the filing by Plaintiffs of their motion to compel, Defendant agreed

to conduct a search for responsive documents; and (3) Defendant performed an adequate search

of files of both current and former Secret Service supervisors to comply with the court's

December 21, 2007 Order.  *See generally* May 29, 2008 Tr. at 23 - 35.[15]  Defendant further

maintained that the Plaintiffs "failed to provide this court with . . . any evidence that Defendant

had a design, a purpose, a plan to hold these documents to themselves[,]" and instead, Plaintiffs'

arguments amounts to "criticisms of the search" performed.  *Id.* at 36-37.

Defendant also maintained that Plaintiffs did not show why no lesser sanction would

suffice.  Defendant's counsel proposed, during the final minutes of his closing argument and for

the first time during the undersigned's consideration of the pending motion, an alternative

sanction: that (1) discovery be re-opened for the "limited purposes of redeposing whomever the

---

[15]  In response to the undersigned's inquiry regarding the scope of the search conducted in 2006 when the requests for production at issue here were propounded, Defendant, through counsel, stated that individual supervisors were not queried in 2006 and that "given the . . . over-breadth of [Plaintiffs']document request, Defendant did a reasonable thing in going to the only three receptacles within the division that handled those types of documents[.]"  May 29, 2008 Tr. at 33.  Defendant further proffered that the documents which were the subject of Plaintiffs' motion to compel were a  "subspecies of documents . . . that Defendant didn't contemplate or didn't think of at the time . . or didn't think it was necessary to capture[.]"  *Id.*

Plaintiffs can establish had any connection with late produced anecdotal evidence[]"; (2) the

Plaintiffs be allowed to "augment their class certification motion, with whatever newfound

information that they find in order to strengthen their position as much as they feel they can[]";

and (3) an "equal division of the costs of [the several days spent in this hearing.]"  *Id.* at 89 - 90.

## FINDINGS WITH RESPECT TO THE EVIDENCE ADDUCED AT THE HEARING

*(1) Defendant failed to conduct a reasonable search in 2006*

The parties do not dispute that Defendant, in 2006, produced 93 boxes of documents in

response to Plaintiffs' first and second requests for production of documents.  Joint Stipulation,

Evid. Hr'g, Joint Exhibit 1 ("Joint Ex. 1");  *see also* May 29, 2008 Transcript of Closing

Arguments (Document No. 577)  at 30-31.  Defendant confined the search which yielded those

documents to three Secret Service Divisions (*i.e.,* Personnel, E.E.O., and Management and

Organization).[16]  Joint Ex. 1 at 1.  However, the responsive documents from the records of

decision-makers are not maintained in these three divisions.  No search for such records was

---

[16] Defendant, in his Proposed Findings of Fact and Conclusions of Law, states that his efforts in 2006 were not confined to these three offices, and that, "memoranda requesting that individuals search for documents responsive to plaintiffs' document requests were also sent to . . . the Office of Investigations, the Office of Protective Operations, the Criminal Investigative Division, Intelligence Division, Security Clearance Division, and RTC." Defendant's Proposed Findings ¶ 20, at 12.  Defendant attempts to support this assertion with statements made by Inspector Kuhn that some of the November 5, 2007 e-mail recipients reported that "'I have sent these documents in already[.]'"  January 10, 2008 Evid. Hr'g Tr. at 120.  However, the undersigned is not persuaded by Defendant's proposed finding of fact: Inspector Kuhn did not state with specificity the number of recipients who made such a statement, the nature of the forwarded documents, the purpose for which the recipient(s) forwarded the documents, and whether the documents were served upon Plaintiffs.  Additionally, Defendant's own witnesses were consistently asked, by Plaintiffs' counsel, whether they were required to search for responsive paper documents in 2006, and they responded that they did not undertake any searches in 2006.  *See* February 25, 2008 Evid. Hr'g Tr. (Document No. 562) at 98-99, 221-222; *see also* March 5, 2008 Morning Session Evid. Hr'g Tr. (Document No. 576) at 13-16, 98; March 6, 2008 Evid. Hr'g Tr. (Document No. 590) at 43;  March 17, 2008 Morning Session Evid. Hr'g Tr.(Document No. 589) at 60.  Defendant also attempts to support this proposed finding with Barbara Saliunas's testimony that the Office of the Assistant Director of Investigations and the Office of Human Resources and Training were searched prior to November, 2007.  *See* March 19, 2008 Afternoon Session Evid. Hr'g Tr. (Document No. 548) at 50-51.  However, the undersigned finds that her testimony regarding this issue suffers from the same deficiencies as that of Inspector Kuhn.

attempted until November, 2007, nearly eighteen months after the requests for production were

initially served.  *See* March 19, 2008 Afternoon Session Evid. Hr'g Tr. (Document No. 548) at

18.  Indeed, Defendant does not dispute that his 30(b)(6) designee testified that the Secret Service

had not, as of the filing by Plaintiffs of their motion to compel, searched the records of any

decision-maker for documents responsive to the requests for production.  *See* Plaintiffs' Evid.

Hr'g Ex. 15 at 85-87.

Moreover, counsel for Defendant candidly admitted during closing arguments that

Defendant did not search for paper documents detailing the substance of recommendations for

promotion decisions.  May 29, 2008 Transcript of Closing Arguments at 33-34.  Defendant

contends that he reasonably "relied upon the [three] divisions that are charged with housing

promotion-related material[s]" as the "most reasonable receptacle for any information dealing

with promotion-related material for the entire Secret Service[,]" and thus, only searched for

responsive documents within those divisions.  *Id.* at 30.  However, in response to the court's

question, counsel for Defendant acknowledged that the Defendant, in 2006, could have "go[ne]

to the individual supervisors, the 182 supervisors within the Secret Service and quer[ied] them

personally about what recommendation material[s] they may have that would be responsive to

the Plaintiffs' request."  *Id.* at 32.  The undersigned cannot countenance Defendant's explanation

that such a search was not performed because he "didn't . . . understand[,]" "contemplate or . . .

think it was necessary to capture ['recommendation material . . . a subspecies of promotion-

related material[,]']" "given the . . . over-breadth of the [Plaintiffs'] document request[s][.]"  *Id.*

Moore, et al., v. Chertoff                                                                    21

at 33-34.[17]   The undersigned observes that Defendant ultimately attempted to perform such a

query of his supervisors only subsequent to the filing of Plaintiffs' motion to compel and in

response to the court's December 21, 2007 Order.  *See* Plaintiffs' Motion Ex. 23 at 6.

In sum, Defendant has failed to persuade the court that he diligently or reasonably

searched for responsive paper documents in 2006.  Thus, the undersigned finds that Defendant

failed to conduct a timely and reasonable search for responsive documents in 2006, in violation

of the requirements of Rule 34 of the Federal Rules of Civil Procedure.

*(2)  Defendant failed to adduce credible evidence of any reasonable search efforts in*
*November and December, 2007 and January, 2008*

Defendant, through the testimony of the individuals he deemed the most knowledgeable

about his search efforts, attempted to explain the scope and method of his belated efforts in

November and December, 2007 and January, 2008.  However, the undersigned finds that the

totality of the evidence adduced during the evidentiary hearing through those witnesses

unpersuasive, inconsistent and exemplary of the inadequacy of Defendant's search efforts.

*(i)  Deficient Search Instructions*

Defendant provided the recipients of his November and December, 2007 e-mails with

ambiguous instructions regarding the locations to be searched for responsive documents.

---

[17]   While Defendant states that he "objected" to certain of the requests, the only motion for protective order
which Defendant filed sought clarification of the trial court's ruling regarding the scope of the claims in the case.
Defendant's Proposed Findings ¶¶ 14-18, at 9-11; *see* Defendant's Motion for Protective Order Regarding "Class
Plaintiffs' First Set of Requests for Production of Documents" (Plaintiffs' Eighth Set of Document Requests In This
Case) (Document No. 355).  Defendant ultimately withdrew the motion for protective order.  *See* Defendant's Notice
of Withdrawal of Defendant's Motion for Protective Order regarding "Class Plaintiffs First Set of Requests for
Production of Documents" (Plaintiffs' Eight Set of Document Requests) (Document No. 359).  In any event, the
granting of Plaintiffs' motion to compel production of the documents renders this contention one of no moment.

Specifically, the e-mail inquiries required a search of "personal files" and "office files[.]"

Defendant's Evid. Hr'g Ex. 14 ("December 26, 2007 e-mail") at 1;  *see also* Defendant's Evid.

Hr'g Ex. 1 ("November 5, 2007 e-mail") at 1.  The ambiguity became evident as Defendant's

own witnesses testified regarding their respective interpretations of the terms "personal files,"

"office files" and "office" in the context of the e-mail inquiries.[18]

    Defendant was aware of the opportunity for misinterpretation of these terms.  In response

to the November 5, 2007 e-mail inquiry, Faron Paramore, SAIC of the Director's Office, testified

that he understood that he was to "conduct a physical search of my office and any files I

maintained in my office or that I maintained anywhere else even if they were at my residence[.]"

