# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                  )
**REGINALD MOORE, <u>et al.</u>,**      )
                                  )
    **Plaintiffs,**              )
                                  )
    **v.**                       )  **Civil Action No. 00-953 (RWR/DAR)**
                                  )
**JANET NAPOLITANO,**               )
                                  )
    **Defendant.**               )
_____  )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, African-American current and former special agents ("SAs") of the United States Secret Service, bring this employment discrimination action individually and on behalf of a putative class of African-American SAs against the Secretary of the Department of Homeland Security under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e <u>et</u> <u>seq.</u> (1994), and the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Plaintiffs claim that the Secret Service has engaged in a pattern and practice of racial discrimination in its promotion of black SAs to the GS-14 and GS-15 levels. Plaintiffs have moved under Federal Rule of Civil Procedure 23 to certify a class of African-American current and former SAs who have allegedly suffered racial discrimination during the course of their employment. Because the class representatives' claims are not typical of the

class members' claims and there is a conflict of interest within the class, the plaintiffs' motion will be denied without prejudice.

BACKGROUND

Plaintiffs' second amended complaint alleges that throughout the proposed class period,[1] the Secret Service has maintained a pattern and practice of discrimination against African-American SAs with regard to selections for competitive positions, discipline, transfers, assignments, testing, and hiring. Plaintiffs generally allege that, over the course of many years, the Secret Service has engaged in a wide variety of racially discriminatory employment practices, that it harbors a racially insensitive environment that tolerates racist activities, and that is fails to protect its African-American SAs from racial discrimination.  Although the Secret Service has received multiple complaints about the discriminatory conduct, plaintiffs claim, no sufficient remedy has been provided.

I.    PROMOTION EVALUATION PROCESS

The plaintiffs' discrimination claims center around the Secret Service evaluation system known as the Secret Service Special Agent Merit Promotion Program ("MPP").  The MPP is used

---

[1] Plaintiffs have been given permission to plead in their second amended complaint non-promotion claims dating back to 1993 and "building block" claims dating back to 1999.  See Moore v. Chertoff, 437 F. Supp. 2d 156, 165 (D.D.C. 2006).

annually to evaluate SAs for promotion. An MPP score on a scale up to 100 points is used by an agent seeking promotion to bid on available or vacant positions throughout an upcoming bid cycle. (Pls.' Mem. of P. & A. in Supp. Of Pls.' Mot. for Class Cert. ("Pls.' Mem.") at 15.) A participating GS-13 Agent receives a total MPP score that consists of three distinct parts: a (1) First Level evaluation; (2) Peer Panel evaluation; and (3) Second Level evaluation. A participating GS-14 Agent receives an MPP score that consists of two parts: a (1) First Level evaluation and (2) Second Level evaluation. (Id. at 15-16.) The first level evaluation to which both GS-13 and GS-14 participating agents are subject is completed by the candidate's immediate supervisor and is signed by a Special Agent in Charge. (Id. at 16.) The supervisor rates each candidate using a scale of one to five on ten specific elements such as writing ability, problem solving, oral communication, knowledge of Secret Service rules and regulations, leadership and management ability, and negotiation skill. (Id.; see also Moore v. Summers, 113 F. Supp. 2d 5, 8 (D.D.C. 2000).)

The Peer Review Panel applies to candidates seeking promotion to the GS-14 level. The Panel evaluates candidates on their "protection" and "investigation" experience. (Pls.' Mem. at 16.) Peer Panel members include agents at the GS-14 level or above, who are given oral instructions on conducting the panel.

Notes are not taken during the Peer Panel evaluation. (<u>Id.</u> at 17.)

A Second Level Panel evaluates candidates for GS-14 or GS-15 promotions. GS-14 Agents are rated on six separate competencies, including written or oral communication, ability to lead or direct others, and ability to analyze problems and recommend solutions. (<u>Id.</u>) The Second Level Panel members include representatives from each of the seven Assistant Director ("AD") offices, and the members are instructed not to take notes and may review and adjust the ratings at their discretion. (<u>Id.</u> at 17-18.)

Once an agent is given an MPP score, she may use her score to bid on vacant positions. In some cases, a vacant position may be filled without the position having to be posted. (<u>Id.</u> at 18.) The MPP scores are then used to generate the Best Qualified List ("BQL"). The candidates are ranked by their MPP scores and the MPP policy creates a cut-off for the ranked list of bidders or candidates. (<u>Id.</u> at 19.) The agent with the highest MPP score is not guaranteed that he or she will be awarded the vacant position. Instead, a recommendation is made to the Director by an Advisory Board that consists of the Deputy Director, seven ADs, and the Chief Counsel. In making its decision, the Advisory Board receives the assignment history, bid history, entry on duty date, and the date of the last promotion of each bidder or

candidate listed on the BQL.  (Id.)  For each vacant position, the relevant AD makes a selection recommendation to the Advisory Board from the BQL for that position.  (Id. at 20.)  Based on the AD's recommendation, the Advisory Board makes a recommendation to the Director.  (Id.)

II.  AGENTS' INDIVIDUAL CLAIMS

    A.    Reginald Moore

    Reginald Moore has been employed by the Secret Service for more than 20 years and served as a GS-13 agent in the Operations Section and the White House Joint Operations Center.  (Id. at 33 (citing Ex. 53).)  An African-American, Moore bid for and was not selected for more than 180 GS-14 positions from 1999 to 2002, and at one point was assigned to train a white selectee for a position on which he had formerly bid.  (Id. at 34-35.)  Moore eventually was promoted to a GS-14 and a GS-15 position, but he alleges that his promotions came only after being transferred to a Chicago field office, serving as an agent for 18 years, and filing an EEO complaint and a lawsuit.  (Id. at 35-36.)

