UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                  )
REGINALD MOORE, <u>et al.</u>,          )
                                  )
        Plaintiffs,               )
                                  )
        v.                        )  Civil Action No. 00-953 (RWR/DAR)
                                  )
JANET NAPOLITANO,                 )
                                  )
        Defendant.                )
_____ )

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, African-American current and former Special

Agents ("SAs") of the United States Secret Service, bring this

employment discrimination action individually and as a putative

class action on behalf of African-American SAs against the

Secretary of the United States Department of Homeland Security

alleging that the Secret Service engaged in a pattern and

practice of racial discrimination in promoting African-American

SAs to GS-14 and GS-15 positions and that the Secret Service's

promotion process has an adverse impact upon African-American SAs

in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e <u>et seq.</u>, and the Civil Rights Act of 1991, 42

U.S.C. § 1981a.  The plaintiffs move to certify a class of

African-American current and former SAs who have allegedly been

denied promotions due to racial discrimination under Federal Rule

of Civil Procedure 23.  The defendant moves to exclude the

testimony of plaintiffs' expert, Dr. Charles Mann, offered in

-2-

support of the plaintiffs' motion for class certification.

Because Dr. Mann is qualified to offer his expert opinion and his

testimony is relevant and reliable, the defendant's motion will

be denied.  Because the class plaintiffs have met Rule 23(a)'s

numerosity, commonality, typicality, and adequacy of

representation requirements, and because the plaintiffs have met

Rule 23(b)(3)'s predominance and superiority requirements, the

plaintiffs' motion for class certification will be granted.

BACKGROUND

The relevant facts for the motion for class certification

were set out in Moore v. Napolitano (Moore III), 269 F.R.D. 21

(D.D.C. 2010) as follows:

> Plaintiffs' second amended complaint alleges that
> throughout the proposed class period,[1] the Secret
> Service has maintained a pattern and practice of
> discrimination against African-American SAs with regard
> to selections for competitive positions, discipline,
> transfers, assignments, testing, and hiring.
> Plaintiffs generally allege that, over the course of
> many years, the Secret Service has engaged in a wide
> variety of racially discriminatory employment
> practices, that it harbors a racially insensitive
> environment that tolerates racist activities, and that
> [it] fails to protect its African-American SAs from
> racial discrimination.  Although the Secret Service has
> received multiple complaints about the discriminatory
> conduct, plaintiffs claim, no sufficient remedy has
> been provided.

------

[1] Plaintiffs have been given permission to plead in their
second amended complaint non-promotion claims dating back to
1993 and "building block" claims dating back to 1999.  See
Moore v. Chertoff, 437 F. Supp. 2d 156, 165 (D.D.C. 2006).

-3-

I.   PROMOTION EVALUATION PROCESS

        The plaintiffs' discrimination claims center
around the Secret Service evaluation system known as
the Secret Service Special Agent Merit Promotion
Program ("MPP").  The MPP is used annually to evaluate
SAs for promotion.  An MPP score on a scale up to 100
points is used by an agent seeking promotion to bid on
available or vacant positions throughout an upcoming
bid cycle.  (Pls.' Mem. of P. & A. in Supp. of Pls.'
Mot. for Class Cert. ("Pls.' Mem.") at 15.)  A
participating GS-13 Agent receives a total MPP score
that consists of three distinct parts: a (1) First
Level evaluation; (2) Peer Panel evaluation; and (3)
Second Level evaluation.  A participating GS-14 Agent
receives an MPP score that consists of two parts: a (1)
First Level evaluation and (2) Second Level evaluation.
(Id. at 15-16.)  The first level evaluation to which
both GS-13 and GS-14 participating agents are subject
is completed by the candidate's immediate supervisor
and is signed by a Special Agent in Charge.  (Id. at
16.)  The supervisor rates each candidate using a scale
of one to five on ten specific elements such as writing
ability, problem solving, oral communication, knowledge
of Secret Service rules and regulations, leadership and
management ability, and negotiation skill.  (Id.; see
also Moore v. Summers [(Moore I)], 113 F. Supp. 2d 5, 8
(D.D.C. 2000).)
        The Peer Review Panel applies to candidates
seeking promotion to the GS-14 level.  The Panel
evaluates candidates on their "protection" and
"investigation" experience.  (Pls.' Mem. at 16.)  Peer
Panel members include agents at the GS-14 level or
above, who are given oral instructions on conducting
the panel.  Notes are not taken during the Peer Panel
evaluation.  (Id. at 17.)
        A Second Level Panel evaluates candidates for GS-
14 or GS-15 promotions.  GS-14 Agents are rated on six
separate competencies, including written or oral
communication, ability to lead or direct others, and
ability to analyze problems and recommend solutions.
(Id.)  The Second Level Panel members include
representatives from each of the seven Assistant
Director ("AD") offices, and the members are instructed
not to take notes and may review and adjust the ratings
at their discretion.  (Id. at 17-18.)
        Once an agent is given an MPP score, she may use
her score to bid on vacant positions.  In some cases, a

-4-

vacant position may be filled without the position
having to be posted. (Id. at 18.)  The MPP scores are
then used to generate the Best Qualified List ("BQL").
The candidates are ranked by their MPP scores and the
MPP policy creates a cut-off for the ranked list of
bidders or candidates. (Id. at 19.)  The agent with
the highest MPP score is not guaranteed that he or she
will be awarded the vacant position.  Instead, a
recommendation is made to the Director by an Advisory
Board that consists of the Deputy Director, seven ADs,
and the Chief Counsel.  In making its decision, the
Advisory Board receives the assignment history, bid
history, entry on duty date, and the date of the last
promotion of each bidder or candidate listed on the
BQL. (Id.)  For each vacant position, the relevant AD
makes a selection recommendation to the Advisory Board
from the BQL for that position. (Id. at 20.)  Based on
the AD's recommendation, the Advisory Board makes a
recommendation to the Director. (Id.)

II.  AGENTS' INDIVIDUAL CLAIMS

     A.   Reginald Moore
     Reginald Moore has been employed by the Secret
Service for more than 20 years and served as a GS-13
agent in the Operations Section and the White House
Joint Operations Center. (Id. at 33 (citing Ex. 53).)
An African-American, Moore bid for and was not selected
for more than 180 GS-14 positions from 1999 to 2002,
and at one point was assigned to train a white selectee
for a position on which he had formerly bid. (Id. at
34-35.)  Moore eventually was promoted to a GS-14 and a
GS-15 position, but he alleges that his promotions came
only after being transferred to a Chicago field office,
serving as an agent for 18 years, and filing an EEO
complaint and a lawsuit. (Id. at 35-36.)

     B.   Luther Ivery
     Luther Ivery is an African-American former agent
who became eligible to bid on GS-14 positions in 1993,
but was not selected for more than 130 GS-14 positions.
For several positions, "his MPP score was not high
enough to place him on the [BQL]." (Id. at 37.)  Ivery
alleges that even once he made the BQL, "he was passed
over for scores of promotions[.]" (Id.)  Ivery was
promoted to a GS-14 position in 2002, but alleges that
his promotion came only as a result of his having filed
suit. (Id. at 39.)  Ivery retired from the Secret

-5-

Service in 2004, but asserts that "he would have reached the GS-15 . . . level before retirement" had he not experienced the Secret Service's discriminatory practices. (<u>Id.</u>)

C.  <u>John Turner</u>

John Turner is an African-American former SA who bid for more than 80 GS-14 positions for which he was not selected. (<u>Id.</u> at 40.)  Originally his MPP score was not high enough to place him on the BQL, but once it was, he was "nevertheless denied dozens of GS-14 positions on which he bid." (<u>Id.</u>)  Turner alleges that he was promoted "six years after he first became eligible" and only after filing an EEO complaint and a lawsuit. (<u>Id.</u> at 41.)

D.  <u>Cheryl Tyler</u>

Cheryl Tyler is a former SA who was employed by the Secret Service from 1984 to 1999. (<u>Id.</u>)  Tyler alleges that she became eligible to bid for a GS-14 promotion in 1993, but deferred bidding until 1996 because her MPP scores were not competitive enough. (<u>Id.</u> at 42-43.)  Tyler was the only African-American female SA in the Atlanta Field Office and that, "[a]t the time she resigned, and . . . the filing of this lawsuit, there were no African-American female Agents in a GS-14 position." (<u>Id.</u> at 41-42.)  Another agent was "troubled . . . by . . . Tyler's experience in the Secret Service's Office of Training" because Tyler had "worked in every possible assignment and/or position within the Office, yet she was continually passed over for promotion." (<u>Id.</u> at 43 (quoting 7/28/00 Webb Decl. ¶ 36).)  Tyler asserts that she resigned in 1999 "because she could not reach the GS-14 level as a result of discrimination" and that the Agency told her that it "was not ready for an African-American female supervisor." (<u>Id.</u> at 44 (citing C. Tyler Decl. ¶¶ 36, 34).)

E.  <u>Yvette Summerour</u>

Yvette Summerour claims that she experienced discrimination by the Secret Service even before it hired her because it delayed her hiring by five years and that, after being hired, from 1998 through 2001, she "applied for and was denied promotion to almost 70 GS-14 positions." (<u>Id.</u> at 44-45.)  In the "calendar year before this lawsuit was filed . . . , [she] applied for and was denied promotion to twelve GS-14

-6-

positions." (<u>Id.</u> at 45.)  Summerour also alleges that
she was "passed over for promotion in favor of a white
(male) Agent who had previously been transferred" as a
result of sexually harassing her.  (<u>Id.</u> at 45-46.)
Summerour claims further that she was "denied dozens of
promotions for which she made the [BQL]" and that it
was only as a result of this lawsuit that she "was
finally promoted to a GS-14 position[.]"  (<u>Id.</u> at 46.)
Summerour "and another African-American female [agent]
. . . were the first GS-14 African-American female
[SAs] in the history of the Secret Service."  (<u>Id.</u>)

   F.   <u>Kenneth Rooks</u>
      Kenneth Rooks is an African-American SA who joined
the Secret Service in 1995 and has been a GS-13 since
approximately 2000.  (<u>Id.</u> at 47.)  Rooks asserts that
he has "bid for over 160 GS-14 positions, but has not
been promoted" and that, even though he received a high
score from his supervisor, he "was kept off the [BQL]
or ranked low on the [BQL], and thus was effectively
disqualified from promotions."  (<u>Id.</u> at 47-48.)

