# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REGINALD G. MOORE, et al.,     )
     )
     Plaintiffs,     )
     )
     v.     )     Civil Action No. 00-953 (PLF/DAR)
     )
JEH C. JOHNSON, Secretary,     )
U.S. Department of Homeland Security,     )
     )
     Defendant.     )
     )

## PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEY'S FEES AND COSTS

### TABLE OF CONTENTS

BACKGROUND ..............................................................................................1

    A.  The Litigation.................................................................................1

          1.  2000-2006:  Complaint, Motions to Dismiss, and Amendments...........1

          2.  2005-2008:  Discovery..........................................................4

          3.  2009-2013:  Class Certification, Mediation, and Expert Motions.........6

          4.  2014-2016:  Summary Judgment .........................................................9

          5.  2016-2017:  Settlement ........................................................9

    B.  The Settlement ................................................................................10

          1.  Changes to the Promotions System.....................................................10

          2.  Training, Improved EEO Systems, and Other Relief .........................11

          3.  Monetary Relief .......................................................12

    C.  The Efforts of Counsel .....................................................................15

LEGAL STANDARD ..........................................................................................15

ARGUMENT ....................................................................................................16

    A.  Class Counsel Obtained a Substantial Benefit for the Class..................................17

    B.  No Class Members Have Objected to the Fee
        Provision in the Settlement Agreement to Date......................................19

    C.  Class Counsel Demonstrated Considerable Skill and Efficiency .........................19

    D.  The Complexity of this Case and Its Nearly Seventeen-Year
        Duration Support Class Counsel's Fee Request ....................................21

    E.  Class Counsel Faced Significant Risk of Non-Payment.......................................22

    F.  Class Counsel Devoted Substantial Effort to Achieving
        This Settlement ...............................................................23

G.  The Award Sought in This Case Is More Than
     Reasonable Given Awards in Similar Cases.........................................................24

CONCLUSION.............................................................................................................28

Plaintiffs seek an award of $8 million in attorney's fees for their nearly seventeen years of tireless effort on behalf of class and $859,049.26 for out-of-pocket costs spent prosecuting the claims in this action.  This figure represents a small fraction of the over $20.4 million of time (comprised of nearly 42,000 hours) that counsel devoted to this case.  Bringing this case to resolution required exchanging and reviewing hundreds of thousands of documents, taking and defending over 50 depositions, attending scores of hearings, filing approximately 190 legal memoranda, compiling over 75 declarations, preparing and exchanging 12 expert reports, briefing and arguing and winning an appeal in the D.C. Circuit, and completing multiple rounds of class certification and dispositive motions briefing—all without compensation.  The modest award Plaintiffs request—one third of the total settlement fund plus $859,049.26 in costs—is eminently reasonable and is below what has been approved in other settlements.  Rather than seeking a multiplier of counsel's lodestar, as is typical in common fund cases, Plaintiffs seek an award that provides nearly $11 million *less* than counsel's actual lodestar.  Plaintiffs' request for $8,000,000 in fees and $859,049.26 in costs is reasonable by any measure and should be granted.

## BACKGROUND

### A.  The Litigation

This case has been vigorously litigated for nearly seventeen years, resulting in over 800 docket entries, countless motions, multiple rounds of dispositive motions and class certification briefing, appellate briefing and argument, and dozens of hearings.  Given the duration of the case, what follows is an abbreviated summary of key phases of the case.

### 1.  2000-2006:  Complaint, Motions to Dismiss, and Amendments

On May 3, 2000, Plaintiffs filed this action on behalf of themselves and all other similarly situated African American Special Agents, alleging race discrimination by the Secret

1

Service.  *See* Doc. 1.  A month later, Plaintiffs submitted a 45-page preliminary injunction motion in response to a letter issued by the Secret Service's Director to all Special Agents regarding Plaintiffs' claims.  *See* Doc. 8.  After briefing and limited discovery on the issue, the Court required the Agency to issue a retraction.  *See* Doc. 72; *Moore v. Summers*, 113 F. Supp. 2d 5, 26-28 (D.D.C. 2000).

In addition to moving for a preliminary injunction, per Local Rule 23.1(b), within 90 days of filing their complaint, Plaintiffs moved for class certification.  *See* Docs. 52, 83.  Before filing their motion, Plaintiffs took several days of 30(b)(6) testimony.  Plaintiffs' counsel also conducted an extensive factual investigation of their own, including interviewing dozens and dozens of current and former Secret Service Agents.  Plaintiffs relied heavily on that testimony and factual investigation to prepare their extensively detailed class certification motion, which totaled 114 pages and included two expert analyses and 38 declarations from class members.  *See* Doc. 52.  Plaintiffs later filed an amended class certification motion totaling 122 pages and providing additional detail, including 57 class member declarations.  *See* Doc. 83.

While the preliminary injunction and class certification motions were pending, Defendant moved to dismiss the Complaint, arguing, among other things, that Plaintiffs had failed to administratively exhaust their claims despite an EEOC regulation and EEOC representations to Plaintiffs regarding the effective date of filing.  *See* Doc. 19.  Four months after filing their opposition, Plaintiffs submitted a supplemental opposition at the Court's request.  *See* Doc. 81. Despite repeated efforts by Plaintiffs, Defendant's motion to dismiss then remained unresolved for over four years.  Left with no other recourse, on Friday, October 22, 2004, Plaintiffs filed a writ of mandamus in the D.C. Circuit seeking to compel a ruling on the motion.  Two days later on Sunday, October 24, 2004, Judge Roberts issued his opinion granting Defendant's motion to

dismiss in part, and denying as moot Plaintiffs' motion for class certification.  The Court held that while the individual discriminatory non-promotion claims of five named Plaintiffs were administratively exhausted, the claims of the class were not exhausted.  *See* Doc. 129.  The ruling required administrative re-filing of the class claims, which delayed class proceedings for another seventeen months.

After re-exhausting their class claims, Plaintiffs filed a motion to amend their complaint to re-introduce the class allegations and to add additional discriminatory acts that had occurred since the May 3, 2000 filing of the original complaint.  *See* Doc. 155.  The motion to amend was extensively briefed, with five briefs filed by the parties.  *See* Docs. 158, 166, 178, 186.  On March 30, 2006, the Court granted Plaintiffs' motion, allowing Plaintiffs to file an updated complaint pleading claims from 1999 onward.

