**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REGINALD G. MOORE, et al.,          )
                Plaintiffs,      )
                          )

           v.             )      Civil Action No. 00-953 (PLF/DAR)
                          )

JOHN KELLY, Secretary,         )
U.S. Department of Homeland Security,  )
                Defendant.     )
                          )

**JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT AGREEMENT**

**TABLE OF CONTENTS**

I.      BACKGROUND ........................................................................................2

        A.      Nature of Lawsuit ..........................................................................2

        B.      Procedural History .........................................................................2

                1.      Litigation...........................................................................2

                2.      Settlement Efforts .............................................................4

                3.      Preliminary Approval Briefing .........................................4

II.     THE PROPOSED SETTLEMENT ...........................................................5

        A.      Monetary Relief .............................................................................5

                1.      Financial Relief for Class Members .................................5

                2.      Attorney's Fees and Costs .................................................8

                3.      Costs of Notice and Administration of the Settlement ....8

                4.      Disposition of Any Residual Funds ..................................9

        B.      Modifications to and Testing of Special Agent GS-14 and GS-15
                Selection Practices ........................................................................9

                1.      The MPP Scoring Phase....................................................9

                2.      The MPP Recommendation and Selection Phase ...........10

                3.      Statistical Testing........................................................... 12

        C.      Additional Injunctive Relief ......................................................12

                1.      Training............................................................................12

                2.      Equal Employment Opportunity and Diversity .............12

                3.      "Second Look" at Promotions Status..............................13

III.    NOTICE TO THE CLASS .......................................................................14

IV.     ARGUMENT............................................................................................15

i

A. The Proposed Settlement Should Be Granted Final Approval ..................15

    1. Legal Standard for Final Approval ................................................15

    2. The Settlement is the Product of Arm's Length Negotiations Between Experienced, Capable Counsel After Meaningful Discovery ........16

    3. The Terms of the Settlement and their Relationship to Plaintiffs' Claims ..........................................................................17

        a. The Financial Relief Afforded By this Agreement is Highly Favorable ...............................................................17

        b. The Non-Monetary Relief Provided is Significant and Achieves a Favorable Result for the Class ........................19

            i. The Settlement Achieves the Stated Goal the Class Sought to Obtain through this Litigation ...............20

            ii. The Proposed Settlement Affords Relief that Might Otherwise Not Be Attained through Litigation......22

    4. The Status of the Litigation Favors Approval of the Settlement .. 22

    5. The Record Contains Considerable Evidence That Class Members Support the Settlement ..................................................................23

B. Adequate Notice Has Been Disseminated to the Class.............................24

C. Attorney's Fees and Costs .......................................................................26

V. CONCLUSION............................................................................................26

After vigorous advocacy and negotiation, Reginald G. Moore, John E. Turner, C. Yvette Summerour, Leroy Hendrix, Cheryl L. Tyler, Luther K. Ivery, Andrew E. Harris, Jr., and Kenneth Rooks (hereinafter, "Class Representatives"), on behalf of themselves and a class of individuals they represent, and Camilla Simms and Lisa Robertson (hereinafter, "Individual Plaintiffs") (together with Class Representatives, collectively "Named Plaintiffs"), and Defendant John Kelly, Secretary, U.S. Department of Homeland Security (hereinafter "Defendant") (together with Named Plaintiffs and Class Members, collectively "Parties"), have agreed to a settlement of the claims in this 16-year-old employment discrimination lawsuit.  The Parties respectfully request, pursuant to Federal Rules of Civil Procedure 23 and 54(d), that the Court issue an order granting (1) final approval of the proposed Settlement Agreement (Doc. 828) ("proposed settlement" or "settlement"), a copy of which is attached hereto as Exhibit 1; and (2) approval of an award of fees and costs to Plaintiffs' counsel.

In late January and early February 2017, the Court granted preliminary approval of the settlement and directed that notice be given to Class Members.  *See* Doc. 832 (granting preliminary approval of injunctive provisions and Class Notice); Doc. 835 (granting preliminary approval of monetary distribution plan).  The notice process has since been completed, with a very low rate of returned mail, suggesting that the notice plan was effective.  *See* Ex. 2 (Decl. of Class Administrator M. Patton) ("Class Admin. Decl.").  No Class Members opted out of the class, and no objections have been filed.  The Parties now respectfully submit that this Settlement merits final approval by the Court.

## I.    BACKGROUND

### A.    Nature of the Lawsuit

This is a Title VII class action brought by African-American Special Agents of the U.S. Secret Service ("Secret Service"), a component of the U.S. Department of Homeland Security, which is headed by Defendant, the Secretary of Homeland Security.  Eight Class Representatives bring a pattern-or-practice disparate treatment race discrimination claim and a disparate impact race discrimination claim on behalf of approximately 121 African-American Special Agents.  At issue in the class complaint portion of this case are promotions of African-American Special Agents who bid for promotion during the time period of 1995-2005 to positions at the GS-14 and GS-15 levels.

Plaintiffs filed this case on behalf of African-American Special Agents to obtain monetary relief and changes to the Secret Service's promotion system at the GS-14 and GS-15 levels.  The proposed Settlement meets both of these objectives.

### B.    Procedural History

#### 1.    Litigation

This lawsuit was filed on May 3, 2000.  It was assigned to Judge Roberts until his retirement in March 2016, and then reassigned to Judge Friedman.  The operative complaint is the Second Amended Complaint (Doc. 362) (Aug. 8, 2006).

The litigation has been long, complex, and hard fought, with over 800 docket entries.  We do not attempt a complete chronology here, but we provide a high-level overview of the proceedings to date.