February 26, 2008 Evid. Hr'g Tr. (Document No. 536) at 31.   He further explained that "my

office" meant "physically being the office that I maintain, the office that I sit in."  *Id.* at 31.

SAIC Paramore testified that he was informed by Edith Shine, one of Defendant's counsel of

_____

[18]   Gregory Mays, RAIC of the Atlantic City Resident Office, testified that the e-mail required a search of his  "office," which he understood to mean  "[t]he entire space of the Atlantic City resident office, to include all of the private offices within the space[]" (February 25, 2008 Evid. Hr'g Tr. (Document No. 562) at 54).  Andrew Gavin, RAIC of the Wilmington, Delaware Resident Office, testified that "office" meant "[t]he office space in which one might find – one might expect to find personnel-type files[]" – an interpretation that he understood applied to "[t]he entire [Wilmington, Delaware] office[]" (February 25, 2008 Evid. Hr'g Tr. at 185); later, RAIC Gavin testified that "office files" were "anything in the office that's documentation generated by administrative matters or investigative matters[,]"  but excluded an "[a]gents' personal paperwork, their emails if they printed things out[,]" an agent's brag sheet and MPP score, an agent's e-mail requesting support for a position on which the agent bid, and a supervisor's e-mail requesting his opinion about an agent in his office (*id.* at 210-12).  Michael Bryant, SAIC of the Buffalo, New York Field Office, testified that the reference in the November 5, 2007 e-mail to "office files" meant "the office files in my office, in the Buffalo field office, the administrative files[]" (March 6, 2008 Evid. Hr'g Tr. (Document No. 590) at 13).  Roy Sexton, SAIC of the Birmingham, Alabama Field Office, testified that he believed that the November 5, 2007 e-mail required that he "search [his] personal records[,]" but that the December 26, 2007 e-mail required that he "search not only my office, but . . . the entire field office[]" ( March 5, 2008 Morning Session Evid. Hr'g Tr. (Document No. 576) at 63, 67-68).  Ray Maytorena, SAIC of the Los Angeles Field Office, testified that "office files" meant "[m]y office files that are contained within my desk and my work area . . . in my particular case it extends to the adjoining conference room[,]" and that "office files" are different from "administrative files" which were on the 13[th] floor of the Los Angeles Field Office (March 17, 2008 Morning Session Evid. Hr'g Tr. (Document No. 589) at 58); later, SAIC Maytorena testified that the "office files" searched in his office included the "administrative files" on the 13[th] floor (*id.* at 84).

record and a member of the Secret Service Chief Counsel's office, that he "had incorrectly

interpreted" the e-mail's instruction regarding the scope of the search of "office files."  *Id*. at 44.

According to SAIC Paramore, Ms. Shine instructed him that he was not only to search the files in

his immediate office space, but all of the files in the entire office, which included the offices of

administrative staff, the Deputy Director and Director.  *Id*. at 45.  SAIC Paramore, after receiving

these instructions, conducted a search of the locations that he did not include in his original

search.

Defendant used the same ambiguous language in the December 26, 2007 e-mail inquiry,

authored by Defendant's Office of Chief Counsel.  *See* Defendant's Evid. Hr'g Ex. 14 at 1.

Defendant did not offer any evidence that he issued further instructions regarding the

construction of the term "office files" in an effort to comply with the December, 2007 Order

granting Plaintiffs' motion to compel.  *See id*. at 106-107.

Defendant's efforts were also notably deficient with respect to his failure to instruct the

inspectors facilitating his search regarding what constituted a document responsive to Plaintiffs'

discovery requests.  For instance, the first request in class Plaintiffs' Second Set of Requests for

Production of Documents included a request for "[a]ll documents relating or referring in any way

to the claims and defenses raised in this case[]"; however, the recipients of the e-mails were

never informed of the claims and defenses involved in the case.  *See* Plaintiffs' Evid. Hr'g Ex. 3

at 7; *see also* January 10, 2008 Evid. Hr'g Tr. at 153-54, 157.  Inspectors Kuhn and Hunnicutt

both testified that they were not provided with a copy of Plaintiffs' first and second sets of

requests for production of documents, even though it was their role to receive documents located

during the searches and to answer any questions posed by the recipients of the e-mail about the

searches.  *See* January 10, 2008 Evid. Hr'g Tr. at 49, 54, 166 (testimony of Inspector Kuhn that

the first time he saw Plaintiffs' first and second sets of requests for production of documents was

on January 10, 2008 during his testimony in Plaintiffs' case-in-chief); *see also* Defendant's Evid.

Hr'g Ex. 1 at 1; February 1, 2008 Tr. at 80-81; Defendant's Evid. Hr'g Ex. 14 at 1.  Additionally,

Inspectors Kuhn and Hunnicutt did not know the meaning of many of the terms utilized in the

instructions included in the e-mails.  *See* Jan. 10, 2008 Evid. Hr'g Tr. at 139 ( testimony of

Inspector Kuhn that he did not know what was meant by the term "bid books" as used in the

November 5, 2007 e-mail defining the term "documents");  *see also* February 5, 2008 Evid. Hr'g

Tr. at 18 (testimony of Inspector Hunnicutt that "I don't know what a bid book is.")

Further, the November 5, 2007 e-mail also required recipients to search "in offices to

which they were previously assigned."  Defendant's Evid. Hr'g Ex. 1 at 1.  Inspector Kuhn

acknowledged that he did not know how the recipients searched for documents in every field or

resident office where they were previously assigned; additionally, he was uncertain whether the

recipients traveled to the offices where they were previously assigned, or asked that their files be

shipped to their current offices so that they could conduct the searches in their current offices.

*See* January 10, 2008 Evid. Hr'g Tr. at 114.  Further, Defendant did not direct any of the

recipients of the e-mails to search files where responsive documents might be located consistent

with the agency's method of indexing files.  *See* January 10, 2008 Evid. Hr'g Tr. at 190-91.

Inspector Kuhn testified that the Secret Service has an administrative filing system for filing its

"office files[,]" including files that are designated "203.061, Promotion of Special Agents";

however, Defendant did not, in either of his e-mail inquiries, direct a search of such files.  Nor

did Defendant request a search of files in off-site storage facilities, such as the Federal Records

Center.

### (ii)  Inconsistent Search Efforts

The undersigned finds that the testimony of Defendant's own witnesses regarding their

purported search efforts undermined Defendant's argument that a reasonable and thorough search

was conducted in response to the November and December, 2007 e-mail inquiries.  Notably, the

evidence adduced at the evidentiary hearing regarding the efforts undertaken by SAICs Paramore

and Bryant, and RAICs Gavin and Mays, in response to the e-mail inquiries exposed the widely

varying extent of the searches conducted.  For example, SAIC Paramore testified that in response

to the November 5, 2007 e-mail inquiry, he undertook an effort, at the behest of Defendant's

counsel, which included a search of his office, and the offices and files of the Director, Deputy

Director and administrative staff members.  *See* February 26, 2008 Evid. Hr'g Tr. at 34, 56.

SAIC Paramore testified that he "opened files and quickly examined the document . . . to discern

whether or not the document could potentially be something that was characterized in . . . what

Chief Counsel's Office was requesting."[19]  *Id*. at 34, 56.  However, the breadth of SAIC

Paramore's search stands in marked contrast to the others about which testimony was adduced.

### (iii)  SAIC Bryant

Although he testified that "administrative files" are "office files," SAIC Bryant

nonetheless failed to search any of the administrative files of the Buffalo field office in

---

[19]  While SAIC Paramore testified that he became a SAIC in October, 2007, he did not recall receiving an e-mail from the Office of Chief Counsel in December, 2007 directing him to conduct a search for responsive paper documents; consequently, he did not perform a search in either December, 2007 or January, 2008.  *See* March 5, 2008 Morning Session Evid. Hr'g Tr. (Document No. 576) at 25-28.

November, 2007.  Instead, SAIC Bryant asked his administrative supervisor if the files in the file

room would contain any information responsive to the e-mail inquiry.  His administrative

supervisor, without conducting a search of any of the files, told him that "the requested

information . . . would not be in . . . an official capacity in [the] file room."  *See* March 6, 2008

Evid. Hr'g Tr. (Document No. 590) at 14-15.[20]  SAIC Bryant unabashedly testified that this

inquiry of his administrative supervisor constituted a search.  *See* March 7, 2008 Evid. Hr'g Tr.

(Document No. 591) at 18-19.  Moreover, SAIC Bryant did not inform the rest of his staff about

the November, 2007 e-mail inquiry, or ask any of them to search for any responsive documents.