    B.    Luther Ivery

    Luther Ivery is an African-American former agent who became eligible to bid on GS-14 positions in 1993, but was not selected for more than 130 GS-14 positions.  For several positions, "his MPP score was not high enough to place him on the [BQL]."  (Id. at 37.)  Ivery alleges that even once he made the BQL, "he was

passed over for scores of promotions[.]" (Id.) Ivery was
promoted to a GS-14 position in 2002, but alleges that his
promotion came only as a result of his having filed suit. (Id.
at 39.) Ivery retired from the Secret Service in 2004, but
asserts that "he would have reached the GS-15 . . . level before
retirement" had he not experienced the Secret Service's
discriminatory practices. (Id.)

C. John Turner

John Turner is an African-American former SA who bid for
more than 80 GS-14 positions for which he was not selected. (Id.
at 40.) Originally his MPP score was not high enough to place
him on the BQL, but once it was, he was "nevertheless denied
dozens of GS-14 positions on which he bid." (Id.) Turner
alleges that he was promoted "six years after he first became
eligible" and only after filing an EEO complaint and a lawsuit.
(Id. at 41.)

D. Cheryl Tyler

Cheryl Tyler is a former SA who was employed by the Secret
Service from 1984 to 1999. (Id.) Tyler alleges that she became
eligible to bid for a GS-14 promotion in 1993, but deferred
bidding until 1996 because her MPP scores were not competitive
enough. (Id. at 42-43.) Tyler was the only African-American
female SA in the Atlanta Field Office and that, "[a]t the time
she resigned, and . . . the filing of this lawsuit, there were no

African-American female Agents in a GS-14 position." (Id. at 41-
42.) Another agent was "troubled . . . by . . . Tyler's
experience in the Secret Service's Office of Training" because
Tyler had "worked in every possible assignment and/or position
within the Office, yet she was continually passed over for
promotion." (Id. at 43 (quoting 7/28/00 Webb Decl.
¶ 36).) Tyler asserts that she resigned in 1999 "because she
could not reach the GS-14 level as a result of discrimination"
and that the Agency told her that it "was not ready for an
African-American female supervisor." (Id. at 44 (citing C. Tyler
Decl. ¶¶ 36, 34).)

        E.    Yvette Summerour

    Yvette Summerour claims that she experienced discrimination
by the Secret Service even before it hired her because it delayed
her hiring by five years and that, after being hired, from 1998
through 2001, she "applied for and was denied promotion to almost
70 GS-14 positions." (Id. at 44-45.) In the "calendar year
before this lawsuit was filed . . . , [she] applied for and was
denied promotion to twelve GS-14 positions." (Id. at 45.)
Summerour also alleges that she was "passed over for promotion in
favor of a white (male) Agent who had previously been
transferred" as a result of sexually harassing her. (Id. at 45-
46.) Summerour claims further that she was "denied dozens of
promotions for which she made the [BQL]" and that it was only as

a result of this lawsuit that she "was finally promoted to a GS-14 position[.]"  (Id. at 46.)  Summerour "and another African-American female [agent] . . . were the first GS-14 African-American female [SAs] in the history of the Secret Service." (Id.)

F.   Kenneth Rooks

Kenneth Rooks is an African-American SA who joined the Secret Service in 1995 and has been a GS-13 since approximately 2000.  (Id. at 47.)  Rooks asserts that he has "bid for over 160 GS-14 positions, but has not been promoted" and that, even though he received a high score from his supervisor, he "was kept off the [BQL] or ranked low on the [BQL], and thus was effectively disqualified from promotions."  (Id. at 47-48.)

G.   Andrew Harris

Andrew Harris was hired by the Secret Service in 1987 and alleges that due to the Secret Service's discriminatory practices against African-Americans, he "had to file EEO complaints in order to be (1) hired, (2) promoted to GS-14, and (3) promoted to GS-15."  (Id. at 49.)  Harris alleges that he "bid on and was denied more than 20 GS-14 positions, despite his qualifications, due to the discriminatory promotions process."  (Id. (citing Ex. 80).)  Harris alleges that the Secret Service told him that he must "bid outside of D.C. to be promoted" even though the requirement to bid outside of the District of Columbia "is not

written in the MPP, and is not imposed on white Agents; instead, it only serves as a barrier to the promotion of African-American Agents." (Id. at 51.)  For support, Harris compiled a list of "thirty-two non-African-American Agents who were promoted from GS-13 to GS-14, and from GS-14 to GS-15, without ever leaving the Washington, D.C. area." (Id. at 51-52 (citing Ex. 85).)

### H.   Leroy Hendrix

Leroy Hendrix alleges that "[b]ecause of the Secret Service's discriminatory promotions process, [he] was forced to bid for more than 230 different GS-14 positions prior to finally being promoted, even though he was qualified for each and every position." (Id. at 52 (citing Ex. 87).)  Hendrix, an African-American, further alleges that he was not selected for a position "when his score was ten points higher than the selectee's score." (Id. at 53 (citing Ex. 88 at 455).)  Hendrix "bid on and was not selected for over forty GS-15 positions" and claims that, although he was "the most qualified choice" for a Special Services Division/White House Mail position, he was not selected and was "forced to vacate his office to make room for the white selectee, and . . . train that Agent." (Id. at 53-54.)  Hendrix states that he "was finally promoted to a GS-15 Assistant Special Agent in Charge position in the Los Angeles Field Office" but that "he was required to accept a cross-country move to be promoted[.]"  (Id. at 54.)