   G.   <u>Andrew Harris</u>
      Andrew Harris was hired by the Secret Service in
1987 and alleges that due to the Secret Service's
discriminatory practices against African-Americans, he
"had to file EEO complaints in order to be (1) hired,
(2) promoted to GS-14, and (3) promoted to GS-15."
(<u>Id.</u> at 49.)  Harris alleges that he "bid on and was
denied more than 20 GS-14 positions, despite his
qualifications, due to the discriminatory promotions
process."  (<u>Id.</u> (citing Ex. 80).)  Harris alleges that
the Secret Service told him that he must "bid outside
of D.C. to be promoted" even though the requirement to
bid outside of the District of Columbia "is not written
in the MPP, and is not imposed on white Agents;
instead, it only serves as a barrier to the promotion
of African-American Agents."  (<u>Id.</u> at 51.)  For
support, Harris compiled a list of "thirty-two non-
African-American Agents who were promoted from GS-13 to
GS-14, and from GS-14 to GS-15, without ever leaving
the Washington, D.C. area."  (<u>Id.</u> at 51-52 (citing Ex.
85).)

   H.   <u>Leroy Hendrix</u>
      Leroy Hendrix alleges that "[b]ecause of the
Secret Service's discriminatory promotions process,
[he] was forced to bid for more than 230 different GS-

-7-

> 14 positions prior to finally being promoted, even
> though he was qualified for each and every position."
> (Id. at 52 (citing Ex. 87).)  Hendrix, an African-
> American, further alleges that he was not selected for
> a position "when his score was ten points higher than
> the selectee's score."  (Id. at 53 (citing Ex. 88 at
> 455).)  Hendrix "bid on and was not selected for over
> forty GS-15 positions" and claims that, although he was
> "the most qualified choice" for a Special Services
> Division/White House Mail position, he was not selected
> and was "forced to vacate his office to make room for
> the white selectee, and . . . train that Agent."  (Id.
> at 53-54.)  Hendrix states that he "was finally
> promoted to a GS-15 Assistant Special Agent in Charge
> position in the Los Angeles Field Office" but that "he
> was required to accept a cross-country move to be
> promoted[.]"  (Id. at 54.)

Moore III, 269 F.R.D. at 24-27.

The plaintiffs have moved for class certification three
times before.  The plaintiffs' third motion for class
certification was considered in Moore III.  There, the plaintiffs
moved to certify a class

> on behalf of all current and former African-American
> Agents who were employed as Criminal Investigators
> (GS/GM-1811) and who had the required time-in-grade to
> seek promotion to competitive positions at the GS-14
> level at any time during the years 1995 to 2004, and/or
> who had the required time-in-grade to seek promotion to
> competitive positions at the GS-15 level at any time
> during the years 1995 to 2005.

Id. at 27 (internal quotation marks and citation omitted).
Although the plaintiffs' proposed class satisfied the numerosity
and commonality prongs, the plaintiffs' motion for class
certification was denied without prejudice because the class
representatives' claims were not typical of the class members'

-8-

claims and there were conflicts of interest within the class.
Id. at 24, 35.

The plaintiffs have again moved for class certification.  In
an effort to cure the defects in the proposed class denied
certification in Moore III, the plaintiffs have narrowed their
proposed class.  The plaintiffs now move to certify a class on
behalf of

> [a]ll current and former African-American Special
> Agents who bid for promotion to a GS-14 position from
> 1995-2004 and were not promoted to GS-14 on the first
> bid list on which they bid; and all current and former
> African-American Special Agents who bid for promotion
> to a GS-15 position from 1995-2005 and were not
> promoted to GS-15 on the first bid list on which they
> bid; but excluding Special Agents who served as an
> Assistant Director, Deputy Director, or the Director of
> the Secret Service during the class period.

Pls.' Mot. for Class Cert. at 2.

In support of their motion for class certification, the
plaintiffs offer the report of statistician Dr. Charles Mann,
which concludes that the MPP process had an adverse impact on
African-American SAs applying for promotion to GS-14 and GS-15
positions during the class period (i.e., 1995 to 2004 for
promotions to GS-14 positions and 1995 to 2005 for promotions to
GS-15 positions) and a four-year background period (i.e., 1991 to
1994).  The defendant moves to exclude Dr. Mann's testimony under
Federal Rule of Evidence 702 and Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993), arguing that
Dr. Mann's expert opinions are unreliable and irrelevant.

-9-

DISCUSSION

I.   MOTION TO EXCLUDE EXPERT TESTIMONY[2]

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, district courts are gatekeepers of expert evidence.  See Daubert, 509 U.S. at 589.  A court must determine as an initial matter whether the proffered

---

[2] In Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2553-54 (2011), the Supreme Court suggested that a court should probably determine whether expert testimony is admissible under Rule 702 and Daubert at the class certification stage.  See Wal-Mart, 131 S. Ct. at 2553-54 ("The District Court concluded that Daubert did not apply to expert testimony at the certification stage of class action proceedings.  We doubt that is so[.]") (citation omitted). The D.C. Circuit has not spoken about whether district judges must conduct a full Daubert analysis at the class certification stage, and courts in other circuits disagree as to what is required of a district judge deciding a motion for class certification.  See In re Rail Freight Fuel Surcharge Antitrust Litig., 286 F.R.D. 88, 92 (D.D.C. 2012) (discussing circuit split).  Nevertheless, "dicta of the United States Supreme Court should be very persuasive." Gabbs Exploration Co. v. Udall, 315 F.2d 37, 39 (D.C. Cir. 1963) (internal quotation marks omitted); see also Bangor Hydro-Electric Co. v. FERC, 78 F.3d 659, 662 (D.C. Cir. 1996) (stating that "Supreme Court dicta tend[] to have somewhat greater force" than dicta from other courts). Accordingly, the defendant's motion to exclude Dr. Mann's expert testimony will be considered before turning to the plaintiffs' motion for class certification.

-10-

witness is qualified to give the expert opinion he seeks to
offer.  See Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 156
(1999); Daubert, 509 U.S. at 589.  Then, a court must "ensure
that any and all scientific testimony or evidence admitted is not
only relevant, but reliable."  Daubert, 509 U.S. at 589.
"Evidence is relevant if[] it has any tendency to make a fact [of
consequence] more or less probable than it would be without the
evidence[.]".  Fed. R. Evid. 401.  When considering the
admissibility of scientific expert testimony, relevance is
primarily a question of "fit," and "requires a valid scientific
connection to the pertinent inquiry as a precondition to
admissibility."  Daubert, 509 U.S. at 591-92.

Expert testimony is reliable if it is based on scientific
knowledge.  Id. at 589-90.  "The [reliability] inquiry forces the
court to focus on [the expert's] principles and methodology, not
on the conclusions that they generate[.]"  Meister v. Med. Eng'g
Corp., 267 F.3d 1123, 1127 (D.C. Cir. 2001) (internal quotation
marks omitted).  In assessing the expert's methodology, a court
may consider "whether the theory or technique had been tested,
whether it had been subjected to peer review and publication, the
method's known or potential error rate, and the method's general
acceptance in the scientific community."  Id. at 1127 (citing
Daubert, 509 U.S. at 593-94).  "Expert testimony that rests
solely on 'subjective belief or unsupported speculation' is not

reliable." <u>Groobert v. President & Dirs. of Georgetown Coll.</u>, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) (quoting <u>Daubert</u>, 509 U.S. at 590).

"In general, Rule 702 has been interpreted to favor admissibility." <u>Khairkhwa v. Obama</u>, 793 F. Supp. 2d 1, 10 (D.D.C. 2011) (citing <u>Daubert</u>, 509 U.S. at 587; Fed. R. Evid. 702 Advisory Committee's note ("A review of the caselaw after <u>Daubert</u> shows that the rejection of expert testimony is the exception rather than the rule.")). Nonetheless, the proponent of the expert witness -- here, the plaintiffs -- bears the burden to prove that the expert testimony is reliable by a preponderance of the evidence. <u>Meister</u>, 267 F.3d at 1127 n.9.

The plaintiffs offer Dr. Mann's report to show that the MPP promotion process had a statistically significant adverse impact on African-American SAs in support of both the plaintiffs' disparate treatment pattern and practice claim and their disparate impact claim. Specifically, Dr. Mann would offer three opinions. First, relying on his "applicant to best qualified list" analysis,[3] Dr. Mann would testify that "[t]he use of MPP scores to create a cut-off for inclusion on the best qualified

_____

[3] The "applicant to best qualified list" analysis compares the number of African-American SAs expected to make a best qualified list for a position based on the number who applied for the position with the actual number of African-American SAs who made the best qualified list. <u>See</u> Pls.' Opp'n to Mot. to Exclude Mann Test., Ex. 2 (Fourth Supp. Decl. of Charles R. Mann, Ph.D. ("Mann Decl.")) ¶¶ 35-43.

-12-

list disproportionately disqualifies African-American Special
Agents for promotion." Pls.' Opp'n to Def.'s Mot. to Exclude the
Test. of Charles R. Mann Offered in Supp. of Pls.' Mot. for Class
Cert. ("Pls.' Opp'n to Mot. to Exclude Mann Test.") at 5; see
also Pls.' Opp'n to Mot. to Exclude Mann Test., Ex. 2 (Fourth
Supp. Decl. of Charles R. Mann, Ph.D. ("Mann Decl.")) ¶¶ 36-43.
Dr. Mann would testify that he found a statistically significant
racial disparity in GS-14 and GS-15 promotions for the background
period and the class period. Pls.' Opp'n to Mot. to Exclude Mann
Test. at 5; see also Mann Decl. ¶¶ 36-43. Second, Dr. Mann
conducted a "mean rank" analysis[4] and "effective pass rate"
analysis,[5] and concluded that "the consideration of rank by MPP
score on the best qualified list disproportionately disadvantages
African-American Special Agents." Pls.' Opp'n to Mot. to Exclude
Mann Test. at 5; see also Mann Decl. ¶¶ 49-75. Dr. Mann would
testify that there is a statistically significant racial
disparity in the GS-14 and GS-15 position best qualified lists
during the background and class periods. Pls.' Opp'n to Mot. to
Exclude Mann Test. at 5; see also Mann Decl. ¶¶ 49-75. Third,

---

[4] The "mean rank" analysis compares "the average, or mean, rank
of African-American[] and non-African-American[ SAs] on the best
qualified list" based on their MPP scores. Pls.' Opp'n to Mot.
to Exclude Mann Test. at 37.