On May 1, 2006, Plaintiffs filed their First Amended and Supplemental Complaint, pleading claims of discriminatory non-promotion and discrimination in the "building blocks" of promotion from 1999 to the present.  *See* Doc. 322.  The First Amended and Supplemental Complaint added Plaintiffs Andrew Harris, Jr., Leroy Hendrix,[1] Kenneth Rooks, Camilla Simms, and Lisa Robertson.  Eight of the named Plaintiffs—the five Plaintiffs whose claims survived Defendant's 2000 motion to dismiss (Moore, Turner, Summerour, Ivery, and Tyler) and Harris, Hendrix, and Rooks, made claims including discriminatory non-promotion.  Two of the named Plaintiffs—Simms and Robertson—were not yet eligible for promotion and pled only "building block" claims.

---

[1]  Plaintiff Hendrix was named in the initial Complaint, *see* Doc. 1, but his claims were dismissed by the October 24, 2004 opinion (Doc. 129).  He was added as a named Plaintiff with discriminatory non-promotion and building block claims in the First Amended and Supplemental Complaint.

Plaintiffs subsequently moved for reconsideration of the Court's temporal limitation on claims.  *See* Doc. 315.  Plaintiffs successfully argued the continuing violation theory, and in July 2006 the Court expanded the time period of Plaintiffs' discriminatory promotion claims.  *See* Doc. 358.

On August 7, 2006, Plaintiffs filed their Second Amended and Supplemental Complaint, expanding the time period of the claims.  *See* Doc. 362.  On September 20, 2006, Defendant moved for partial dismissal of the Second Amended and Supplemental Complaint,[2] and the parties briefed the motion.  *See* Doc. 370.  Almost two years after Defendant filed its motion to dismiss, Judge Roberts denied the Defendant's motion without prejudice to re-filing.  *See* 6/26/2008 Minute Order.

## 2.  2005-2008:  Discovery

The discovery phase of this case spanned from 2005 to 2008.  Individual discovery prior to the 2006 amendments opened on December 3, 2004 and initially closed on August 1, 2005, but was later extended to allow for limited follow-up discovery.  *See* 4/13/2006 Order granting Doc. 308.  After the class claims were re-introduced, individual and class discovery opened on May 8, 2006 and was conducted simultaneously.  Fact discovery ultimately closed on March 31, 2007, although discovery disputes continued well into 2008.

During discovery, the parties conducted over fifty depositions of individual fact witnesses and spent over 20 additional days in Rule 30(b)(6) depositions. Twelve expert reports were exchanged and seven days of expert testimony were taken.  Hundreds of thousands of pages of documents were produced.

---

[2]  Defendant moved to dismiss the First Amended and Supplemental Complaint and Plaintiffs filed their opposition. *See* Docs. 338, 349.  The Court's opinion allowing the Second Amended and Supplemental Complaint was entered before Defendant's reply was filed.

Discovery in this case was very contentious.  Plaintiffs sent more than 50 deficiency letters to Defendant.  Magistrate Judge Deborah Robinson was tasked with resolving discovery disputes, of which there were many.  Defendant was ordered by the Magistrate Judge to produce discovery over objection thirteen times.  *See* Doc. 565-3 (Joint Exhibit Regarding Orders Compelling Production from Defendant or For Sanctions) at 2-3, 4-7.  None of these rulings was overturned by the District Judge.  *See id.*  Plaintiffs were forced to file an additional three motions to compel, only after which did Defendant agree to provide some or all of the requested discovery.  *See id.* at n.1.  The Defendant was sanctioned four times during discovery, once during the initial individual discovery period and three additional times after the class claims were re-introduced.  *See* Doc. 565-3 at 4-5; Doc. 635; *Moore v. Napolitano,* 723. F. Supp. 2d. 167 (D.D.C. 2010); *Moore v. Chertoff*, 577 F. Supp. 2d. 165 (D.D.C. 2008).

The parties had protracted disputes regarding Defendant's search for paper and electronic documents in response to Plaintiffs' class discovery requests.  Magistrate Judge Robinson ultimately granted Plaintiffs' motions to compel further searches, and sanctioned Defendant for both failures.  *See* 9/13/2007 Oral Ruling granting Doc. 457; Doc. 565-3 at 3; *see also Moore v. Chertoff*, 255 F.R.D. 10, 14 (D.D.C. 2008).  After the Court granted Plaintiffs' motion to compel, Plaintiffs constructed the electronic search protocol.  After the third sanction, Magistrate Judge Robinson ordered an evidentiary hearing on Defendant's compliance with the Court's Order to conduct an adequate search for paper documents and to consider further potential sanctions.

The evidentiary hearing began in January 2008 and spanned sixteen days, during which the Court heard dozens of hours of testimony from ten witnesses, admitted over 100 exhibits, took argument from counsel, and received briefing from the parties.  *See Moore*, 255 F.R.D. at 16-17, 20; Doc. 568 at ¶ 3.

On December 17, 2008, the Magistrate Judge sanctioned Defendant by ordering that "once Plaintiffs have established a *prima facie* case of discriminatory non-promotion, Defendant may not defend any such *prima facie* case" and ordered that Defendant pay Plaintiffs their fees and costs incurred in the sanctions hearing. *Moore*, 255 F.R.D. at 37. Immediately following the ruling, the parties fully briefed Defendant's Objection to the Magistrate Judge's December 17, 2008 ruling (*see* Docs. 605, 615). The Court ultimately affirmed the sanctions decision with modifications.[3]  *See Moore*, 723 F. Supp. 2d at 184-85.

### 3.   2009-2013:  Class Certification, Mediation, and Expert Motions

Having completed discovery on their class claims, on August 4, 2008 Plaintiffs moved to certify a class of all African-American Special Agents eligible for promotion to GS-14 from 1995-2004 and to GS-15 from 1995-2005. *See* Doc. 585. In large part due to the lack of available statistical data regarding the "building blocks" of promotions necessary to allow meaningful analysis of class building block claims, Plaintiffs did not move to certify a class on those claims. The briefing on Plaintiffs' class certification motion was comprised of over 280 pages.[4]

Simultaneously with class certification, the parties also briefed Defendant's motion in limine to exclude the testimony of Plaintiffs' statistical expert. *See* Docs. 633, 639, 649. That briefing spanned an additional 119 pages and was complete in November 2009.