Extensive discovery by both Plaintiffs and Defendant was completed between 2005 and 2008.  Numerous depositions were taken, to include both fact and Federal Rule of Civil

Procedure 30(b)(6) depositions. Twelve expert reports were exchanged and seven days of expert testimony were taken. Hundreds of thousands pages of documents were produced. The Parties also responded to interrogatories and requests for admission.

The Court granted Plaintiffs' motion for class certification on February 25, 2013, certifying a class of "all current and former African-American Special Agents who bid for promotion to a GS-14 position from 1995 to 2004 and were not promoted to GS-14 on the first bid list on which they bid; and all current and former African-American Special Agents who bid for promotion to a GS-15 position from 1995 to 2005 and were not promoted to GS-15 on the first bid list on which they bid; but excluding Special Agents who served as an Assistant Director, a Deputy Director, or the Director of the Secret Service during the class period." *Moore v. Napolitano*, 926 F. Supp. 2d 8, 35 (D.D.C. 2013). Eight Named Plaintiffs were designated Class Representatives, and undersigned counsel for Plaintiffs were appointed as class counsel. *Id*. After full briefing and oral argument, in 2014 the U.S. Court of Appeals for the D.C. Circuit denied Defendant's request for interlocutory review and allowed the class certification decision to stand. *In re Johnson*, 760 F.3d 66, 69 (D.C. Cir. 2014). Notice was mailed to the 121-member potential class in accordance with Federal Rule of Civil Procedure 23(c)(2)(B). *See* Doc. 742 (May 13, 2013). Seven potential Class Members opted out, and 114 current and former African-American Special Agents remain in the class.

Defendant moved for summary judgment on Plaintiffs' class action claims on March 25, 2015. Doc. 811. Defendant had also moved for summary judgment on those portions of the Second Amended Complaint (Doc. 362), that were not included in the certified class, as well as on the claims of the two plaintiffs named in that complaint who were not Class Members. Doc. 768. These motions are fully briefed and oral argument was held on May 5, 2016. The Court

informally stayed ruling in July 2016 so the Parties could attempt to negotiate a settlement, which they successfully have done.

### 2. Settlement Efforts

The Parties' efforts to settle this litigation have been extensive. One such attempt was from November 2010 to September 2011 under the auspices of a private mediator. The Parties' original agreement was to attempt mediation for up to four months, but the process continued much longer. The mediation entailed many face-to-face meetings, phone calls, and exchanges of proposals. Despite a very substantial allocation of resources to the process by all involved, and much progress, ultimately mediation was not successful. *See* Docs. 829-3, 831-3 (Decl. of Jennifer Klar) ("J. Klar Decl.") at ¶¶ 3-4.

The Parties made another effort to negotiate a settlement in July 2016, this time without the assistance of a neutral. Again, hundreds of hours were devoted to face-to-face meetings, phone calls, and the development of and negotiation over proposals. Efforts to craft mutually agreeable injunctive relief regarding the Secret Service's promotions process were especially time consuming. After nearly six months, the Parties reached the settlement presented to the Court herein. *Id.* ¶¶ 6-8.

### 3. Preliminary Approval Briefing

On January 27, 2017, the Parties jointly moved for preliminary approval of the injunctive provisions of the settlement and the notice plan. *See* Doc. 829. Plaintiffs separately moved for preliminary approval of the monetary distribution plan because Defendant did not take a position on the division of the $24 million Settlement Fund and reserved the right to object to Plaintiffs' request for attorney's fees and costs, which had not yet been filed. *See* Doc. 831. On March 13, 2017, Plaintiffs submitted their Motion for an Award of Attorney's Fees and Costs (Doc. 837), to

which Defendants responded on March 20, 2017 (Doc. 838).  Defendants did not take a position on Plaintiffs' request for fees or costs.  *See* Doc. 838.

## II.   THE PROPOSED SETTLEMENT

### A.   Monetary Relief

The Settlement provides for the payment of $24 million by Defendant subject to certain opt-out thresholds.  Settlement at 7 and 32.  This includes funds for payments to all Named Plaintiffs and Class Members in full and complete satisfaction of all claims made in this litigation, including without limitation, claims for economic and non-economic damages of any kind, back pay, front pay, interest (including both pre-judgment and post-judgment interest), compensatory damages, attorney's fees, and litigation expenses and costs, as well as administration of the settlement.  Settlement at 8.

#### 1.   Financial Relief for Class Members

$14.94 million[1] of the Settlement Fund will be used to make payments to the Named Plaintiffs and Class Members.  The amounts are specified for the Named Plaintiffs, including the eight class representatives and the two other Named Plaintiffs.  The amounts for the Class Members will be determined by a neutral, Michael K. Lewis, by applying the criteria specified below to each person's circumstances.  Mr. Lewis will have discretion to make awards up to the same amount received by the class representatives.

Each class representative will receive $300,000.  These payments are compensation for damages due to emotional distress, mental anguish, and pain and suffering, and in recognition of

---

[1] The Class Notice and preliminary approval briefing used the figure $14.8 million because Plaintiffs had reserved the right to request up to $1 million in costs.  Plaintiffs' counsel ultimately only requested $859,049.26 in costs.  Therefore, the $140,950.74 difference between the $1 million initially reserved for costs and the costs actually sought reverts to the class, bringing the total amount distributed to the Named Plaintiffs and Class Members to $14,940,950.74.

their significant efforts in bringing and prosecuting this action for the sixteen years it has been pending, including the insistence throughout the litigation on a class resolution, involvement in litigation strategy, provision of information to Class Counsel, significant role in affirmative discovery, responding to the Secret Service's discovery requests, appearing and testifying at depositions noticed by the Secret Service, and advancing the interests of the Class. The two Named Plaintiffs who are not Class Representatives or Class Members (Camilla Simms and Lisa Robertson) will receive $50,000 each in compensatory damages due to emotional distress, mental anguish, and pain and suffering. Collectively, these payments to the Named Plaintiffs total $2.5 million.