*See* March 6, 2008 Evid. Hr'g Tr. at 23.[21]  Rather, SAIC Bryant merely looked at the personal

files maintained in his desk, his calendar and e-mail account.  *See* March 6, 2008 Evid. Hr'g Tr.

at 14-15.  Additionally, he testified that he did not search in closets, credenzas, safes, vaults, off-

site storage, or file cabinets other than the one containing his own personal documents.  March 7,

2008 Evid. Hr'g Tr. at 13-15.[22]  Although he stated that he makes recommendations for

---

[20] SAIC Bryant attempted to explain his failure to search for responsive paper documents by testifying regarding the knowledge, experience and duties of his administrative supervisor.  He also testified that the Inspection Division conducted a search of the Buffalo field office files in May, 2007; however, he later acknowledged that the Inspection Division was not searching for documents responsive to the November 5, 2007 e-mail inquiry.  *See id.* at 15-20.

[21] On March 4, 2008, nearly two months after the deadline for the date for production of documents in accordance with the order granting Plaintiffs' motion to compel, and two days prior to being called as a witness in the evidentiary hearing, SAIC Bryant, at the direction of Defendant's counsel, instructed his staff to search for paper documents in accordance with the November, 2007 e-mail.  *See* March 7, 2008 Evid. Hr'g Tr. at 19.  SAIC Bryant testified that he told counsel for Defendant about his search efforts approximately one month before he testified, but that he was not informed that his search was inadequate or instructed to do any further searches until he was scheduled to testify.  SAIC Bryant testified that he was directed to search the "100 and 200 series files in the Buffalo field office[]" and to bring those files with him to Washington, D.C.  *See id.* at 19-22.

[22] The undersigned notes that despite his cursory efforts, SAIC Bryant signed a Paper Document Search Certification form on November 6, 2007, indicating that he performed a thorough search of his office.  *See* Defendant's Evid. Hr'g Ex. 23 at 1-2.  He later testified that "my impression was that I was certifying that my office files, my personal files had been–had been reviewed."  March 6, 2008 Evid. Hr'g Tr. at 29.  SAIC Bryant did not testify to any search efforts undertaken in response to the December 26, 2007 e-mail; instead, he unequivocally

promotions via personal e-mail to a supervisor in Washington, SAIC Bryant did not locate any

such e-mails.[23]  *See id.* at 33.  He further stated that "I would assume they were – they're stored

somewhere on my computer, but they're not available to me.  They could be stored in

headquarters.  I'm not exactly sure where they could be."  *Id.* at 35.  SAIC Bryant further testified

that although he is aware of the "duty to preserve the e-mails containing recommendations – to

your [deputy assistant director][,]" he was not aware of the Secret Service's policy to print-and-

save such documents.  *Id.* at 37.

### (iv)  RAIC Gavin

Defendant's assertion that RAIC Gavin's actions in response to the December 26, 2007

e-mail inquiry constitutes a search, as that term is used in Defendant's opposition to Plaintiffs'

motion for sanctions, is entirely misplaced.  RAIC Gavin testified that he received the December

26, 2007 e-mail inquiry requesting that he conduct a search for responsive paper documents.

February 25, 2008 Evid. Hr'g Tr. (Document No. 562) at 184.  Like SAIC Bryant, RAIC Gavin

inquired of the resident administrative manager whether there were merit promotion documents

or promotion-related materials in the Wilmington office; without conducting a search for such

---

testified that although he received the December 26, 2007 e-mail from the Office of Chief Counsel, he did not perform a search as directed by the e-mail.  *Id.* at 27 ("the previous document was in November and this was in December and it was essentially asking me to conduct the same search again.").  Despite his inaction, SAIC Bryant testified that he completed and signed the "Paper Document Search Certification" form attached to the December 26, 2007 e-mail, certifying that a thorough search had been conducted.  He testified that his certification was based upon the search efforts he conducted in November, 2007.  *See id.* at 29; *see also* Defendant's Evid. Hr'g. Ex. 24 at 1.

[23]  SAIC Bryant was confronted with a certification he signed in 2003 regarding the individuals selected for RAIC and ATSAIC over Plaintiff Hendrix, although he testified that the document did not refresh his memory that Plaintiff Hendrix sought either of the two positions.  *See* March 6, 2008 Evid. Hr'g Tr. at 42-43.  He said that if he had printed and saved recommendation e-mails he would have kept them in his "administrative files."  *Id.* at 44-45. He later testified that "'my administrative files' meant "personal administrative files[.]"  *Id.* at 45.  No responsive paper documents were located in this search, despite Plaintiff Hendrix's bid on more than one promotion in the Buffalo field office during SAIC Bryant's tenure as SAIC.  *See* March 7, 2008 Evid. Hr'g Tr. at 33-34.

documents, she told RAIC Gavin that there would be no such information in the office.  *See id*. at

187.  Armed with this information, RAIC Gavin testified that he looked in a small two-drawer

filing cabinet in the resident administrative manager's office that contained "[a]dministrative

files that range from billing for equipment and supplies, to applicants, to background

investigations, routine administrative documentation."  *Id*. at 189.  However, he did not open any

office or administrative files; instead, he conducted a search by looking at the file folder labels

affixed to each file.  *See id*. at 212;  *see also id*. at 189 (RAIC Gavin "looked through the

[numbered] classification codes and to make sure there were no loose files in there.").[24]  RAIC

Gavin also failed to search any of the file cabinets of the agents or administrative staff, or to

confirm whether they conducted a search of their files or desks.  *Id*. at 210, 212, 216.  Instead, he

stated that he asked each of his special agents "whether they had any promotion-related materials

in their office space, and they all said, 'no.'"  *Id*. at 191-192, 202.  He later admitted that he

simply "took them at their word" that they did not have any responsive paper documents.  *Id*. at

202.  RAIC Gavin stated that he did conduct a search of his own personal file, "a five section

folder of my own where I keep my activity reports and other miscellaneous documents, my travel

vouchers."  *Id*. at 209.  However, any further efforts occurred in the "normal course of [his]

activities[.]"  *Id*. at 193 ("I looked in closets because I happened to be in the closet.  I looked in

cabinets because I happened to look in cabinets.")  He stated that he did not specifically look for

notes, notebooks, memos, calendar entries, or print-and-save e-mails in response to the

December 26, 2007.  *See id.* at 232 (testimony by RAIC Gavin that he "considered the

---

[24] RAIC Gavin explained that he did not look in any of the file folders "[b]ecause my . . . resident administrative manager has been doing this for years and she knows where everything goes and she knows that you're not supposed to put personnel-related documentation in this filing cabinet."  *Id.* at 189.

coincidental examination of a calendar compliance[.]").  Despite this lackluster effort, on

January 3, 2008, RAIC Gavin signed the Paper Document Search Certification form that a

reasonable and thorough search was conducted.  *See* Defendant's Evid. Hr'g Ex. 16.

### (v)  RAIC Mays

RAIC Mays testified that in response to the December 26, 2007 e-mail, he searched the

office's administrative files by looking at the stickers and labels affixed to the file folders; he

stated that he "would read the title on the folder and if I thought there was any reasonable

expectation that something responsive to this request would be in the folder, then I would pull

the folder out and flip through the pages[.]"  February 25, 2008 Evid. Hr'g Tr. at 63.  RAIC Mays

further testified that he "looked through" his desk, credenza, notebooks in his personal office,

background investigation files, and closets.  *See id.* at 63-67.  Additionally, RAIC Mays testified

that he immediately asked the resident administrative manager and investigative assistant to

search their desks, files and offices for any responsive paper documents in their possession.  *Id.*

at 61.  Although he testified that there were five special agents in his office, RAIC Mays asked

only one agent to search for responsive paper documents.  *Id.* at 66.  RAIC Mays explained that

he believed this agent could have responsive paper documents since he had worked in the Secret

Service for a long period of time.  *Id.*  He further stated that at some later point in the process, he

forwarded an e-mail to the rest of the members of his staff, asking them to conduct a search of

their offices.  *Id.* at 73.  However, he never received a response from any of them (*id.* at 114) or

spoke with them regarding their search efforts; thus, he could not testify regarding whether they

conducted a search or the scope of any performed search.  *Id.* at 83-84.  Despite his failure to

follow up with his staff members regarding their search efforts, RAIC Mays signed the Paper

Document Search Certification form on December 28, 2007.  Defendant's Evid. Hr'g Ex. 15.  He

testified that he believed he was certifying that he "had done a reasonable complete search of

every file in the office that may contain any kind of document responsive to the request and that

nothing was found."   February 25, 2008 Evid. Hr'g Tr. at 69.

### *(vi)  Inspector  Hunnicutt's credibility*

Defendant's contention that he performed a reasonable search effort in response to the

court's December 21, 2007 Order is further undermined by the testimony elicited from Inspector

Hunnicutt.  Defendant assigned Inspector Hunnicutt, a GS-15 grade level Secret Service agent

with sixteen years of experience in the agency, including a Presidential protective detail, the task

of facilitating and validating his search effort.  *See* February 20, 2008 Evid. Hr'g Tr. (Document

No. 561) at 88.  Counsel for Defendant represented that Inspector Hunnicutt would testify

regarding how she "ensured that a . . . thorough search would be conducted by the various

offices[.]" January 10, 2008 Evid. Hr'g Tr. at 22.    However, Inspector Hunnicutt's attempts to

validate Defendant's search efforts proved to be a process that lacked trustworthiness, and her

testimony was riddled with discrepancies.