The individual named plaintiffs seek to certify a class

> on behalf of all current and former African-American
> Agents who were employed as Criminal Investigators
> (GS/GM-1811) and who had the required time-in-grade to
> seek promotion to competitive positions at the GS-14
> level at any time during the years 1995 to 2004, and/or
> who had the required time-in-grade to seek promotion to
> competitive positions at the GS-15 level at any time
> during the years 1995 to 2005.

(Pls.' Mot. for Class Cert. at 2.)

## DISCUSSION

To obtain class certification, plaintiffs must establish the four prerequisites of Rule 23(a) and show that the case falls within at least one of the three categories of Rule 23(b). Jarvaise v. Rand Corp., 212 F.R.D. 1, 2 (D.D.C. 2002) (citing Pigford v. Glickman, 182 F.R.D. 341, 345 (D.D.C. 1998)). The moving party must establish "that all requirements for proceeding as a class action have been satisfied." Taylor v. D.C. Water & Sewer Auth., 241 F.R.D. 33, 36 (D.D.C. 2007). "Whether a class should be certified is a preliminary question, and disputes regarding the merits of a case or the weight of evidence are not proper considerations at the class-certification stage." Id.; see also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974). Thus, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Eisen, 417 U.S. at 178 (internal quotation marks omitted). District courts have broad discretion to decide whether a party moving for class

certification has carried its burden. Hartman v. Duffey, 19 F.3d 1459, 1471 (D.C. Cir. 1994) (citing Bermudez v. U.S. Dep't of Agric., 490 F.2d 718, 725 (D.C. Cir. 1973)). In considering a motion for class certification, a court presumes the allegations in the complaint to be true. McReynolds v. Sodexho Marriott Servs., Inc., 208 F.R.D. 428, 431 (D.D.C. 2002).

Under Rule 23(a), the plaintiffs must demonstrate that (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy of representation"). Fed. R. Civ. P. 23(a). "Failure to adequately demonstrate any of the four is fatal to class certification." Garcia v. Johanns, 444 F.3d 625, 631 (D.C. Cir. 2006).

I.   NUMEROSITY

"'Rule 23(a)(1) permits maintenance of a class action if "the class is so numerous that joinder of all members is impracticable."'" Encinas v. J.J. Drywall Corp., 265 F.R.D. 3, 8 (D.D.C. 2010) (quoting Taylor, 241 F.R.D. at 37 (quoting Fed. R. Civ. P. 23(a)(1))). "While a class of at least forty members is sufficiently numerous to satisfy this requirement presumptively,

'[t]here is no specific threshold that must be surpassed[.]'"
Id. (quoting Taylor, 247 F.R.D. at 37) (alterations in original).
Rather, a court must examine the specific facts before it.  Id.
While "[m]ere conjecture, without more, is insufficient to
establish numerosity, . . . plaintiffs do not have to provide an
exact number of putative class members in order to satisfy the
numerosity requirement."  Pigford, 182 F.R.D. at 347.

Plaintiffs estimate that there are at least 120 members of
the proposed class.  They also assert that joinder is
impracticable since "class members who are current Agents can be
stationed at any given time in the Secret Service['s]
Headquarters in Washington, D.C., or one of the more than 150
field offices and resident offices throughout the United States
and abroad."  (Pls.' Mem. at 63-64; Pls.' Reply to Def.'s Opp'n
to Pls.' Mot. for Class Cert. ("Pls.' Reply") at 35-36 n.30.)
Plaintiffs state that their estimate of 120 putative class
members "is derived from the Agency's bid database produced in
discovery[.]"  (Pls.' Reply at 34-35, n.28.)

On its face, plaintiffs' proposed class of 120
geographically dispersed members is sufficiently numerous to
satisfy Rule 23(a)(1).  See Taylor, 241 F.R.D. at 37.  The
defendant, however, advances several arguments against the
plaintiffs' estimate, including that the proposed class is
overinclusive because it encompasses individuals who were

ineligible for promotions because they neither participated in the promotion process nor met requirements beyond time-in-grade necessary to be eligible to participate in the promotions process. (Def.'s Opp'n to Pls.' Mot. for Class Cert. ("Def.'s Opp'n") at 34-35.) The defendant further argues that the plaintiffs' "class definition . . . includes untimely claims[,]" that class members must "have been employed at the Secret Service as of September 11, 1999 . . . [or] 45 days prior to the day Plaintiff Turner first contacted an EEO Counselor[,]" and that "aside from the named plaintiffs, only twenty-one other potential class members both submitted declarations making claims of discrimination about the promotion process, and bid for promotions, during the relevant times." (Id. at 36-38, 40 (footnote omitted).) It appears, then, that the defendant is arguing that the plaintiffs' proposed class size will shrink upon application of Rule 23(a)'s commonality and typicality requirements.[2]

---

[2] The defendant also states that the plaintiffs' proposed class contains two subclasses that must independently meet the numerosity requirement, arguing that class members whose only alleged harm is a delayed promotion cannot be factored into the numerosity analysis because "plaintiffs present no statistical evidence demonstrating that the promotions of African-American SAs are actually delayed" and "the unrefuted statistical evidence demonstrates that the Secret Service promoted African-American SAs to GS-14 and GS-15 positions faster than non-African-American SAs." (Def.'s Opp'n at 40-42.) The defendant further argues that once the individuals who claim delayed promotions are excluded from the class, there are only 35 potential class members who bid but were never selected for a promotion, and that