[5] The "effective pass rate" analysis tests "whether the effective
cut-off score" -- "the lowest MPP score held by an Agent who was
promoted" -- "on the best qualified list had an adverse impact on
African-Americans." Pls.' Opp'n to Mot. to Exclude Mann Test. at
38.

-13-

based on his "best qualified to selected" analysis,[6] Dr. Mann concludes that "[f]ewer African-American Special Agents are promoted from the best qualified list than would be expected in the absence of discrimination[.]" Pls.' Opp'n to Mot. to Exclude Mann Test. at 5; see also Mann Decl. ¶¶ 45-48. Dr. Mann found statistically significant racial disparities in GS-13 to GS-14 level promotions that occurred from 1998 to 2000, and in GS-14 to GS-15 level promotions that occurred in 2002 to 2005. Pls.' Opp'n to Mot. to Exclude Mann Test. at 5; see also Mann Decl. ¶¶ 45-48.

There is no dispute that Dr. Mann is qualified to offer statistical expert testimony.[7] Instead, the Secret Service

_____

[6] The "best qualified to selected" analysis "compares the number of African American promotions 'expected' based on the number of African Americans who made the best qualified list to the number of African-Americans actually promoted." Pls.' Opp'n to Mot. to Exclude Mann Test. at 41.

[7] The defendant's motion does not dispute that Dr. Mann is qualified to offer expert opinions based on statistical analyses. See also Pls.' Opp'n to Mot. to Exclude Mann Test., Ex. 1 (Charles Mann Dep. at 7:15-20). Dr. Mann has a Bachelor of Science in Applied Mathematics, a Master of Science in Mathematical Statistics, and a doctorate in Statistics. Mann Decl., Attach. A (Mann Resume at 1). Dr. Mann is the President of a "consulting firm which provides statistical, econometric and data processing services." Id. In this capacity, Dr. Mann "provides expert witness services and statistical guidance in connection with a wide range of litigation." Id. Dr. Mann has also testified in numerous state and federal court proceedings. See Mann Decl., Attach. A. (Mann Test. List). Based on his extensive education and experience, Dr. Mann is qualified to testify as an expert in statistics.

-14-

argues that Dr. Mann's testimony should be excluded because it is unreliable and is not relevant.

    A.   <u>Relevance</u>

        1.   Relevance of statistical evidence to disparate treatment pattern and practice claim and disparate impact claim

The plaintiffs assert that all three of Dr. Mann's opinions are relevant to both their disparate treatment pattern and practice claim and their disparate impact claim. The defendant counters that the plaintiffs' claims require different statistical showings. <u>See</u> Reply in Supp. of Def.'s Mot. to Exclude the Test. of Charles R. Mann at 2.

While "[f]unctionally the disparate treatment and disparate impact models have different aims," the same statistical evidence is often relevant to both disparate treatment pattern and practice claims and disparate impact claims. <u>Segar v. Smith</u>, 738 F.2d 1249, 1266-67 (D.C. Cir. 1984). "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." <u>Ricci v. DeStefano</u>, 557 U.S. 557, 577 (2009). Disparate treatment occurs "when an individual alleges that an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin."

Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 985–86 (1988).

In a disparate treatment case, "the plaintiff is required to

prove that the defendant had a discriminatory intent or motive."

Id. at 986.   One method of proving disparate treatment is to show

that an employer engaged in a pattern and practice of

discrimination.   Where a plaintiff alleges such systemic

discrimination, "[t]he ultimate factual issues are . . . simply

whether there was a pattern or practice of such disparate

treatment and, if so, whether the differences were 'racially

premised.'"   Int'l Bhd. of Teamsters v. United States, 431 U.S.

324, 335 (1977).   In a pattern and practice case, a plaintiff has

to "establish by a preponderance of the evidence that racial

discrimination was the company's standard operating procedure[,]

the regular rather than the unusual practice."   Id. at 336.   The

plaintiff may meet his burden by offering circumstantial evidence

that is "entirely statistical in nature."   Palmer v. Shultz, 815

F.2d 84, 90 (D.C. Cir. 1987); see also Segar, 738 F.2d at 1267.

> Statistics showing racial or ethnic imbalance are
> probative in a [pattern and practice case] only because
> such imbalance is often a telltale sign of purposeful
> discrimination; absent explanation, it is ordinarily to
> be expected that nondiscriminatory hiring practices
> will in time result in a work force more or less
> representative of the racial and ethnic composition of
> the population in the community from which employees
> are hired.   Evidence of longlasting and gross disparity
> between the composition of a work force and that of the
> general population thus may be significant[.]

<u>Teamsters</u>, 431 U.S. at 339 n.20; <u>see also</u> <u>Segar</u>, 738 F.2d at 1267 (explaining that a plaintiff in a pattern and practice case alleging race discrimination may provide evidence "of a disparity in the position of members of the plaintiff class and *comparably qualified* whites").

"Disparate impact claims . . . 'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.' 'Proof of discriminatory motive . . . is not required under a disparate-impact theory.'" <u>Anderson v. Zubieta</u>, 180 F.3d 329, 338 (D.C. Cir. 1999) (second alteration in original) (citation omitted) (quoting <u>Teamsters</u>, 431 U.S. at 335 n.15). To establish disparate impact, a plaintiff "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." <u>Watson</u>, 487 U.S. at 994; <u>see also</u> <u>Young v. Covington & Burling LLP</u>, 846 F. Supp. 2d 141, 156–57 (D.D.C. 2012) ("The plaintiff's evidence of causation must establish that the employment practice 'select[s] applicants for hire or promotion in a . . . pattern significantly different from that of the pool of applicants.'" (internal quotation marks omitted) (quoting <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 425 (1975))). Despite the differences

between pattern and practice disparate treatment claims and disparate impact claims, "an important point of convergence" is that both "are attacks on the systemic results of employment practices."  Segar, 738 F.2d at 1267.

> The pattern or practice claim amounts to an allegation that an observed disparity is the systemic result of an employer's intentionally discriminatory practices.  The disparate impact claim amounts to an allegation that an observed disparity is the systemic result of a specific employment practice that cannot be justified as necessary to the employer's business.  Consequently the proof of each claim will involve a showing of disparity between the minority and majority groups in an employer's workforce.

Id.  Because both the disparate treatment and disparate impact claims can be proven using the same statistical showing, the relevance of Dr. Mann's testimony can be considered for both of the claims at the same time.

> 2.   Relevance of statistical evidence showing an adverse impact at individual stages of a multiple step employment decision process

Dr. Mann's statistical evidence shows an adverse impact at the individual levels of the MPP process.  While the defendant does not dispute that statistical evidence showing an adverse impact at an individual stage is relevant to the plaintiffs' disparate impact claim, the defendant argues that Dr. Mann's testimony is not relevant to the plaintiffs' disparate treatment pattern and practice claim because none of Dr. Mann's conclusions are based on the "relevant statistic" -- "a comparison of the promotion rates of qualified (or eligible) African-American and

-18-

non-African-American special agents." Mem. in Supp. of Def.'s Mot. to Exclude the Test. of Charles R. Mann ("Def.'s Mem. to Exclude Mann Test.") at 17-20. Stated simply, the defendant argues that only a disparity at the bottom line creates an inference of discrimination in a pattern and practice case. However, the Supreme Court impliedly dismissed this argument in Connecticut v. Teal, 457 U.S. 440 (1982). In Teal, four African-American employees brought suit claiming that the employer's multi-step promotion process had a disparate impact on African-Americans because the first step in the promotion process, a written examination, had an adverse impact on African-Americans. Id. at 443. The employer countered that despite African-Americans' poor performance on the written examination, the employer applied "an affirmative-action program in order to ensure a significant number of minority supervisors." Id. at 444. Thus, the employer argued that its promotion process did not have a disparate impact on the plaintiffs because the "employer has compensated for a discriminatory pass-fail barrier by hiring or promoting a sufficient number of black employees to reach a nondiscriminatory 'bottom line.'" Id. at 453. After considering the purpose of disparate impact claims, the Supreme Court held that, in disparate impact cases, the "bottom line defense" is "no answer" to the plaintiffs' prima facie case of employment discrimination. Id. at 456.

-19-

Although the "bottom line" defense is not applicable in a disparate impact case, the Court in Teal noted that

> a nondiscriminatory "bottom line" and an employer's good-faith efforts to achieve a nondiscriminatory work force, might in some cases assist an employer in rebutting the inference that particular action had been *intentionally discriminatory*:  "Proof that [a] work force was racially balanced or that it contained a disproportionately high percentage of minority employees is not wholly irrelevant on the issue of intent when that issue is yet to be decided."