Nearly two years after Plaintiffs filed their motion—and after Plaintiffs' second mandamus petition filed with the D.C. Circuit—in June 2010, the Court denied Plaintiffs' motion

---

[3] The Court held that, Defendant was "precluded from offering any legitimate, nondiscriminatory reason to rebut any prima facie case of disparate treatment discriminatory nonpromotion of the [eight] individual named plaintiffs"; but (2) "may defend against the plaintiffs' [class] statistical showing by either attacking the accuracy of the plaintiffs' statistical showing or presenting competing statistical evidence to refute the significance of the plaintiffs' showing." *Moore v. Napolitano*, 723 F. Supp. 2d 167, 184-85 (D.D.C. 2010).

[4] *See* Docs. 585, 597, 606, 617, 618, 619, 624, 626, 629, 630.

for class certification without prejudice.  It found that certification could not be granted under the proposed definition which included those who were eligible but did not bid for promotion during the class period or were promoted at the time of their first bid, and those in positions that could make them subject to direct accusations of discrimination by other class members.  *See Moore v. Napolitano*, 269 F.R.D. 21, 33-35 (D.D.C. 2010).  In conjunction with its ruling on class certification, the Court denied Defendant's Motion to exclude Plaintiffs' expert as moot, without prejudice to refiling.  *See id*. at 35.

A few months later in the fall of 2010, the parties agreed to enter a four-month mediation period scheduled to end on March 18, 2011.  The parties engaged the services of Linda Singer of JAMS.  In an effort to reach an agreement, the parties participated in multiple in-person meetings and numerous phone calls, and prepared and exchanged a host of written materials.  *See* Ex. 2 to Doc. 831 (J. Klar Decl.) at ¶ 3.  Although the mediation period was ultimately extended another four months while the parties continued to work toward a resolution, it was ultimately unsuccessful, and the mediation period ended on July 28, 2011.  *Id*. at ¶ 4.

After making small revisions to the class definition to exclude those who did not bid during the class period, were promoted on their first bid, or served as Director, Assistant Director, or Deputy Assistant Director of the Secret Service during the class period, Plaintiffs re-filed their motion for class certification on October 27, 2011.[5]  Briefing for that motion (which totaled 283 pages[6]) was complete in April 2012.

While Plaintiffs' class certification motion was being briefed, the parties also briefed and argued before Magistrate Judge Robinson an emergency motion regarding Defendant's contacts

---

[5] This change resulted in the removal of only seven individuals from the 2008 proposed class definition.  *See* Doc. 677 at 45 n. 48.

[6] *See* Docs. 677, 697, 710, 711, 714, 717

with putative class members.  While Magistrate Judge Robinson issued a temporary ruling in November 2011 regarding specific contacts with putative class members (Doc. 686), the parties continued to work over a period of months to resolve issues and were ultimately able to reach agreement in December 2012 on a protocol Defendant was required to follow for ex parte contacts with class members.  *See* Docs. 686, 731, 732.

In addition, in February 2012, Defendant filed another *Daubert* motion seeking to exclude Plaintiffs' statistical expert for the purposes of class certification, which was fully briefed in June 2012.  The briefing exceeded 115 pages.  *See* Docs. 703, 709, 723.  In February 2013, the Court issued its ruling denying Defendant's *Daubert* motion.  *See* Doc. 734.

In that same February 2013 Order, the Court granted Plaintiffs' motion for class certification.  *See* Doc. 734.  Notice of the Court's certification ruling was issued to the class in May 2013.  *See* Doc. 742.

Pursuant to Federal Rule of Civil Procedure 23(f), Defendant appealed the Court's ruling certifying the class to the D.C. Circuit.  Two rounds of briefs were submitted.  After initial briefing on whether the D.C. Circuit should accept the appeal, the D.C. Circuit ordered full merits briefing.  Appellate briefs were submitted in the fall of 2013 and oral argument was held in April 2014.  The D.C. Circuit denied Defendant's appeal in August 2014.

While Defendant's appeal was pending, there was briefing on multiple discovery issues in the District Court.  In October 2013, Defendant moved to re-open both fact and expert discovery, including additional fact depositions and expert opinions, and Plaintiffs opposed.  *See* Docs. 757, 761.  On March 4, 2014, the Court denied Defendant's motion.

However, Defendant was permitted to replace its industrial psychologist expert who had passed away since discovery closed.  Further litigation was engendered by Defendant's

replacement expert report, which Plaintiffs moved to strike as exceeding the limitations set by the Court.  The parties briefed Plaintiffs' motion to strike in November and December 2013.  *See* Docs. 760, 764, 765.  After a hearing, Magistrate Judge Robinson granted Plaintiffs' motion to strike Defendant's replacement expert report.  *See* Doc. 784.  The District Court denied Defendant's objection to the magistrate judge's ruling after a second round of briefing.  *See* Docs. 787, 792, 793, 804.

### 4.   2014-2016:  Summary Judgment

At the same time as the parties were briefing these discovery issues and preparing for oral argument in the D.C. Circuit, the parties were also briefing dispositive motions.  In January 2014, Defendant filed a dispositive motion seeking dismissal and/or partial summary judgment on Plaintiffs' building block claims, as well as the individual claims of Plaintiffs Camilla Simms and Lisa Robertson.  Briefing on that motion (which again totaled over 230 pages) was complete in December 2014.

In March 2015, Defendant filed another dispositive motion, this time seeking summary judgment on Plaintiffs' class claims.  *See* Doc. 811.  Briefing on Defendant's motion exceeded 160 pages and was completed in June 2015.  *See* Docs. 811, 816, 820.  In May 2016, the Court heard oral argument on Defendant's two pending dispositive motions.

### 5.   2016-2017:  Settlement

After the Court took Defendant's pending dispositive motions under advisement, the parties made one more attempt to explore whether they could agree on a resolution of the case. Beginning in July 2016 and continuing until January 2017, counsel for both parties engaged in intense and time-consuming negotiations.  These negotiations included repeated in-person meetings, numerous conference calls, and countless exchanges of proposed settlement terms.

*See* Ex. 2 to Doc. 831 (J. Klar Decl.) at ¶¶ 6-8.  Through these time-intensive efforts, the parties were ultimately able to reach an agreement on a proposed settlement in January 2017.  *See* Doc. 828.