Mr. Lewis will divide $12.44 million[2] among the Class Members who timely submit valid claim forms. Mr. Lewis is an experienced arbitrator and mediator who is a co-founder of JAMS. Mr. Lewis served in a similar capacity, and was approved by the Court, in connection with the class action settlement in *Pigford v. Glickman*, 185 F.R.D. 82, 106 (D.D.C. 1999).

Mr. Lewis will have discretion to make awards of up to $300,000. He will base his determinations on the following criteria:

    1) The Class Member's severity and duration of emotional distress resulting from the conduct alleged in the lawsuit;

    2) The impact of the conduct alleged in the lawsuit on the Class Member's employment and day-to-day experience at the Secret Service (such as any effect on tenure or ability to stay at the Agency, everyday life on the job, etc.);

    3) The Class Member's efforts to combat discrimination, such as:

        a. Whether the Class Member ever made a discrimination complaint or filed an EEO charge;

---

[2] This figure is higher than identified in the Class Notice and preliminary approval briefing for the reasons discussed above. *See supra note* 1.

    b.  The Class Member's degree of participation in the lawsuit, such as sitting for a deposition or executing a declaration;

4)  The Class Member's efforts to achieve promotion, including:

    a.  The duration of the Class Member's bids for promotion;

    b.  The frequency of the Class Member's bids for promotion;

    c.  The extent to which requirements for promotion were placed on a Class Member not placed on comparable white Agents (such as the requirement of a move for promotion);

5)  The Class Member's career experience as a result of the conduct alleged in the lawsuit compared to non-black comparators, including:

    a.  Whether the Class Member attained the grade on which he or she bid during the class period;

    b.  If the Class Member bid for GS-14, his or her number of GS-13 assignments in the Secret Service after his or her GS-13 protection assignment without or before promotion;

    c.  If the Class Member bid for GS-15, his or her number of GS-14 assignments without or before promotion;

    d.  The Class Member's length of time at the lower grade without or before promotion to the grade on which he or she bid during the class period; and

    e.  The length of the Class Member's tenure at the Secret Service without or prior to promotion to the grade on which he or she bid during the class period.

Mr. Lewis will ascertain the information required to make his determinations from the following sources:

1) Class Counsel will provide Mr. Lewis with objective personnel information about each Class Member provided during the litigation;

2) Each Class Member will be afforded an opportunity to submit responses to a questionnaire, in the form attached as Exhibit 3 to Plaintiffs' Motion for Preliminary Approval of Distribution of Settlement Proceeds (Doc. 831-4); and

3) Class Members may elect to participate in an interview of one hour with Mr. Lewis.

The awards made by Mr. Lewis shall be binding and non-appealable.

Mr. Lewis will be charged with distributing the full $12.44 million to the Class Members. He will not have discretionary authority to allocate less than this full amount. If all 106 eligible Class Members participate, their average award will be $117,358.

2.      Attorney's Fees and Costs

Plaintiffs have requested one-third ($8 million) of the Settlement Fund in attorney's fees. *See* Doc. 837. The current combined lodestar of Class Counsel and other attorneys who previously served as co-counsel is more than $20.4 million. The fees sought by Plaintiffs' counsel are thus over $12 million *less* than their lodestar. Plaintiffs have also requested reimbursement for $859,049.26 in out-of-pocket costs expended in support of the litigation over the last sixteen years. *See id.* Defendant does not take a position on either request. *See* Doc. 838.

3.      Costs of Notice and Administration of the Settlement

Plaintiffs retained Settlement Services, Inc., an experienced class action administration firm, to serve as Class Administrator and provide notice of the settlement to Class Members,

send and process claim forms, and administer related aspects of the settlement.  As discussed above, Plaintiffs also retained Michael Lewis as a neutral to determine the distribution of funds to Class Members.  $200,000 will be set aside to pay for the services of Mr. Lewis and Settlement Services, Inc.

### 4.    Disposition of Any Residual Funds

If, after final distribution of the Settlement Fund to the Named Plaintiffs, Class Members, and payment of attorney's fees and costs and settlement administrative fees, there are any funds remaining, the remainder will be redistributed to the Class Members on a pro rata basis subject to the $300,000 cap set forth in Paragraph III.B. of the Settlement Agreement.  Should funds remain after redistribution to Class Members such that no further redistribution can be made, then any funds still remaining at that point will revert to the government.

### B.    Modifications to and Testing of Special Agent GS-14 and GS-15 Selection Practices

The Settlement the Parties propose includes provisions affecting two of the phases of the Merit Promotion Plan for GS/GM-1811 Promotions ("MPP"): the scoring phase and the recommendation and selection phase.

### 1.    The MPP Scoring Phase

After the class period ended in 2005, the Secret Service independently implemented substantial modifications to its scoring process for promotions to the GS-14 and GS-15 levels under the MPP.  The Secret Service used an outside expert and subject matter experts to construct a competency-based model and conduct validation studies.  Plaintiffs have reviewed these improvements and agree that they are satisfactory with respect to construction of the scoring system.  *See* Settlement at 9 and 10.  The Secret Service is currently working with an

outside expert to update those competencies and make additional improvements to the MPP scoring process (the "2017 MPP scoring process").  *Id.*

In this Proposed Settlement, the Secret Service has agreed to continue to maintain a competency-based scoring system that is validated by an outside expert, and to continue to publish the competencies used in the scoring process, as it has since at least 2009.  *Id.* at 10. Further, if statistical testing reveals that the 2017 MPP scoring process' reliability falls below the range generally accepted in the field based on the assessment of an outside expert, the Secret Service will work with its outside expert to assess possible changes to improve reliability.  *Id.* The Secret Service further agrees to provide Plaintiffs the opportunity to review the final 2017 report reflecting the validity and reliability testing, and efforts to improve reliability, if any.  *Id.*