Inspector Hunnicutt testified that she created and utilized questionnaire forms to capture

contemporaneous responses from the recipients of the December, 2007 e-mail regarding their

search efforts; she further testified that she asked each recipient a series of questions to learn who

conducted a search of a given office, and what locations each recipient searched.  *See*

Defendant's Evid. Hr'g Ex. 9.  However, six agents, selected by the Defendant, were called to

testify regarding the manner in which each conducted his search.  In some instances, agents

testified regarding their search efforts in a manner which was inconsistent with the responses

recorded by Inspector Hunnicutt on the questionnaire forms.  For instance, Agent Maytorena said

that he did not search file cabinets in response to the December 26, 2007 e-mail, because he does

not have any file cabinets.  *See* March 17, 2008 Morning Session Evid. Hr'g Tr. at 73.   Yet, the

questionnaire completed by Inspector Hunnicutt during her discussion with SAIC Maytorena

indicates with a "y" that a search was conducted of the file cabinets.  *See* Plaintiffs' Evid. Hr'g

Ex. 46-47.[25]  The same affirmative response appeared on the questionnaire for "vaults"; however,

SAIC Maytorena testified that he did not search any vaults.  *See* March 17, 2008 Morning

Session Evid. Hr'g Tr. at 76.   SAIC Maytorena also testified that Inspector Hunnicutt asked him

if notes and notebooks had been searched and he said he told her yes; however, her questionnaire

forms indicate "N/A."  *See id*. at 94; *see also* Plaintiffs' Evid. Hr'g  Ex. 46- 47.  SAIC Bryant

testified that he only searched his personal files, computer, and calendar, and that he told

Inspector Hunnicutt that he searched his personal files, computer, and office files.  March 7, 2008

---

[25]  Plaintiffs' Evid. Hr'g Ex. 46 is a questionnaire from the compilation of questionnaire forms in the binder given to the court on February 5, 2008.  Plaintiffs' Evid. Hr'g Ex. 47 is a questionnaire from the compilation of questionnaire forms in the binder given to the court on February 20, 2008.  *See* March 17, 2008 Morning Session Evid. Hr'g Tr. at 95-96; *see also* Plaintiffs' Evid. Hr'g Ex. 40 & 41.   During the evidentiary hearing, counsel for Defendant provided Plaintiffs and the court with copies of the binder purportedly created and maintained by Inspector Hunnicutt.  *See* February 5, 2008 Evid. Hr'g Tr. at 57-58.  However, upon further examination by Plaintiffs and the court, the undersigned became aware of discrepancies between the copy of the exhibit utilized by counsel for Defendant and the copies provided to Plaintiffs and the court.  *See* February 12, 2008 Evid. Hr'g Tr. (Document No. 560) at 77-83.   Counsel for Defendant initially suggested that an error in copying the questionnaires accounted for the discrepancies.  *Id.* at 78.   However, Inspector Hunnictt's own testimony was that she created the discrepancies when, on January 9, 2008 and January 30, 2008, she "transferred" questionnaire responses from "misnumbered" questionnaire forms to "correctly" numbered questionnaire forms (February 20, 2008 Evid. Hr'g Tr. at 30, 32-33), and subsequently placed the original forms in a "burn bag" to be destroyed.  *Id.* at 30-31.  According to counsel for Defendant, the binder provided to Plaintiffs and the court is the version given to agency counsel on January 9, 2008 by Inspector Hunnicutt (*id*. at 38); after copies were made of the binder and returned to Inspector Hunnicutt, on January 30, 2008, Inspector Hunnicutt removed a number of "misnumbered" questionnaires and replaced them with the "transferred" information.  *See id.* at 33-34, 38-39.

Evid. Hr'g Tr. at 13-15& 17–19.  However, Inspector Hunnicutt testified that SAIC Bryant told

her he only searched his computer.  February 12, 2008 Evid. Hr'g Tr. (Document No. 560) at 18-

19, 37-39 & 70-71.  SAIC Bryant testified that his testimony, and not that of Inspector Hunnicutt,

was the truth.  March 7, 2008 Evid. Hr'g Tr. at 17-19.

The undersigned's inability to accord any of Inspector Hunnicutt's testimony any

significant measure of credibility is further compromised by her startling lack of responsiveness

and candor.  For example, during questioning by counsel at the evidentiary hearing, Inspector

Hunnicutt's testimony included prolonged pauses between the questions and her answers during

which she alternately stared in the distance or cast her gaze downward.  When asked to explain,

Inspector Hunnicutt said that she was trying to provide counsel with "the best answer" (February

1, 2008 Evid. Hr'g Tr. at 33; *see also* February 12, 2008 Evid. Hr'g Tr. at 36); however, the

undersigned noted that Inspector Hunnicutt paused before answering even routine questions, such

as,  "During your service as a GS-14 at the Secret Service, did you ever make any

recommendations, whether formal or informal, to the people above you in the chain of command

about who should be or who should not be promoted?"  *Id.* at 8; *see also id.* at 26, 32-33;

February 5, 2008 Evid. Hr'g Tr. at 66.  Moreover, Inspector Hunnicutt frequently gave answers

which were patently non-responsive. For example, in response to Plaintiffs' counsel's question

regarding the number of times she spoke to Inspector Kuhn about Defendant's effort to locate

responsive paper documents, Inspector Hunnicutt, after some prodding, stated "To the best of my

knowledge, I have the responsibility to provide information regarding the collection of paper

documents from current employees, currently employed.  I would – [.]"  February 1, 2008 Evid.

Hr'g Tr. at 26-28; *see also id.* at 30-31, 42-43& 48-49; February 5, 2008 Evid. Hr'g Tr. at 52, 74-

77; February 12, 2008 Evid. Hr'g Tr. at 15-16, 43-46, 48, 51; February 20, 2008 Evid. Hr'g Tr. at

37, 67-68, 84-88, 103.

### (vii) Defendant's Disregard of the Rule on Witnesses

RAICs Mays and Gavin testified that days before their scheduled testimony, the SAIC of

the Philadelphia Field Office, Robert Slama, forwarded them an e-mail containing a link to a

news article which contained a summary of Inspector Hunnicutt's testimony.  February 25, 2008

Evid. Hr'g Tr. at 51-52, 245.[26]  RAIC Mays testified that on February 21, 2008, the same day he

learned he would be a witness in the evidentiary hearing (*id.* at 109), he received an e-mail from

SAIC Slama, in which Slama said "'Hey, read this before you go.'"  *Id.* at 113.  RAIC Mays

testified that the e-mail contained "a link to an article. I clicked on the link, and as the article

popped up, I glanced at it and quickly realized it had something to do with the case, and I closed

it without reading it."  *Id.* at 51-52.  RAIC Mays further testified that the article "had 'Secret

Service' in the title[]" and that he "remember[ed] seeing something about Carrie Hunnicutt's

name in the first paragraph or something, and then I just remember [sic] what Ms. Braswell told

---

[26] On March 19, 2008, Robert Slama, SAIC of the Philadelphia Field Office, testified that on February 21, 2008, he received an e-mail from Mike White, Assistant Special Agent in Charge (ASAIC),  which contained a link to a "public news clip" of "an article about an agent by the name of Honeycutt [sic] . . . describ[ing] the possibility that she may have destroyed some critical documentation."  March 19, 2008 Morning Session Evid. Hr'g Tr. (Document No. 592) at 9-10, 11; *see also* Defendant's Evid. Hr'g Ex. 33 (e-mail to Robert Slama from Mike White, Assistant Special Agent in Charge, Dignitary Protection Detail).  SAIC Slama testified that although he "did not" know what was meant by ASAIC White's introductory statement of "Bob & Dave, the most interesting thing you will read today.  Click on the first link[,]" *(id.* at 12-13), after reading the news article he sent an e-mail back to Mr. White with the statement "Oh booooy" because he "was shocked at what [he] read and what – the perception of what happened or what was reported in that e-mail – in that news clip . . . ."  *Id.* at 16.  SAIC Slama later testified that Plaintiffs' Evidentiary Hearing Exhibit 48 is similar in content to the news article contained in the e-mail he received from ASAIC White.  *Id.* at 36.