Even taking as true the defendant's argument that "the size of the proposed class of those denied GS-14 and GS-15 promotions would total only 36" (Def.'s Opp'n at 44), a class of 36 members can still satisfy Rule 23(a)'s numerosity prong.  See, e.g., Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 246 F.R.D. 293, 306 (D.D.C. 2007) (certifying a class of only 30 class members); Riordan v. Smith Barney, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (certifying a class of 29 members); Town of New Castle v. Yonkers Contracting Co., Inc., 131 F.R.D. 38, 40-41 (S.D.N.Y. 1990) (certifying a class of 36 members); Alvarado Partners, L.P. v. Mehta, 130 F.R.D. 673, 675 (D. Colo. 1990) (certifying a class of 33 members).  Thus, the plaintiffs have satisfied Rule 23(a)(1)'s numerosity prong.

---

these members should be divided into two subclasses based on grade level of promotion sought and "neither [sub]class . . . is so numerous as to make joinder impracticable."  (See id. at 42-43.)  The plaintiffs refute the need to separate the class into sub-classes.  (See Pls.' Reply at 36 n.31 ("[T]he circumstances presented support that subclasses are neither necessary nor appropriate.").)  The defendant's argument regarding delayed bidders speaks more to Rule 23(a)'s commonality and typicality requirements than to numerosity requirements.  Further, a court has broad discretion to determine whether to certify a class with subclasses, and the circumstances here do not warrant dividing the class into subclasses based on the grade level of promotion sought.  See Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997) (noting that the "use of a subclass [is useful] . . . where the named representative cannot be found to adequately represent all the interests in the class").

## II.  COMMONALITY

"To establish commonality under Rule 23(a)(2), a plaintiff must identify at least one question common to all members of the class."  Garcia, 444 F.3d at 631.  "'[F]actual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members.'"  Encinas, 265 F.R.D. at 8 (quoting Bynum v. District of Columbia, 217 F.R.D. 43, 46 (D.D.C. 2003)).  Courts have noted that the commonality requirement "is 'often easily met'" and that "proposed class actions seeking injunctive and declaratory relief . . . 'by their very nature' present common questions of law and fact."  Taylor, 241 F.R.D. at 37 (quoting 7A Wright, Miller & Kane, Fed. Practice and Procedure § 1763 (3d ed. 2005)).  However, plaintiffs in Title VII class actions must not only demonstrate that class plaintiffs suffered discrimination on the basis of membership in a particular group; "plaintiffs must make a 'specific presentation' that identifies the questions of law or fact common to the class representative and the putative class."  McReynolds, 208 F.R.D. at 440-41 (quoting Wagner v. Taylor, 836 F.2d 578, 589 (D.C. Cir. 1987)).  In other words, a "plaintiff must 'bridge th[e] gap' between her own alleged discrimination and a 'common policy' that affected the members of the putative class."  Taylor, 241 F.R.D. at 37-38

(quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158 (1982)).

In cases where plaintiffs allege disparate treatment of a class, plaintiffs seeking class certification must "show (i) discrimination (ii) against a particular group (iii) of which the plaintiff is a member, *plus* (iv) some additional factor that permits the court to infer that members of the class suffered from a common policy of discrimination." Love v. Johanns, 439 F.3d 723, 728 (D.C. Cir. 2006) (internal quotation marks and brackets omitted) (emphasis in original). Regarding a complaint of "class-wide discriminatory *impact*, [plaintiffs] must make a showing sufficient to permit the court to infer that members of the class experienced discrimination as a result of the disparate effect of a facially neutral policy." Garcia, 444 F.3d at 632 (internal quotation marks omitted) (emphasis in original). To satisfy Rule 23(a)'s commonality requirement, plaintiffs may put forth statistical and anecdotal evidence to support an inference that the defendant's policies and procedures are subjective and susceptible to racial discrimination and have a common impact upon the acts of discrimination that the plaintiffs allege they suffered. See Taylor, 241 F.R.D. at 40-44. The plaintiffs here offer both statistical and anecdotal evidence.

A.    Statistical evidence

      1.    Dr. Sharf's testimony

Plaintiffs argue that the agency-wide scoring process for competitive promotions is highly subjective and that the scoring process, "in policy and practice, has adversely affected African-American Agents because they have been denied competitive promotions for which they were qualified in favor of less-qualified white Agents."  (Pls.' Mem. at 32.)  Plaintiffs rely, in part, on the expert testimony of Dr. James Sharf, who testified that "the MPP and its implementation by the Secret Service are based on unreliably subjective" peer review panels, assistant director panels and advisory boards, and are governed by "unreliably subjective discretion by the Assistant Directors and Director."  (Id., Ex. 33 ¶ 6.)  Sharf provides examples of the MPP's "subjectivity and unreliability" which include that the "reasons for Peer Panel scoring are not recorded and after the fact explanations for the scorings are arbitrary and unreliable"; that the Agency "may promote Special Agents who have not bid on a position, rendering the bidding process unreliable"; that an Assistant Director "may, in his sole discretion, change an Agent's score after a score has been assigned"; and that the significance of differences in an Agent's bid history, MPP scores and time in the field varied significantly between Assistant Directors.  (Id., Ex. 33 ¶ 7.)