Id. (emphasis added) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 580 (1978)) (citing Teamsters, 431 U.S. at 339 n.20). Although statistics showing "a nondiscriminatory bottom line" can be used to rebut the inference of discrimination, "[a] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination."  Furnco, 438 U.S. at 579. Therefore, statistical evidence showing an adverse impact at a component level may be offered in support of a pattern and practice claim.  See United States v. City of New York, 683 F. Supp. 2d 225, 249 (E.D.N.Y. 2010) (finding that statistical evidence showing statistically significant disparities at individual levels of the employer's hiring process was sufficient to establish a prima facie case that the employer had a pattern and practice of discriminating against African-American applicants).[8]

---

[8] Contrary to the defendant's argument, allowing statistical evidence at the component level to create an inference of discrimination to support the plaintiffs' pattern and practice claim is consistent with Moore I.  In Moore I, the plaintiffs'

-20-

Here, Dr. Mann seeks to testify that there are statistically
significant disparities at the individual stages of the MPP
process based on his applicant to best qualified list analysis
and his best qualified list to selected analysis.  Because his
analyses of these stages show disparities between African-
American SAs and non-African-American SAs, Dr. Mann's testimony

---

motion to enjoin the Secret Service from further use of the MPP
process was denied because the plaintiffs' statistical evidence
was "insufficient to give rise to an inference that the
performance evaluation system is discriminatory[.]"  113 F. Supp.
2d at 7.  The plaintiffs offered statistical evidence showing a
disparity between African-American and non-African-American SAs
promoted to GS-14 positions.  However, the statistical analysis
erroneously assumed that all African-American GS-13 SAs were
eligible for promotion to GS-14 when, in reality, only SAs that
completed three years "in grade" and who bid on a position were
eligible.  Id. at 20-21.  That is, the plaintiffs' evidence was
insufficient because it failed to control for the "most common
nondiscriminatory reason for a systemic disparity in treatment":
ineligibility.  Id. at 20.  Because the plaintiffs' statistical
evidence was not "'based on a comparison of those [African-
American SAs] eligible for selection who were actually selected
with the corresponding proportion of eligible [non-African-
American SAs] who were actually selected[,]" id. (quoting Palmer,
815 F.2d at 90), the plaintiffs' statistical evidence did "not
demonstrate that a racial disparity exists in the promotion of
GS-13s to GS-14[,]" id. at 21.  Accordingly, the plaintiffs'
motion for preliminary injunction was denied because the
plaintiffs did not demonstrate a likelihood of success on the
merits.  Id. at 21.  Moore I stands for the proposition that
discrimination cannot be inferred from statistical analyses that
include African-American SAs who are ineligible for promotion in
the sample population.  Here, Dr. Mann's analyses consider only
GS-13s and GS-14s eligible for promotion.  Mann Decl. ¶¶ 16-17;
see also Pls.' Opp'n to Mot. to Exclude Mann Test. at 22.
Accordingly, Dr. Mann's current analyses do not contain the same
deficiencies identified in the statistical analyses considered in
Moore I.

is relevant to the plaintiffs' disparate treatment and disparate impact claims.[9]

Dr. Mann's testimony based on his mean rank and effective pass rate analyses is also relevant to the plaintiffs' claims. The plaintiffs provide evidence that the members of the promotion Advisory Board testified that they considered a SA's rank on the best qualified list when making promotion recommendations. See id., Ex. 5 (Examples from Def.'s Resp. to Pls.' Interrogs. 4(c)); see also Pls.' Opp'n to Mot. to Exclude Mann Test. at 37. If a SA's rank on a best qualified list affects whether that SA will be promoted, Dr. Mann's mean rank analyses will help the trier of fact determine whether the MPP process is discriminatory. The plaintiffs also provide evidence that some "members of the promotion Advisory Board . . . [felt] that some Special Agents who made the best qualified list had scores that were simply too

---

[9] That Dr. Mann did not directly compare the MPP scores received by African-American and non-African-American SAs does not compel a different conclusion regarding the relevancy of Dr. Mann's applicant to best qualified list analysis as the defendant argues. The defendant asserts that the "fact in issue" is "whether African-American SAs receive lower MPP scores than non-African-American SAs." Def.'s Mem. to Exclude Mann Test. at 33. The plaintiffs establish, however, that Dr. Mann's applicant to best qualified list analysis is relevant because it "measure[s] the adverse impact of how MPP scores are actually used," Pls.' Opp'n to Mot. to Exclude Mann Test. at 33, and "models the real-world effect on African-American Agents of the MPP's first use of scores by measuring the impact by race on failure to make the best qualified list," id. at 34. The applicant to best qualified list analysis is based on the MPP scores and is relevant as a proxy for the scores. Because this analysis showing an adverse impact on African-American SAs is probative of whether the MPP process is discriminatory, it is relevant.

-22-

low to result in promotion." Pls.' Opp'n to Mot. to Exclude Mann Test. at 38; see also id., Ex. 8 (Examples from Def.'s Resp. to Pls.' Interrogs. 4(c)). Based on this testimony, Dr. Mann analyzed whether "there was an adverse impact on African-American Special Agents with respect to Agents who made the best qualified list yet had an MPP score lower than the effective cut-off score." Pls.' Opp'n to Mot. to Exclude Mann Test. at 38. Thus, even if a SA makes a best qualified list, his MPP score may be too low to be considered for a promotion. Because the plaintiffs have presented evidence that to actually be considered for a promotion a SA must not only make the best qualified list but must also have a competitive MPP score, Dr. Mann's effective pass rate analysis is relevant.

        B.   Reliability

        Dr. Mann bases his testimony on "pools analyses." Pls.' Opp'n to Mot. to Exclude Mann Test. at 29. "A pools analysis looks to pools of similarly situated employees to determine how the promotion success of a certain pool . . . stacks up against that of a control group[.]" McReynolds v. Sodexho Marriott Servs., Inc. (McReynolds II), 349 F. Supp. 2d 1, 8 (D.D.C. 2004). The statistician must "compare 'similarly situated employees' and . . . the pools must be properly defined by controlling for a variety of factors[,]" id., such as seniority and education in a non-promotion case, see Coward v. ADT Sec. Sys., Inc., 140 F.3d

-23-

271, 276 (D.C. Cir. 1998) (Sentelle, J., concurring).  In a non-

promotion case, the statistician proceeds from the assumption

that "absent discriminatory promotion practices, the proportion

of the protected group in each of the job classifications and

grade levels would approximate the proportion of the protected

group with the minimum necessary qualifications for promotion in

the employer's labor force as a whole."  Davis v. Califano, 613

F.2d 957, 964 (D.C. Cir. 1979) (citing Teamsters, 431 U.S. at 339

n.20).

Dr. Mann described the application of his methodology.

First, he used information he received from the Secret Service to

define his pools, and considered pools composed of eligible

bidders "for whom selection would be a promotion (increase in

grade) and who ha[d] not already been selected for another

promotion from the bid list" who bid on any vacancy announcement

during a period of time.  Mann Decl. ¶ 16.  In his applicant to

selected analysis, Dr. Mann included only "informative" pools.

According to Dr. Mann, "informative" pools are diverse (i.e.,

"pools that have at least one African-American eligible and at

least one non-African-American eligible") and competitive (i.e.,

pools that "have at least one successful eligible and at least

one not successful eligible").  Id. ¶ 77.  Then, Dr. Mann

conducted the following analyses: (1) applicant to best qualified

list, (2) best qualified list to selected, (3) mean rank on the

-24-

best qualified list, and (4) attainment of the effective pass rate.  Id. ¶¶ 36-43, 45-75.  Finally, Dr. Mann reported that his results were statistically significant when his analyses showed a 0.025 probability standard using a one-tailed test.  Pls.' Opp'n to Mot. to Exclude Mann Test. at 23.  Dr. Mann explained that he used one-tailed tests instead of two-tailed tests because, unlike a two-tailed test, a one-tailed test can be used to determine whether an observed difference is adverse or favorable to African-Americans.[10]  Mann Decl. ¶¶ 30-32.  Dr. Mann's analyses report statistical significance over an aggregated period of years as opposed to annually.

Pool analyses can satisfy Daubert.  See, e.g., McReynolds v. Sodexho Marriott Servs., Inc. (McReynolds III), 349 F. Supp. 2d 30, 45 (D.D.C. 2004).  The defendant's proffered statistical

---

[10] "[T]he terms 'one-tailed' and 'two-tailed'[] . . . refer to the 'tails' or ends of the bell-shape curve, which represents in graph form a 'random normal distribution.'" Palmer, 815 F.2d at 93 (citing W. Curtis, Statistical Concepts for Attorneys 72-73 (1983)).  "In these random distributions, the area under any segment of the bell curve measures the probability of that range of results occurring randomly." Id.  As Dr. Mann asserts, one-tailed and two-tailed analyses serve different purposes.  A one-tailed analysis tests whether a difference is significant in one direction.  For example, a one-tailed analysis can be used to test "whether a group is disfavored in hiring decisions." Hartman v. Duffey, 88 F.3d 1232, 1238 (D.C. Cir. 1996).  A two-tailed analysis tests whether a difference is significant in either direction.  For example, a two-tailed analysis can be used to test whether a group is treated differently -- be it better or worse -- than another group.  See Palmer, 815 F.2d at 95 (explaining that two-tailed tests can be used to identify "statistically significant deviations in either direction from an equality in selection rates").

-25-

expert, Dr. Paul White, also used pools analyses for some of his
analyses.  Pls.' Opp'n to Mot. to Exclude Mann Test. at 29 &
n.25; see also Def.'s Mem. to Exclude Mann Test., Ex. 4, White
Report at 7.  Dr. Mann's decision to exclude non-competitive best
qualified lists "where fewer Agents bid for the position than the
number used to create the cut-off score[,]" Pls.' Opp'n to Mot.
to Exclude Mann Test. at 30, does not make Dr. Mann's testimony
unreliable as the defendant argues, Def.'s Mem. to Exclude Mann
Test. at 34-36.  Even if the non-competitive lists are among the
data relevant to Dr. Mann's analyses, there is "no authority
rigidly requiring that an expert review all relevant information
in a case in order to have his or her testimony admitted into
evidence."  SEC v. Johnson, 525 F. Supp. 2d 70, 75 (D.D.C. 2007).
"Indeed, Federal Rule of Evidence 705 specifically 'eliminates
the prior practice of requiring an expert to set out,
specifically, the facts and data underlying an opinion before
allowing the expert to testify.'"  Id. at 75-76 (citing Ambrosini
v. Labarraque, 101 F.3d 129, 132 (D.C. Cir. 1996)).  Thus,
Dr. Mann's failure to review lists he considered to be non-
informative is not a ground for excluding his testimony; instead,
"it provides subject matter for cross-examination."  Id. at 76.[11]
Similarly, the defendant's argument that Dr. Mann did not report

---

[11] An expert who fails to review relevant data, and can offer no
good reason for it or does not understand the omitted relevant
data, has not reliably applied a scientific methodology.  See
Fed. R. Evid. 702(d).  That, of course, did not occur here.

all of the results from his best qualified to selected analysis, Def.'s Mem. to Exclude Mann Test. at 22-23, is not conclusive because Dr. Mann was not required to apply his methodology "to all the evidence presented." See Johnson, 525 F. Supp. 2d at 75-76.  His testimony must be based upon "sufficient" facts or data.  Fed. R. Evid. 702(b).