## B.  The Settlement

The relief provided through the Settlement in this case is exceptional.  The Settlement achieves critical changes to the Secret Service's promotions system, institutes additional measures specifically designed to prevent future discrimination, and provides for substantial monetary relief.  *See* Doc. 828.

### 1.  Changes to the Promotions System

The Settlement results in critical changes to both phases of the promotions system:  the scoring phase and the recommendations/selections phase.  With respect to scoring, the Settlement requires the agency to continue to maintain[7] a scoring system validated by an outside expert that assesses whether an Agent possesses the qualities subject matter experts have identified as key to performing well at the GS-14 and GS-15 levels.  The Settlement requires the Secret Service to adopt a new recommendations/selections system that is similarly validated and tethered to specific criteria.   Specifically, the Secret Service must develop and implement a new recommendations/selections process based on the use of a set of standardized, job-related factors that will be developed with the help of outside experts and internal subject matter experts.  These factors will be published to all Agents and considered by the Advisory Board in recommending or selecting Special Agents for promotion to GS-14 and GS-15 level vacancies.  The Settlement also includes a process for using outside experts to update the standardized, job-related factors as

---

[7] After the class period ended, the Secret Service replaced its prior scoring system with a new system created with the assistance of external and internal experts.

needed.  Under the new system, any management or organizational considerations affecting promotions will be standardized and neutrally applied.

In addition, the Settlement requires that the Secret Service contemporaneously write down the reason(s) for each promotion decision, including the specific criteria or evaluative factor(s) applied.  The Secret Service will conduct annual audits to ensure that the various modifications to the recommendation/selection process are being properly implemented and applied.  In addition, the Executive Chief of the Office of Human Resources (or his/her representative) will attend all Advisory Board meetings where selection decisions are discussed to ensure the criteria and factors are being applied and that multiple candidates are being considered for each position (where multiple candidates applied).

These changes must stay in place until at least the end of the 2021 selection year.  During that time, the Secret Service will engage an outside expert to do statistical testing to determine whether African-American Special Agents are disadvantaged under the new scoring process or the recommendations/selections process, and explore alternatives using an outside expert should any such signs of disadvantage be found.

## 2.   Training, Improved EEO Systems, and Other Relief

In addition to changes to the promotions process, the Settlement requires training on the use of the new standardized evaluative factors, as well as training on stereotyping and unconscious bias.  In addition, the settlement includes several provisions designed to promote equal employment opportunity and diversity.  For example, the Secret Service will expand its existing Prevention of Harassment Hotline to allow Agents to also report incidents of misconduct and race discrimination.  Complaints of race discrimination against African-American Special Agents will be tracked by a manager to determine if a pattern exists. The Secret Service currently

11

has and will maintain a specific discipline policy for those engaged in biased conduct or who fail to report such conduct.  The Settlement also empowers the Equal Employment Opportunity Director to share concerns about a potential promotion/reassignment candidate's EEO performance with the Advisory Board responsible for making selection recommendations, even if the issue does not rise to the level of an official finding of discrimination or retaliation by the candidate.

Further, the Secret Service will take a "second look" at those Class Representatives and Class Members who received a final score based on their participation in the MPP scoring process for the 2016/2017 promotion cycle and either (a) have not been promoted to the GS level they were seeking between 1995 and 2005, or (b) bid for GS-14 between 1995 and 2004 and have since been promoted to GS-14 but have not been promoted to GS-15 and took longer to get promoted to GS-14 than the average time it took non-African-American Special Agents to be promoted to GS-14.  If a class member falls into one of these two categories and through the "second look" it is determined that the class member was overlooked for promotion previously, the Secret Service will refer that Agent to the Advisory Board for further consideration for promotion.

### 3.  Monetary Relief

The Settlement provides for a common fund of $24 million in monetary relief.  This Settlement Fund[8] provides relief to: (a) Class Members; (b) Named Plaintiffs; (c) counsel; and (d) those involved in the distribution and claims administration process.

---

[8] If fifteen to twenty-nine Class Members opt out of the Settlement, the Settlement Fund will be reduced to $22 million.  If thirty or more Class Members opt out, Defendant will have the choice of reducing the Settlement Fund to $21 million or canceling the Settlement.

First, at least $12,440,000 of the Settlement Fund will be designated for payments to the approximately 106 Class Members (excluding Class Representatives).  This provides significant monetary relief to class members; assuming 100 percent Class Member participation, the average award to each class member would exceed $117,000, which is unusually high compensation in this type of case.[9]

The individual allocation to each Class Member will be determined by Michael K. Lewis, an experienced arbitrator and mediator who has had no prior role in this litigation.  He will rely on personnel information that class counsel will provide, responses to a questionnaire that each Class Member will have the opportunity to provide, and a one-hour interview with any Class Member who requests one.  Mr. Lewis will base his allocation decisions on the following factors:  (1) how much emotional distress the class member suffered as a result of being denied promotion between 1995 and 2005; (2) how being denied promotion impacted the class member's employment at the Secret Service or day-to-day experience; (3) any efforts the class member took to combat discrimination, such as whether the class member made a discrimination complaint or submitted an EEO charge, and whether/how the class member participated in the lawsuit; (4) what steps the class member took to get promoted, including how frequently and for how long he/she bid for promotion, and whether the class member was subjected to promotion requirements not placed on non-black Special Agents; and (5) the class member's career experience compared to non-black Special Agents, including whether the class member has since gotten the promotion he/she sought between 1995 and 2005, how long it took to get that

---

[9] Because counsel are seeking just over $859,000 in costs, which is below the $1 million referenced in the Notice to the class and in Plaintiffs' motion for approval of the monetary distribution of the settlement, the amount to the class has increased by the difference.

promotion, how many assignments he/she held without or before being promoted, and how long he/she worked for the Secret Service before getting that promotion.

Second, $2,500,000 million of the Settlement Fund will be designated for payments to the Named Plaintiffs.  Each of the eight named Class Representatives will recover $300,000 for compensatory damages due to emotional distress, mental anguish, pain and suffering, and in recognition of the Class Representatives' significant efforts in bringing and prosecuting this action for the nearly seventeen years it has been pending, including the insistence on a class resolution, involvement in litigation strategy, provision of information to class counsel, significant role in affirmative discovery, responding to Secret Service's discovery requests, appearing and testifying at depositions noticed by Secret Service, and advancing the interests of the class.  In addition, two additional Named Plaintiffs who have individual discrimination claims in this lawsuit but are not members of the class will receive $50,000 each to resolve their claims.