### 2.    The MPP Recommendation and Selection Phase

With respect to the recommendation and selection phase of the MPP, the Secret Service commits through this Proposed Settlement to completing the further development and implementation of a competitive selection process that is based upon standardized evaluative factors that are job-related, and that provides for accountability and flexibility in decision-making.  *Id.* at 11.  More specifically, the Proposed Settlement requires the Secret Service to engage an outside expert to assist in analyzing the existing MPP selection procedures and to develop a list of job-related standardized evaluative factors to be used in making recommendation and selection decisions for vacancies at the GS-14 and GS-15 levels.  *Id.* at 11-12.  The outside expert's analysis is not intended to replicate the competencies identified and assessed during the scoring phase of the MPP.  It is intended that the standardized evaluative factors developed will involve objective elements, rather than subjective elements.  *Id.* at 13.

10

The Secret Service shall provide employees with notice of the new MPP selection procedures by publishing them as part of the MPP. *Id.* at 17-18.

Under the terms of the proposed agreement, the Secret Service's Advisory Board will use the identified standardized evaluative factors to consider and evaluate candidates for competitive promotion to GS-14 and GS-15 vacancies. Certain neutrally applied "organizational" factors may also be considered. *Id.* at 15. While the Secret Service retains discretion to consider MPP scores in evaluating promotion candidates, under the proposed agreement the Advisory Board will not consider MPP scores that are not different from each other in a statically significant manner as a basis for differentiating between candidates with such scores. *Id.* at 21. Within the framework set out in the Proposed Settlement, the Advisory Board retains discretion to determine whom to recommend and select for promotion. *Id.* at 13-17.

Further, the Secret Service's Executive Chief of the Office of Human Resources ("EC HUM"), or designee, will attend all meetings of the Advisory Board where selection decisions are discussed and will ensure that multiple candidates are considered by the Board for each vacancy (unless multiple candidates did not bid on the vacancy). *Id.* at 19-20. When a candidate is ultimately selected for promotion, the Secret Service will create and maintain contemporaneous written records of decisions regarding MPP selections. *Id.* at 17. The Secret Service will conduct annual audits of the required MPP selection documentation. *Id.* at 20. The purpose of these audits is to ensure that the standardized evaluative factors are being used, that multiple candidates are being discussed and considered for each vacancy where multiple candidates exist, that organizational factors are applied in the manner prescribed by the Proposed Settlement Agreement, that recommendation/selection decisions are being properly documented

11

and that the documentation is being maintained in accordance with policy and the provisions of the settlement. *Id.* at 20.

### 3.  Statistical Testing

Through this Proposed Settlement, the Secret Service has agreed to retain an outside expert to analyze data from specified stages of the MPP to determine whether that stage has an adverse impact on African-American Special Agent candidates. *Id.* at 22-21. Should the results of the statistical testing indicate adverse impact for African-American Special Agents, an outside expert will assist the Secret Service in trying to ascertain the cause of the impact and will also assist the Secret Service in considering and testing alternatives to address the adverse impact. *Id.* at 23. For a term of years specified in the Proposed Settlement, the Secret Service will provide Plaintiffs with the expert's final report regarding the testing and analysis of alternatives, if such analysis is needed. *Id.* at 24.

### C.  **Additional Injunctive Relief**

#### 1.  Training

The Proposed Settlement also requires certain forms of training. Those sitting on the Advisory Board or those Special Agents in Charge and Division Chiefs involved in the GS-14 and GS-15 promotion process will be trained on the application of the standardized evaluative factors. Advisory Board members will also receive a briefing on equal employment opportunity and diversity issues, including unconscious bias and stereotyping. *Id.* at 18 and 25.

#### 2.  Equal Employment Opportunity and Diversity

The Proposed Settlement contains several provisions designed to highlight the Agency's continuing commitment to equal employment opportunity concerns and diversity going forward. The Secret Service has agreed that when the Equal Employment Opportunity ("EEO") Director

is aware of information, beyond an official finding of discrimination or retaliation, about a promotion/reassignment candidate that may raise a concern, that information may be shared with the Advisory Board. *Id.* at 24-26. The Secret Service has in place a specific disciplinary offense for those engaging in biased conduct or the failure to report such conduct, and the Secret Service has agreed to maintain a specific disciplinary offense for such conduct. *Id.* at 26. In addition, the Agency has agreed to expand its existing Prevention of Harassment Hotline so that it can be used for reporting incidents of race discrimination. *Id.* at 26. The Agency has further agreed to track certain complaints of race discrimination—whether they are raised through the hotline or formal written complaints—by Responsible Management Official ("RMO") in an effort to identify any patterns. *Id*. at 25-26.