Moore, et al., v. Chertoff                                                                                        34

me.  I clicked it off.  I closed it immediately and didn't read it." *Id*. at 113.[27]

RAIC Gavin testified that on or about February 21, 2008, he also learned that he would be

a witness in the evidentiary hearing (*id*. at 225), and that on the Friday before his testimony, the

SAIC of Philadelphia sent him an e-mail regarding the lawsuit.  *Id.* at 249.[28]  RAIC Gavin

testified that he "didn't open it. . . [SAIC Slama] told me he was sending it to me and I told him

I'd been instructed by Ms. Braswell not to talk with anybody or read any accounts of it, so I

deleted it."  *Id.* at 245.  RAIC Gavin further testified that SAIC Slama asked him "'Did you . . .

hear about the problem that Carrie Drayer[] . . . had trouble with . . . her testimony[?]'" *(id.* at

246), but that he "told [SAIC Slama] I couldn't talk about it."  *Id*.

SAIC Slama forwarded the e-mails, despite being "told by [his] superiors that witnesses

may be called tied to the request for information and preservation of evidence."  March 19, 2008

---

[27]  SAIC Slama testified that on February 21, 2008, he "sent [the e-mail] to [RAIC] Gregory Mays[,]" who "during our conversation said that he was going to Washington to talk to chief counsel's office concerning issues tied to this court proceeding[,]" (March 19, 2008 Morning Session Evid. Hr'g Tr. at 16-18); *see also* Defendant's Evid. Hr'g Ex. 34 (February 21, 2008 e-mail to RAIC Gregory Mays).   SAIC Slama testified that he was "not sure if [RAIC Mays] did or . . . did not" inform him that he was scheduled to be a witness at the evidentiary hearing, (*id.* at 18), but that "when [RAIC Mays] said that he was going [to Washington, D.C.], I just thought this would be interesting that he should see this and how serious this situation is and how the perception that if someone did do something wrong, that was a very bad thing, and as he works for me, I did not want anything like that to occur in the Philadelphia District of the Secret Service."  *Id.* at 19.  SAIC Slama testified that he told RAIC Mays, "this can't happen in this office or anywhere.  This – 'this', [Plaintiffs'] Exhibit 48, should never have happened."  *Id.* at 59. SAIC Slama further testified that he "assumed that [RAIC Mays] [read the document ] when he received it," but that he "didn't recall having a conversation that [RAIC Mays] said, I read the e-mail[.]"  *Id.* at 20.

[28]  SAIC Slama testified that "[l]ater on, I sent [the e-mail] to one additional person, which was [RAIC] Gavin . . . ."  *Id.* at 17; *see also* Defendant's Evid. Hr'g Ex. 35 (February 22, 2008 e-mail to RAIC Andrew Gavin). SAIC Slama testified that he had a conversation with RAIC Gavin on February 22, 2008 and RAIC Gavin told him he "may have to go to Washington.  When he said that, I said, [']hey, there's an interesting article here['], and I sent it to him."  *Id.* at 26.  SAIC Slama testified that after he forwarded the e-mail, RAIC Gavin told him that he may be a witness in a court proceeding, and that he could not look at anything.  *Id.*  SAIC Slama, in response to counsel's inquiry about his intent in forwarding the e-mail to RAIC Gavin, testified that "I'm very proud of the Secret Service, . . . [RAIC Gavin]'s been a friend.  And I said to him, [']Jeff, this can't happen.  We need to be straightforward, and you're probably going to be down there and be questioned about this information.[']"  *Id.* at 30.  Slama testified that he did not have "a clue[]" that he or "anyone in our office" would be a witness in these proceedings.  *Id.* at 63.

Morning Session Evid. Hr'g Tr. at 21.[29]  SAIC Slama testified that he "had an idea that I

shouldn't talk to witnesses; but I didn't know that I knew any witnesses[,]" and "[i]t didn't occur

to me that [RAIC Mays] would be a witness."  *Id.*

       Despite the knowledge that his potential witnesses were exposed to a news media article

about the testimony of Inspector Hunnicutt, Defendant offered testimony from RAICs Mays and

Gavin on February 25, 2008.  Counsel for Defendant proffered that she "became aware . . . on

Friday [February 22, 2008]" that the SAIC of Philadelphia had e-mailed the link to a news article

regarding testimony given during the evidentiary hearing to the two witnesses (February 25, 2008

Evid. Hr'g Tr. at 260-61), and that she "immediately investigated to see what those two

witnesses had done when they received the e-mail."  *Id.* at 263.   Defendant's counsel maintained

that RAICs Mays and Gavin "had no inappropriate exposure[]" to any testimony from the

hearing, and denied that the e-mail transmitted from the Philadelphia SAIC was a violation of the

rule of witnesses, opining that "because the witnesses did not look at the – at what was in the

link, if they did not read any testimony, then there was no violation of the rule of witnesses."  *Id.*

at 261-62, 264.[30]  When the undersigned inquired of Defendant whether it was appropriate for the

---

[29]  SAIC Slama testified initially that Michael Stenger, AD of the Office of Investigations, "in mid-February, 2008" during an "information sharing conference call with the other special agents" informed the agents that "there is a possibility that you may be questioned on your imaging of your hard drive or how you searched your office[]" (*id.* at 39) which SAIC Slama assumed meant that such questioning would occur "informally and formally in a court proceeding[.]"  *Id.*  SAIC Slama further acknowledged that he understood AD Stenger's statements to mean the special agents should not talk to each other because they may be required to testify in court.  *Id.* at 40.  SAIC Slama later testified on re-direct examination that AD Stenger "didn't specifically" say that he could not discuss the case with other agents, but that he thought "it was an interpretation on [his] part, and maybe [AD Stenger] inferred it[.]"  *Id.* at 62.

[30]  Counsel for Defendant proffered that she did not "bring it to the attention of the court because both witnesses told [her] that they had not seen any summary of testimony; therefore there had been no violation of the Court's rule on witnesses, so I saw no need to bring it to the Court's attention."  *Id.* at 261.  The undersigned observes that Defendant also failed to alert Plaintiffs of this irregularity before the evidentiary hearing began on February 25, 2008.

SAIC of Philadelphia to send an e-mail to the special agents, counsel for the Defendant

responded that "it was very unfortunate that he did that.  I don't know what his intent was behind

it, and I can't say anything more than I thought it was very unfortunate[.]"  *Id.* at 262-63.

Defendant further proffered that he was "extremely prejudiced by the fact that a reporter has been

sitting in this courtroom taking down what has been going on in these proceedings and we have

had to exclude numerous witnesses because they unknowingly . . . have been reading press

reports and know what the testimony is . . . we have had to exclude many."  *Id.* at 266.

Defendant's counsel acknowledged that "because this [proceeding] is appearing over a long

period of time, people who we don't even know are googling to find out what's going on in the

case . . . and they're getting access to press reports . . . we determine[d] that we can't use those

individuals as a witness[es], and . . . we have determined that it's more widespread than we had

initially realized."  *Id.* at 267.  Counsel admitted that this issue "has made it difficult" to answer

the court's question regarding which witnesses are coming and when, (*id.* at 267-68), but stated

that "the Secret Service employees have a right to read press accounts just like anyone else.

We're the ones that have to deal with it in terms of the witnesses that we bring into court[.]"  *Id.*

at  269.[31]

        The undersigned finds that the potential witnesses with respect to the evidentiary hearing

included everyone who signed a certification, as that is what Defendant offered as his evidence

that a thorough and reasonable search was performed in response to the court's December 21,

---

[31]   SAIC Slama testified that Ed Donovan, Secret Service Special Agent, forwarded the e-mail of the link to
the news article to Mike White, Tyler McQuiston, Secret Service Special Agent, Joseph Brennan, Secret Service
Special Agent, and Frank Romano, Secret Service Special Agent, and that Mike White also forwarded the e-mail to
David Beach, ASAIC of the Philadelphia Field Office.  *See* March 19, 2008 Morning Session Evid. Hr'g Tr. at 12,
14-16 .

2007 Order.  Defendant, through the receipt of the signed certifications, had notice of the pool of

individuals from which the potential witnesses would be selected.  Defendant also was well

aware of the presence in the courtroom of at least one reporter, and of the media coverage of

these proceedings; nonetheless, Defendant failed to instruct the potential witnesses to refrain

from reading press reports of testimony elicited during the hearing.  *See id.* at 267.   Even after

learning that the SAIC in Philadelphia transmitted by e-mail the links to the newspaper article,

counsel for the Defendant saw fit to do absolutely nothing about it.  Thus, any difficulty or

prejudice Defendant may have suffered during the evidentiary hearing was of his own making.

### (viii)  Former Employees

Defendant also offered testimony about his efforts to contact former Secret Service

employees to ask that they search for responsive paper documents.  *See* January 10, 2008 Evid.