The defendant argues that Sharf's testimony is unreliable because Sharf "specifically conceded that he could not attest that the MPP process, even if unreliable, had disadvantaged African-Americans." (Def.'s Opp'n at 46.) Indeed, Sharf stated that he had not "formed an opinion one way or the other" as to whether African-Americans are disadvantaged as a result of the MPP process. (Id., Ex. 8, 188:23-25, 189:3-9.) However, the plaintiffs have not provided Sharf's testimony for the purpose of proving that the MPP's subjectivity disadvantaged African-Americans. Rather, they have provided it to show that subjectivity is involved at each stage of the Secret Service's evaluation system. (See Pls.' Mem. at 67.)

The defendant further argues that the promotion recommendations "include a consideration of specific, objective criteria." (Def.'s Opp'n at 46.) However, "[w]hether a particular [decision-maker] uses objective criteria in making particular promotion decisions is irrelevant to the commonality analysis; instead what is significant is that the determination of which criteria to use is left entirely to the individual [decision-maker]." McReynolds, 208 F.R.D. at 442. The plaintiffs have offered at least some evidence that the MPP promotions process includes some subjective decision-making. For example, the ADs sitting on Second Level Panels are able to review and adjust candidates' ratings without justification.

Also, ADs are given no instruction, guidance, or criteria to use in making promotion recommendations to the Directors. (Pls.' Mem. 18-20.) Thus, even though objective criteria are a component of the MPP scoring process, the process still includes some subjective decision making, and Sharf's testimony can support an inference that the plaintiffs were victims of promotion decisions that were affected by a discriminatory MPP.

    2.  Dr. Charles Mann's report

    Plaintiffs also rely on Dr. Charles Mann's report, which considers "whether the data [plaintiffs] have provided supports an assertion of adverse impact of the [Secret Service's] employment policies against African-American . . . SAs . . . as compared with non-African-American SAs." (Pls.' Mem., Ex. 2 ¶ 12.) "Mann found that for the years 1998 to 2000, the difference between expected African-American promotions in the absence of discrimination, taking as given the presence of African-Americans on the [BQL], and actual African-American promotions to GS-14 was statistically significant and adverse to African-Americans with a probability level of .0045, which corresponds to less than one chance in 222 or more than 2.8 standard deviations." (Pls.' Mem. at 13 (citing Mann Report, Ex. 2 ¶ 45) (footnote omitted).) Mann further found that "[f]or promotions to the GS-15 level, . . . for the years 2002 to 2005, the difference between expected African-American promotions in

the absence of discrimination, taking as given the presence of African-Americans on the [BQL], and actual African-American promotions to GS-15 was statistically significant and adverse to African-Americans with a probability level of .0195, which corresponds to less than one chance in 51 or more than 2.3 standard deviations."  (Id. (citing Mann Report, Ex. 2 ¶ 47) (footnote omitted).)  From this evidence, the plaintiffs conclude that fewer African-Americans were promoted to GS-14 and GS-15 levels "than would be expected in the absence of discrimination based even on the number of African-Americans who actually made the [BQL]."  (Id.)

The defendant attacks Mann's report on several grounds.[3] First, the defendant asserts that the results fail to demonstrate that African-American SAs as a class were under-promoted during the relevant time periods and that the evidence is restricted to two cherry-picked time periods of three and four years which are different for applicants to the GS-14 level than for those to the

---

[3] A large portion of the defendant's opposition is devoted to a discussion of the merits of the analyses of the parties' respective statistical experts.  Specifically, the defendant argues that there is "un-rebutted evidence that African-American agents as a class were promoted at the same speed, if not faster than, non-African-American agents."  (Def.'s Opp'n at 49.) However, "[t]he battle of statistical experts, while central to the ultimate issue of liability, is not relevant to the issue of class certification."  Jarvaise, 212 F.R.D. at 3 n.1.  "[A]n examination of the statistics proffered by plaintiffs" is appropriate in determining class certification, McReynolds, 208 F.R.D. at 435, if the court can infer discrimination from them. Taylor, 241 F.R.D. at 44.

GS-15 level.  (Def.'s Opp'n at 49.)  The defendant also argues

that Mann's report fails to consider the composition of all the

BQLs and ignores a "substantial number of BQLs where all African-

American bidders were included."  (Id. at 54.)  According to the

defendant, for "approximately 34% of vacancies during the period

from 1995 to 2004 for GS-14 positions, and for approximately 73%

of vacancies from 1995 to 2005 for GS-15 positions, all

candidates who applied for the vacancy were considered for

promotion."  (Id. at 53.)

    Notwithstanding these arguments, Mann's evidence is

statistically significant because a "standard deviation of 1.96

or higher indicates a 'level of statistical significance [that]

is sufficient to establish a prima facie case of both disparate

treatment and disparate impact.'"  Taylor, 241 F.R.D. at 44

(quoting Anderson v. Zubieta, 180 F.3d 329, 340 (D.C. Cir. 1999))

(alteration in original).  Moreover, Mann's conclusions are

appropriate to consider since they measure only time periods that

fall within the proposed class periods.

    Further, the fact that the report makes no explicit findings

related to the rate at which African-American SAs receive

promotions in comparison to non-African-American SAs (see Pls.'

Mem, Ex. 2) does not necessarily undermine a finding of an

inference of discriminatory policy or practice within the MPP

promotions system.  Title VII disparate impact cases are not

measured only at the "bottom line" -- in this case, the plaintiffs' promotions –- because "Title VII guarantees . . . individual respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria." <u>Connecticut v. Teal</u>, 457 U.S. 440, 451 (stating that "Title VII strives to achieve equality of opportunity by rooting out 'artificial, arbitrary, and unnecessary' employer-created barriers to professional development that have a discriminatory impact upon individuals") (emphasis in original).  If the MPP scoring process did, as alleged, prevent the plaintiffs from being promoted to GS-14 and GS-15 levels, then Mann's failure to make ultimate conclusions regarding the rate of African-Americans promoted within the Secret Service is not fatal to the plaintiffs' statistical showing.