The defendant argues that Dr. Mann's opinions are unreliable because they are not based on statistically significant results. See Def.'s Mem. to Exclude Mann Test. at 27-29.  "[G]ross statistical disparities" between African-American SAs and non-African-American SAs alone may raise an inference of discrimination.  Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-08 (1977) (citing Teamsters, 431 U.S. at 339).  "[T]he threshold at which statistical evidence alone raises an inference of discrimination [cannot] be lower than 1.96 standard deviations, whether one views this number as signifying a 5% probability of randomness using a two-tailed approach or a 2.5% probability of randomness using a one-tailed approach." Palmer, 815 F.2d at 96 n.9.  Although "[t]he D.C. Circuit has expressed a preference for two-tailed tests over one-tailed tests" to determine whether statistical evidence alone creates an inference of discrimination in a Title VII case, Moore I, 113 F. Supp. 2d at 20 n.2 (citing Palmer, 815 F.2d at 95), the Circuit "by no means intend[ed] entirely to foreclose the use of one-tailed

-27-

tests[.]" Palmer, 815 F.2d at 95.  Dr. Mann used one-tailed

tests and concluded that stages of the MPP process have an

adverse impact on African-American SAs where his analyses showed

results that were statistically significant at a 2.5% probability

of randomness.  Although two-tailed tests are favored in Title

VII cases, Dr. Mann reliably applied the one-tailed tests and his

conclusions followed from his analyses.

Dr. Mann aggregated data across periods of time, a method

the defendant criticizes as unreliable because the results are

not based upon individual years.  See Def.'s Mem. to Exclude Mann

Test. at 21-23.  In his deposition, Dr. Mann explained that he

did not report year-by-year data because he believed that there

was "no real significance to the years."  Pls.' Opp'n to Mot. to

Exclude Mann Test., Ex. 1, Mann Dep. at 260:21-261:6.  He also

stated that unlike aggregated data, disaggregated annual data may

have only yielded "small numbers and tests not powerful enough to

detect [a disparity]."   Id.  "Where, as here, 'policies have

remained unchanged over a period of time and there have been no

substantial changes in the [promotion process], it would be

unreasonable to require a plaintiff to break his or her data into

year by year subgroups.'"  Eldredge v. Carpenters 46 N. Cal.

Cntys. Joint Apprenticeship & Training Comm., 833 F.2d 1334, 1339

n.7 (9th Cir. 1987) (quoting D. Baldus & J. Cole, Statistical

Proof of Discrimination § 7.1 (1986 Supp.)); see also Lilly v.

-28-

Harris-Teeter Supermarket, 720 F.2d 326, 336 n.17 (4th Cir. 1983)
("If possible, it is highly preferable to examine the statistical
data for the time period in combined form, rather than year by
year.  Combined data is more likely to demonstrate the 'pattern
or practice' of defendant's policies, whether discriminatory or
not.'").  The plaintiffs have provided sufficient evidence that
the MPP process did not substantially change over the class
period.  Thus, it was a reliable for Dr. Mann to aggregate data
across several years.

In his four analyses, Dr. Mann also aggregated data across
vacant positions.  In Segar v. Smith, the D.C. Circuit described
"repeatedly disaggregating [data] until groups were too small to
generate any statistically significant evidence of
discrimination" as a "methodological misstep[.]"  738 F.2d at
1286.  This is because "if an expert isolates units or groups and
runs separate analyses for them, such methodology may mask
whether 'the overall decision-making process' produces a
discriminatory result, whereas analyzing an entire group will
indicate whether the identified employment practice was the cause
of the disparity."  McReynolds II, 349 F. Supp. 2d at 15 (quoting
Smith v. Xerox, 196 F.3d 358, 368-69 (2d Cir. 1999)).  Thus,
"'[p]ooling data is sometimes not only appropriate but necessary,
since statistical significance becomes harder to attain as the
sample size shrinks.'"  Id. (quoting Coates v. Johnson & Johnson,

756 F.2d 524, 541 (7th Cir. 1985)).  Dr. Mann's methodology finds

support in precedent involving aggregating data in similar

situations and is reliable.

Finally, the defendant argues that Dr. Mann's testimony

based on his best qualified to selected analysis is unreliable

because Dr. Mann should have expected that his multiple analyses

would yield some "significant" results as random error.  The

defendant further argues that Dr. Mann should have conducted

additional tests to "determine the likelihood that his results

are consistent with . . . pure statistical chance[.]"  Def.'s

Mem. to Exclude Mann Test. at 29-30.  The defendant's argument is

supported only by the declaration of defendant's proffered

expert, Dr. Laura Malowane, "an expert statistician retained by

the Secret Service for purposes of this Daubert motion."  Id. at

30 n.9.  Because the defendant's disclosure of Dr. Malowane as an

expert was untimely, Dr. Malowane's declaration should not be

considered.[12]  However, even if the defendant's arguments based

---

[12] The plaintiffs argue that Dr. Malowane's declaration should be
stricken under Federal Rule of Civil Procedure 37(c) as having
been disclosed untimely in violation of Rule 26(a)(2), or
alternatively, 26(a)(1).  Rule 26(a)(2) requires that a party
"disclose to the other parties the identity of any [expert]
witness it may use at trial[.]"  Fed. R. Civ. P. 26(a)(2)(A)
(emphasis added).  Rule 26(a)(1) requires that a party disclose
the name and address "of each individual likely to have
discoverable information . . . that the disclosing party may use
to support its claims or defenses[.]"  Fed. R. Civ. P.
26(a)(1)(A).  "If a party fails to provide information or
identify a witness as required by Rule 26(a) or (e), the party is
not allowed to use that information or witness to supply evidence
on a motion . . . unless the failure was substantially justified

or is harmless." Fed. R. Civ. P. 37(c).  The plain language of
Rule 26(a)(2) limits the rule to experts who may testify at
trial.  Because the defendants insist that Dr. Malowane will not
testify at trial, Rule 26(a)(2) does not support striking her
declaration.

The D.C. Circuit has not announced whether initial
disclosures under Rule 26(a)(1) require a party to disclose
expert witnesses who will not testify at trial, and courts in
other districts are split.  Compare Musser v. Gentiva Health
Servs., 356 F.3d 751, 756-57 (7th Cir. 2004) (explaining that
Rule 26(a)(1) applies to fact witnesses and Rule 26(a)(2) applies
to expert witnesses), with Reed v. Smith & Nephew, Inc., 527 F.
Supp. 2d 1336, 1348 (W.D. Okla. 2007) (explaining that Rule
26(a)(1) bars undisclosed expert witness testimony offered in
support of defendant's motion to exclude testimony by plaintiff's
expert because "[t]he identity of a de facto expert, whose
testimony serves to contravene that of Plaintiffs' expert, is
certainly information that Defendant has used 'to support its
claim[]' that [plaintiff's expert's] testimony should be
excluded").  However, courts that have considered whether an
undisclosed expert can support a motion to exclude an expert's
testimony under Daubert agree that "'courts should not permit the
[movant] to obtain a hearing on a motion in limine by relying on
affidavits from experts unless their identity and reports have
been supplied to the [proponent of the expert witness] in the
course of discovery and the [proponent] had an opportunity to
depose them.'"  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717,
739 (3d Cir. 1994) (internal alterations omitted) (quoting
Margaret A. Berger, Procedural Paradigms for Applying the Daubert
Test, 78 Minn. L. Rev. 1345, 1372 (1994)); see, e.g., Reed, 527
F. Supp. 2d at 1347-48; Nightlight Sys., Inc. v. Nitelites
Franchise Sys., Inc., Civil Action No. 1:04-CV-2112-CAP, 2007 WL
4563875, at *9 (N.D. Ga. May 11, 2007) (agreeing with the "Third
Circuit's preference for the disclosure and deposition of expert
witnesses before any Daubert hearing" articulated in Paoli).  In
Paoli, the Third Circuit explained that experts who testify at
Daubert hearings should be subject to discovery since

> under Daubert a judge at an in limine hearing must make
> findings of fact on the reliability of complicated
> scientific methodologies and this fact-finding can
> decide the case, it is important that each side have an
> opportunity to depose the other side's experts in order
> to develop strong critiques and defenses of their
> expert's methodologies.

Paoli, 35 F.3d at 739.  The court added that "fairness [also]
suggests that each side should have an equal opportunity to
depose the other side's experts."  Id.  After all, some of the

on Dr. Malowane's untimely declaration were considered, they

would not be grounds to find that Dr. Mann's testimony is

inadmissible because Dr. Malowane erroneously assumes that

Dr. Mann conducted several, individual tests within each

---

purposes of Rule 26 are to "avoid surprise and the possible
miscarriage of justice [and] to disclose fully the nature and
scope of the controversy[.]" See Wright, Miller, & Kane, 8
Federal Practice and Procedure 22–23 (3d ed. 2010); see also
Pierce v. Pierce, 5 F.R.D. 125, 125 (D.D.C. 1946).

     "Rule 37(c)(1) is a self-executing sanction[.]" Norden v.
Samper, 544 F. Supp. 2d 43, 49 (D.D.C. 2008) (internal quotation
marks omitted).  "[T]he overwhelming weight of authority is that
preclusion is required and mandatory absent some unusual or
extenuating circumstances -- that is, a 'substantial
justification.'" Elion v. Jackson, Civil Action No. 05-0992
(PLF), 2006 WL 2583694, at *1 (D.D.C. Sept. 8, 2006) (quoting
Klonoski v. Mahlab, 156 F.3d 255, 269, 271 (1st Cir. 1998)).  The
proponent of the evidence bears the burden of showing that the
failure to disclose the evidence "was substantially justified or
is harmless," Fed. R. Civ. P. 37(c).  See Norden, 544 F. Supp. 2d
at 50.