Third, attorney's fees and costs for the nearly seventeen years of work counsel have put into this case will be paid out of the $24 million Settlement Fund.

Fourth, $200,000 will be used to pay administrative costs related to the Settlement.  This includes funds to pay for the services of Michael Lewis.  It also includes the cost of the Claims Administrator that has notified Class Members of the Settlement, and created and maintains a website dedicated to the case.  The Claims Administrator will also mail and process claims forms and process payments to Class Members.

14

### C.  The Efforts of Counsel

This Settlement is the result of nearly seventeen years of effort by counsel for Plaintiffs. Counsel has devoted almost 42,000 hours to this case,[10] valued at over $20.4 million.  *See* Ex. 1 (Klar Decl.) ¶¶ 25, 36.  Counsel gathered 74 declarations from current and former Special Agents, took and defended over fifty depositions, prepared hundreds of pages of responses to written discovery, reviewed and analyzed hundreds of thousands of pages of documents produced in discovery, briefed and argued an appeal in the D.C. Circuit, and exchanged thousands of pages of legal memoranda.

Plaintiffs faced vigorous opposition from able defense counsel at every phase of this case over its nearly seventeen-year duration.  As the sheer number of docket entries (over 800) attests, tremendous effort was required to litigate this case to resolution.

To date, counsel has not received compensation for the thousands of hours of work counsel has invested in this case.[11]  *See* Ex. 1 (Klar Decl.) ¶¶ 22, 25.  Nor has counsel been reimbursed for any of the $859,049.26 of expenses incurred in litigating this case, including costs for experts, depositions, transcripts, and out-of-town travel.  *See id.* at ¶¶ 34-35.

### LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 23(h), attorney's fees and costs are awarded in certified class actions as authorized by law or by the parties' agreement.  *See* Fed. R. Civ. P.

---

[10] Because counsel's contemporaneous records are voluminous (especially given the nearly seventeen-year duration of this case) and contain confidential and privileged information, consistent with established practice in common fund cases, class counsel have summarized the records in their supporting declaration, attached as Exhibit 1.  *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 284 (3d Cir. 2009) (summaries of time records sufficient in common fund case because Court used information only to cross-check reasonableness of fee award); *see also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

[11] The only compensation Plaintiffs have received were the few payments Defendant was required to make as sanctions.

23(h).  The Court must ensure that the fees and costs awarded to counsel are reasonable.  *See, e.g.*, *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 204 (D.D.C. 2011).

The "percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases."  *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993); *see also In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 87–88 (D.D.C. 2013) (Friedman, J.).  Courts typically consider seven factors in evaluating fee requests under the percentage-of-recovery method:

> (1) the size of the fund created and the number of persons benefited, (2) the presence or absence of substantial objections by class members to the settlement terms or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of litigation, (5) the risk of nonpayment, (6) the time devoted to the case by plaintiffs' counsel, and (7) awards in similar cases.

*Black Farmers*, 953 F. Supp. 2d at 88 (internal citations omitted).

## ARGUMENT

Plaintiffs' request for $8 million in fees and $859,049.26 in costs is reasonable under each of the seven factors considered in assessing fee awards in common fund cases.  Counsel achieved exceptional results against unrelenting opposition.  No class member has objected to the fees requested.  Class counsel skillfully litigated this case for nearly seventeen years in the face of difficult legal challenges and a considerable risk that they would never be compensated for their efforts.  Bringing this case to resolution required almost 42,000 hours of work valued at over $20.4 million and cost $859,049.26 in out-of-pocket expenditures.  Yet Plaintiffs seek a percentage of the fund well within the reasonable range that amounts to a mere fraction of what counsel outlaid—millions less than the lodestar multipliers typically awarded in common fund cases.

Each of these seven factors is discussed below.

### A. Class Counsel Obtained a Substantial Benefit for the Class

The relief class counsel obtained for the class is exceptional.  It achieves comprehensive and transformative improvements to the Secret Service's promotions system, and beyond.  It requires a new system for promotions recommendations and selections that is developed with outside experts—a system that ensures that promotions decisions are tethered to the specific qualities and criteria identified (in advance) as key to performance in the position at issue. Because of this Settlement, the Secret Service's promotions system will be validated and regularly tested for adverse impact. The new system further enhances transparency by creating specific criteria to guide decision-making and publishing those factors to all Agents, requiring that any organizational considerations are applied neutrally and uniformly, and ensuring that reasons for selection are properly documented.

Significantly, these changes specifically address attributes of the Secret Service's prior promotions system that the Class identified as discriminatory.  *See* Doc. 829 at 13-14.  For example, the Class has long maintained that unwritten organizational considerations were selectively applied during the class period to deny promotions to African Americans. *See* Doc. 677 at 55-56.  Class Members have likewise contended that the "no fingerprints" manner in which selections decisions were made during the class period without any established selection criteria or contemporaneous documentation of the reasons for selections resulted in discrimination.  *See* Doc. 585 at 20-22.  The Settlement provides remedial measures to specifically address these and a host of other problematic attributes of the Secret Service's promotions system.  The responsiveness of the Settlement class counsel achieved further demonstrates its substantial benefit to the class.

Beyond promotions, the Settlement mandates improvements in the Secret Service's handling of EEO and diversity issues through training, and new systems for tracking, reporting, and identifying potential discrimination concerns.  There is no question that the Class stands to benefit from the non-monetary relief class counsel obtained through the Settlement.