### 3.        "Second Look" at Promotions Status

Through this proposed agreement, the Secret Service has agreed, once the selection process standardized evaluative factors have been created and adopted, that it will give the following Class Representatives and Class Members a Second Look for consideration for possible promotion to the GS-14 or GS-15 level: (a) those four individuals who have not been promoted to the GS level to which they were seeking promotion during the Class Period, who are participating in the MPP scoring process for the 2016/2017 promotion cycle, and who receive a final score; and (b) and those three individuals promoted to the GS-14 level after a longer period than the average non-African American Special Agent as determined by the Secret Service for the Class Periods, who are participating in the MPP scoring process of 2016/2017, and who receive a final score. *Id.* at 28. A group comprised of a representative from the Secret Service's EEO Office, the Assistant Director of the Office of Investigations, and an Assistant Director (or other positioned individual) who is a Class Member will review relevant information regarding

13

these seven "second look" Special Agents and consider the standardized evaluative factors to determine whether any such Agent was previously overlooked in promotions.  *Id.*  For any Agent identified as being overlooked, the Secret Service will refer that Agent to the Advisory Board for further consideration for promotion; the Advisory Board will give additional consideration to any such referred Special Agents for a period of one year with regard to any position for which that Agent bids and makes the Best Qualified List.  *Id.* at 29

## III.    NOTICE TO THE CLASS

On January 31, 2017, the Court approved the Class Notice and proposed procedures for notifying Class Members regarding the settlement.  *See* Doc. 832.  Settlement Services, Inc., the Class Administrator, carried out the required notifications and tasks in accordance with the Court's Order and the terms of the Notice.  On February 16, 2017, class counsel provided the Class Administrator with a spreadsheet listing addresses for all 116 Class Members.  *See* Ex. 2 (Class Admin. Decl.) at ¶ 3.  These addresses were compiled from: class counsel's pre-existing database of Class Member addresses updated and maintained during the litigation for purposes of communication with the class; address information provided by Defendant for Class Members who are current Secret Service employees; and updated information obtained directly from individual Class Members.

The Class Administrator mailed the Class Notice to all 116 Class Members using the addresses provided by counsel.  The Notices were sent via first-class mail on February 21, 2017. *See Id.* at ¶ 6.  Since that time, only seven Notices were returned as undeliverable with no forwarding address.  *Id.* at ¶ 7.  For those seven individuals, the Class Administrator ran locator traces and reached out to counsel for additional information.  *Id.*  Counsel for the parties were

14

able to provide updated or additional address information for all seven individuals, and the Class Administrator promptly re-sent the Notices using the new address information.  *See id.*

In addition, consistent with the Notice, the Class Administrator established a website (www.secretserviceclassaction.com) to provide general information about the settlement, and a toll-free telephone line that Class Members could call with questions about the settlement or Notice.  *See Id.* at ¶¶ 4-5.

The deadline for Class Members to mail requests for exclusion from the class or objections to the settlement was March 29, 2017.  *Id*. at ¶¶ 8-9.  To date, the Class Administrator has not received any requests for exclusion or objections to the settlement, whether timely or otherwise.  *Id*. at ¶¶ 8-9.

## IV.    ARGUMENT

The Proposed Settlement warrants final approval under Rule 23.

### A.    The Proposed Settlement Should Be Granted Final Approval

#### 1.    Legal Standard for Final Approval

In assessing whether to grant final approval, the Court must determine whether the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  There is "'no obligatory test'" in the D.C. Circuit for determining whether that standard is met.  *Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 8 (D.D.C. 2006) (quoting *Pigford*, 185 F.R.D. at 98); *Equal Rights Ctr. v. Wash. Metro. Area Transit Auth.*, 573 F. Supp. 2d 205, 211 (D.D.C. 2008).  However, there are five factors that courts in this Circuit typically consider:

> (1) whether the settlement is the result of arm's-length negotiations; (2) the terms of the settlement in relation to the strengths of plaintiffs' case; (3) the status of the litigation proceedings at the time of settlement; (4) the reaction of the class; and (5) the opinion of experienced counsel.

*Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 163 (D.D.C. 2014); *see also, e.g.*,

*Ceccone v. Equifax Information Servs. LLC*, No. 13-CV-1314, 2016 WL 5107202, at *4 (D.D.C.

Aug. 29, 2016).  Among these considerations, the primary task is to "evaluat[e] the terms of the

settlement in relation to the strength of the[] case."  *Pigford v. Glickman*, 206 F.3d 1212, 1217

(D.C. Cir. 2000); *see Thomas v. Albright*, 139 F.3d 228, 231 (D.C. Cir. 1998) ("The Court's

primary task is to evaluate the terms of the settlement in relation to the strength of the plaintiffs'

case").  A court's discretion "to reject a settlement is restrained by the 'principle of preference'

that encourages settlements."  *Pigford*, 185 F.R.D. at 103 (citation omitted).

Application of the factors set forth above for both steps of the approval process confirms

that the Proposed Settlement should receive final approval.

2. The Settlement is the Product of Arm's Length Negotiations Between Experienced, Capable Counsel After Meaningful Discovery

As described above, the settlement is the product of extensive arm's length negotiations

by experienced counsel.  Both sides were represented in those negotiations by accomplished and

highly experienced counsel: the government by lawyers from the U.S. Department of Justice, the

U.S. Department of Homeland Security, and the Secret Service, Plaintiffs by lawyers from

Hogan Lovells and the civil rights firm of Relman, Dane & Colfax.  Plaintiffs' counsel have been

appointed class counsel in numerous other cases, and the Court observed in appointing them

class counsel in this case that "[t]here is no dispute as to whether the plaintiffs' class counsel are

appropriate, and there is no indication that class counsel lack the experience and knowledge

required to represent the class."  *Moore*, 926 F. Supp. 2d at 35.

Counsel are well-informed of the strengths and weaknesses of the case.  Both rounds of

in-depth negotiations—in 2010/2011 and 2016—came after the completion of discovery, and the

second round came after summary judgment briefing and argument and after an appeal to the

D.C. Circuit on class certification.

That the Parties were unable to reach an agreement during the first round, despite trying

for ten months with the assistance of a highly-regarded mediator, is testament to how hard-

fought the negotiations were.  It took nearly six more months in the second round to reach a

resolution.