Hr'g Tr. at 132-133,155-157.  Inspector Kuhn testified that the Office of Chief Counsel sent a

letter to former agents in which Chief Counsel inquired whether they had previously made or

received recommendations of any of the Plaintiffs, and requested a search of their records for

paper documents related to any decision or bid selection recommendation in the applicable time

period.  *Id.* at 155; *see also* January 25, 2008 Evid. Hr'g Tr. (Document No. 556) at 18-19;

Defendant's Evid. Hr'g Ex. 5.  Defendant also attached a certification form to the letter which the

former agents were required to complete and return to the Chief Counsel's office.  January 25,

2008 Evid. Hr'g Tr. at 27.  Inspector Kuhn testified that by January 7, 2008, Defendant had

attempted to contact every former agent on the list of supervisory former agents complied by the

Office of Chief Counsel.  January 25, 2008 Evid. Hr'g Tr. at 27.  He further testified that by

Moore, et al., v. Chertoff                                                                 38

January 25, 2008 Defendant had received certifications or verbal responses from 264 of the 291

former agents polled.  *Id.* at 28, 31; *see also* Defendant's Evid. Hr'g Ex. 6.

Inspector Kuhn also testified that it is the policy of the Secret Service to retain files and

records related to the business of the Secret Service in the field or resident office when an agent

leaves the agency.  *See* January 10, 2008 Tr. at 135-36.  However, he also testified that "some

files are archived . . . after a certain amount of time[]" in the Federal Records Center.  *Id.* at 136-

37.  His knowledge that responsive documents could be stored at the Federal Records Center

notwithstanding, Inspector Kuhn had no knowledge of whether the Secret Service attempted to

search records at the Federal Records Center for documents responsive to Plaintiffs' discovery

requests.  *Id.* at 137-38.


**STANDARDS APPLICABLE TO THE DETERMINATION OF A MOTION FOR
SANCTIONS PURSUANT TO RULE 37**

Rule 37 of the Federal Rules of Civil Procedure provides, in pertinent part, that

> [i]f a party . . . fails to obey an order to provide . . . discovery,
> . . . the court where the action is pending may issue further just
> orders.  They may include the following:
> (i)   directing that the matters embraced in the order or other
>       designated facts be taken as established for purposes of the
>       action, as the prevailing party claims;
> (ii)  prohibiting the disobedient party from supporting or opposing
>       designated claims or defenses, or from introducing designated
>       matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv)  staying further proceedings until the order is obeyed;
> (v)   dismissing the action or proceeding in whole or in part;
> (vi)  rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except
>       an order to submit to a physical or mental examination.

Fed.R.Civ.P. 37(b)(2)(A);[32] *see also Bonds v. District of Columbia,* 93 F.3d 801, 807-08 (D.C.

Cir. 1996), *cert. denied,* 520 U.S. 1274 (1997)); *Law Office of Azita Mojarad v. Aguirre,* No.

CIV.A.05-0038, 2006 WL 785415, at *10 (D.D.C. March 27, 2006); *Peterson v. Hantman,* 227

F.R.D. 13, 15 (D.D.C. 2005) ("The Federal Rules authorize a wide array of sanctions, including

staying the proceedings pending compliance with a court order, taking certain facts as

established, prohibiting a party from introducing certain matters into evidence, finding a party in

contempt of court, and dismissing the action or any part thereof.").

The district court has broad discretion in managing discovery, and "[t]his deference

[accorded by the circuit] extends to the district court's imposition of discovery sanctions." *Flynn

v. Dick Corp.,* 481 F.3d 824, 835 (D.C. Cir. 2007) (citing *Jankins v. TDC Mgmt. Corp.,* 21 F.3d

436, 445 (D.C. Cir. 1994)); *see also Bonds,* 93 F.3d at 807 ("Under Rule 37, the district court has

broad discretion to impose sanctions for discovery violations.") (citation omitted); *Mojarad,*

2006 WL 785415, at *10 (the list of sanctions enumerated in Rule 37(b)(2)(A) is neither

exhaustive nor mutually exclusive, and "the court may impose [more than one of the enumerated

sanctions] at the same time[]"; "[t]he imposition of the number and type of sanctions employed

under [Rule 37(b)(2)(A)] is left to the discretion of the trial judge.") (citations omitted); *Bolger

v. District of Columbia*, 248 F.R.D. 339, 343 (D.D.C. 2008); *Henry v. Onsa*, No. CIV.A.05-2406,

2008 WL 552627, at *2 (D.D.C. Feb. 27, 2008); *Handy v. Shaw, Bransford, Veilleux & Roth,* No.

CIV.A.00-2336, 2006 WL 3791387, at *8 (D.D.C. Dec. 22, 2006) ("Indeed, the 'district court

has been delegated a good deal of discretion in making discovery orders and enforcing them with

---

[32]  Rule 37(b)(2) was amended effective December 1, 2007.  While the text of the rule as amended varies to some degree from the text quoted in the authorities cited herein, "[t]hese changes are intended to be stylistic only." Fed.R.Civ.P. 37 advisory committee notes (2007 Amendment).

Moore, et al., v. Chertoff                                                                                       40

sanctions[.]'") (citation omitted));  *see also United States v. Proceeds of Drug Trafficking*

*Transferred to Certain Foreign Bank Accounts*, 252 F.R.D. 60, 62-63 (D.D.C.  2008) ("Sanctions

are integral to the operation of the judicial system[,]" and Rule 37 "allows the court to apply a

variety of sanctions to any *party* in a case.") (citations omitted).

        However, the District of Columbia Circuit has held that

> [t]he central requirement of Rule 37 is that "any sanction must
> be 'just,'" . . . which requires in cases involving severe sanctions
> that the district court consider whether lesser sanctions would be
> more appropriate for the particular violation. . . . The choice of
> sanction should be guided by the "concept of proportionality"
> between offense and sanction. . . . Particularly in the context of
> litigation-ending sanctions, we have insisted that "'since our
> system favors the disposition of cases on the merits, dismissal
> is a sanction of last resort to be applied only after less dire
> alternatives have been explored without success' or would
> obviously prove futile." . . . In determining whether a severe
> sanction is justified, the district court may consider the
> resulting prejudice to the other party, any prejudice to the
> judicial system, and the need to deter similar misconduct in the
> future.

*Bonds,* 93 F.3d at 808 (citations omitted).  Applying this standard, a judge of this court held that

"any sanctions awarded must be proportional to the underlying offense." *Banks v. Office of the*

*Senate Sergeant-At-Arms,* 241 F.R.D. 370, 372 (D.D.C. 2007) (citing *Bonds,* 93 F.3d at 808); *see*

*also Rude v. Dancing Crab at Wash. Harbour, LP,* 245 F.R.D. 18, 22 (D.D.C. 2007)  ("When the

most severe sanctions, such as dismissal or default, are requested, the Court must determine

whether lesser sanctions would be more appropriate.") (citing *Bonds,* 93 F.3d at 808).

        In *Bonds*, the District of Columbia Circuit, in reversing the District Court's grant of a

preclusion sanction pursuant to Rule 37,  held that "[i]n determining whether a severe sanction is

justified, the district court may consider [1] the resulting prejudice to the other party, [2] any

prejudice to the judicial system, and [3] the need to deter similar misconduct in the future."

*Bonds*, 93 F.3d at 808 (citation omitted).[33]  The Circuit further held that "[b]efore imposing [a

broad preclusion sanction] . . . the district court should consider a less drastic sanction in light of

the three factors[.]"  *Id.* at 809 (citation omitted).[34]

> Moreover, instead of, or in addition to, the enumerated sanctions,

>> the court must order the disobedient party, the attorney advising
>> that party, or both to pay the reasonable expenses, including
>> attorney's fees, caused by the failure, unless the failure was
>> substantially justified or other circumstances make an award of
>> expenses unjust.

Fed.R.Civ.P. 37(b)(2)(C); *see also DL v. District of Columbia*, 251 F.R.D. 38, 49 (D.D.C. 2008)

("This Court has previously observed that 'the language of the Rule itself is mandatory, dictating

that the Court must award expenses upon granting a motion to compel disclosure unless one of

the specified bases for refusing to make such an award is found to exist.'") (citation omitted).

## DISCUSSION

The undersigned, following a hearing, granted Plaintiffs' Motion to Compel Defendant to

Comply With His Discovery Obligation to Conduct a Reasonable Search for Responsive Paper

---

[33]  With respect to the third of these considerations, the Circuit observed that while "[t]he district court's
interest in deterrence is a legitimate one, . . . sanctions based only on principles of deterrence 'call for careful
evaluation to ensure that the proper individuals are being sanctioned (or deterred) and that the sanctions or deterrent
measures are not overly harsh.'"  *Id.* (citations omitted).  However, the sanctions for which the instant Memorandum
Opinion provides are not based "only" on principles of deterrence, but instead, on considerations of all three of the
considerations articulated by the Circuit.

[34]  In *Bonds*, the Circuit found that the sanction under review effectively denied the defendant a trial on the
merits, a sanction which required that the district court either "make a finding supported by the record that the more
severe sanction is necessary to avoid prejudice to the plaintiffs or to the court's calendar or to prevent a benefit to the
defendant, or–if the sanction is based only on deterring future discovery misconduct–the more severe sanction must
be supported by a finding of flagrant or egregious misconduct by the defendant."  *Id.*  However, while the sanction
for which the instant Memorandum Opinion provides is indeed a preclusion sanction, it neither "approaches a default
judgment" (*see id.* at 808) nor denies Defendant the right to a trial on the merits.  *See* n.4, *supra*.