Finally, although Mann's report omits an analysis of the MPP in promotions from pools of applicants who all made the BQL (Pls.' Mem., Ex. 2 ¶ 77),[4] this omission does not preclude proof that the MPP was used to discriminate in promotions in which not all applicants made the BQL.  Thus, Mann's report could support

_____

[4] Mann also did not analyze promotions made without the use of a BQL, nor could he have analyzed the impact of the MPP upon agents who were deterred from seeking an MPP score and bidding for a promotion.  (See Pls.' Mem, Ex. 2 ¶¶ 44, 78.)

an inference that the MPP promotions policies and process during the relevant class period was susceptible to racial discrimination and affected plaintiffs' experiences.

B.  Anecdotal evidence

The plaintiffs also offer anecdotal evidence of discrimination from the testimony of African-American current and former Secret Service agents and state that the employees' declarations "provide the 'personal experiences . . . ' that bring 'the cold numbers [of disparity] convincingly to life.'" (Pls.' Mem. at 69 (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 339 (1977).)  In addition to anecdotal evidence provided by the named plaintiffs, the record includes numerous declarations of putative class members who allege that they have experienced discrimination at the hands of the Secret Service.[5]

For example, Agent Wayne Robinson testified that "two of his immediate supervisors . . . told [him] that [he] could improve his chances for promotion if [he] bid on positions that would require [relocation.]  However, many white Agents . . . have been

_____

[5] Plaintiffs also offer anecdotal evidence of discrimination that should not actually bear upon commonality here because it does not involve promotions or fall within the class period. (See, e.g., id., Ex. 1, Banner Decl. ¶ 9 ("When I arrived at work one morning, I found two Nigerian postage stamps on my desk with a message to 'Go back to Africa.'"); Bryant Decl. ¶ 27 ("In September of 1991, frustrated with the discriminatory policies and practices that had repeatedly resulted in denials of promotions to which I was entitled, I left the [Agency.]").)

promoted . . . and did not have to relocate."  (Id., Ex. 1,
Robinson Decl. ¶ 20.)  Robinson "believe[s] this is an example of
the Secret Service imposing requirements on African-American
[SAs] for promotion that are not required of white Agents."
(Id.)

Agent Tamara Blair testified that "[b]ecause of the Secret
Service's discriminatory . . . practices, [she] did not receive
recognition for work equal to or better than that of white [SAs]
who were recognized" and that supervisors "would often give
awards to white male SAs . . . [even though she] had
significantly higher [performance ratings] than the other [SAs]."
(Id., Blair Decl. ¶ 12.)  She testified further that "[d]espite
achieving consistently strong First Level Evaluation scores,
[her] overall MPP scores have not reflected [her] performance
. . . .  [T]he scores given by the panel bear little relationship
to an Agent's abilities and accomplishments but rather reflect
whether the Agent is hooked into the right network[.]"  (Id.,
Supp. Blair Decl. ¶ 14.)  "[W]hite Agents . . . get higher
scores."  (Id.)

Agent Kenneth Bradshaw testified that despite ranking "very
highly on performance evaluations by [his] direct supervisors[,]"
his total scores were low because "an Agent's scores are easily
manipulated by the peer panels to the advantage of white Agents."
(Id., Bradshaw Decl. ¶ 17.)  Bradshaw "once heard [an AD] admit

. . . that, for many promotions, the Secret Service leadership already knows who they are going to give the position(s) to from the time they are posted [and] before Agents even bid. In such cases, the scoring process is meaningless." (Id. ¶ 18.)

Agent Angela Burns-Ramirez stated that even though she "received a 96% from [her] direct supervisor" on her 2003-2004 MPP score, she received only 52% on the portion of the evaluation completed by those who did not supervise her work, which "demonstrates the subjectivity and potential for abuse of the construction of the MPP scores." (Id., Supp. Burns-Ramirez Decl. ¶ 19.) She believes that her "low score was the result of [racial] discrimination." (Id.) Burns-Ramirez "bid on more than 75 GS-14 positions before [she] was finally promoted" and "believe[s] that [she] did not get the GS-14 positions [on which she earlier bid] . . . because of [her] race." (Id. ¶ 14.)

Further, Agent Burrell testified that despite having received positive performance reviews, having served in "two of the most demanding squad positions in the Los Angeles Field Office[,]" and having had "more supervisory experience than most white Agents promoted to GS-14," his white co-workers have been promoted over him. (Id., Burrell Decl. ¶¶ 13, 15, 18.) Agent Rodney Stewart testified that despite receiving high first-level scores, his overall MPP scores have been low. (Id., Supp. Stewart Decl. ¶ 22.) "For example, in 2004-2005, [Stewart]

received a 48/50 on [his] First Level Evaluation, but only a

. . . 56% on the remainder of [the] evaluation." Id.  He

testified that "MPP scores are entirely subjective and used to

keep African-American Agents from receiving promotions."  Id.

Given the plaintiffs' extensive anecdotal accounts of

discrimination within the Secret Service and their statistical

showing that raises an inference of a causal discriminatory

policy, the plaintiffs have carried their burden of establishing

Rule 23(a)'s commonality requirement.

III. TYPICALITY

"Typicality requires that the claims of the representative

be typical of those of the class."  Encinas, 265 F.R.D. at 9

(internal quotation marks omitted).  "This inquiry overlaps with

the commonality inquiry, as each seeks to determine the

practicality of proceeding with a class action and the extent to

which the plaintiffs will protect the interests of absent class

members."  Id.  "A plaintiff's claims can be typical of those of

the class even if there is some factual variation between them."