     Here, Dr. Mann's declaration that Dr. Malowane attacks was
disclosed on September 28, 2007.  The defendant had until
November 27, 2007 to disclose its expert reports.  The report the
defendant submitted on November 27, 2007 from its expert,
Dr. White, acknowledged Dr. Mann's declaration but did not
disclose the new detailed critique contained in Dr. Malowane's
declaration that was not disclosed until 2012, well beyond the
2008 close of discovery.  The defendant asserts that its non-
disclosure was harmless because the plaintiffs should have asked
to depose Dr. Malowane before filing their opposition brief.
Reply in Support of Def.'s Mot to Exclude Test. of Charles R.
Mann at 24 n.6.  Whether the disclosure this late in the case
newly attacking an issue raised years ago did or did not violate
Rule 26, it certainly was not in keeping with fair opportunities
to depose an opponent's expert during the discovery period.
Moreover, discovery after the deadline hinders the ability "to
move the case expeditiously forward from the end of discovery,
through dispositive motions, to pre-trial and trial." Coles v.
Perry, 217 F.R.D. 1, 5 (D.D.C. 2003).  The defendant has not
shown that its failure to disclose Dr. Malowane was substantially
justified or harmless, and Dr. Malowane's declaration should not
be considered in support of the defendant's Daubert motion.

analysis.[13]  However, the plaintiffs and Dr. Mann insist that
Dr. Mann did not independently consider the pools; instead, the
results from individual year and position analyses are
"components of aggregated analyses[.]"  Pls.' Opp'n to Mot. to
Exclude Mann Test. at 13.  Because Dr. Mann aggregated the data
in his analyses, Dr. Malowane's argument that Dr. Mann should
have considered the probability that his "individual" results
were the result of random error is inapplicable.

Because Dr. Mann is qualified to offer his expert testimony
and his opinions are relevant and based on reliable methodology,
his expert testimony is admissible under Rule 702 and <u>Daubert</u>.

## II.  MOTION FOR CLASS CERTIFICATION

To maintain a class action, the four prerequisites in Rule
23(a) must be met and the case must fall into one of the three
categories in Rule 23(b).  Fed. R. Civ. P. 23; <u>see also</u> <u>In re
Veneman</u>, 309 F.3d 789, 792 (D.C. Cir. 2002).

### A.  <u>Rule 23(a) prerequisites</u>

Under Rule 23(a), the party seeking class certification must
show that:

> (1) the class is so numerous that joinder of all
> members is impracticable [("numerosity")];
> (2) there are questions of law or fact common to the
> class [("commonality")];

---

[13] In her declaration, Dr. Malowane asserts that Dr. Mann
analyzed 84 subsets of data in his applicant to best qualified
analysis, Def.'s Mem. to Exclude Mann Test., Ex. 1 (Malowane
Decl. ¶ 11), and that Dr. Mann conducted 28 tests in his best-
qualified list to selected analysis, <u>id.</u> ¶ 33.

(3) the claims or defenses of the representative
parties are typical of the claims or defenses of the
class [("typicality")]; and
(4) the representative parties will fairly and
adequately protect the interests of the class
[("adequacy of representation")].

Fed. R. Civ. P. 23(a); see also Wal-Mart Stores, Inc. v. Dukes,

131 S. Ct. 2451, 2548 (2011).  "Failure to adequately demonstrate

any of the four is fatal to class certification." Garcia v.

Johanns, 444 F.3d 625, 631 (D.C. Cir. 2006).

    "[A] Title VII class action, like any other class action,

may only be certified if the trial court is satisfied, after a

rigorous analysis, that the prerequisites of Rule 23(a) have been

satisfied." Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147,

161 (1982).  "Frequently, that 'rigorous analysis' will entail

some overlap with the merits of the plaintiff's underlying

claim." Wal-Mart, 131 S. Ct. at 2551.  However, "the question is

not whether the plaintiff or plaintiffs have stated a cause of

action or will prevail on the merits, but rather whether the

requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin,

417 U.S. 156, 178 (1974).  In considering a motion for class

certification, a court presumes the allegations in the complaint

to be true. Stephens v. US Airways Group, Inc., Civil Action No.

07-1264 (RMC), 2012 WL 6086930, at *3 (D.D.C. Dec. 7, 2012).

-34-

1.  Numerosity

To obtain class certification, the class must be so numerous that "joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1); see also Encinas v. J.J. Drywall Corp., 265 F.R.D. 3, 8 (D.D.C. 2010) (citing Taylor v. D.C. Water & Sewer Auth., 241 F.R.D. 33, 37 (D.D.C. 2007)).  "Typically, a class in excess of 40 members is sufficiently numerous to satisfy this requirement." Lindsay v. Gov't Employees Ins. Co., 251 F.R.D. 51, 55 (D.D.C. 2008) (citing 5 Moore's Federal Practice § 23.22[3][a] at 23-63 (3d ed. 2002)).  However, "[t]here is no specific threshold that must be surpassed in order to satisfy the numerosity requirement[.]" Taylor, 241 F.R.D. at 37; see also Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 330 (1980) (explaining that the numerosity requirement "imposes no absolute limitations").  Instead, courts must examine "the specific facts of each case[,]" Gen. Tel. Co. of the Nw., 446 U.S. at 330, "including 'geographic dispersion of class members.'" Encinas, 265 F.R.D. at 8 (quoting Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)).

Moore III found the "plaintiffs' proposed class of 120 geographically dispersed members" to be "sufficiently numerous to satisfy Rule 23(a)(1)." 269 F.R.D. at 28.  It also found that a class as small as 36 members can satisfy Rule 23(a)'s numerosity prong.  Id.  Here, the plaintiffs again estimate that the class

-35-

would contain 120 members who are geographically dispersed.  See
Mem. of P. & A. in Supp. of Pls.' Mot. for Class Cert. ("Pls.'
Mem. for Class Cert.") at 45-46; Pls.' Reply in Support of Mot.
for Class Cert. at 5.[14]  As Moore III found, a proposed class of
120 members satisfies the numerosity requirement.

The defendant advances several arguments against the
plaintiffs' estimate.  The defendant claims that the plaintiffs
fail to prove numerosity because the plaintiffs' statistical
expert, Dr. Mann, found that a statistically significant number
of under-promotions occurred only from 1998 to 2000 for GS-14
positions and from 2002 to 2005 for GS-15 positions.  Def.'s
Opp'n to Pls.' 4th Mot. for Class Cert. ("Def.'s Opp'n to Mot.
for Class Cert.") at 44-45.  The defendant asserts that given the
dearth of statistical evidence showing under-promotions for the
remainder of the class period, the "plaintiffs' class must be
limited to those who bid for the appropriate promotion in those
times periods, shrinking the class to 42."  Id. at 45.  The
defendant also contends that the proposed class must exclude
those who have conflicts of interest (i.e., any class member who

_____

[14] The plaintiffs derive this number from the "'bid database'
produced by Defendant in discovery[.]"  Pls.' Mem. for Class
Cert. at 45.  According to the plaintiffs, the database shows
that "127 different African-American Special Agents actually bid
on GS-14 or GS-15 positions during the class period."  Id.  After
excluding "those who were selected for promotion on their first
bid and those who served as the Director, the Deputy Director, or
an Assistant Director during the class period," the proposed
class includes 120 members.  Id. at 45-46.

-36-

was involved in the first-level promotion evaluation scores of
another putative class member or who rated other putative class
members during panel evaluations), id., and class members whose
claims are barred for failure to timely exhaust their
administrative remedies, id. at 41-42.  After the defendant's
"required exclusions," the plaintiffs' proposed class would
contain only 27 members.  Id. at 44-45.

The defendant's arguments do not alter the conclusion that
the plaintiffs have satisfied the numerosity requirement because
they pertain not to numerosity but to Rule 23(a)'s commonality,
typicality, and adequacy of representation requirements.
Moreover, as is discussed above, three of Dr. Mann's analyses
showed statistically significant disparities for the entire class
period.  Furthermore, a class of 27 members can still satisfy the
numerosity prong where, such as here, joinder is impractical
because the class members are geographically dispersed.  See
Anderson v. Pa. Dep't of Pub. Welfare, 1 F. Supp. 2d 456, 461
(E.D. Pa. 1998); cf. Gen. Tel. Co. of the Nw., 446 U.S. at 330
(suggesting that 15 class members is too few for a Title VII
class action).

        2.   Commonality

Commonality under Rule 23(a)(2) requires the court to
determine whether there is at least one question of law or fact
common to the class.  Wal-Mart, 131 S. Ct. at 2556.  "'[F]actual

variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members.'" Encinas, 265 F.R.D. at 8 (quoting Bynum v. District of Columbia, 217 F.R.D. 43, 46 (D.D.C. 2003)).  To satisfy this requirement, a plaintiff must "demonstrate that the class members 'have suffered the same injury[.]'" Wal-Mart, 131 S. Ct. at 2551 (quoting Falcon, 457 U.S. at 157).  That is to say, "[t]heir claims must depend upon a common contention[.]" Id.  The "common contention" must be "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.  A plaintiff's burden is to "bridge the gap" between her individual claim and "the existence of a class of persons who have suffered the same injury as that individual[.]" Falcon, 457 U.S. at 157.