In addition to these crucial reforms, the Settlement provides unprecedented monetary relief to the class.  The common fund totals $24 million.  Obtaining damages of that magnitude for a class totaling 106 Agents is no small feat.  The size of the fund ensures that all class members will be sufficiently compensated for their injuries.  Indeed, given the size of the fund, each class member would recover over $117,000 if the fund were divided evenly and there were no opt-outs.  These figures far exceed the recoveries awarded in comparable employment discrimination class actions.  *See, e.g.*, *Stewart v. Rubin*, 948 F. Supp. 1077, 1082-83 (D.D.C. 1996) (approving settlement providing $4.7 million to a class of 245 federal law enforcement agents with the Bureau of Alcohol, Tobacco, and Firearms, which amounts to an average of approximately $19,200 per class member); *Neal v. D.C. Dep't of Corrections*, Civ. A. No. 93-cv-2420 (D.D.C. June 28, 1999) (granting final approval of Title VII settlement allocating $4,350,000 among a class of 130, with an average recovery of approximately $35,000 per class member)[12]; *Thomas v. Albright*, 139 F.3d 227, 230 (D.C. Cir. 1998) (African American Foreign Service Officers receive $10,900 for delays or denials of promotion); *Wright v. Stern*, 553 F. Supp. 2d 337 (S.D.N.Y. 2008) (3,500 employees of New York City's Department of Parks and Recreation receive $11,869,000 in damages, which averages to $3,400 per class member).  Indeed, the structure of the claims process alone provides Class Members another important

---

[12] Because this opinion is unavailable on Westlaw or Pacer, it is attached here for the Court's convenience as Exhibit 2.

benefit: the opportunity to obtain individualized, non-formulaic relief based on a neutral's assessment of each class member's specific experience and circumstances.

The result obtained here is even more exceptional given the risk that Plaintiffs might not prevail at trial and the high likelihood that even if they did prevail, they would not recover comparable damages and any remedial relief would be far less comprehensive, detailed, or responsive to the class's specific concerns than this Settlement.

### B. No Class Members Have Objected to the Fee Provision in the Settlement Agreement to Date

Pursuant to the Settlement Agreement, Notice was provided to the class indicating that class counsel would seek up to $8 million in fees and up to $1 million in expenses out of the total Settlement Fund. Class members may submit objections to the Settlement, including the proposed fee award, until March 29, 2017. Although the time for submitting an objection has not lapsed, as of this writing no objections to the terms of the Settlement have been received. Additionally, class counsel have already discussed the Settlement with numerous class members, and have found that the Settlement has been well received.

### C. Class Counsel Demonstrated Considerable Skill and Efficiency

In assessing skill and efficiency, courts generally look to counsel's experience, the results achieved for the class, the amount of work done by counsel, and the complexity of the case. *See, e.g.*, *Black Farmers*, 953 F. Supp. 2d at 92-93; *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 78-79 (D.D.C. 2011); *Vista Healthplan, Inc. v. Warner Holdings Co. III, LTD.*, 246 F.R.D. 349, 364 (D.D.C. 2007).

Class counsel certainly demonstrated considerable skill and efficiency in this case. As detailed in the attached declaration, counsel have a wealth of experience in civil rights and class action litigation. *See* Ex. 1 (Klar Decl.) at ¶¶ 6-21. John Relman, Jennifer Klar, Megan Cacace,

and the Relman, Dane & Colfax team specialize in federal civil rights litigation, and have significant experience in complex federal litigation, including class actions. *Id*. at ¶¶ 6-12. Desmond Hogan and others at Hogan Lovells brought to bear decades of experience in complex federal litigation, and specifically class action litigation and D.C. Circuit appeals. *Id*. at ¶¶ 13-17. Prior counsel David Shaffer and Ronald Schmidt of Thelan, Reid & Priest[13] came with experience representing other federal law enforcement agents, including the Federal Bureau of Investigation and the Bureau of Alcohol, Tobacco and Firearms, in similar race discrimination class actions. *Id*. at ¶ 18. Class counsel's construction of this well-balanced team of complementary skills and experiences enabled counsel to litigate the case efficiently and effectively.

The results obtained in this case further demonstrate these qualities. While the Settlement achieved in this case is exceptional for the reasons detailed above, counsel's performance is equally evident in the conduct of the litigation over the preceding nearly seventeen years. Counsel successfully obtained class certification and defended that certification on appeal to the D.C. Circuit. Significantly, this was among the first few employment discrimination cases briefed after *Wal-Mart* where certification was granted, and because of the timing of the Supreme Court's *Wal-Mart* decision, counsel did not have the benefit of a settled legal landscape or multiple precedents interpreting and applying the *Wal-Mart* decision at the time Plaintiffs moved for certification. Counsel's success in achieving class certification alone demonstrates counsel's skill and efficiency.

As detailed more fully below, this litigation required extensive briefing and argument on a host of issues. For example, class counsel successfully rebuffed Defendant's *Daubert* motions

---

[13] Both Shaffer and Schmidt later moved to Shaffer Rapaport & Schmidt and Garvey Schubert Barer.

and repeated challenges to Plaintiffs' statistical evidence, and filed no less than 17 discovery

motions, resulting in four discovery sanctions against Defendant.  That counsel was able to

achieve these results all the while facing vigorous and skilled opposition from the U.S.

Attorney's Office is a testament to counsel's skill and ability.  Moreover, as discussed in the

following section, the complexity of the case and the tens of thousands of hours of work required

to achieve this result similarly attest to counsel's performance.

**D.  The Complexity of this Case and Its Nearly Seventeen-Year Duration Support Class Counsel's Fee Request**

This has been a long and laborious litigation.  Class counsel has been prosecuting this

case for nearly seventeen years.  The extraordinary duration of counsel's effort certainly affirms

the reasonableness of the fees requested.  Class counsel has faced a determined adversary in

every stage of the proceedings.  Indeed, not only have the docket entries exceeded 800 in this

case, but class counsel alone has filed approximately 190 legal memoranda.  And that is just

briefing; it does not account for all of the arguments, hearings, and status conferences at which

counsel appeared, or all of the time spent on status reports or joint submissions.

This case has also raised a host of complex legal issues.  The parties spent years in a

battle of the experts; counsel grappled with statistical arguments throughout expert discovery,

multiple rounds of *Daubert* briefing, and substantial statistical arguments in both the class

certification and summary judgment stages.  This long-standing battle required mastery of

complicated and technical statistical arguments and the array of legal precedents addressing the

admissibility and reliability of various statistical methods.  In addition, as described above,

achieving class certification was particularly challenging given the timing of class certification

briefing on the heels of the Supreme Court's *Wal-Mart* decision.