It is clear, in sum, that the settlement presented to the Court is "the product of serious,

informed, non-collusive negotiations" "between experienced, capable counsel," such that a

"presumption of fairness, adequacy, and reasonableness" should attach.  *In re Vitiamins Antitrust*

*Litig.*, 1999 WL 1335318, at \*5; *Blackman*, 454 F. Supp. 2d at 8; *see also In re Johnson*, 760

F.3d at 72 (describing the government's then-14-year defense of the case as "tenacious[]").

> 3.    The Terms of the Settlement and their Relationship to Plaintiffs' Claims
>
>   a.    *The Financial Relief Afforded By this Agreement is Highly Favorable*

On the monetary side, the Secret Service has agreed to pay $24 million to resolve all

claims in this case.  *See* Settlement at 7, 32.  The $12.44 million to be divided by Mr. Lewis

among the non-named Class Members would average to approximately $117,358 per person, and

is an exceptional recovery in an employment class action.  While named class representatives

have received six-figure awards in a fair number of employment class actions, rarely do

unnamed class members obtain compensation this high.  *Stewart v. Rubin*, 948 F. Supp. 1077

(D.D.C. 1996), and *Thomas v. Albright*, 139 F.3d 227 (D.C. Cir. 1998)—both employment class

actions against the federal government—are illustrative.  As here, *Stewart* was a Title VII class

action brought by African-American Special Agents of a federal law enforcement agency (the

ATF) challenging employment practices including promotions.  The Court approved a settlement

that provided $4.7 million to be divided among 245 class members, for an average award of approximately $19,200.  *Id.* at 1082 (size of settlement fund), 1083 (size of class).  In *Thomas*, African-American Foreign Service Officers sued the Department of State.  The average award for those who experienced delays in and denials of promotion was $10,900, and the average award for class members who were terminated was $16,400.  *Id.* at 230.  Even the $75,000 awarded to "the four class members who had incurred the greatest injuries," *id.*, was substantially less than the average that will be awarded across the class here.  The District Court found that the financial recovery "was 'at the high end' of what the class could have expected after trial," and the D.C. Circuit called that determination "reasonabl[e]" in the course of rejecting a challenge to the fairness of the settlement.  *Id.* at 232.

The financial relief obtained for the class through this Settlement is especially favorable given the substantial risk that Plaintiffs would face even if the pending summary judgment motion was denied and the case proceeded to trial.  There is no smoking gun that makes this case a sure thing.  To the contrary, much of the evidence comes from expert witnesses and involves subjects, such as complex statistical analysis, that are not familiar to most jurors.  The government would undoubtedly present a vigorous and skilled defense, as it has throughout the litigation.  And even with a victory at the initial liability phase, Class Members would need to overcome at the second phase ("*Teamsters* hearings"), the government's presentation of individualized non-discriminatory reasons why Special Agents were denied promotion.  Achieving an average award of over $100,000 while avoiding these very significant risks is an excellent outcome for the class.  *See, e.g.*, *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 22037741, at *4 (D.D.C. June 16, 2003) ("monetary recovery certainly cannot be assumed;" granting final approval to class action settlement).

18

Plaintiffs would also face substantial delay if the case proceeded to trial. Even if a trial were scheduled and won in 2017, appeal and the Plaintiff-by-Plaintiff *Teamsters* hearings would lengthen the process considerably. We expect the claims determinations to be made by Mr. Lewis, by contrast, to be completed within two months of his receipt of Class Member claims information following final approval of the settlement.

In addition, the settlement achieves this result while preserving some of the less tangible, but very important, benefits of trial. All Class Members will have the opportunity to describe their personal experiences to a neutral decision maker and feel like they have been heard. They will be able to engage directly with that decision maker and will receive an individualized assessment of the harm they suffered based on fair and consistent criteria. In some respects, this level of participation and transparency may be more meaningful to Class Members than what could be provided through trial, where jury deliberation is necessarily more opaque. This process also avoids the imprecision attendant to a formulaic division of damages, which would likely undercompensate some and overcompensate others.

For these reasons, the financial terms of the settlement provide an exceptionally favorable result for the class, both in terms of size and process.

> b.      *The Non-Monetary Relief Provided is Significant and Achieves a Favorable Result for the Class*

The non-monetary relief afforded by this Settlement effectuates the stated goals of the class and provides certain relief that the class would have no guarantee of obtaining if they proceeded with litigation. Considered, as it must be, in the context of Plaintiffs' goals and the risks they would face if the case proceeded to summary judgment adjudication and possible trial, the settlement achieves a favorable result for the class.

i.    The Settlement Achieves the Stated Goal the Class Sought
to Obtain through this Litigation

The injunctive relief achieved through this Settlement addresses the specific issues the class asserted in this litigation.

First, the settlement ensures that the promotions system challenged by the class as discriminatory based on race is going-forward based on objective and job-related factors.  During the class period, the Secret Service used a scoring system in which an Agent's MPP score was based on a supervisor's evaluation and peer and/or second level evaluation.  *See* Doc. 677 at 5. Plaintiffs have alleged that the Secret Service's use of these scores had an adverse impact on African-Americans.  *See, e.g.*, Doc. 711 at 31-32.  Selection recommendations were made by the Advisory Board without any written or published restriction or guidance as to what should be considered in selecting candidates for promotion from the Best Qualified Lists, and without any contemporaneous records of the reason(s) for any selection decision.  *See* Doc. 585 at 20-21. Plaintiffs have maintained that under this framework, at times during the class period fewer African Americans were selected for promotion than would be expected in the absence of discrimination at either the GS-14 or GS-15 levels.  *See, e.g.*, Doc. 677 at 12.  In addition, Class Representatives and Class Members described being turned down for promotion based on Agency considerations, when the same Agency consideration was alleged to have not applied to non-African-American Special Agents.  *See id.* at 55-56.  Plaintiffs' expert opined that the MPP promotions system in place during the class period did not adhere to principles governing how selection policies should be designed in order to be valid, non-discriminatory, and job related (meaning that the selection procedures serve their purpose of identifying the characteristics of the most qualified candidate for the position at issue).  *See id.* at 10-11.