Documents (Document No. 488, Part 1) and awarded Plaintiffs their costs, including reasonable

attorneys' fees, of moving to compel discovery; Defendant's motion for reconsideration of the

order granting the motion to compel (Document No. 520) has been denied.  Memorandum

Opinion and Order (Document No. 587).  Accordingly, determination of the pending motion

requires consideration solely of what sanction, if any, "in addition to" the award of costs, is

warranted by the application of Rule 37(b)(2)(A).  *See* Fed.R.Civ.P. 37(b)(2)(C).[35]  The

undersigned makes this determination in accordance with the methodology articulated by the

District of Columbia Circuit, and upon consideration of each of the factors the Circuit directed

the District Court to consider in determining whether "a severe sanction" is justified.[36]

### (1) Prejudice to Plaintiffs

The undersigned finds that the day for the court to consider the merits of this case has

been delayed in large measure by the Defendant's failure to provide discovery without the

---

[35]  *See also* January 10, 2008 Evid. Hr'g Tr. at 7-8 (the purpose of the evidentiary hearing would be to determine "what additional sanction should be entered because the violation [of the Federal Rules of Civil Procedure] has [previously] been established.").  Defendant states that "[t]he only issues now before the court are whether plaintiffs have proven by clear and convincing evidence that defendant failed to act in a reasonable manner with regard to plaintiffs' 2006 discovery requests at issue and whether defendant has acted reasonably during the course of discovery, specifically concerning defendant's response to the Court's December 21, 2007 Order to produce miscellaneous, paper recommendation documents to plaintiffs."  Defendant's Proposed Findings at 2. However, the undersigned finds that this assertion–like many others Defendant advanced during the proceedings with respect to the motion for sanctions–is a characterization of the record which is wholly devoid of a factual basis.

[36]  *Bonds*, 93 F.3d at 808.  The Circuit did not define "severe," but appeared to suggest that a "broad preclusion order" could "approach[] a default judgment in its severity."  *Id.*  Plaintiffs, by their motion, did not request a default judgment, and this court has not, by this Memorandum Opinion and accompanying order, imposed one; nonetheless, given Defendant's concerns that the sanction sought by Plaintiffs is akin to a default, (*see* nn.3-4, *supra*), the undersigned will apply the most exacting standard which the Circuit has articulated.  *Cf. Davis v. Auto Club Family Ins. Co.*, No. CIV.A.07-8545, 2008 WL 5110619, at *1 (E.D. La. December 2, 2008) (dismissal as a sanction for violation of an order to provide discovery may be ordered "only when the following conditions are met: (1) the refusal to comply results from bad faith or willfulness and is accompanied by delay or contumacious conduct; (2) the violation is attributable to the client instead of the attorney; (3) the violating conduct substantially prejudices the other party; and (4) a less severe sanction would not achieve the same result.") (citations omitted).

Moore, et al., v. Chertoff                                                                                           43

virtually continuous intervention of the court.  Defendant's contention that he "sought to mitigate

any adverse impact of this relatively minor delay by attempting to work with plaintiffs to

expeditiously retrieve the documents requested[]" (Defendant's Opposition at 24), is, in this

context, entirely unpersuasive.  Defendant failed even to commence a reasonable search for the

full extent of the documents responsive to Plaintiffs' May and June, 2006 requests for production

of documents until sixteen months after the requests were served, a delay which cannot fairly be

characterized as "relatively minor[.]"  *Id.*  Plaintiffs' moved to compel the production of

documents after Defendant's 30(b)(6) designee testified that Defendant did not search the records

of SAICs outside of the District of Columbia, or the records of SAICs, Deputy Assistant

Directors (DADs), Assistant Directors (ADs), the Deputy Director, or the Director based in

Washington, D.C., for documents relating to Plaintiffs' discriminatory promotion claims (*see*

Plaintiffs' Ex. 22 (Transcript of  30(b)(6) Deposition of Tracy Lawson) at 85-87, 95); Defendant

neither offered evidence from which the court could infer that Ms. Lawson was mistaken, nor

called any witnesses who credibly testified that at any time, Defendant reasonably searched for

the full extent of the responsive documents.  Thus, the undersigned cannot find that even at this

late date, a reasonable search for the full extent of the responsive documents has been

undertaken.

Defendant's failure to timely search for and serve the documents responsive to Plaintiffs'

requests for production of documents–either in accordance with Rule 34 of the Federal Rules of

Civil Procedure or in compliance with the court's order compelling discovery–has prejudiced

Plaintiffs' ability to conduct meaningful discovery and to prepare to address the merits of their

claims.  *See, e.g., Turner v. Clark County Sch. Dist.,* No. 2:07-CV-101, 2008 WL 5120544, at *3

Moore, et al., v. Chertoff                                                                    44

(D. Nev. December 4, 2008).  As a court addressing a comparable failure explained,

> [t]o rectify the prejudice caused by [the party's] failure
> to comply with the discovery order, the Court would be
> required to grant a further extension of the discovery
> and other pretrial deadlines which is contrary to public
> interest in the expeditious resolution of litigation and
> the court's need to manage its dockets.

*Id.* (citations omitted).  Additionally, Plaintiffs "have been 'required to waste time, money, and

effort in pursuit of cooperation' that [Defendant] is obligated to provide under both the Federal

Rules and the Court's orders."  *Gallina v. Wyandotte Police Dep't,* No. 4:07-CV-12640, 2008

WL 5090551, at *2 (E.D. Mich. November 26, 2008) (citation omitted).

     Additionally, the undersigned finds that Defendant's effort to dispute Plaintiffs' need for

the documents (*see, e.g.,* Defendant's Opposition at 11, 28-29) is of no moment.  A party upon

whom requests for production of documents are served is not at liberty to withhold from

production documents deemed to be of minimal "evidentiary value" (*see* Defendant's Proposed

Findings ¶¶ 43-48, at 94).  Defendant–like all litigants–had the opportunity to perfect his

objections to Plaintiffs' requests for production of documents in the manner prescribed by the

Federal Rules of Civil Procedure, but failed to do so;[37] his belated effort to dispute Plaintiffs'

need for the documents is, the undersigned finds, of no relevance to the court's consideration of

the issue of the prejudice to Plaintiffs caused by Defendant's failure to timely search for and

produce the full extent of the documents responsive to Plaintiffs' requests for production.

     Notably absent from Defendant's Proposed Findings of Fact and Conclusions of Law is

any meaningful dispute of the proposition that Plaintiffs are prejudiced by Defendant's failure to

---

[37] *See* n.17, *supra.*

comply with their Rule 34 obligation and the court's order compelling discovery.  Defendant

suggests that Plaintiffs' claim of prejudice "is premised on the assumption that there is a huge

cache of responsive paper recommendation documents previously undisclosed by defendant that

is essential to [P]laintiffs' case."  Defendant's Proposed Findings ¶ 34, at 90.  Plaintiffs have not

advanced such argument, and the court makes no such finding.  More important, however, is that

no authority supports the proposition that the volume of withheld documents is dispositive of the

sanction which is warranted by the application of Rule 37; indeed, the 30-year-old decision on

which Defendant relies for this proposition does not concern Rule 34 requests for production of

documents at all, and is limited to consideration of the adequacy of a search pursuant to a

Freedom of Information Act request.[38]

        Defendant's suggestion that Plaintiffs "cannot be prejudiced by the non-production of

documents that do not exist" (Defendant's Proposed Findings ¶ 36, at 91) is equally misplaced:

since Defendant never offered evidence that he conducted a reasonable search for responsive

documents, Defendant has no basis upon which to maintain that the requested documents "do not

exist[.]"  Moreover, Defendant's contention that the requested documents "do not exist" is

contradicted by the testimony of Defendant's current employees: during the evidentiary hearing,

Defendant made no effort to rebut Plaintiffs' contention that "[d]uring the course of depositions

in December, 2006, several former and current employees of Defendant testified to the existence

of types of documents responsive to Plaintiffs' discovery requests that had not been produced and

in some instances, that Defendant had claimed do not exist."  *See* Plaintiffs' Motion at 5 (citation

---

[38]  *Id. (*citing *Grolier, Inc. v. Federal Trade Comm'n,* No. CIV.A.76-1559, 1978 WL 1348 at *4 (D.D.C. Mar. 10, 1978)).

omitted); *see also* Plaintiffs' Reply at 1 ("The significance of these newly-produced,

contemporaneous records is staggering.").  Defendant made no effort to rebut these contentions

during the evidentiary hearing.