Id.  Most importantly, "the named plaintiffs' injuries [must]

arise from the same course of conduct that gives rise to the

other class members' claims."  Id. (internal quotation marks

omitted).

The plaintiffs seek to certify a broad class of all African-

American current and former agents who were employed as Criminal

Investigators and who had the required time-in-grade to seek promotion during the class period.  The plaintiffs assert that "[j]ust like Class Plaintiffs, any class member who was eligible for promotion to a GS-14 or GS-15 position was subject to the same excessively subjective policies and practices of the MPP, including those Agents who were discouraged completely from participating" in the MPP promotions process.  (Pls.' Reply at 41.)  The defendant argues that the plaintiffs have failed to show that the individuals' claims will be typical of the class claims because all class representatives elected to obtain MPP scores and bid on announced vacancies.  Thus, the class cannot include individuals who elected not to participate in the promotion process or were selected for promotion during their first promotion bid cycle because the "class representatives all participated in the promotion process on multiple occasions[.]" (Def.'s Opp'n at 56-57.)

Here, the named plaintiffs all participated in the bid process, and all but two eventually received promotions.  "[A] formal [bid] for employment is not a condition precedent to relief from unlawful discrimination where the 'application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him.'" Rodriguez v. U.S. Dep't of Treasury, 131 F.R.D. 1, 6 (D.D.C. 1990) (quoting Int'l Bhd. of Teamsters, 431 U.S. at 367).

Indeed, in some cases, courts have "included within a class those persons who were discouraged from applying based upon the knowledge that the discriminatory policy was in place." Id.[6]

Tyler is the closest the class representatives come to having as a member a deterred bidder.  Tyler's bidding was merely deferred, though, not wholly deterred.  With no class representative who was deterred from ever bidding, there is every risk that the interests of the absent, wholly deterred bidders would not at all stages of this litigation be equally advanced and protected by the merely deferred bidders.

Further, the class representatives' claims are not typical of the claims of any putative class member who was eligible for a promotion and received it on her first bid.  That particular class member may not have suffered an injury at all, much less an injury typical of the injuries alleged by the class

---

[6] Rodriguez warned, though, that including within a class a group of deterred or discouraged bidders could undermine "the interest of judicial economy which class litigation is designed to serve" since "[t]he focus of the class litigation with regard to these individuals would most certainly shift from defendants' conduct to the factual circumstances of individual plaintiffs." Rodriquez, 131 F.R.D. at 7; see also Selzer v. Bd. of Educ. of N.Y., 113 F.R.D. 165, 167 (S.D.N.Y 1986) (citing Falcon, 457 U.S. at 157 n.13).  Rodriquez also opined that deterred bidder claims could undermine numerosity.  See Rodriguez, 131 F.R.D. at 6. Where the "existence of a substantial group of deterred applicants remains speculative following plaintiff's discovery," id. -- as appears to be the case here, considering that the plaintiffs do not include any estimate of the number of deterred bidders in the putative class because the Secret Service's database does not include deterred bidders (see Pls.' Reply at 35 n.28) -- such a group may be unidentifiable.  Id. at 7.

representatives.[7]  See, e.g., Cohen v. Chilcott, 522 F. Supp. 2d
105, 115 (D.D.C. 2007) ("The typicality requirement aims at
ensuring that the class representatives have suffered injuries in
the same general fashion as absent class members." (internal
quotation marks omitted)).

Here, then, the mere fact that there may be a broad group of
African-American agents who were eligible for promotion to the
GS-14 or GS-15 levels is insufficient, on its own, to satisfy
Rule 23(a)'s typicality requirement.  See, e.g., Falcon, 457 U.S.
at 162 ("We have repeatedly held that the bare fact that a
plaintiff alleges racial or ethnic discrimination is not enough
to justify class certification.").  The plaintiffs are attempting
to certify a broad class of African-American agents who were
eligible for promotion, but who may or may not have claims that

---

[7] The defendant also argues that plaintiffs have no
representative for claims by GS-13 SAs denied promotion because
all class representatives seeking promotion to the GS-14 level
were in fact promoted, save for Tyler and Rooks.  The defendant
contends that Tyler's non-promotion claim is not typical of those
of the putative class because she never made a single BQL for any
position on which she bid and that Rooks's non-promotion claim is
not typical because she became eligible to bid and began bidding
only in 2004.  (Def.'s Opp'n at 57-58.)  However, this argument
is unpersuasive since "[t]he facts and claims of each class
member do not have to be identical to support a finding of
typicality."  Cohen v. Chilcott, 522 F. Supp. 2d 105, 115 (D.D.C.
2007).  Rather, class representatives must have suffered injuries
in the same general fashion as have absent class members.  Id.
Here, Tyler's and Rooks's non-promotions are injuries suffered in
the same general fashion as those suffered by putative class
members who bid, but were never promoted.  That Tyler did not
make a BQL or that Rooks became eligible to bid only in 2004 does
not undermine this finding.

are typical of those of the class representatives.  Thus, the
plaintiffs' class, as proposed, does not satisfy the typicality
requirement of Rule 23(a).