In cases where the plaintiffs allege systemic disparate treatment, plaintiffs may demonstrate commonality by providing "'significant proof that an employer operated under a general policy of discrimination . . . if the discrimination manifested itself in . . . promotion practices in the same general fashion[.]'" Wal-Mart, 131 S. Ct. at 2553 (quoting Falcon, 457 U.S. at 159 n.15); see also Love v. Johanns, 439 F.3d 723, 728 (D.C. Cir. 2006) (explaining that in cases where plaintiffs

-38-

allege disparate treatment of a class, plaintiffs seeking class
certification must "show (i) discrimination (ii) against a
particular group (iii) of which the plaintiff is a member, *plus*
(iv) some additional factor that permits the court to infer that
members of the class suffered from a common policy of
discrimination" (internal quotation marks omitted)).  Regarding a
complaint of "class-wide discriminatory *impact,* [plaintiffs] must
make a showing sufficient to permit the court to infer that
members of the class experienced discrimination as a result of
the disparate effect of a facially neutral policy." Garcia, 444
F.3d at 632 (internal quotation marks omitted).  To satisfy Rule
23(a)'s commonality requirement, plaintiffs may put forth
statistical and anecdotal evidence to support the inference that
the defendant-employer operated under a general policy of
discrimination and that the discrimination manifested itself in
the defendant's challenged policies and procedures. See
McReynolds v. Sodexho Marriott Servs., Inc. (McReynolds I), 208
F.R.D. 428, 441 (D.D.C. 2002) (citing Wagner v. Taylor, 836 F.2d
578, 592 (D.C. Cir. 1987)); see also Wal-Mart, 131 S. Ct. at
2555-56.  Here, the plaintiffs offer both statistical and
anecdotal evidence.

      a.   *Statistical evidence*

The plaintiffs rely on Dr. Mann's report to show that the
"MPP promotions policy operates to adversely impact class

members[.]" Pls.' Mem. for Class Cert. at 49.  As is discussed
above, Dr. Mann found that for the class period and the four-year
background period, the difference between African-American SAs
expected to reach a best qualified list in the absence of
discrimination and the actual number of African-American SAs who
reached a best qualified list, for both GS-14 and GS-15
promotions, was statistically significant.  See Pls.' Opp'n to
Mot. to Exclude Mann Test. at 5; see also Mann Decl. ¶¶ 36-43.
Dr. Mann also found that for the class period and the four-year
background period, the consideration of rank by MPP score on the
best qualified list disproportionately disadvantaged African-
Americans, for both GS-14 and GS-15 promotions; the disparity in
African-American SAs mean rank on best qualified lists and
African-American SAs on best qualified lists with an MPP score
above the effective pass rate are statistically significant.
Dr. Mann further found that for the years 1998 to 2000, the
difference between expected African-American promotions in the
absence of discrimination, taking as a given the presence of
African-Americans on the best qualified list, and actual African-
American promotion to GS-14 positions was statistically
significant.  See Pls.' Opp'n to Mot. to Exclude Mann Test. at 5;
see also Mann Decl. ¶¶ 49-75.  For the years 2002 to 2005, the
difference between expected African-American promotions in the
absence of discrimination, taking as a given the presence of

-40-

African-Americans on the best qualified list, and actual African-American promotion to GS-15 positions was statistically significant.  Pls.' Opp'n to Mot. to Exclude Mann Test. at 5; <u>see also</u> Mann Decl. ¶¶ 45-48.

The defendant attacks Dr. Mann's report on several grounds.  The defendant makes many of the same arguments which were addressed and dismissed above.  The defendant also asserts that because Dr. Mann's best qualified to selected analysis shows "disparities in . . . two distinct time frames [for GS-14 and GS-15 positions, the analysis] actually rebut[s] any inference of a 'common' discriminatory process because the same officials decided which agents to promote to GS-14 and GS-15 positions at any one time."  Def.'s Opp'n to Mot. for Class Cert. at 60.  Even assuming that is true, the plaintiffs can still establish commonality because Dr. Mann's other three analyses show statistically significant disparities for the entire class period.  For example, Dr. Mann's applicant to best qualified list analysis shows that a stage of the MPP process had an adverse impact on African-American SAs during the class period.  Thus, there is at least one aspect common to the class for the entire class period.  As such, Dr. Mann's report is sufficient to create an inference that the Secret Service had a common policy of discrimination.  <u>See</u> <u>Anderson</u>, 180 F.3d at 339-40.

-41-

b.   _Anecdotal evidence_

The plaintiffs also offer anecdotal evidence in the form of declarations of named plaintiffs and putative class members alleging that they were discriminated against by the Secret Service.  In their declarations, SAs assert that the Peer Panel and Second Level Panel "discriminatorily diminished and discounted" their "demonstrated skills and qualifications" causing them to receive lower MPP scores than non-African-American SAs, Pls.' Mem. for Class Cert. at 50, that they were denied promotions as a result of their low MPP scores, id. at 51, and that the MPP process "empower[ed] the Advisory Board and Director to discriminate against African-American Agents by selectively employing criteria to recommend white Agents for promotion over qualified African-American candidates," id. at 52; see also id. at 52-56.  The anecdotal evidence, which is summarized in Moore III, 269 F.R.D. at 31-32, brings "the cold numbers" of Dr. Mann's statistical evidence "convincingly to life." Teamsters, 431 U.S. at 339.  The plaintiffs' statistical and anecdotal evidence raises an inference of discrimination that is manifested through the MPP process.  Thus, the plaintiffs have carried their burden of establishing commonality.

3.   Typicality

"Typicality requires that the claims of the representative be typical of those of the class." Taylor, 241 F.R.D. at 44

-42-

(citing Fed. R. Civ. P. 23(a)(3)).  "Typical" does not mean

identical.  See Encinas, 265 F.R.D. at 9 ("A plaintiff's claims

can be typical of those of the class even if there is some

factual variation between them.").  "[A] class representative's

claims are typical of those of the class if 'the named

plaintiffs' injuries arise from the same course of conduct that

gives rise to the other class members' claims.'"  Id. (quoting

Bynum v. District of Columbia (Bynum I), 214 F.R.D. 27, 35

(D.D.C. 2003)).

> "[T]he commonality and typicality requirements of Rule
> 23(a) tend to merge. Both serve as guideposts for
> determining whether under the particular circumstances
> maintenance of a class action is economical and whether
> the named plaintiff's claim and the class claims are so
> interrelated that the interests of the class members
> will be fairly and adequately protected in their
> absence."

Wal-Mart, 131 S. Ct. at 2551 n.5 (quoting Falcon, 457 U.S. at 157

n.13).

In Moore III, the plaintiffs' proposed class did not satisfy

Rule 23(a)'s typicality requirement for two reasons.  First, the

proposed class included SAs who were deterred from ever bidding

but none of the class representatives had been wholly deterred

from bidding.  Second, "the class representatives' claims [were]

not typical of any putative class member who was eligible for a

promotion and received it on her first bid."  Moore III, 269

F.R.D. at 33.  In their revised class definition, the plaintiffs

exclude deterred bidders and SAs who were eligible for promotion

-43-

and promoted on their first bid.  There is no dispute that these
changes cured the typicality defects identified in Moore III.
Def.'s Opp'n to Mot. for Class Cert. at 46 n.38.  Thus, the
plaintiffs' proposed class satisfies the typicality requirement
of Rule 23(a).

        4.  Adequacy of representation

    The fourth prerequisite for class certification requires the
court to determine whether the proposed representatives will
fairly and adequately represent the interests of the class.
Taylor, 241 F.R.D. at 45.  "'Two criteria for determining the
adequacy of representation are generally recognized: 1) the named
representative must not have antagonistic or conflicting
interests with the unnamed members of the class, and 2) the
representative must appear able to vigorously prosecute the
interests of the class through qualified counsel.'"  Twelve John
Does v. District of Columbia, 117 F.3d 571, 575-76 (D.C. Cir.
1997) (quoting Nat'l Ass'n of Reg'l Med. Programs, Inc., 551 F.2d
340, 345 (D.C. Cir. 1976)).

    When there is a dispute as to the existence of a conflict of
interest between class members, a court must bear in mind that
"[c]lass members whose interests are antagonistic in fact to, or
even 'potentially conflicting' with, the interests of the
ostensibly representative parties cannot be bound, consistent
with the requirements of due process to an adjudication taken in

-44-

their name." Phillips v. Klassen, 502 F.2d 362, 366 (D.C. Cir.
1974) (quoting Hansberry v. Lee, 311 U.S. 32, 44 (1940)).  In
employment discrimination cases, the fact that some class members
are supervisors does not constitute a per se conflict of
interest.  However, it does pose a serious problem where class
plaintiffs have accused other class members of the same type of
discrimination from which they seek relief.  See Wagner, 836 F.2d
at 595; McReynolds I, 208 F.R.D. at 447.

In Moore III, the plaintiffs failed to "propose[] for
consideration a class free of conflicts of interests[.]"  Moore
III, 269 F.R.D. at 35.  The record demonstrated that there were
"direct accusations of discrimination within the [proposed]
class" and that "several potential class members were directly
involved in the Peer Panel or Second Level evaluation process[.]"
Id. at 34.  Involvement in the review panels "raises a specter of
these class members' participation in the discriminatory conduct
of which plaintiffs complain."  Id.  Accordingly, representation
as proposed was found to be inadequate.  Id. at 35.  ("Although
the existence of supervisors among the class members does not
automatically undermine the adequacy of representation, the
conflict of interests here -- which includes direct accusations
of discrimination among and between class members and class
representatives -- is not insignificant.").

-45-

Here, there is no dispute that counsel are competent to represent the class's interest.  However, there is again a dispute regarding a potential conflict of interest among class plaintiffs and class members.  The plaintiffs argue that the class meets the final requirement of Rule 23(a) because "[p]laintiffs and the class members . . . have the same interests": "to prove the existence of a pattern or practice of discrimination with respect to the Secret Service's promotions policy and establish that its promotions policy and practices have a disparate impact on class members."  Pls.' Mem. for Class Cert. at 63.  The plaintiffs further contend that their revised class definition is free from conflicts and excludes all of the class members identified in <u>Moore III</u> as having been directly accused of discrimination.  <u>Id.</u> at 65-67.  Because there are no direct accusations of discrimination within the class, the plaintiffs assert that "the inclusion within the class of supervisors or class members who participated on panels evaluating other class members cannot defeat adequacy of representation."  <u>Id.</u> at 70.  The defendant counters that the plaintiffs cannot satisfy the adequacy of representation requirement because the proposed class contains "supervisors who actively participated in an allegedly discriminatory promotions process against [other putative class members] who were seeking promotions."  Def.'s Opp'n to Mot. for Class Cert. at 66.  To

-46-

support its argument, the defendant points to several instances where a class member generally alleged that he received a discriminatorily low score from the Peer Panel or Second Level Panel and a supervisory putative class member was a member on that panel.  See id. at 69-70.