Creating the Settlement in this case also presented a complex challenge (which is even more apparent given the parties' inability to reach a negotiated settlement in 2011 despite the efforts of a skilled mediator from JAMS over an extended period exceeding six months). In order to prepare the settlement agreement, counsel had to craft a blueprint for devising a new promotion selections system and formulate a comprehensive and detailed agreement covering both phases of the promotions process, adverse impact testing, reporting and documentation, training, complaint tracking, EEO considerations, and "Second Look" provisions.

Long before these settlement discussions, the parties' protracted discovery battles also raised difficult legal issues. Class counsel used the 30(b)(6) deposition mechanism to uncover lack of discovery compliance. Class counsel extensively briefed and argued the contours of a party's search and production obligations in a putative class action of this size and conducted a sixteen-day hearing on the issue. Because of these discovery battles, class counsel was also forced to identify the appropriate remedies for specific discovery violations considering both the specific authority for particular types of sanctions and the nature of the specific prejudice to be remedied. After the class was certified, the parties briefed the issue of post-certification discovery standards and the extensive record of discovery in this case.

### E.  Class Counsel Faced Significant Risk of Non-Payment

Class counsel undertook monumental efforts in this case—tens of thousands of hours of work—without guarantee that they would ever receive compensation. For nearly seventeen years, class counsel has been providing representation on a contingency fee basis, entirely fronting the costs of the litigation and devoting tremendous effort without any assurance of payment in the end.

Throughout this case, class counsel faced substantial risk of non-payment.  Plaintiffs' class claims were initially dismissed in 2004.  *See* Doc. 129.  Only after re-exhausting administrative remedies and moving to reinsert their claims were the class claims revived.  *See* Doc. 155.  After getting past the motion to dismiss, there was still no guarantee the class would be certified—far from it.  The Court initially denied Plaintiffs' motion for class certification and then the *Wal-Mart* decision came down, which unsettled class certification law.  Even after the class was ultimately certified in 2013, class counsel continued to face significant risk of being left empty-handed.  Had the case proceeded to trial, there would be no guarantee Plaintiffs would prevail.  To the contrary, a finding for Plaintiffs would require a lay jury to understand and accept Plaintiffs' statistical evidence in the face of vigorous challenge by Defendant and Defendant's expert.  Furthermore, trial would be difficult because many of the events at issue took place so long ago; the class period itself ends more than ten years ago, and memories inevitably fade over time.

For all of these reasons, the risk of non-payment class counsel faced supports the full fee award requested here.  *See, e.g.*, *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 7 (D.D.C. 2008) (risk of non-payment supports fee request given contingency arrangement, vigorous defense, and possibility of denial of certification or loss at trial); *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 123 (D.D.C. 2007) (same).

### F.  Class Counsel Devoted Substantial Effort to Achieving This Settlement

There is no question that class counsel has devoted tremendous effort to this case.  Counsel has dedicated almost 42,000 hours over nearly seventeen years to bring this case to resolution.  Negotiating, drafting, and finalizing the Settlement alone took six months and hundreds of hours of work—not to mention the years of intense litigation that preceded it.

Counsel compiled over 75 declarations, took or defended over fifty deposition, reviewed hundreds of thousands of pages of documents, prepared no fewer than 17 motions to compel, completed multiple rounds of class certification and dispositive motions briefing, successfully defended class certification in the D.C. Circuit, and submitted nearly 200 legal memoranda.

All in all, the effort invested by counsel exceeds $20.4 million of time and $859,049 in unreimbursed expenses.  This extraordinary expenditure further validates an award of the requested fees and costs.

### G.   The Award Sought in This Case Is More Than Reasonable Given Awards in Similar Cases

Counsel's request for $8 million in attorney's fees and $859,049.26 in costs represents approximately 36 percent of the settlement fund.  Whether considered in terms of its percentage of the common fund or its relationship to the lodestar, the award sought in this case is reasonable and well within the range of awards in similar cases.

There is no set common fund percentage that is appropriate in every case.  Instead, "the percentage is to be determined by the court based on reasonableness under the circumstances of a particular case."  *Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993).  Because determination of the appropriate percentage is an individualized case-by-case determination, the percentage deemed "reasonable" varies from case to case.  Courts in this district have observed that "fee awards in common fund cases range from fifteen to forty-five percent." *Vista Healthplan*, 246 F.R.D. at 364; *Wells*, 557 F. Supp. 2d at 7; *In re Lorazepam & Clorazepate Antitrust Litig.*, No.  MDL 1290(TFH), 2003 WL 22037741, at *7 (D.D.C. June 16, 2003); *In re Vitamins Antitrust Litig.*, No. MDL 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001).  However, courts have also set fee awards at percentages above and below that range, and other courts have described the range of most common percentage

awards more narrowly. *See, e.g.*, *Black Farmers*, 953 F. Supp. 2d at 101–02 (awarding 7.2 percent of the common fund); *Greene v. Emersons Ltd.*, No. 76 CIV. 2178 (CSH), 1987 WL 11558, at *1 (S.D.N.Y. May 20, 1987) (approving a 46.2 percent fee award); *Swedish Hosp. Corp.*, 1 F.3d at 1272 (observing that as of 1993 common funds awards were often in the 20 to 30 percent range).

The $8 million in attorney's fees and $859,049.26 in costs sought here amounts to just over 36 percent of the fund, which falls well within the reasonable range. Courts in this district frequently award fees of the same or higher percentage of the common fund. *See, e.g.*, *Stephens v. US Airways Grp., Inc.*, 102 F. Supp. 3d 222, 230–31 (D.D.C. 2015) (affirming that 38 percent "is within the range of settlements in other common fund cases" and awarding that percentage); *Vitamins Antitrust*, 2001 WL 34312839, at *10 (approving 34% award); *Radosti*, 760 F. Supp. 2d at 78–79 (approving an award of just over 33 percent); *Wells*, 557 F. Supp. 2d at 7–8 (approving a 45 percent award*); In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494, 498–99 (D.D.C. 1981) (awarding fees of 45 percent of the settlement).