These concerns as asserted by Plaintiffs are specifically addressed in the Proposed Settlement.  It requires that the Secret Service to continue to maintain a competency-based scoring process validated by an outside expert such as that which was put in place by the Secret Service in 2009.  *See* Settlement at 10.  The Settlement further obligates the Secret Service to complete further development and implementation of a set of standardized evaluative factors that are job-related, and that are to provide for accountability and flexibility in the final decision-making stage of the existing MPP, the recommendation and selection phase; to continue to publish the competencies used in MPP scoring phase; to publish the standardized evaluative factors applied in the recommendation and selection phase; and to contemporaneously document the reasons(s) for each candidate's selection for promotion or reassignment to a competitively bid GS-14 or GS-15 Special Agent vacancy.  *See* Settlement at 10, 17-18; *see also* Doc. 677 at 53-56.  The Settlement also requires statistical testing and reporting to identify possible adverse impact on African-American Special Agent candidates stemming from the MPP GS-14 and GS-15 promotion process.  *See* Settlement at 21-25.

Second, the settlement contains several measures to ensure that changes to the MPP as implemented continue to be applied.  Advisory Board members, Special Agents in Charge, and Division Chiefs are to be trained on the new standardized evaluative factors and the use of those factors in making recommendations as part of the MPP process.  *Id.* at 18-19.  In addition, the Secret Service's EC HUM, or designee, must be present for all Advisory Board discussions of candidates and make sure that the standardized evaluative factors and the organizational factors are neutrally applied.  *See* Settlement at 19-20.  The Secret Service will also perform audits to confirm implementation of the changes to the recommendation and selection phase of the MPP.  *See* Settlement at 20.

21

Third, the Proposed Settlement responds to the allegations made by Class Members that racial incidents went unaddressed. *See, e.g.*, Doc. 677 at 37-43. The Secret Service has agreed to create and publish to Secret Service employees a policy to provide for the use of the existing Prevention of Harassment Hotline to be used as a mechanism for reporting incidents of misconduct and discrimination. *Id.* at 27. Calls to the Hotline reporting incidents of discrimination against African-American Special Agents on the basis of race will be tracked by RMOs to determine if a cognizable pattern exists. *Id.* And, as the Secret Service had already independently implemented a specific discipline offense for those engaged in biased conduct or who fail to report biased conduct, the Secret Service agreed to continue to maintain and publish a specific discipline policy for those who engage in biased conduct or who fail to report biased conduct. *Id.* at 27-28.

ii.      The Proposed Settlement Affords Relief that Might Otherwise Not Be Attained through Litigation

The Settlement the Parties propose is not only favorable to Class Members in achieving the class's goals, but it provides certainty of relief that would otherwise not be possible in litigation. If the class proceeded with litigation, there would be no certainty of any recovery, let alone the tailored injunctive relief set forth in this Settlement or the monetary relief achieved here. Had this case proceeded to trial, even if Plaintiffs did prevail, any changes to the Secret Service's MPP obtained through court order likely would not be as detailed or meticulously designed as those proposed here.

4.      The Status of the Litigation Favors Approval of the Settlement

Just as in *In re Vitamins Antitrust Litigation*, 305 F. Supp. 2d 100 (D.D.C. 2004), the matter has been ongoing for years and summary judgment, the resolution of which would substantially affect the Parties' prospects, is pending. The Court in that case found that:

22

> [T]hese Settlements do not come too early to be suspicious nor too late to be a waste of resources.  It is in fact at a desirable point in the litigation for the parties to reach an agreement and resolve these issues without further delay, expense, and litigation.

*Id.* at 105.  Those findings apply here in full.

It is important to note that much more litigation would need to come, at substantial cost, if the case were litigated to conclusion.  A trial would likely require the better part of a month.  Even assuming a win for Plaintiffs, each Plaintiff (except for the class representatives) would still need to go through individual "*Teamsters* hearings."  Each would need to establish his or her damages in those hearings.  Moreover, Defendant would be free during those hearings to dispute the inference of discrimination with evidence that any particular non-promotion "was not based on its policy of discrimination."  *Teamsters*, 431 U.S. at 362; *see also In re Johnson*, 760 F.3d at 75.  Additionally, at the end of this process Defendant would still be able to appeal the class certification decision, as well as other discovery-related decisions that, if set aside on appeal, could mean years more of litigation in this case.

The Settlement comes after sufficient litigation to assure that the decisions on both sides are well-informed, and early enough—despite the many years the case has been pending—to save significant time and resources.  It is an ideal time for a settled resolution.

     5.     The Record Contains Considerable Evidence That Class Members Support the Settlement

Not a single objection to the settlement has been filed.  *See* Ex. 2 (Class Admin. Decl.) at ¶ 9.  (Nor have any Class Members have filed notices opting out of the settlement.  *Id.* at ¶ 8.)  Indeed, fifteen Class Members submitted declarations stating their unequivocal support for the

settlement during the preliminary approval phase.  *See* Docs. 829-5, 831-6 (Class Member

Declarations); Docs. 829-6, 831-7 (Class Representative Declarations).  This includes all eight

Class Representatives and seven additional Class Members.  These Class Members all stated that

monetary and non-monetary terms of the settlement are "good and fair."  *See* Docs. 829-5, 831-6

at ¶ 9; Docs. 829-6, 831-7 at ¶ 8.  The absence of objections or exclusion requests reaffirms and

reinforces the Class Member support for the settlement exhibited during the preliminary approval

process.