### (2) Prejudice to the Judicial System

The gravamen of "prejudice to the judicial system" is that

> counsel may not pick and choose when to comply with a court order
> depending on counsel's unilaterally determined excuses or justifications
> not to comply with the order.  The order is either obeyed or appealed.
> Nor should courts issue orders which they are unwilling to enforce.
> There is importance *per se* in not allowing a party to ignore orders-the
> litigation process would otherwise descend into chaos.

*Ajaxo Inc. v. Bank of America Tech. & Operations, Inc.,* No. CIV-S-07-0945, 2008 WL 5101451,

at * 2 (E.D. Cal. December 2, 2008); *see also Perez v. Berhanu,* No. CIV.A.07-0373, 2008 WL

4604065, at *3 (sanctioned parties' "disrespect for the Court" was demonstrated by their failure

to respond to the opposing parties' discovery requests, coupled with their disregard of the

discovery deadline, failure to timely respond to the opposing parties' motion for sanctions, and

failure to appear at a scheduled status hearing).

The undersigned now finds, on the basis of the findings with respect to the evidence

adduced at the evidentiary hearing, that Defendant has made a mockery of Rule 34, the case

management orders of the court, the order granting Plaintiffs' motion to compel, and the

evidentiary hearing.  Among these, the testimony of the witnesses Defendant offered as the most

knowledgeable about Defendant's efforts to reasonably search for and produce the documents

responsive to Plaintiffs' requests for production of documents stands as the most egregious.  Not

only did it become evident that no reasonable search for the documents responsive to Plaintiffs'

requests for production was ever conducted; in addition, the credibility of the witness who was

tasked with the responsibility of validating the "searches" was thoroughly eviscerated.

Moreover, the court's ability to conduct an orderly and efficient evidentiary hearing was

further compromised by Defendant's inability to call all of the witnesses he identified because of

the decision of at least one of his witnesses to circulate an e-mail regarding the testimony of

Inspector Hunnicutt to other witnesses whose names were included on Defendant's witness list.

The witness who did so, as well as those agents who read even some portion of the e-mail, were

agents of one of the premiere federal law enforcement agencies, whose training includes

preparation for court proceedings, and whose tasks include the protection of the President of the

United States.  Thus, the undersigned finds that the agents were well aware that the circulation of

an article regarding the testimony of a witness who testified at the hearing to prospective

witnesses for the same hearing would tend to obstruct the fact-finding process.  The undersigned

observes that Defendant's counsel expressed her regret for this circumstance; however, the same

counsel acknowledged that Defendant, as a consequence of the transmission of the summary of

Inspector Hunnicutt's testimony, was unable to call many of the witnesses he intended to call.

The undersigned finds that the circulation of the article–in the manner in which daily e-mail

quips are distributed in jest–prejudiced the judicial system.

The sole basis upon which Defendant submits that his actions have not prejudiced the

judicial system is that "[t]here is no evidence that [D]efendant exercised bad faith in filing or

opposing any discovery motion throughout the history of this case."  Defendant's Proposed

Findings ¶ 49, at 97.  However, it is settled that "[b]ad faith does not require actual ill will;

substantial and prejudicial obduracy may constitute bad faith."  *Ajaxo,* 2008 WL 5101451, at *2

(citation omitted); *see also Henry,* 2008 WL 552627, at *3 (the "multiple warnings" to the

parties with respect to their repeated failures to comply with the rules and orders governing the

conduct of discovery "compel the conclusion that [their] disregard of the undersigned's order

compelling discovery was willful.") (citations omitted).  The undersigned finds that the

"substantial and prejudicial obduracy" which is evident from the consideration of the testimony

of Defendant's managers and agents virtually mandates a finding that Defendant's

noncompliance with the applicable rules and orders was willful.  Like the sanctioned parties in

*Ajaxo*, Defendant in this action has effectively rewritten both Rule 34 and this court's orders to

justify his production of only those documents he was inclined to produce.[39]

### *(3) Need to Deter Similar Misconduct in the Future*

In entering a default judgment as a Rule 37 sanction, another judge of this court observed

that "[a] lesser sanction may also yield similar misconduct by other litigants by indicating that

flagrant violations will yield only minor sanctions."  *Perez,* 2008 WL 4604065, at *3.  A finding

"that there is no behavior to deter as [D]efendant's actions are the kind of behavior contemplated

by both the Court and the Federal Rules[]" (*see* Defendant's Proposed Findings ¶ 54, at 99)

would require that the court disregard the findings which the undersigned has already articulated

with respect to (1) the willfulness of Defendant's failure to reasonably search for and produce the

documents responsive to Plaintiffs' requests for production; (2) the lack of credibility of the

witnesses identified by Defendant as the most knowledgeable; and (3) the blatant disregard of

witnesses whom Defendant identified as among those who would testify at the hearing of the

---

[39] *See* n.15, *supra*

protocols precluding the dissemination of a summary of the testimony of a witness who has

testified at a proceeding to a witness in the same proceeding who has not yet testified.  Moreover,

such a finding would extend a virtual license to Defendant–in this and other litigation to which

Defendant is a party–as well as to other litigants, to do likewise.  *See Perez,* 2008 WL 4604065,

at *3.  Indeed, the multiple lesser sanctions the court has previously imposed (*see* Joint Ex. 3) did

not deter the discovery misconduct which was the subject of the sixteen-day evidentiary hearing.

### *(4) Lesser Sanctions Would Not be More Appropriate*

The undersigned finds that there is no basis in the record with respect to this action upon

which to conclude that "lesser sanctions would be more appropriate."  *See Rude,* 245 F.R.D. at

22 (citing *Bonds,* 93 F.3d at 808).  The prior orders compelling discovery, denying a motion for

protective order precluding certain discovery, and awarding lesser sanctions (*see* Joint Ex. 3 at 2-

5) have proven "ineffective or obviously futile[,]" given Defendant's insistence (*see* Defendant's

Proposed Findings ¶¶ 54, 59, at 99, 101) that his actions "are the kind of behavior contemplated

by both the Court and the Federal Rules[,]" and that "there is no basis for imposing any

sanction."  Put another way, lesser corrective actions–the first of which was in the form of the

August 3, 2000 Order compelling in part Defendant to provide discovery–have not deterred

Defendant from his disregard of his discovery obligations.  *See, e.g., Webb v. District of*

*Columbia*, 189 F.R.D. 180, 184 (D.D.C. 1999); *cf. Gallina*, 2008 WL 5090551, at *3 (party's

"repeated violations of the Court's rules and orders, the dilatory tactics with respect to discovery,

and the overall lack of meaningful participation in effectively adjudicating this case[]" warrants

finding "that dismissal is the only appropriate sanction.").

Consideration of what "lesser sanctions" might be appropriate has been further hindered

by Defendant's refusal to even propose any until counsel's closing argument following the

sixteen-day evidentiary hearing.   During the May 29, 2008 closing arguments–eight moths after

Plaintiffs filed their motion to compel–Defendant proposed re-opening discovery; allowing

Plaintiffs to supplement their motion for class certification; and an equal division of costs for the

expense of adjudication of the instant motion.  *See* May 29, 2008 Tr. at 89-90.   However, the

undersigned finds that Defendant's proposal is disingenuous in that it is not a sanction tailored in

any meaningful way to mitigate the prejudice suffered by the Plaintiffs, the prejudice to the

judicial system and the need to deter similar misconduct in the future.  *See Webb*, 189 F.R.D. at

192 (lesser sanction not tailored to address prejudice to opposing parties, prejudice to the court,

and need for deterrence is rejected as inadequate).   In any event, given Defendant's continued

delay and obfuscation, "there is no reason to believe that [Defendant] will be responsive to any

future orders."  *Perez*, 2008 WL 4604065, at *3.

**CONCLUSION**

     On the basis of all of the findings articulated herein, the undersigned finds that the

preclusion sanction for which the instant Memorandum Opinion provides is "just," and is

"guided by the 'concept of proportionality' between offense and sanction."  *See Bonds,* 93 F.3d

at 808 (citations omitted).   While the sanction is not "litigation-ending[,]" the undersigned has

nonetheless considered the extent to which "'less dire alternatives have been explored without

success' or would obviously prove futile[]" (*see id.*), and, for the reasons set forth herein,

answered the inquiry in the affirmative.   Accordingly, Plaintiffs' Motion for Sanctions

Moore, et al., v. Chertoff                                                                 51

(Document No. 488, Part 2) is granted, and the requested preclusion sanction imposed, by the

Order filed contemporaneously with this Memorandum Opinion.[40]

December 17, 2008                                    _____/s/_____
                                                    DEBORAH A. ROBINSON
                                                    United States Magistrate Judge

---

[40]  The undersigned makes no findings herein regarding the court's inherent authority to impose the sanctions requested by Plaintiffs'.  However, as the D.C. Court of Appeals and this district court has held "the appropriate standard under either the rules of civil procedure or the Court's inherent powers is essentially the same." *Webb*, 189 F.R.D. at 184.