## IV.  ADEQUACY OF REPRESENTATION

The final requirement of Rule 23(a) requires the court to
"determine whether the proposed representatives can adequately
represent the interests of the class."  <u>Taylor</u>, 241 F.R.D. at 45.
A representative is adequate if "(1) his interests do not
conflict with those of other class members, and (2) he will
vigorously prosecute the interests of the class through qualified
counsel."  <u>Lindsay v. Gov't Employees Ins. Co.</u>, 251 F.R.D. 51, 55
(D.D.C. 2008).  When there is a dispute as to the existence of a
conflict of interest between class members, a court must bear in
mind that "[c]lass members whose interests are antagonistic in
fact to, or even 'potentially conflicting' with, the interests of
the ostensibly representative parties cannot be bound, consistent
with the requirements of due process to an adjudication taken in
their name."  <u>Phillips v. Klassen</u>, 502 F.2d 362, 366 (D.C. Cir.
1974) (quoting <u>Hansberry v. Lee</u>, 311 U.S. 32, 41-42 (1940)).  In
employment discrimination cases, although the fact that some
class members are supervisors does not constitute <u>per se</u> a
conflict of interest, it does pose a serious problem where class

plaintiffs have accused class members of the same type of
discrimination from which they seek relief.  Wagner, 836 F.2d at
595; McReynolds, 208 F.R.D. at 447 (D.D.C. 2002).

Here, there is no dispute as to the competency of counsel to
represent the class's interest.  There is a dispute, however,
regarding a potential conflict of interest among class plaintiffs
and class members.  The plaintiffs assert that there is no
conflict of interest because class plaintiffs "share identical
interests in this lawsuit as the class members, and . . . desire
the same relief[,]" namely, "to prove the existence of the Secret
Service's pattern and practice of race discrimination in the
promotions process, and the adverse impact on African-American
Agents from the excessively subjective and unfettered policies
and practices of the MPP." (Pls.' Mem. at 71-72.)  The defendant
counters that the plaintiffs cannot satisfy the adequacy
requirement because the "proposed class would include . . .
former and current supervisors who have been personally and
substantially involved in the very promotion process that
plaintiffs claim is discriminatory." (Def.'s Opp'n at 75.)

As one example, the defendant notes that "Andrew Harris, one
of the named plaintiffs, has served on a promotion rating
panel[,]" and in this capacity, he "personally rated four . . .
[of] his fellow class representatives [who] claim discrimination
in the very scores that he was involved in assigning." (Id.

(citing Ex. 5 ¶ 67).)  The defendant further states that Agents
Summerour and Moore have accused potential class members of
making discriminatory promotion decisions.  (Id. at 77.)
Plaintiffs counter that Summerour and Moore did not accuse the
identified potential class members of actual discrimination, but
merely asserted that these senior agents "were going along with
or participating in the Agency's discriminatory promotions
process."  (Pls.' Reply at 44 n.38.)

       The record reflects direct accusations of discrimination
within the class.  For example, Summerour testified that she
believed that Larry Cockell –- a putative class member --
discriminated against her when he denied her a higher MPP score.
(Def.'s Opp'n at 77, Ex. 42, 46:8-15 ("Q: Did you believe that
Larry Cockell discriminated against you when he refused to change
the score?  A: Yes, I do.  Q: And why do you say that?  A:
Because . . . I think he facilitated [the Agency's
discriminatory] system by letting it continue and not trying to
change it.").)  When asked whether there were senior-level
African-American agents who were a part of the Secret Service's
"Good 'ol Boy Network," Summerour stated that she believed that
Cockell and other African-American agents were a part of that
network.  (Id., Ex. 42, 253:11-24.)

       The record also demonstrates that several potential class
members were directly involved in the Peer Panel or Second Level

evaluation process, which raises a specter of these class members' participation in the discriminatory conduct of which plaintiffs complain.  For example, between 1995 and 2005, sixteen African-American supervisors participated, at least once, as a Peer Panel member rating SAs for promotion to GS-14 positions. (Id. at 77 n.59 (citing Ex. 5 ¶ 67).)  During the same time period, eight African-American Supervisors participated as Second-Level Panel evaluation members rating SAs for promotion to GS-14 and GS-15 positions.  (Id., Ex. 5 ¶ 68.)

Although the existence of supervisors among the class members does not automatically undermine the adequacy of representation, the conflict of interests here –- which includes direct accusations of discrimination among and between class members and class representatives –- is not insignificant. Because plaintiffs have not proposed for consideration a class free of conflicts of interests, the representation as proposed is inadequate.  See, e.g., In re PEPCO Employment Litig., Civil Action No. 86-0603 (RCL), 1992 WL 442759, at *22 (D.D.C. Dec. 4, 1992) (denying certification of a subclass in light of direct accusations of discrimination among class members and holding that the existence of any conflict is sufficient to prevent certification).

CONCLUSION AND ORDER

Given the plaintiffs' proposed definition of the class and the current composition of the group of class representatives, the plaintiffs have failed to satisfy the typicality and adequacy of representation elements required by Rule 23(a), and their motion for class certification will be denied without prejudice.[8] Accordingly, it is hereby

ORDERED that plaintiffs' motion [585] for class certification be, and hereby is, DENIED without prejudice.  It is further

ORDERED that defendant's motion [633] in limine be, and hereby is, DENIED as moot.  It is further

ORDERED that plaintiffs' motion [650] for oral argument be, and hereby is, DENIED as moot.

SIGNED this 4th day of August, 2010.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge

---

[8] In response to plaintiffs' motion for class certification, the defendant has filed a motion in limine, seeking to exclude Dr. Mann's testimony.  Because the plaintiffs' motion for class certification will be denied, the defendant's motion [633] in limine will be denied as moot.  Plaintiffs' motion [650] for oral argument also will be denied as moot.