The record demonstrates that several potential class members were directly involved in the Peer Panel or Second Level evaluation process.  For example, between 1995 and 2005, at least fourteen supervisory putative class members participated as Peer Panel or Second Level Panel members rating other putative class members for promotion to GS-14 and GS-15 positions.  Id. at 68 (citing id., Ex. 17 (Decl. of Karen Waring ¶ 32)).  The record is silent with respect to any direct accusations of discrimination within the newly constituted class relevant to the plaintiffs' employment discrimination claim.[15]  Because the record does not show specific allegations of discrimination by class members against other class members, the representation as proposed is adequate.  See, e.g., McReynolds I, 208 F.R.D. at 445-48 (finding that the presence of both supervisors and non-supervisors in a

_____

[15] The defendant also argues that the plaintiffs' accusations of generally discriminatory behavior by others in the class and plaintiffs' allegations that putative class members tried to discourage African-American SAs from participating in this civil action preclude class certification.  While these statements do demonstrate conflicts within the class, they do not reflect on the specific claims in the lawsuit.  Thus, they are not relevant to the adequacy of representation determination.  See McReynolds I, 208 F.R.D. at 446.

class does not undermine adequacy of representation where there were no direct accusations of discrimination within the class).

B.   Rule 23(b) requirement

The plaintiffs claim that the class satisfies the requirements of Rule 23(b)(3), which provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  In determining whether a proposed class meets the Rule 23(b)(3) requirements, a court should consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

1.   Whether common questions of law or fact predominate over questions affecting only individual members

To establish Rule 23(b)(3)'s predominance requirement, the plaintiffs must show that the issues identified as common in the Rule 23(a) commonality inquiry predominate over non-common issues for both their pattern and practice claim and their disparate impact claim.  See In re Vitamins Antitrust Litig., 209 F.R.D.

251, 262 (D.D.C. 2002).  Generally speaking, "predominance is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position."  Cohen v. Chilcott, 522 F. Supp. 2d 105, 116 (D.D.C. 2007) (internal quotation marks omitted); see also Encinas, 265 F.R.D. at 10 ("If the questions of law and fact identified as common to the named plaintiffs and members of the class predominate over any non-common issues, the requirement is satisfied.").

The plaintiffs argue that in light of the "centrality of Plaintiffs' statistical evidence of the discriminatory nature of the MPP promotions policy," to both of their claims, they have met the predominance requirement.  Pls.' Mem. for Class Cert. at 75.  Here, the common issues of whether the MPP promotions process discriminates against African-American SAs and whether the Secret Service has a pattern and practice of race discrimination which the plaintiffs will try to prove through their statistical evidence predominate over individual issues. See, e.g., Jarvaise, 212 F.R.D. at 4.  All members of the class will rely on the same statistical evidence to make the same claim: that the MPP process discriminates against African-American SAs seeking promotions to GS-14 and GS-15 positions. The only apparent non-common factual issues are whether there

-49-

were legitimate, nondiscriminatory reasons not to promote a

specific SA.  See Def.'s Opp'n to Mot. for Class Cert. at 81-82.

These issues, however, are not germane to the liability stage of

a pattern and practice claim,[16] are not relevant to the

plaintiffs' disparate impact claim, and thus do not destroy

predominance.

> 2.   Whether class action is superior method of
>      adjudication

"'Rule 23(b)(3) favors class actions where common questions

of law or fact permit the court to consolidate otherwise

identical actions into a single efficient unit.'"  Encinas, 265

F.R.D. at 10 (quoting Bynum I, 214 F.R.D. at 40); see also In re

Nifedipine Antitrust Litig., 246 F.R.D. 365, 371 (D.D.C. 2007)

("[C]ertification is appropriate in cases in which a class action

---

[16] In Teamsters, the Supreme Court adopted a bifurcated approach
for pattern and practice class actions.  In the first stage,
regarding liability, the plaintiffs have the burden to
"demonstrate that unlawful discrimination has been a regular
procedure or policy followed by an employer or group of
employers." Teamsters, 431 U.S. at 360.  "If the plaintiffs
succeed in establishing liability in the first phase, the court
may order class-wide injunctive and declaratory relief." Taylor,
205 F.R.D. at 46 (citing Teamsters, 431 U.S. at 336).  "If the
plaintiffs also seek individual monetary relief, they proceed to
the second phase, called a 'Teamsters hearing.'" Id. (citing
Hartman, 88 F.3d at 1235 n.2).  At the "Teamsters hearing," the
plaintiffs are entitled to the presumption that "individual
[employment] decisions were made in pursuit of the discriminatory
policy[,]" Teamsters, 431 U.S. at 359, and the burden is on the
defendant to show that there was a legitimate, non-discriminatory
reason for the adverse employment decision such that the employee
is not entitled to additional, individualized relief.  See
Hartman, 88 F.3d at 1235 n.2.

would promote judicial efficiency and uniformity of decision as
to persons similarly situated." (internal quotation marks
omitted)); In re Lorazepam & Clorazepate Antitrust Litig., 202
F.R.D. 12, 31 (D.D.C. 2001) (explaining that a class action is
superior because "[a] class action would also provide inclusion
of those members who would otherwise be unable to afford
independent representation").

The alternative method of resolving the plaintiffs' claims
is through individual, single-plaintiff suits.  A class action
will be more efficient than individual actions because all of the
cases will require the courts to determine whether the MPP
promotions process is discriminatory.  Moreover, a class action
will promote uniformity in decisions.  The plaintiffs also argue
that a class action is superior because many putative class
members will not pursue an individual suit "in light of the
substantial expert costs associated with documenting the MPP's
discriminatory nature and impact[.]"  Pls.' Mem. for Class Cert.
at 80.  The defendant counters that the hope of high damages
awards is sufficient to compel plaintiffs to bring individual
suits.  The Supreme Court has acknowledged that "'[t]he policy at
the very core of the class action mechanism is to overcome the
problem that small recoveries do not provide the incentive for
any individual to bring a solo action prosecuting his or her
rights.'"  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617

(1997) (quoting <u>Mace v. Van Ru Credit Corp.</u>, 109 F.3d 338, 344

(7th Cir. 1997)).  However, "the text of Rule 23(b)(3) does not

exclude from certification cases in which individual damages run

high[.]"  <u>Id.</u>  Moreover, the defendants cite no evidence for

their assertion that the plaintiffs may potentially recover large

damage awards.  At any rate, the interests of efficiency and

uniformity support a finding that a class action is a superior

method of adjudicating the plaintiffs' claims.  Thus, the class

will be certified under Rule 23(b)(3).

    C.  <u>Notice</u>

    If a court certifies a class under Rule 23(b)(3),

> the court must direct to class members the best notice
> that is practicable under the circumstances, including
> individual notice to all members who can be identified
> through reasonable effort.  The notice must clearly and
> concisely state in plain, easily understood language:
> > (i) the nature of the action;
> > (ii) the definition of the class certified;
> > (iii) the class claims, issues, or defenses;
> > (iv) that a class member may enter an appearance
> > through an attorney if the member so desires;
> > (v) that the court will exclude from the class any
> > member who requests exclusion;
> > (vi) the time and manner for requesting exclusion;
> > and
> > (vii) the binding effect of a class judgment on
> > members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).  The plaintiffs have not submitted a

proposed notice that satisfies all requirements of Rule 23(c)(2).

Accordingly, the plaintiffs will be ordered to file a proposed

order.

-52-

D.   Appointment of class counsel

The plaintiffs also seek an order appointing current plaintiffs' counsel as class counsel.  Rule 23(g) requires a court to appoint

> adequate class counsel to represent the class after considering: (1) the work counsel has done in identifying or investigating potential claims in this action, (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (3) counsel's knowledge of the applicable law, and (4) the resources counsel will commit to representing the class.

Johnson v. District of Columbia, 248 F.R.D. 46, 58 (D.D.C. 2008) (internal quotation marks omitted).  Further, a "court may consider any 'other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.'"  Id. (quoting Fed. R. Civ. P. 23(g)(1)(B)).  There is no dispute as to whether the plaintiffs' class counsel are appropriate, and there is no indication that class counsel lack the experience and knowledge required to represent the class.  Therefore, plaintiffs' current counsel will be appointed as class counsel.

CONCLUSION AND ORDER

The plaintiffs have shown by a preponderance of the evidence that Dr. Charles Mann is qualified to offer expert statistical testimony and that his testimony is relevant and reliable.  The plaintiffs have also satisfied Rule 23(a)'s prerequisites and

-53-

Rule 23(b)(3)'s requirements for class certification.

Accordingly, it is hereby

ORDERED that the defendant's motion [703] to exclude the
testimony of Dr. Charles Mann be, and hereby is, DENIED.  It is
further

ORDERED that the plaintiffs' motion [677] for class
certification under Rule 23(b)(3) be, and hereby is, GRANTED.
The class consists of all current and former African-American
Special Agents who bid for promotion to a GS-14 position from
1995 to 2004 and were not promoted to GS-14 on the first bid list
on which they bid; and all current and former African-American
Special Agents who bid for promotion to a GS-15 position from
1995 to 2005 and were not promoted to GS-15 on the first bid list
on which they bid; but excluding Special Agents who served as an
Assistant Director, a Deputy Director, or the Director of the
Secret Service during the class period.  The class is certified
to adjudicate whether the Secret Service has a pattern and
practice of engaging in race discrimination in making promotions
decisions to GS-14 Special Agent positions from 1995 to 2004 and
GS-15 Special Agent positions from 1995 to 2005, and whether the
Secret Service's Merit Promotion Plan had an adverse impact on
African-American Special Agents seeking promotion to GS-14
positions from 1995 to 2004 and GS-15 positions from 1995 to
2005.  The following will be appointed as class counsel:  John P.

-54-

Relman, Jennifer I. Klar, and Megan Cacace of Relman, Dane &

Colfax PLLC, and E. Desmond Hogan of Hogan Lovells USA.  It is

further

    ORDERED that the plaintiffs file by March 18, 2013 a

proposed order that complies with the requirements in Rule

23(c)(2)(B).

    SIGNED this 25th day of February, 2013.


                                      _____/s/_____
                                        RICHARD W. ROBERTS
                                        United States District Judge