Considering the specific circumstances of this case as required, *Democratic Cent. Comm. of D.C.*, 3 F.3d at 1573, only affirms the reasonableness of counsel's request. For example, in *Wells v. Allstate*, the court held that an award of 45 percent of the common fund was justified where class counsel achieved class certification in spite of difficult legal challenges, faced a substantial risk of non-payment by litigating on a contingent basis, achieved a favorable settlement, sought fees less than their lodestar, and received no class member objections to the requested fee award, among other things. *See Wells*, 557 F. Supp. 2d at 8. All of the same factors are present here, and then some. Here, counsel achieved class certification in the face of difficult legal challenges, took the case on contingency and litigated for almost seventeen years

without payment, achieved an outstanding settlement, and seeks only a fraction of counsel's

lodestar.  Yet unlike *Wells*, where counsel sought $725,000 in fees and costs in a settlement

where only $800,000 was to be divided among class members, the fees requested here represent

only a fraction of the $12.4 million awarded to the class ($14.9 million if one includes awards to

named plaintiffs).  In short, counsel's requested award falls within the accepted range and is

more than reasonable in the circumstances of this case.

Although not required in this Circuit, *Swedish Hosp. Corp.*, 1 F.3d at 1266–67, district

courts often employ a "lodestar cross-check" to confirm the reasonableness of an award by

comparison to the hours and fees actually expended.  *See, e.g.*, *Black Farmers*, 953 F. Supp. 2d

at 101.  In most instances, awarding a percentage of the common fund results in a recovery in

excess of counsel's lodestar.  *See, e.g.*, Newberg on Class Actions § 15:89 (5th ed.) (indicating

that the percentage of recovery method results in recoveries "running from a floor around

counsel's lodestar to a ceiling around three times lodestar").  "Multiples [of the lodestar] ranging

up to four are frequently awarded in common fund cases. . . ."  *Black Farmers*, 953 F. Supp. 2d

at 101-02 (internal quotations omitted); *see also Wal-Mart Stores, Inc. v. VISA USA, Inc.*, 396

F.3d 96, 123 (2d Cir. 2005) (noting that "multipliers of between 3 and 4.5 have become

common") (quotation marks omitted); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 & n.6

(9th Cir. 2002) (approving a multiplier of 3.65 and noting that it fell within the typical range in

common fund cases).  As this Court has observed, a percentage award resulting in a recovery that

is just under two times counsel's lodestar "is unremarkable in common fund cases."  *Black

Farmers*, 953 F. Supp. 2d at 102; *see also Lorazepam & Clorazepate Antitrust*, 2003 WL

22037741, at *9 (finding that percentage awards amounting to 1.15 and 1.36 times the lodestar

are "near the low end of normal multipliers").  Indeed, the D.C. Circuit has affirmed a percentage

of the common fund that results in an award of approximately 3.3 times the fees actually expended on the case. *See Swedish Hosp. Corp.*, 1 F.3d at 1272; *Black Farmers*, 953 F. Supp. 2d at 102.

Here, counsel's lodestar is $20,424,892.50 based on over 41,927 hours of work on this case through February 28, 2017 at counsel's standard billing rates. *See* Ex. 1 (Klar Decl) ¶¶ 28, 30-33, 36. Counsel has also incurred an additional $859,049.26 in unreimbursed expenses for a total of $21,283,941.76 in fees and costs. *Id.* at ¶¶ 35, 36. The $8 million in fees and $859,049.26 in costs counsel requests as compensation pales in comparison to counsel's actual expenditures, representing just over two-fifths (approximately 43 percent) of counsel's lodestar (or approximately 42 percent including counsel's incurred costs).

Thus, any question regarding the percentage sought by counsel here is answered when considered in the context of counsel's lodestar. Simply noting other instances in which courts have awarded percentages smaller than the approximately 36 percent sought here offers no challenge to the reasonableness of counsel's request here, where the percentages applied in other cases resulted in awards several times *more* than counsel's lodestar and Plaintiffs' request here is for millions *less*.

Given that percentage awards exceeding three times counsel's lodestar have been accepted by this Circuit and awards twice the lodestar are "unremarkable," class counsel's request for a small fraction of their lodestar is eminently reasonable. *See, e.g.*, *Vista Healthplan*, 246 F.R.D. at 364–65 ("Class counsel is requesting attorneys' fees that are less than their lodestar without any multiplier, which serves as further evidence of the reasonableness of their attorneys' fee request"); *Haught v. Summit Res., LLC*, No. 1:15-cv-0069, 2016 WL 1301011, at *12 (M.D. Pa. Apr. 4, 2016) ("Thus, because the lodestar amount is more than the requested

27

attorneys' fee award, the multiplier indicates that the award is reasonable on its face."); *Cogdell v. Wet Seal, Inc.*, Case No. SACV 12-1138 AG AN(x), 2013 WL 12134045, at *2 (C.D. Cal. Dec. 9, 2013) ("A lodestar analysis confirms the reasonableness of the award, as the award is slightly less than the total fees billed by Class Counsel, even without applying a multiplier."); *Williams v. SuperShuttle Int'l, Inc.*, Case No. 12-cv-06493-WHO, 2015 WL 685994, at *2 (N.D. Cal. Feb. 12, 2015) (fees requested held reasonable given that they were less than counsel's lodestar); *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, Civ. A. No. 03-CV-4372 (DMC), 2009 WL 4730185, at *9 (D.N.J. Dec. 4, 2009) ("Here, not only is the lodestar multiplier low, it is negative. The lodestar cross-check, accordingly, supports the Court's reasonableness analysis."); *Rinky Dink, Inc. v. World Bus. Lenders, LLC*, CASE NO. C14-0268-JCC, 2016 WL 3087073, at *4 (W.D. Wash. May 31, 2016) (finding the requested fee "especially reasonable" because it was less than counsel's lodestar).  Accordingly, the lodestar cross-check analysis underscores the reasonableness of counsel's fee request.

## CONCLUSION

For the foregoing reasons, the award sought here is reasonable in light of the controlling legal standards and the circumstances of this case.  Plaintiffs respectfully request that this Court award $8 million in attorney's fees and $859,049.26 in costs from the common fund.

Respectfully submitted,

_____/s/_____
John P. Relman (D.C. Bar # 405500)
Jennifer I. Klar (D.C. Bar # 479629)
Megan Cacace (D.C. Bar # 981553)
Relman, Dane & Colfax PLLC
1225 Nineteenth Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888

28

_____/s/_____

E. Desmond Hogan (D.C. Bar # 458044)
Kathryn Marshall Ali (D.C. Bar #994633)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

*Attorneys for Plaintiffs and the Class*

Dated:  March 13, 2017

29