> **B.**    **Adequate Notice Has Been Disseminated to the Class**

Prior to finally approving the Proposed Settlement, the Court "must direct notice in a

reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P.

23(e)(1).

Notice in accordance with this standard was accomplished pursuant to the procedures set

forth in the settlement and in the Court's Preliminary Approval Order and Scheduling Order.  *See*

Settlement at 30-33; Docs. 832, 836.  Defendant provided Plaintiffs' counsel with updated

address information for those Class Members who remain employed by the Secret Service.

Class counsel has long maintained a database of Class Member addresses.  Counsel updated that

database with the addresses provided by Defendant and information obtained through direct

communication with individual Class Members.  Class counsel provided the updated addresses

to the Class Administrator.  *See* Ex. 2 (Class Admin. Decl.) at ¶ 3.

On February 21, 2017, the Class Administrator mailed the Court-approved Notice (Doc.

829-7) to all 116 Class Members via first-class mail.  *See Id.* at ¶ 6.  Since that time, only seven

Notices were returned as undeliverable without forwarding information.  *Id.* at ¶ 7.  The Class

Administrator notified counsel for both parties of these results and ran locator traces on these

24

individuals.  *Id.*  Class counsel and/or Defendant's counsel provided additional address information for each of these seven individuals, and the Class Administrator promptly re-sent the Notices using the updated information.  *Id.*

In addition to mailing the Notices, the Class Administrator established a website (www.secretserviceclassaction.com) to provide general information about the settlement, and a toll-free telephone line that Class Members could call with questions about the settlement or Notice.  *See Id.* at ¶¶ 4-5.

As clearly indicated in the Notice, any requests for exclusion from the class or objections to the settlement had to be post-marked by March 29, 2017.  *Id*. at ¶¶ 8-9.  The Class Administrator has not received any requests for exclusion or objections to the settlement, whether timely or otherwise.  *Id*. at ¶¶ 8-9.

Here, both Rule 23(e)(1)'s "reasonable manner" requirement and applicable due process requirements have been satisfied through the Class Administrator's first-class mailing of the Court-approved Notice.  *See Peters v. National R.R. Passenger Corp.*, 966 F. 2d 1483, 1486 (D.C. Cir. 1992); *Brown v. Wells Fargo Bank N.A.*, 25 F. Supp. 3d 144, 149 (D.D.C. 2014). Indeed, only seven Notices were returned undeliverable and all seven were then re-sent using additional address information.  *See In re APA Assessment Fee Litig.*, 311 F.R.D. 8, 21 (D.D.C. 2015) (granting final approval where 187 notices were returned as undeliverable).   The Notices were sent in accordance with the Court-approved schedule, thereby ensuring that Class Members were provided sufficient time to decide if they wanted to object or opt out.  *See* Doc. 836 (Notices to be mailed on February 21, 2017 and opt-outs or objections due thirty-six days later on March 29, 2017); Ex. 2 (Class Admin. Decl.) at ¶ 6 (confirming that Notices were mailed on February 21).

As the Court already determined in ordering the mailing of notice in the Preliminary Approval Order, the content of the proposed Notice was also sufficient.  As required under Rule 23(c)(2)(B) and Rule 23(e)(5), it described the case and terms of settlement, provided the class definition, told Class Members that they may appear through an attorney, told them that they may be excluded from the class or object to the settlement and how to do so, and explained the binding effect of a class judgment on Class Members.  The Notice also described the claims process that will be utilized if the settlement receives final approval.

### C.    Attorney's Fees and Costs

Plaintiffs seek to recoup $8 million in attorney's fees and $859,049.2 in costs from the Settlement Fund to compensate Plaintiffs' counsel for their nearly seventeen years of work on the case.  Such an award would amount to a mere fraction of the over $20.4 million that counsel have devoted to the case through nearly 42,000 hours of work.  Defendant has taken no position on Plaintiffs' request for fees and costs.  *See* Doc. 838.  As detailed in Plaintiffs' Motion for an Award of Attorney's Fees and Costs (Doc. 837), Plaintiffs' fee request is reasonable, well-within the permissible range, over twelve million dollars less than counsel's lodestar, and many times less than warranted based on application of typical lodestar multipliers.  For these reasons and those set forth in Plaintiffs' fee petition, the court should award Plaintiffs the attorney's fees and costs requested.

### V.    CONCLUSION

For the reasons set forth above, the Parties respectfully submit that that Court should grant final approval to the Settlement Agreement and enter the proposed final approval order in the form submitted herewith.

26

Respectfully submitted,


/s/
E. Desmond Hogan (D.C. Bar # 458044)    Channing D. Phillips (D.C. Bar # 415793)
Kathryn Marshall Ali (D.C. Bar #994633)    United States Attorney
Hogan Lovells USA                          for the District of Columbia
555 Thirteenth Street, N.W.
Washington, D.C. 20004                    Daniel F. Van Horn (D.C. Bar # 924092)
(202) 637-5600                            Chief, Civil Division



/s/                                       /s/
John P. Relman (D.C. Bar # 405500)        Marina Utgoff Braswell (D.C. Bar # 416587)
Jennifer I. Klar (D.C. Bar # 479629)      Benton G. Peterson (WI Bar # 1029849)
Megan Cacace (D.C. Bar # 981553)          Peter C. Pfaffenroth (D.C. Bar # 496637)
Relman, Dane & Colfax PLLC                Assistant U.S. Attorneys, Civil Division
1225 Nineteenth Street, N.W., Ste 600     555 Fourth Street, N.W.
Washington, D.C. 20036                    Washington, D.C. 20530
(202) 728-1888                            (202) 252-2561

*Attorneys for Plaintiffs & the Class*    *Attorneys for Defendant*


Dated:  April 10, 2017